**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

ROCCO CIOFOLETTI, et al., on behalf of themselves and all others similarly situated,

Plaintiff,

-vs-

SECURIAN FINANCIAL GROUP, INC., et al.,

Defendants.

Case No.:18-cv-03025-JNE-ECW

---

**OPPOSITION TO DEFENDANT SHURWEST, LLC'S**
**MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs allege in their Second Amended Complaint ("SAC") that Shurwest, directly and through its employees and agents, participated in a multi-state scheme to market and sell indexed universal life insurance ("IUL") policies from Minnesota Life Insurance Company ("MLIC") and Securian Life Insurance Company ("SLIC") funded by an illegal "structured cash flow" product (among them a so-called "IRA Reboot") which Shurwest and Securian agents procured from a fraudulent enterprise known as Future Income Products, Inc. ("FIP"). *See* SAC ¶¶ at 46-48 (describing the illegal loan scheme). Shurwest, through its employees and agents, marketed, promoted, sold, advised, and facilitated the sale of IUL policies in conjunction with FIP's structured cash flow products ("FIP Products"), which were to be used to finance the IUL policies' massive premiums ("FIP-IUL Package" or "FIP-IUL Scheme"). As a part of FIP-IUL Scheme, Shurwest: (1)

1

solicited clients (including Plaintiffs and Class members); (2) offered investment advice to Class members to buy the structured cash flow product; (3) arranged the financial transactions to create the structured cash flow product; (4) submitted Class members' IUL policy applications and premiums to MLIC and SLIC; and (5) received lucrative commissions from MLIC and SLIC from sales of those policies. SAC ¶40.[1]  Plaintiffs seek damages from Shurwest for breach of fiduciary duty, aiding and abetting the Securian Defendants' breach of fiduciary duty, and respondeat superior liability for the conduct of its agents.  Plaintiffs seek disgorgement of monies with which Shurwest was unjustly enriched.

Shurwest has moved to dismiss the SAC on two grounds.  First, pursuant to Fed. R. Civ. P. 12(b)(2), Shurwest argues that Plaintiffs cannot make prima facie showing that personal jurisdiction over it can be exercised in Minnesota.   Second, Shurwest seeks dismissal for failure to state a claim under Rule 12(b)(6).

Both grounds are meritless. Shurwest has agents in the State of Minnesota, is authorized to do business in Minnesota, has done business in Minnesota, and has agreed to venue in Minnesota for the conduct alleged in the SAC.  In addition, the SAC more than adequately states claims for which relief to which Shurwest must answer. For these and the following reasons, Shurwest's motion to dismiss should be denied.

---

[1] Plaintiffs allege the Securian Defendants, including MLIC and SLIC, participated in the scheme.

## FACTUAL BACKGROUND

**A.     Shurwest's Pivotal Role in The Scheme.**

**1.     Shurwest's Relationship with the Securian Defendants, Including MLIC and SLIC.**

Shurwest and the financial advisor-brokers who sold MLIC and SLIC IUL policies, were members of the so-called "Securian Financial Network."  The Securian Financial Network is a nationwide network of financial services firms whose purpose is to provide financial planning and advice to their clients (such as Plaintiffs and Class members). SAC ¶¶ 34, 37. The Securian Defendants (including MLIC and SLIC), invited, encouraged and facilitated clients' use of financial advisor-brokers in its Securian Financial Network (such as Shurwest, its agents and employees) in the purchase of MILC and SLIC IUL policies. SAC ¶¶29-32, 44-45. The Securian Financial Network has been touted on the Securian website as a "long-term resource to provide expertise and create strategies" to help clients and their families "achieve [their] financial goals." SAC ¶¶34-35.

Shurwest was at all relevant times a "Master Broker General Agent" and "Broker" pursuant to contracts with MLIC and Securian Life Insurance Company ("SLIC"). SAC ¶¶14, 37. Directly and through its agents and employees, Shurwest marketed, promoted, and sold MLIC and SLIC IUL policies and FIP Products to client insureds, and it educated members of the Securian Financial Network in the marketing, promotion, and sale of life insurance policies. SAC ¶¶28, 37.

In addition to its contractual Master Broker General Agent relationship with Securian, Shurwest served as an independent marketing organization ("IMO") to MLIC,

SLIC and the financial advisor brokers within the Securian Financial Network. SAC ¶¶38, 40. In its role as an IMO, Shurwest provided education, marketing, and distribution services to financial advisor-brokers and agents in the Securian Financial Network. SAC ¶40. Shurwest acknowledges that it was an "IMO that marketed annuities and life insurance products to financial planners and licensed insurance agents." SW Br. at 3.

Pursuant to its contracts with MLIC and SLIC, Shurwest recommended the producers (a/k/a financial advisor-brokers) who MLIC and SLIC should appoint to be their agents. SAC ¶40.[2] Shurwest also provided "services" to IUL policyholders (such as Plaintiffs), including premium finance products, education, marketing, and distribution. SAC ¶40. When a financial advisor-broker who used Shurwest's services sold an MLIC or SLIC IUL policy, Shurwest received a portion of the commission MLIC or SLIC paid to the financial advisor-broker. SAC ¶40.

Pursuant to the Master Brokerage General Agreement with MLIC and SLIC, Shurwest agreed to supervise MLIC and SLIC brokers to ensure they complied with applicable insurance laws and regulations governing the sales and servicing of MLIC and SLIC's products. SAC ¶ 41. Shurwest also agreed to review all insurance applications before submitting them to MLIC and/or SLIC, to insure they were properly completed. SAC¶ 41. In the Master Brokerage General Agreement and in Broker Sales Contracts

---

[2] For Example, as reflected in documents produced in the litigation by the Securian Defendants, Shurwest recommended, and MLIC appointed agents as individual producer "advisors," in which the appointment was set up under Ronald Shurts (of Shurwest), authorized to sell MLIC products in Minnesota. *See* Declaration of Lee Squitieri ("Squitieri Decl.") Exs. 8 & 9.

Shurwest also agreed to comply and require its financial advisor-brokers to comply with MLIC and SLIC's anti-money laundering policy.  SAC ¶¶41, 42.

### 2.    Shurwest's relationship with Minnesota.

The Master Brokerage General Agreement contains a choice of law and venue provision for litigation of matters concerning Shurwest's conduct under the Agreement. Pursuant to Section 4.10 (Squitieri Decl. Ex. 16) Minnesota law applies.  In addition, the parties – the Securian Defendants and Shurwest – agreed to the jurisdiction of this Court for litigation related to performance of the Master Brokerage General Agreement.

In performing its responsibilities under the Master Brokerage General Agreement, Shurwest has engaged in continual course of business with Securian, a collection of Minnesota companies, and it has "purposefully availed" itself of the privilege of doing business in Minnesota from at least 2002 through the present.

At all times relevant to the SAC, Shurwest held a license to do insurance business in Minnesota.  *See* Squitieri Decl. Ex.1.  Shurwest's co-founder and principal, Ronald Shurts also secured a license to do business in Minnesota. Squitieri Decl., Ex. 2.  And Shurwest's affiliate, Annexus (Squitieri Decl., Ex. 3) obtained – in various forms -- licenses to transact business in Minnesota. Squitieri Decl., Exs. 4,5,6,7.

As part of its insurance business activities under the Master Brokerage General Agreement, Shurwest continuously initiated and engaged in activities with Securian in Minnesota. Shurwest communicated with Securian in effectuating the transactions and transferred, or arranged for the transfer of, Plaintiffs' and class members' premium payments to Securian in Minnesota for the insurance policies at issue in this case, policies

which emanated from Minnesota. Squitieri Decl., Ex 16. Shurwest further sent applications and other documents to Securian in Minnesota to request appointment of agents and the processing of other applications.  Squitieri Decl., Exs 8 & 9.  Among the agents for whom Securian secured an appointment was an insurance agency located in Minnesota.

Annexus -- licensed in Minnesota -- and Securian also enjoy close business relations.  Squitieri Decl., Exs. 10 and 11.  According to publicly filed documents, Annexus' co-founder Ronald Shurts (Squitieri Decl., Ex. 12) is "manager" of both Shurwest and Annexus. Squitieri Decl., Exs. 11 and 13, respectively. Annexus and Securian have close business ties. Squitieri Decl., Exs. 14.  The logos of Shurwest and Annexus are jointly reflected on a website marketing an IUL policy. https://www.annexus.com/annexus-minnesota-life-introduce-new-innovation-in-iul/. Squitieri Decl., Ex. 15.

### 3.    Shurwest, its Agents and Employees Drove the Scheme.

In accordance with its role under the Master Brokerage General Agreement, Shurwest, directly and through its employees and agents, served as the deal maker, instigator, and conduit through which clients of financial advisor-brokers within the Securian Network (including Plaintiffs and class members) were sold the FIP-IUL Package. Indeed, it was Shurwest that reassured the financial advisor-brokers who sold the FIP-IUL Package that it was appropriate for the specific clients who were purchasing them. SAC¶74.

6

### a. Shurwest Introduced and Marketed the FIP-IUL Package to Financial Advisor-Brokers in the Securian Financial Network and Facilitated Sales of the FIP-IUL Package to Plaintiffs and the Class.

Through conferences, webinars and face-to-face meetings, Shurwest marketed FIP Products to members of the Securian Financial Network as a means of financing the purchase of MLIC and SLIC policies. SAC ¶¶49, 52-53. Using typical Securian marketing material, Shurwest – in its capacity as an agent/broker for the Securian Defendants – promoted FIP Products as one of many investment products available to finance the premiums to be paid for IUL policies. *Id.*

Shurwest denies it had any involvement, but it was Shurwest employees who introduced financial adviser-brokers to FIP Products at meetings held *at Shurwest's corporate headquarters* and at conferences held nearby. SAC ¶53. Indeed, Shurwest admits in its brief that Melanie Shulze-Miller was its employee and promoted the FIP-IUL Scheme. SW Br. at 4. Moreover, at a March 2017 conference *sponsored by Shurwest*, Shurwest hosted "Special guest speakers" from MLIC to present on the topic of "Premium Finance." SAC ¶55.

Plaintiffs allege Shurwest employees promoting the FIP-IUL Package at these meetings and elsewhere at all acted times within the scope of their employment with Shurwest, with the actual or apparent authority of Shurwest, and their actions relative to the FIP Products were known or should have been known to Shurwest. SAC ¶53.

**b. Financial Advisor-Brokers Sold the FIP-IUL Package to Plaintiffs and the Class Pursuant to Broker Agreements with MLIC and SLIC Wherein Shurwest Was the Master Broker Agent.**

After being introduced to the FIP-IUL Package by Shurwest, financial advisor-brokers offered the FIP Products to Plaintiffs and the Class as a vehicle to finance MLIC and SLIC IUL policy premiums. SAC ¶56. To offer MLIC and SLIC life insurance policies financed by FIP Products, financial advisor-brokers within the Securian Network were required to sign broker agreements with MLIC or SLIC wherein Shurwest was the Master Broker Agent. SAC ¶¶50-51. These agreements required the financial advisor-brokers to remit policy applications and initial premiums for the IUL policies to Shurwest. SAC ¶50. Thus, *Shurwest*, not the financial advisor-brokers, submitted the IUL applications and premiums to MLIC and SLIC. SAC ¶50.

Shurwest directed the financial advisor-brokers to arrange for Plaintiffs and members of the Class to pay a lump sum to FIP to obtain the stream of structured cash flows it was offering, which – in turn – would be used to purchase the life insurance policies. SAC ¶56. Shurwest oversaw and directed the financial advisor-brokers in effectuating the transactions. SAC ¶57. Consistent with the terms of its broker agreements, Shurwest also accepted and transferred Plaintiffs' and Class members' premiums for the IUL policies in connection with those transactions. SAC ¶57. Plaintiffs allege the financial advisor-brokers always acted within the scope of their respective agency agreements with Shurwest, and with MLIC or SLIC, and acted with the actual or apparent authority of both Shurwest and the Securian Defendants. SAC ¶50.

8

4.  **When FIP Was Exposed as a Fraud, the FIP-IUL Scheme Promoted by Shurwest Crumbled and Plaintiffs and Class Members Lost the Source of Funding for Their MLIC and SLIC IUL Policies.**

FIP's illegal product was eventually exposed and FIP collapsed under the weight of over 20 state attorney general actions, as well as a Consumer Financial Protection Bureau action. SAC ¶ 3. Unfortunately, when FIP collapsed, so did the funding for the IUL policies sold to Plaintiffs and the class members as part of the FIP-IUL Package. SAC ¶60. As a result, Plaintiffs and the class could no longer fund their MLIC and SLIC IUL policies. SAC ¶60.  Their IUL policies lapsed, they incurred surrender charges and other penalties, and they lost policies that never accumulated enough value to provide Plaintiffs and class members with the source retirement of income that had been the objective for purchasing the policy. SAC ¶60.

Thus, Shurwest's conduct as a primary actor in the FIP-IUL scheme resulted in Plaintiffs and Class members' loss of insurance, tax liability, loss of capital, and the payment of illegal fees and other charges. Meanwhile, Shurwest benefitted from lucrative commissions on the IUL policies sold to Plaintiffs and the class. SAC at ¶40.

5.  **The FIP Receivership and the FIP Receiver's Observation that Shurwest Was Integrally Involved in the Scheme.**

As this Court is aware, a Receiver has been appointed to recover ill-gotten funds from FIP and FIP Receivership Entities. *See United States v. Kohn,* No. 6:19-cr-00239-BHH (D.S.C. Mar. 12, 2019) at Dkt. 103-1, Ex. 3 (appointing the "FIP Receiver" and establishing the "FIP Receivership"). Shurwest claims the FIP Receivership extends "over all entities with responsibility for investor losses." SW Br. at 6. However, the FIP

Receivership does not encompass all of Plaintiffs' and class members' losses. Recognizing this, the Receiver has stated that private plaintiffs may pursue relief beyond the scope of the FIP Receivership, including relief from wrongdoers such as Shurwest. *See* ECF No. 116-1 at p 49 of 58 (August 29, 2019 email from FIP Receiver's counsel Walt Tollison to Robert Rikard stating view that Shurwest is not subject to stay provision).

While not naming Shurwest as a FIP Receivership Entity, the FIP Receiver has noted that "Shurwest, LLC was integrally involved in the underlying Ponzi scheme." *See* Squitieri Decl., Ex. 18 (Rule to Show Cause) at 5.n2. The Receiver has further stated that "Shurwest has been sued by a substantial number of FIP victims across the country and was the employer for Melanie Jo Schulze-Miller." *Id.* The Receiver has also remarked that DLA Piper, who also represents Shurwest here and appeared in the FIP Receivership proceedings on behalf of Shurwest, represented several key FIP Receivership Entities during the course of the Ponzi scheme, including on matters involving:

- FIP;

- FIP's founder, Scott A. Kohn;

- Pensions, Annuities and Settlements, LLC;

- Cash Flow Investment Partners LLC;

- Cash Flow Outsourcing Services, Inc.;

- AAA Auto Leasing to Own Holdings, LLC;

- Buy Sell Annuity, Inc.;

- Pension Advance, LLC;

10

- PAS California LLC; and

- London Square Specialty Services, LLC.

*See* Squitieri Decl., Ex. 18 (Rule to Show Cause) and exhibit C to same (January 30, 2020
DLA Piper email to FIP Receiver counsel, identifying eight FIP related matters for which
time was billed).  *See also* ECF No. 137-2 (Ex. 2 to  Declaration of Jason Lewis in Support
of Shurwest LLC's Motion to Dismiss (March 3, 2020 Amended Receivership Order)), at
pp. 2-3 (listing FIP Receivership Entities).

## **ARGUMENT**

## **POINT I**

### **THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER SHURWEST**

**A.     Rule 12(b)(2) Standards.**

Since Shurwest has challenged this Court's jurisdiction, it is Plaintiffs' burden to
show that jurisdiction exists.  *Fast Path, Inc. v. Arbela Techs Corp.*, 760 F.3d 816, 820 (8th
Cir. 2014).   Because the issue was raised on a motion to dismiss and there is no evidentiary
hearing anticipated, all Plaintiffs need do here is to present a prima facie showing of
jurisdiction.  *Ally Bank, supra* *2 citing *DeLong Equip. Co. v. Wash. Mills Abrasive*, 840
F.2d 843, 845 (11th Cir. 1988).  The evidentiary showing required at the prima facie stage
is "minimal".  *In Re Municipal Stormwater Pond*, 18-cv-3495 2019 WL 8014509 at *2
(Nov 25, 2019, D. Minn.) citing *K-V Pharm. Co. v. J. Uriah & CIA, S.A.*, 648 F.3d 588,
592 (8th Cir 2011).  Plaintiffs must set forth enough facts from which a "reasonable
inference that the defendant[ ] may be subjected to jurisdiction in the forum state."

*Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir. 2008).  In making its determination, the Court views  the facts in the light most favorable to the non-movant and resolves all factual conflicts in favor of the non-moving.  *Pangea, Inc. v. Flying Burrito LLC,* 647 F.3d 741, 745 (8th Cir 2011).

Jurisdiction is determined by reference to Minnesota's long arm-statute, which is designed to reach as far as the federal due process will allow.  *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408 (Minn. 1992); Minn. Statute SEC 543.19 (2000) (Minn. long-arm statute). Accordingly, this Court need only address jurisdiction under the due process clause of the fourteenth amendment.  *See generally*, *Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.*, 950 F.2d 526, 528 (8th Cir. 1991) (citing *Rostand v. On-Deck, Inc.*, 372 NW 2d 717, 719 (Minn. 1985).

The due process boundaries are defined by "certain minimum contacts" with the forum state that, taken together, demonstrate that "the defendant's conduct and connection with the forum state are such that he  should reasonably anticipate being hauled into Court there."  *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 297 (1980). In determining whether there are sufficient contacts to anchor jurisdiction, the Court "looks to the contacts in the aggregate and the totality of the circumstances."  *C.H. Robinson Worldwide, Inc. v. FLS Transportation, Inc.*, 772 N.W. 2d 528, 538 (Minn. App. 2009); *NW Airlines v Astley Aviation Svcs, Inc.*, 111 F.3d 1386, 1390 (8th Cir. 1997).  Shurwest's reasonable anticipation of being sued here is assessed by examining if there is "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Soo Line R. R. Co.,*

12

*supra* at 528-529, *quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

"[T]he substantial connection between the defendant and the forum state necessary for a finding of minimum contacts must come about by *an action of the defendants purposefully directed toward the forum State*." *Asahi Metal Industry, Inc. v. Superior Court*, 480 U.S. 102, 112 (1987) citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Such contacts can exist at the time the cause of action arose or when the suit was filed or within a reasonable time period before the filing of the lawsuit. *Pecorino v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003).

"General" or "specific" jurisdiction can provide a basis for hailing Shurwest into this Court. *Daimler A.G. v. Bauman*, 134 S. Ct. 746, 754 (2014)( explaining the two types of jurisdiction ). Where consent to jurisdiction has been established, legal analysis of general or specific jurisdiction is unnecessary. *Knowlton v. Allied VanLines, Inc.*, 900 F.2d 1196, 1200 (8th Cir. 1990). Such rule obtains even where the plaintiff is not a Minnesota resident. *Ally Bank v. Lenox Financial Mortgage Corp.*, 16-cv-2387, 2017 WL 830391, *3 (Mar. 2, 2017, D. Minn.). General jurisdiction arises where the defendant's contacts are so continuous and systematic so that it is in effect "at home." *Daimler*, 134 S. Ct. at 760. For, "specific jurisdiction" "the suit must arise out of or relates to the defendant's contacts with the forum" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco City*, 137 S. Ct. 1773, 1780 (2017).

The Eighth Circuit utilizes a five-factor test in analyzing the propriety of a court's exercise of  specific or general jurisdiction over a non-resident defendant: (1) the nature and quality of contacts with the forum state; (2) the quantity of contracts with the forum

state; (3) the relation of the details of the action to the contacts; (4) the interests of the forum state in providing a forum for residents; and (5) the convenience of the parties. *Wells Dairy, Inc. v. Food Mover's Int'l., Inc.*, 607 F.3d 515, 518 (8th Cir. 2010). The third factor distinguishes specific jurisdiction from general jurisdiction. *McGill v. Conwed Corporation,* 17-cv-01047, 2017 WL 453827 at *9 (D. Minn., Oct. 10, 2017). The first three factors above are of most importance and are usually considered together. *Northrop King Co. v. Companies Productora Semillas Algoodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir 1995). The fourth and fifth factors are not considered determinative. *Downing v. Goldman Phipps, PLLC*, 764 F.3d 906, 912 (8th Cir. 2014).

> **B.    Shurwest Consented to Jurisdiction in Minnesota by Procuring a License to Transact Business in Minnesota and by Agreeing to Forum Selection and Choice of law Provisions in its Contracts With Securian.**

As explained above, jurisdiction can also be based upon consent of the Defendant. The Minnesota choice of law and venue provisions in the Shurwest-Securian contracts (Squitieri Decl., Exs. 16 and 17 at Section 4.10) are thus highly relevant to the jurisdiction question. The Eighth Circuit explained the significance of "consent" as a basis for personal jurisdiction in *Knowlton*:

> Consent is the other traditional basis of jurisdiction, existing independently of long arm statutes. Personal jurisdiction, unlike subject matter jurisdiction, is primarily concerned with fairness to individual parties. Objections to jurisdiction over the person may be waived, either expressly or by not asserting them in a timely manner. A defendant may voluntarily consent or submit to the jurisdiction of a court which otherwise would not have jurisdiction over it. *See Insurance Corp. of Ireland, Ltd. v. Compagnie Des Bauxites De Guinee*, 456 U.S. 694, 102 S. Ct. 2099, 72 L.Ed. 2d 492 (1982).

*Knowlton*, *supra* at 1119 (1982).  *See also Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 923 (8th Cir. 1995) (finding provision relevant but not dispositive without other "deliberate activities" within the forum); *S.B. Schmidt Co. v. A to Z Paper Co.*, 452 N.W. 2d 485, 489 (Minn. Ct. App. 1990); *Bellboy Seafood Corp. v. Kent Trading Corp.*, 484 N.W. 2d 796, 796-797 (Minn. 1992).

In *Burger King*, *supra* at 482, Justice Brennan, addressed the holding of the Circuit Court that "choice of law provisions is irrelevant."  The Supreme Court held:

> Nothing in our cases, however, suggests that a choice of law provision should be ignored in considering whether a defendant has "purposefully invoked the benefits and protections of a state's law" for jurisdictional purposes. Although such a provision standing alone would be insufficient to confer jurisdiction, we believe that when combined with the 20-year interdependent relationship *Rudzewicz* established with *Burger King's* Miami headquarters, it reinforced his deliberate affiliation with the Forum State and the reasonable foreseeability of possible litigation there.  As Judge Johnson argues in his dissent below, *Rudzewicz*, "purposefully availed himself of the benefits and protections of Florida's laws" by entering into contracts expressly providing that these laws would govern franchise disputes" [citation omitted].

This case is stronger than *Burger King*.  Here, as in Burger King, Shurwest and Securian have shared a long term active relationship as demonstrated by Shurwest's almost 20 years of being licensed in Minnesota. Squitieri Decl., Ex. 1. But, unlike *Burger King,* the applicable contractual provision has no disclaimer.   Section 4.10 also contains a venue clause and,  unlike the Burger King clause, that clause is mandatory.   *See* Squitieri Decl. Exs. 16 and 17.  *Cf.  Viracon v. J&L Curtain Wall, LLC*, 929 F.Supp. 2d 878, 884 (D. Minn. 2013 ("Had *Viracon* wanted to ensure jurisdiction over *J&L* in Minnesota, it could

15

have included a mandatory Minnesota forum selection clause in its standard terms of sale.").

### C. Shurwest "Purposefully Availed" Itself Of "Benefits and Protections" of Minnesota Laws.

"The crucial factor in determining whether the defendant availed itself of jurisdiction is the resident defendant's efforts to initiate or induce the transaction." *Vitaron, Inc. v. J&L Curtain Wall LLC*, 929 F.Supp. 2d 878, 884 (D. Minn. 2013) citing and quoting *Prisma Int'l, Inc. v. A.J. Office Furniture Co.*, No. C1-97-1943, 1998 WL 297530, at *3 (Minn. Ct. App. June 9, 1998). The "crucial factor" here is Shurwest's sending applications and premium dollars to Securian in Minnesota for the issuance of policies known to be emanating from Minnesota and subject to Minnesota laws and regulations. Shurwest would interact with Securian in Minnesota to facilitate the issuance of those polices.

Shurwest also recruited financial advisor-brokers and sponsored them to Securian in Minnesota in order for them to be permitted to sell Securian policies. Shurwest-sponsored agents submitted to Securian for appointment were located in Minnesota. Shurwest would earn commissions from Securian based on the activities of these and other agents in selling Securian policies. This is analogous to the *Prisma Int'l*, *supra*, defendant's "effort to induce or initiate the transaction." *Id*. at *3. *See also*, *Dent-Air, Inc. v. Beech Mountain Air Serv. Inc.*, 332 NW 2d 904, 907 (Minn. 1983) (non-resident defendant submits to jurisdiction by soliciting, advertising and initiating business with in-state resident).

16

The nature of Shurwest's contracts with Securian and MLIC/SLIC also militate in favor of finding specific and general jurisdiction: the contracts are continuous and cover a host of activities to be conducted in Minnesota. In *Walden v. Fiore*, 134 S.Ct. 1115, 1122 (2014), the Supreme Court noted the necessity for a finding of jurisdiction in the presence of a contractual relationship that "envisioned continuing and wide range contacts in the forum state." Continued and numerous contacts in the forum state initiated by the defendant over whom jurisdiction was sought was also the basis for finding jurisdiction in *Marshall v. Inn On Madeline Island,* 610 N.W. 2d 670, 676-677 (Minn. Ct. App. 2000). There, it was held that solicitation of business through advertisements in Minnesota, telephone calls and mail to residents of Minnesota, and contracting with Minnesota residents and sending employees to train in Minnesota sufficed for an exercise of general jurisdiction.

Shurwest makes only a two-paragraph generic argument supporting its denial of general jurisdiction. SW. at 10. It asserts that since it is registered in Arizona, maintains its principal place of business in Arizona and does not have any offices, employees, assets or property in Minnesota, "this Court lacks general personal jurisdiction over Shurwest." *Id*. at 10. Shurwest's rationale? It has no physical presence in Minnesota and therefore it is ONLY "at home" in Arizona and not Minnesota. Having financial advisors-brokers in Minnesota makes Shurwest's factual assertion untrue. Regardless, the Eighth Circuit has clearly rejected this theory for defeating jurisdiction, holding that "[t]he lack of physical presence in a state cannot alone defeat jurisdiction." *Oriental Trading Co., Inc. v. Firetti*, 236 F.3d 938, 943 (8th Cir. 2001).

**D.      The Court Can Fairly Exercise Specific Jurisdiction Over Shurwest.**

The exercise of specific jurisdiction depends on minimum contacts and claims arising out of the conduct within the forum. Here, both requirements are easily satisfied. As demonstrated above, the minimum contacts are sufficient for general jurisdiction purposes and are thus clearly enough for specific jurisdiction.

Also easily satisfied is the requirement that the claims asserted arise out of, or are related to, the defendant's activities in the forum state. Here, it is clear that the claims arise out of Shurwest's Minnesota state-licensed activities. The SAC and other recitations herein and supported by exhibits clearly show that the  claims in this case arise out of the fact that Shurwest utilized  its position as a Securian agent to  induce Securian to issue  insurance policies on which Shurwest would earn lucrative commissions.

**E.      Shurwest's Attempt to Argue its way out of Jurisdiction in a State Where it has Voluntarily Sought to Conduct Insurance Business for Almost Twenty Years is Factually and Legally Meritless.**

Shurwest denies any sufficient contacts with Minnesota to allow jurisdiction over it, but its narrow and conclusory refutations raise more questions than they settle. Shurwest alleges that it does not own any assets or property in Minnesota, it never trained anyone in Minnesota to market, promote or sells FIP or its products, and it never provided any services related to FIP or its products in Minnesota.  *See* ECF No. 138 (Declaration of Jim Maschek dated April 24, 2020 in Support of Shurwest Motion to Dismiss) at ¶¶ 5, 8. The evidence adduced in opposition (Squitieri Decl., Exs. 1-9; 16-17) reveals an effort by Shurwest to obscure, if not hide, its relationship with this State. Shurwest does not deny that it does business in Minnesota, but it refuses to explain what activities, services, and

18

business it pursues or performs in Minnesota. According to the Minnesota Commerce website, the license held by Shurwest is required to "*transact business*" in Minnesota.

"Shurwest directs its more detailed arguments to refuting "specific jurisdiction." SW. at 11-18. It identifies "two main reasons" why the allegations fail to establish jurisdiction: the statement of jurisdiction in the Complaint at ¶ 7 is "vague and conclusory" and the remaining allegations "fail to mention any connection with Minnesota," *Id*. at 12; and Shurwest contends it did not "have anything to do with the underlying misconduct related to the FIP products . . ." *Id*. at 13. These are hollow and meritless arguments. Plaintiffs have made the requisite showing that Shurwest has deep and long-standing connections to Minnesota. Shurwest's conduct is addressed elsewhere in this memorandum. Needless to say, the SAC alleges overwhelming facts concerning Shurwest's participation in the underlying scheme. Shurwest's claim that it "had no involvement with FIP" (SW Br. at 16) misses badly; the case is about its involvement with Securian and the actions both Defendants undertook to sell the FIP-IUL Package.

Shurwest maintains that its agents' and employees' conduct cannot be imputed to Shurwest because they supposedly went rogue, and thus any employees' contacts with Securian and/or conduct and activities in Minnesota cannot connect Shurwest to Minnesota. SW Br. at 14-15. This again ignores the sale of policies in Minnesota, the submission of premiums and applications to Minnesota, the use of Shurwest's Minnesota license, the presence of Shurwest-sponsored agents, and the litany of other facts showing how Shurwest's execution of the FIP-IUL scheme materially implicated Minnesota activities.

19

The cases Shurwest cites are inapplicable.  Both *Hagen v. Burmeister & Assocs., Inc.*, 633 N.W. 2d 497, 504-05 (Minn. 2001) and  *Kusner v. Gage*, 161 N.W. 2d 40, 42-44 (1968), discussed vicarious liability of an employer.  Neither addressed whether an employee's/agent's actions within a state can constitute or contribute to the "minimum contacts" necessary to anchor general or specific jurisdiction.

Shurwest argues that its contracts with the Securian Defendants cannot, by themselves, establish jurisdiction.  It cites *Vetta-Zelo, Inc. v. Ideum, Inc.*, No. Civ. 13-367, 2013 WL 3177804, at *5 (D. Minn. June 24, 2013) and *Mountaire Feeds, Inc. v. Agro-ImpEx S.A.*, 677 F.2d 651, 655 (8th Cir. 1982); *Firstpath, Inc. v. Arbela Techs. Corp.*, 760 F. 3d 816, 821 (8th Cir. 2014).   Plaintiffs, however, do not rely solely on the contracts for jurisdiction.   As demonstrated herein, there are multiple continuous contacts Shurwest has had in the State that support the exercise of jurisdiction in Minnesota.

Finally, Shurwest claims that allegations of its agency for Securian do not suffice because Plaintiffs have not alleged anything other than Shurwest acted on behalf of its principal – Securian.  SW. at 16-17, citing *Chamfer Engineering, Inc. v. Tapco Intern. Inc.*, 82 F.R.D. 33, 35 (D. Minn. 1979) and *First National Bank of Minneapolis v. White*, 420 F.Supp. 1331, 1336 (D. Minn. 1976). The evidence, however, more than establishes a basis for jurisdiction in addition to, and independent of, Shurwest's status as Securian's agent.

**F.    The Fourth and Fifth Jurisdictional Factors Also Favor the Exercise of Jurisdiction.**

The fairness factor tips in favor of jurisdiction. Unfairness could arise if parties which purposefully derive benefit from interstate activities were allowed to escape from

consequences arising from these activities. *Burger King Corp.*, *supra*, 471 U.S. at 473-74. Here, Shurwest has held a license to transact insurance agent business in Minnesota for almost twenty years. Shurewest has dealt continuously with a Minnesota company, selling its Minnesota product, sending applications and premiums to Minnesota, and receiving commissions from Minnesota. The claims in this case have arisen out of the very business for which Shurwest sought and maintains its license.

The "burden of litigation" factor also tips in favor of jurisdiction; it is not so great that dismissal is warranted. In *Ace Steinbach v. Cutler*, 518 F.3d 580, 588 (8th Cir. 2008), the Eighth Circuit held that "burden of litigation" of litigating in Minnesota for a California company which "derives profit from the sale of its books across the country" "was not . . . so great as to required dismissal."). The same is true for Shurwest.

**G**.   **If The Court Decides That Jurisdiction Has Not Been Satisfactorily Established, Plaintiffs Seek Leave to Conduct Jurisdictional Discovery Which Has Already Been Requested of Shurwest.**

"Where issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U. S. 340, 351, n. 13, 98S, t. 238, 57 L.Ed.2d 253 (1978). Such discovery is permitted when a plaintiff offers "documentary evidence "regarding a defendant's contacts with the forum state . *In Re Municipal Stormwater Pond*, 18-cv- 3495, 2019L 8014509, (November 25, 2019 D. Minn.) *citing and quoting Steinbuch* , 518 F3d at 589. Here, particularly with Shurwest's factual assertions refuted by the documents, there is ample basis to conclude that jurisdictional discovery is warranted.

21

## POINT II

**PLAINTIFFS STATE PLAUSIBLE CLAIMS FOR RELIEF.**

**A.     Rule 12(b)(6) Standards.**

Federal Rules of Civil Procedure 8 requires a Plaintiff to present "a short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ. P. 8. For a plaintiff's claim to meet this standard and survive a Rule 12(b)(6) motion to dismiss, the plaintiff's "'complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Smith v. Questar Capital Corp.*, 2013 U.S. Lexis 108703, 2013 WL 3990319 (D. Minn. Aug. 2, 2013) (*quoting Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Although "labels" and "conclusions" are not sufficient, a plaintiff is not required to include detailed factual allegations in the complaint.   *Smith*, 2013 U.S. Dist. LEXIS 108703, at *5 (citing *Iqbal,* 556 U.S. at 678; *Twombly*, 550 U.S. at 555). While a complaint must show more than a "sheer possibility" of relief to meet the plausibility standard, there is no "probability" requirement.   *Id.* Thus, a well pled complaint should not be dismissed even "'if actual proof of the facts seems improbable and that a recovery is very remote and unlikely.'" *Smith,* 2013 U.S. Dist. LEXIS 108703, at *6 (citing *Twombly*, 550 U.S. at 556).

A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"   *Smith,* 2013 U.S. Dist. LEXIS 108703, at *6 (citing *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556).   In considering a 12(b)(6) motion to dismiss, the court must

"take the plaintiff's factual allegations as true and grant all reasonable inferences in favor of the plaintiff." *Smith,* at *6 (citing *Crooks v. Lynch,* 557 F.3d 846, 848 (8th Cir. 2009)).

Evaluating the complaint is a "'context specific task that requires the reviewing court to draw on its judicial experience and common sense" and review the complaint "'as a whole, not parsed piece by piece[.]'" *Smith,* at *7 (citing *Iqbal,* 556 U.S. at 679); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). A complaint should not be dismissed "'unless it appears beyond doubt that a plaintiff can prove no set of facts that would entitle him to relief.'" *Smith,* at *7 (citing *Coleman v. Watt,* 40 F. 3d 255, 258 (8th Cir. 1994)). As the United States Supreme Court states in a case cited by Shurwest at page 20 of its brief, "Ordinary pleading rules are not meant to impose a great burden upon plaintiff." *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 343-46 (2005)

Plaintiffs have more than satisfied the pleading rules here.

## B. Shurwest's Untested and Self-Serving Materials Should Not Be Considered by the Court in Deciding Shurwest's 12(b)(6) Motion to Dismiss.

Shurwest cannot credibly deny that the SAC sets forth extensive fact allegations specifically describing Shurwest's role in the FIP-IUL Scheme. *See* pp. 3-4, 6-10, *supra*. Nor does Shurwest deny that several of its former employees, including Shulze-Miller, Seabolt, and Johnson orchestrated and operated the FIP-IUL Scheme while they were employed at Shurwest. Shurwest's only defense is to argue that its employees acted outside the scope of their employment, without Shurwest's knowledge, in conducting the scheme. Shurwest's argument is based exclusively on material outside of the SAC, including self-serving declarations from Jim Maschek, and the so-called rogue former employees Shulze-

Miller, Seaboldt, and Johnson. *See* ECF Nos. 138, 138-1, 138-2, and 138-3. Plaintiffs have had no opportunity to take discovery from Shurwest on any of these fact intensive matters of agency.[3]

Although other facts outside the SAC and discussed above demonstrate that the factual assertions in the declarations submitted by Shurwest are false,[4] the Court should not even consider these extraneous materials. In deciding a Rule 12(b)(6) motion, the Court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *Smith,* at * 7 (citing Rule 12(b)(6); *Porous Media Corp. v. Pall Corp.,* 186 F. 3d 1077, 1079 (8th Cir. 1999) (noting generally

---

[3] Shurwest does not actually attack the sufficiency of the allegations in the SAC that its employees and the financial advisor-brokers were its agents acting within the scope of their authority, actual or implied, and with Shurwest's knowledge. Instead, Shurwest attempts to create material fact disputes regarding the agency of its former employees by introducing "facts" to contradict the well-pled allegations in the SAC. The existence and scope of such agency relationships are questions of fact that should not be decided on a motion to dismiss. *See e.g., Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1069 (D. Minn. 2013) (holding under Minnesota law 'the Existence of an agency relationship is a question of fact and may be proved by circumstantial evidence of a course of dealing between the parties"). Notably, if an agent makes representations that induce a sale, and the principal retains the benefits of the sale, the seller/principal is bound by the agent's representations. *Id.* (citing *Swanson v. Domning,* 251 Minn. 110, 86 N.W.2d 721-22 (Minn. 1957). A principal may not retain the benefits of a transaction obtained by allegedly fraudulent representations and at the same time escape liability for the fraud by which the benefits were obtained. *See Swanson,* 86 N.W.2d at 721-22. Thus, Shuwest may not deny liability for the acts of its employees and agents and at the same time retain the benefits (enormous commissions) from sales of the FIP-IUL Package.

[4] Fed. R. Civ. P. 56(h) provides: "Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions."

24

court must ignore materials outside the pleadings but may consider "some materials that are  part of the public record or do not contradict the complaint).  However, the court "simply may not … resolve factual disputes on the basis of preemptive (and untested) submissions" and may only "consider extra-pleading material necessarily embraced by the pleadings . . . and all documents they incorporate by reference" *Piper Jaffray Cos., Inc. v. National Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997). *See also Smith,* at *7 (quoting *Piper Jaffray*).  The court has discretion to consider matter outside the pleadings but if the court considers such matters, the 12(b)(6) motion "must be treated as a motion for summary judgment." *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992).  In that event, a plaintiff is entitled to submit contrary declarations, take discovery, or otherwise defend himself under Rule 56(d).   Plaintiffs have had no such opportunity here.

Thus, in *Smith*, the court considered materials embraced by the complaint, including an agreement that formed the basis of the dispute and other materials that were attached to the complaint.  However, the court declined to convert the motion to dismiss into a motion for summary judgment and did not consider other "statements and materials referenced in the parties' briefing in the context of [the] Motion to Dismiss"  that were not embraced within the complaint. *Smith,* at *9-10.

In *Piper Jaffray,* the court commented on the "unfortunate" trend of parties submitting voluminous extra-pleading material to support their motions to dismiss.  967 F. Supp. at 1152.  Recognizing the need for discovery precluded the court from converting the motion into one for summary judgment, the court resisted the "temptation to peer into

Piper's website, compare Wall Street Journal listings of fund pieces or otherwise consider matter not contemplated by the pleadings." *Id.*

The Court should similarly reject Shurwest's invitation to resolve factual disputes based on Shurwest's preemptive (and untested) submissions and allow Plaintiffs to fully develop their case against Shurwest through discovery.

### C.   The SAC Contains Extensive Fact Allegations Describing Shurwest's Pivotal Role in the FIP-IUL Scheme

Completely ignoring  dozens of paragraphs in the SAC detailing specific and well-pled facts regarding Shurwest's role in marketing and selling the FIP-IUL Package (*See* pp. 3-4, 6-10 above), Shurwest wildly asserts that Plaintiff's SAC includes only "vague allegations of some convoluted collective participation in the alleged misconduct."  SW Br. at 18. Shurwest also cherry picks a few references in the SAC to "Defendants" collectively, as if there is no specific conduct for which Plaintiffs seek to hold Shurwest liable.  SW Br. at 19.  Shurwest contends the SAC should be dismissed "for this reason alone."  SW Br. at 19. Shurwest's analysis-free argument should be rejected.

As discussed above, a complaint must be evaluated as a whole, not parsed piece by piece.  *Smith,* at *7, *supra* (additional citing references omitted).  The SAC sets forth extensive factual allegations regarding Shurwest's pivotal role in the FIP-IUL Scheme.  *See* pp. 3-4, 6-10 above (describing paragraphs and allegations in the SAC).  Plaintiffs will not repeat them here as Shurwest references only two paragraphs in the 119-paragraph SAC for its assertion that Plaintiffs have "lumped together" the Defendants. SW Br. at 19. These paragraphs, contained in Plaintiffs' unjust enrichment count against all Defendants, state:

"Defendants" have unjustly benefitted through the illegal loan scheme" and "Defendants earned . . . benefits at the expense of Plaintiffs."  SW Br. at 19 (referencing SAC ¶¶ 117-118).

These allegations sum up a litany of factual allegations throughout the SAC that Shurwest (as well as Securian defendants) were unjustly enriched by the FIP-IUL scheme at the expense of Plaintiffs. SAC paragraph 116 of Plaintiffs' unjust enrichment claim incorporates by reference all the preceding paragraphs in the SAC, among them the paragraph alleging Shurwest received commissions on the MLIC and SLIC IUL policies sold as part of the FIP-IUL Package. *See e.g.,* SAC ¶ 40. This allegation explicitly states one of the ways Shurwest "benefitted" from the scheme.

The single case cited by Shurwest to support its argument is inapposite. SW Br. at 19 (citing *Kludt v. MCF-Rush City,* No. 17 CV-3842, 2018 WL 3059680, at *4 (D. Minn. May 30, 2018) (subsequent history omitted)). In *Kludt*, the Plaintiff's *six paragraph* complaint contained only conclusory allegations that the defendants "discriminated against him," "interfered with legal assistance," and "retaliated against him," without providing any of the factual allegations about how or who did so. *Id.* The scant allegations *Kludt* are nothing like the extensive fact allegations regarding Shurwest in the SAC and the *Kludt* case is, therefore, not dispositive here. The Court should, accordingly, reject Shurwest's baseless argument that the SAC should be dismissed because the allegations are "vague" or "generalized."

### D.       Plaintiffs State a Claim for Breach of Fiduciary Duty.

The SAC adequately states a breach of fiduciary duty claim against Shurwest based on the actions of its employees and financial advisor-brokers acting within the scope of their agency on Shurwest's behalf.   To state a claim breach of fiduciary duty under Minnesota law,[5] Plaintiff must allege the existence of a fiduciary duty; (2) breach of that fiduciary duty; (3) causation; and (4) damages.  *Hot Stuff Foods, LLC v. Dornback*, 726 F. Supp. 2d 1038, 1043 (D. Minn. 2010) (citing *Padco, Inc. v. Kinney & Lange,* 444 N.W.2d 889, 891 (Minn. Ct. App. 1989)). The existence of a fiduciary relationship is a question of fact dependent on the circumstances of each individual case unless the parties have a relationship that establishes a fiduciary duty *per se. See Parkhill v. Minnesota Life Ins. Co.*, 995 F. Supp. 983, 990 (D. Minn. 1998) (citing *TooDmbs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985) (holding existence of fiduciary duty is question of fact unless parties have relationship that establishes fiduciary duty *per se*).

Shurwest disputes only that Plaintiffs failed to plead the existence of a fiduciary relationship. It does this not by dissecting what was pled, but by disputing it, claiming: (a) it was not involved in the FIP-IUL Scheme; and (b) but even if Shurwest was involved in the scheme, Plaintiffs' own financial advisors are to blame, not Shurwest. SW Br. at 20-21. Both arguments should be rejected.

---

[5] Shurwest, at least for purposes of this motion, does not dispute that Minnesota law applies. *See* SW Br. at 19 (citing standards for pleading a breach of fiduciary duty claim "under Minnesota law").

   1.  **Shurwest's Denial of Involvement in the Scheme is not a Proper Basis to Dismiss Plaintiff's Breach of Fiduciary Duty Claim.**

  Shurwest argues that Plaintiffs' breach of fiduciary duty claim fails because the alleged 'illegal loan scheme' from which the allegations arise was perpetrated by FIP and related entities and individuals – not Shurwest." SW Br. at 19. Shurwest also argues that because it wasn't involved in the scheme, it couldn't have *caused* Plaintiffs' injury. SW Br. at 20 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343-346 (2005)).[6]

  Shurwest's conclusory argument, premised on self-serving declarations not embraced by the pleadings, has no basis in the SAC. Indeed, the SAC pleads that the illegal loan scheme emanating from FIP was used by Shurwest in the promotion and sale of MLIC and SLIC IUL policies. SAC ¶¶49, 52-53. Accepted as true, the *argument* that it wasn't involved and, because it wasn't involved, it couldn't have caused Plaintiffs' injuries, carries no weight. Further, the declarations purporting to support the argument cannot be considered on a motion to dismiss. *See Smith, Piper Jaffray, supra.*

  However, if considered, Shurwest's declarations and argument that it "didn't do it," is belied by the FIP Receiver's assertion that Shurwest played an integral role in FIP's scheme. *See* Squitieri Decl. Ex. 18. They are also countered by the sworn testimony of former financial advisor-brokers who testified under oath, consistent with the allegations in the SAC (*e.g.,* SAC ¶¶ 8, 9, 28, 37-43, 49-58, 52, 61-62, 64-74), that (among other things):

---

[6] Notably, the *Broudo* case does not involve a breach of fiduciary duty claim.

- Shurwest was the conduit through which the financial advisor-brokers could be licensed to sell the MLIC and SLIC UIL policies that were part of the FIP-IUL package (they could not do so without Shurwest). *See* Squitieri Decl. Ex. 19 at pp. at 53, 59, 89, 98-99; Ex. 21 at p. 39

- Shurwest introduced financial advisor-brokers to FIP and they relied on Shurwest. *See* Squitieri Decl. Ex. 19 at pp.27-28, 32-33, 39, 43, 53, 59, 89, 98-99; Ex. 20 at p. 7; Ex. 21 a pp. 16, 18. Ex. 21 at pp. 25, 39-40, 45, 51, 55.

- Management at Shurwest knew about its employees' FIP activities and supported it. *See* Squitieri Decl. Ex. 19 at pp. 14, 50-51, 62, 64, 72-75; Ex. 20 at pp. 9, 14, 18, 41-44, 45.

- Use of Shurwest email was not inadvertent. *See* Squitieri Decl. Ex. 19 at pp. 141-143.

- Financial advisor-brokers believed they were dealing with Shurwest. *See* Squitieri Decl. Ex. 19 at pp. 42, 55, 65, 67, 71-72, 163-64; Ex. 21 at pp. 35-36.

- Shurwest's employees never told them Shurwest prohibited their FIP activities. *See* Squitieri Decl. Ex. 19 at pp. 42, 143; Ex. 21 at pp. 25.

- Shurwest marketed, promoted, explained, and structured the FIP-IUL Package. *See* Squitieri Decl. Ex. 19 at pp. 69, 160.

- Shurwest wined and dined the financial-advisor brokers at Shurwest's offices in Arizona to convince them to sell the FIP-IUL Package. *See* Squitieri Decl. Ex. 19 at pp. 50, 61, 73-74; Ex. 20 at pp. 8-9, 14.

- Shurwest met with the financial advisor-brokers' clients to explain the FIP-IUL Scheme and ensure the sale Ex. 20 at pp. 4, 19-20, 22-24.

- Shurwest prepared all the paperwork, reviewed and processed the MLIC and SLIC IUL applications, forwarded the premiums for those policies to MLIC and SLIC, and received commissions from SLIC and MLIC from the sales of those policies.  Decl. at 14, 19-20, 22-24, 39, 59-60; Ex. 21 at pp. 25.

As discussed above, these material and disputed issues of fact about Shurwest and its employee's and agent's roles defeat Shurwest motion.   At the very least, they demonstrate that Shurwest's factual assertions should only be decided after Plaintiffs have had a full opportunity to take discovery.

### 2. Plaintiffs' Adequately Allege the Existence of a Fiduciary Relationship.

Blaming the Plaintiffs "own financial advisors," who Shurwest recruited and supervised (see SAC ¶80), Shurwest claims it had no fiduciary duty to Plaintiffs – even if the allegations of Shurwest's misconduct are true.  SW Br. at 20-21. In support of this argument, Shurwest speculates that Plaintiffs and Class members were "likely unaware Shurwest even existed" and repeats again the refrain that it was not involved in the scheme. *Id.* at 21. Beyond this, Shurwest merely denies that Plaintiffs allege that they "placed their faith or confidence in Shurwest as their fiduciary or the Shurwest invited such confidence or made assurances." SW at 20.  These arguments are ripe for discovery, not decision on a 12(b)(6) motion to dismiss.  Moreover, Shurwest is wrong.

31

A fiduciary relationship can arise in many contexts.  *State v. Cambell,*, 756 N.W.2d 263, 270 (2008).  Generally, a fiduciary relationship exists "'when confidence is reposed on one side and there is resulting superiority and influence on the other.'"  *Id.* (citing and quoting *Toombs v.* 361 N.W.2d at 809. *See also Cummings*, 715 F. Supp.2d at 912 (citing *Buscher v. Brown & Brown, Inc.,* No. A08-1813, 2009 Minn. App. Unpub. LEXIS 955, 2009 WL 259937, at *2 (Minn. App. Aug. 25, 2009); *Stark v. Equitable Life Assurance Soc'y of United States*, 205 Minn. 138, 285 N.W. 466, 470 (Minn. 1939)).  An agent is a fiduciary.  *See e.g., Church of the Nativity of Our Lord v. Watpro, Inc.*, 491 N.W.2d 1, 5 (Minn. 1992), *overruled on other grounds, Ly v. Nystrom* 615 N.W.2d 302, 314 N.25 (Minn. 2000). A disparity of business experience and invited confidence may also be a sufficient basis for finding a fiduciary relationship.  *Toombs,* 361 N.W.2d at 809 (citing *Murphy v. Country House, Inc.*, 307 Minn. 344, 240 N.W.2d 507 (1976). As Shurwest argues in its brief, a fiduciary relationship may exist where there is "financial control, repeated assurances, and invited confidences."  SW Br. at 20 (citing *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-CV-2310, 2006 WL 3544956, at *6 (D. Minn. Dec. 8, 2006) (noting existence of fiduciary relationship is a question of fact)).

In addition, under Minnesota law, persons who represent that they are financial planners have a fiduciary duty to persons for whom services are performed for compensation. *Cummings v. Paramount Partners, LP,* 715 F. Supp.2d 880, 912 (D. Minn. 2010) (citing Minn. Stat. § 45.026, subd. 2). A financial planner is someone who indicates that they are planners, counselors, or advisers of finances or investments, or who "'make similar representations in "advertisements, cards, signs, circulars, letterheads, or in another

32

manner.'" *Cummings*, 715 F. Supp.2d at 912 (citing Minn. Stat § 45.026, subd. 1(b)). Thus, in *Cummings*, for example, the court held that plaintiffs adequately pled their breach of fiduciary duty claim, including the existence of a fiduciary relationship, where they alleged manner in which the defendants solicited their investments. 715 F. Supp. 2d at 912.

Here, Plaintiffs allege they were sold the FIP-IUL Package by financial advisor-brokers within the Securian Network. SAC at ¶¶8-9. Shurwest suggests that it had no relationship with these financial advisors, but these financial advisor-brokers recommended to sell MLIC and SLIC IUL policies and then supervised by Shurwest as they did so.  SAC ¶40.  Indeed, a financial advisor-broker could not sell the FIP-IUL Package without first signing a broker agreement with MLIC wherein Shurwest was the Master Broker Agent. SAC ¶41; 50. Pursuant to the Master Broker Agreement, Shurwest had an obligation to "supervise" the financial advisor-brokers and review all policy applications before sending them to MLIC. SAC¶41. Plaintiffs allege the financial-agent brokers were acting within the scope of their respective agency agreements with Shurwest and MLIC/SLIC and acted on their behalf in the sale of the FIP-IUL Package to Plaintiffs and Class members with their knowledge and consent. SAC ¶50.

Shurwest's role was to educate its and Securian's financial advisor-brokers on how to sell IUL policies to Plaintiffs and the class. Shurwest received commissions from MLIC and SLIC when its employees and the financial advisor-brokers (who were its agents) sold the IUL policies as instructed to do so by Shurwest.  In order to purchase IUL policies, Plaintiffs and class members had to be able to pay for them.  As alleged in the SAC, Shurwest promoted FIP Products as a means of paying for the IUL policies.  It recruited

and marketed the FIP-IUL Scheme to financial advisor-brokers (who were its agents), and, according to its motion to dismiss, who Shurwest knew had fiduciary relationships with Plaintiffs. SAC ¶¶ 88-89 (noting Shurwest recruited financial advisors, educated them and taught them how to influence Plaintiffs and Class members into purchasing the FIP-IUL Package); SW Br. 20-21 (arguing Plaintiffs purchased the FIP-IUL Package on the "advice of their financial advisors").

As a matter of law, financial advisors have a fiduciary relationship with the clients for whom they offer financial advice for compensation (here commissions from their IUL premium payments). *See Cummings,* Minn. Stat. § 45.026. Shurwest directed the conduct of the financial advisors and received a portion of the financial advisor-broker's commission on the sale of IUL policies. SAC ¶40. Whatever fiduciary duties may have been breached by Shurwest's agents were at the direction of Shurwest. *See e.g.,* SAC ¶¶88-95.

Plaintiffs also allege that in the relationship between Plaintiffs and these financial advisor-brokers (acting on behalf of Shurwest and MLIC), there was a disparity of business experience and invited confidence. *See e.g.,* SAC ¶¶90-94. As set forth in the SAC, IULs are complex financial instruments which require the services of a financial advisor. SAC ¶¶29, 44. These instruments were so complex that Securian defendants encouraged and invited clients to purchase them through financial advisors from its Securian Network. SAC ¶31-35; 45. The Securian website further advertised that such financial advisors could offer "suitable choices to serve clients and their unique situations with a range of life insurance, annuities and wealth management solutions." SAC ¶ 35. The financial advisor-brokers who

34

sold the FIP- IUL Package to Plaintiffs were members of the Securian Network. As noted above, the financial advisor-brokers who sold the FIP-IUL Package to Plaintiffs and the class had agency agreements with Shurwest and MLIC/SLIC.

The FIP-IUL Package created by Shurwest was even more complex, so complex that there was a disparity of business experience between even Shurwest and the financial agent-brokers (such as the ones who sold the package to Plaintiffs) who relied on Shurwest to conduct due diligence on the FIP Product, train them, and facilitate its use. SAC ¶¶ 40, 54, 62, 88-95. Indeed, the financial advisor-brokers relied on Shurwest to provide access to the FIP-IUL Package which it created (in fact Shurwest recruited them to sell it); recommendations and due diligence on FIP and the FIP-IUL Package structure; and the education, marketing, and distribution, services necessary for them to sell the FIP-IUL Package to their clients. SAC at ¶¶52-57.

It is reasonable to infer that the business disparity that existed between Shurwest and the financial advisor-brokers extended and was even more pronounced in the relationship with Plaintiffs and the class. *See Zayed v. Associated Bank, N.A.,* 779 F.3d 727, 729 (8th Cir. 2015) (noting on motion to dismiss court accepts as true the well-pled allegations in complaint and draws all reasonable inferences in favor of the nonmoving party).

Thus, Plaintiffs have adequately pled the existence of a fiduciary relationship between agents acting on Shurwest's behalf and Plaintiffs. Whether Plaintiffs will ultimately prevail is an issue of fact that should not be decided on a motion to dismiss. They need not "prove" or "establish" their claim in the SAC; they need only state a

*plausible* claim. *See Benner v. St. Paul Pub. Schs.,* Cas. No. 17-01568, 2017 U.S. Dist. LEXIS 198821 (D. Minn. Dec. 4, 2017) ("Plaintiff is not required to prove a prima facie case in his complaint") (citing *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009))

**E.    Plaintiffs State a Claim for Aiding and Abetting Breach of Fiduciary Duty.**

Aiding and abetting requires: (1) the primary tortfeasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach. *Rilley v. MoneyMutual, LLC,* 329 F.R.D. 211, 217 (D. Minn. 2019) (citing *Zayed v. Associated Bank*, N.A., 779 F.3d 727, 733 (8th Cir. 2015)).

In support of its motion to dismiss this claim, Shurwest first argues that Plaintiffs have not "established" that the Securian Defendants owed Plaintiffs a fiduciary duty, claiming that the insurer-insured relationship is not generally a fiduciary one. SW Br. at 21 (citing *St. Paul Fire & Marine Ins. Co. v. A.P.I., Inc.,* 738 N.W. 2d 401, 407 (Minn. Ct. App. 2007)).  Shurwest acknowledges that a fiduciary duty may arise with an insurer but claims that only under certain circumstances that do not exist here.  SW Br. at 22.

In support, Shurwest cites the summary judgment decision *Parkhill v. Minn. Mut. Life Ins. Co.,* 174 F. Supp. 2d 951, 959 (D. Minn. 2000) ("*Parkhill II*")) where, after a full and fair opportunity to take discovery, the Plaintiff was not able to prove his claim that a fiduciary duty existed. That is not the procedural situation here.  Also inapposite is *St. Paul*

36

*Fire & Marine Ins. Co. v. A.P.I., Inc.*, 738 N.W.2d 401, 407 (Minn. Ct. App. 2007), decided on appeal after a jury trial. That case involved the court's failure to properly instruct the jury of the circumstances that must exist for an insurer to have a duty to defend an insured and the concomitant duty to reasonably settle. Neither of those duties, albeit fiduciary ones, are at issue here.

More analogous to the present situation is the court's denial of an insurer defendant's motion to dismiss a fiduciary duty claim in *Parkhill v. Minnesota Mut. Life Ins. Co.*, 995 F. Supp. 983 (D. Minn. 1998) ("*Parkhill I*"). There, the court found sufficient allegations that the defendant held a special relationship with plaintiff where plaintiff alleged the defendant insurer's agent held himself out to plaintiff as an expert and confidant. *Parkhill I,* 995 F. Supp. at 991.  In denying the motion to dismiss, the court reiterated that the existence of a fiduciary relationship is an issue of fact dependent on the circumstances of each individual case. *Id.* (citing *Toombs,* 361 N.W.2d at 809) (additional citations omitted).  The court further observed:

> Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be Ex.___cluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation as a fact exists, in which confidence is reposed on one side and there is resulting superiority and influence on the other, and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal.

*Parkhill I,* 995 F. Supp. at 990.

Here, the facts supporting the existence of a fiduciary relationship are much more pronounced than in *Parkhill.  Parkhill* involved only the sale of life insurance by an

insurance agent to his insured. The plaintiff did not allege the agent was a financial advisor. There was no investment vehicle like FIP involved and no complex packaging of an investment with a complex IUL policy requiring the advice of a financial planner.

In contrast to *Parkhill* and as discussed above, the financial advisor-brokers who sold the FIP-IUL Package to Plaintiffs were not merely acting as insurance agents, but were "financial advisors," who were also acting within the scope of agency agreements with both Shurwest and with MLIC to sell the FIP-IUL Package. *See supra* p. 3-4. Indeed, on the Securian website, MLIC/SLIC encouraged and "invited confidence" in these financial advisor-brokers to help clients reach their financial goals. *Id.* Moreover, as discussed above, while the IUL policies themselves are complex instruments, the FIP-IUL Package was even more so. Plaintiffs adequately allege there was an invited confidence and disparity of business experience between the financial agent-brokers and Plaintiffs sufficient to state the existence of a fiduciary relationship. Whether Plaintiffs can prove the existence of the fiduciary relationship is, at least, a question of fact; it should not be decided on a motion to dismiss. *See Toombs, Parkhill I. supra.*

Shurwest also claims Plaintiffs do not allege Shurwest had knowledge of the Securian Defendant's breach of fiduciary duty but instead only plead in conclusory faction that Shurwest had actual and constructive knowledge of the "illegal FIP loan". SW Br. at 22. However, the knowledge requirement is where a plaintiff's complaint contains general allegations of the defendant's knowledge and allegations of circumstances strongly indicating knowledge. *Zayed,* 779 F.3d at 734-745. Thus, for example, in *Zayed*, the Eighth Circuit reversed the lower court's decision to dismiss the plaintiff's complaint alleging the

38

bank had aided and abetted a Ponzi scheme. *Id.* Reviewing the complaint as a whole, the court found the plaintiff adequately alleged the bank's knowledge where the complaint included general allegations of that knowledge, allegations strongly indicating knowledge by the bank's vice president, and allegations detailing the Ponzi transactions. *Id.*

Here, as in *Zayed*, Plaintiffs state a plausible aiding and abetting claim. Plaintiffs allege generally that Shurwest had knowledge of the illegal FIP scheme and allege circumstances strongly indicating Shurwest's actual knowledge. Indeed, Plaintiffs allege Shurwest was a referral source for FIP and created, marketed, promoted, and facilitated the FIP-IUL Package. SAC ¶49. Shurwest told financial broker-agents that it had done due diligence on the FIP Product. SAC ¶¶54, 62; 71. Plaintiffs allege the existence of state regulatory investigations as early as 2014, alleging that FIP's business model of buying pensions was an illegal scheme. Multiple states issued cease and desist orders, the Minnesota Attorney General filed a lawsuit against FIP. Plaintiffs further allege Shurwest facilitated and directed the transactions in which the FIP Product was sold. *See* SAC ¶¶50, 54. Had Shurwest been doing its due diligence, as it says it was doing, it would have known of the problems with FIP.

The cases cited by Shurwest are distinguishable. SW Br. At 22. Unlike here, the plaintiffs in those cases did not allege facts strongly suggesting the aider and abettor's integral involvement in the alleged scheme, who created, facilitated, marketed, and promoted the fraudulent product being used by the primary tortfeasor in furtherance of its breaches of fiduciary duty. *See e.g., Varga v. U.S. Bank, N.A.,* 952 F. Supp.2d 850, at 858 (D. Minn. 2013) (noting plaintiff's failure to plead the aider and abettor knew the breach

of fiduciary duty was taking place); *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012) (U.S. Bank failed to allege how it knew the actions of *unknown* parties constituted fraud); *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) (failure to plead facts showing aider and abettor's general awareness of primary tortfeasor's violations of the securities laws).

### F.   Plaintiffs State a Claim for Vicarious Liability.

Shurwest argues that it cannot be held liable for the actions of the financial advisor-brokers, whom Shurwest refers to as "Securian brokers whom Shurwest had recommended to Securian." Shurwest claims it does understand who these "Securian brokers" are.   SW Br. at 23.   However, looking at the SAC as a whole, it is clear that the referenced brokers Shurwest recommended to Securian are the financial advisor-brokers who sold the FIP-IUL Packages to Plaintiffs and the Class.[7] As discussed above, those financial advisor-brokers are agents of both Shurwest *and* MLIC (Securian Defendants) by virtue of their broker agreements. Thus, Plaintiff has pled the existence of a principal-agent relationship. As discussed above, Plaintiffs have also plead that these financial advisor-brokers were fiduciaries acting on behalf of MLIC and Shurwest within the scope of their agencies in selling the FIP-IUL Package. *See* SAC ¶¶ 50, 53.

### G.   Plaintiffs Adequately Plead Unjust Enrichment.

Plaintiffs adequately allege their unjust enrichment claim. "Unjust enrichment is an equitable doctrine used to prevent a defendant from wrongfully benefitting from fraud,

---

[7] *See* Squitieri Decl. at Exs. 8&9.

mistake or moral wrongdoing against the plaintiff." *Cummings*, 715 F. Supp.2d at 910 (citing *Myer v. Dygert,* 156 F. Supp.2d 1081, 1089 (D. Minn. 2001)).  A party "is unjustly enriched when it knowingly receives something of value that it was not entitled to under circumstances that make it unjust for the party to retain the benefit.  Cummings, 715 F. Supp.2d at 910 (citing *Ehlen v. Hanratty & Assoc., Inc.,* No. A08-2290, 2009 Minn. App. Unpub. LEXIS 1127, 2009 WL 3255399, at *6 (Minn. Ct. App. Oct. 13, 2009)). An unjust enrichment claim, which must involve unjust or illegal conduct, may be based "on failure of consideration, fraud, mistake and situations where it would be morally wrong for one party to enrich himself at the expense of another.'" *Cummings*, 715 F. Supp.2d at 911(citing *Auntie Ruth's Furry Friends' Home Away From Home, Ltd. v. GCC Prop. Mgmt., LLC*, No. A08-1602, 2009 Minn. App. Unpub. LEXIS 1030, 2009 WL 2926485, at *7 (Minn. Ct. App. Sept. 15, 2009) (emphasis removed) (quoting *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984)).

Shurwest argues that Plaintiffs fail to allege an implied-in-law or "quasi-contract." SW Br. at 24.  However, a "quasi contract" is merely a situation in which a benefit is conferred on one party without consideration.  *See Acton Constr. Co. v. State*, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986) (The elements of a quasi contract are: (1) a benefit is conferred; (2) the defendant appreciates and knowingly accepts the benefit; and (3) the defendant's retention of the benefit under the circumstances would be inequitable).

Plaintiffs allege a "quasi contract" situation in the SAC.  Plaintiffs allege Shurwest has knowingly received something of value -- commissions from the sale of the MLIC and SLIC IUL polies as part of the FIP-IUL Scheme.  SAC ¶40.  Plaintiffs also allege Shurwest

41

was not entitled to under the circumstances to keep the commissions since they were earned as part of the FIP-IUL scheme involving the sale of the illegal and unsuitable FIP Product to finance the IUL policies.

## **CONCLUSION**

This court has jurisdiction over Shurwest.  Plaintiffs state plausible claims for relief. For these and all the foregoing reasons, Shurwest's motion to dismiss should be denied.


Dated:  June 2, 2020                    */s/ Kenneth A. Wexler*

Kenneth A. Wexler (*pro hac vice*)
Kara A. Elgersma (*pro hac vice*)
**WEXLER WALLACE LLP**
55 W. Monroe Street
Suite 3300
Chicago, Illinois 60603
Tel: (312) 346-2222
kaw@wexlerwallace.com
kae@wexlerwallace.com

*Attorneys for Stospal Plaintiff*


Lee Squitieri (*pro hac vice*)
**SQUITIERI & FEARON, LLP**
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
lee@sfclasslaw.com

*Attorneys for Ciofoletti Plaintiff*

Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
Amanda M. Williams (#341691)
Daniel J. Nordin (#392393)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
awilliams@gustafsongluek.com
dnordin@gustafsongluek.com

*Attorneys for Ciofoletti and Stospal*
*Plaintiffs*