UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ELEANOR and ROCCO CIOFOLETTI, and LARRY STOSPAL on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SECURIAN FINANCIAL GROUP, INC., MINNESOTA LIFE INSURANCE COMPANY, SECURIAN LIFE INSURANCE COMPANY, SHURWEST LLC and MINNESOTA MUTUAL COMPANIES, INC.,<br><br>Defendants. | Civil Action No.: 18-cv-03025-JNE-ECW |

**INDEX TO EXHIBITS SUPPORTING SHURWEST, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL**

Exhibit A – Deposition Testimony of Rocco Cioffoletti, taken February 1, 2021

Exhibit B – Deposition Testimony of Eleanor Cioffoletti, taken February 1, 2021

Exhibit C – Deposition Testimony of Larry Stospal, taken January 27, 2021

Exhibit D – Plaintiffs' Responses to Shurwest, LLC's First Set of Interrogatories

Dated: March 10, 2021                    Respectfully submitted,

/s/ Jason M. Hopkins
Brooke D. Anthony (#0387559)
Philip J. Kaplan (#0389351)
**ANTHONY OSTLUND**
**BAER & LOUWAGIE P.A.**
3600 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 349-6969
Fax: (612) 349-6996
Email:  banthony@anthonyostlund.com
         pkaplan@anthonyostlund.com

*and*

Jason S. Lewis
(Texas No. 24007551 *pro hac vice*)
Jason M. Hopkins
(Texas No. 24059969 *pro hac vice*)
**DLA PIPER LLP (US)**
1900 N. Pearl St., Ste. 2200
Dallas, Texas 75201
Tel: (214) 743-4500
Fax: (214) 743-4545
Email:  jason.lewis@dlapiper.com
         jason.hopkins@dlapiper.com

***Attorneys for Defendant Shurwest, LLC***

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MINNESOTA
 3
 4    ELEANOR AND ROCCO CIOFOLETTI,    )   Case No.
      and LARRY STOSPAL, on behalf of  )   18-cv-03025-JNE-
 5    themselves and all others        )   ECW
      similarly situated,              )
 6                                     )
 7            Plaintiff,               )
                                       )
      vs.                              )
 8                                     )
      SECURIAN FINANCIAL GROUP, INC.,  )
 9    MINNESOTA LIFE INSURANCE         )
      COMPANY, SECURIAN LIFE           )
10    INSURANCE COMPANY, SHURWEST LLC  )
      and MINNESOTA MUTUAL COMPANIES,  )
11    INC.,                            )
                                       )
12            Defendants.              )
      _____)
13
14
15           VIDEO-RECORDED VIDEOCONFERENCE
16           DEPOSITION OF ROCCO CIOFFOLETTI
17              Monday, February 1, 2021
18                    Volume I
19
20    Reported by:
      ROCHELLE HOLMES
21    CSR No. 9482
22    Job No. 4439789
23    PAGES 1 - 37
24
25
                                          Page 1
```

1    UNITED STATES DISTRICT COURT
2      DISTRICT OF MINNESOTA
3
4  ELEANOR AND ROCCO CIOFOLETTI,    )  Case No.
   and LARRY STOSPAL, on behalf of  )  18-cv-03025-JNE-
5  themselves and all others        )  ECW
   similarly situated,              )
6                                   )
          Plaintiff,                )
7                                   )
   vs.                              )
8                                   )
   SECURIAN FINANCIAL GROUP, INC.,  )
9  MINNESOTA LIFE INSURANCE         )
   COMPANY, SECURIAN LIFE           )
10 INSURANCE COMPANY, SHURWEST LLC  )
   and MINNESOTA MUTUAL COMPANIES,  )
11 INC.,                            )
                                    )
12       Defendants.                )
                                    )
13 _____ )
14
15
16     Deposition of ROCCO CIOFFOLETTI, taken on behalf of
17 Defendants, via videoconference, beginning at 2:48 p.m.
18 and ending at 3:47 p.m. on Monday, February 1, 2021,
19 before ROCHELLE HOLMES, Certified Shorthand Reporter
20 No. 9482, Certified Realtime Reporter No. 0123.
21
22
23
24
25

Page 2

1  APPEARANCES (CONTINUED):
2  (ALL APPEARANCES REMOTE VIA ZOOM)
3
4  For Defendant Shurwest:
5
6      DLA PIPER
7      BY:  JASON HOPKINS, ATTORNEY
8          MARINA STEFANOVA, ATTORNEY
9      1900 N. Pearl Street, Suite 2200
10     Dallas, TX  75201-4629
11     Jason.Hopkins@dlapiper.com
12     Marina.stefanova@dlapiper.com
13
14
15
16 VIDEOGRAPHER:  SOSEH KEVORKIAN
17
18 ALSO PRESENT:  BETH WIEDERHOLT
19
20
21
22
23
24
25

Page 4

1  APPEARANCES:
2  (ALL APPEARANCES REMOTE VIA ZOOM)
3
4  For Plaintiffs:
5
6      SQUITIERI & FEARON, LLP
7      BY:  LEE SQUITIERI, ATTORNEY
8          FLETCHER MOORE, ATTORNEY
9      32 E. 57th Street, 12th Floor
10     New York, NY 10022
11     (212) 421-6492
12     lee@sfclasslaw.com
13
14 For Defendants Securian Financial Group, Minnesota Life
15 Insurance Company, Securian Life Insurance Company and
16 Minnesota Mutual Companies:
17
18     ALSTON & BIRD
19     BY:  KATHY J. HUANG, ATTORNEY
20     333 South Hope Street, 16th Floor
21     Los Angeles, CA 90071-3004
22     213.576.1123
23     Kathy.huang@alston.com
24
25

Page 3

1                    INDEX
2    WITNESS          EXAMINATION BY          PAGE
3    ROCCO CIOFFOLETTI
4    Volume I
5              MS. HUANG              7
6              MR. HOPKINS            31
7
8
9                  EXHIBITS
10   NUMBER          DESCRIPTION          PAGE
11   Exhibit 1      "9/15/2016 1:57 p.m.         35
                    Eleanor B. Cioffoletti
12                  See Monthly Bank Details"
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1         February 1, 2021 | 1  not. |

1           February 1, 2021
2           2:48 p.m. - 3:47 p.m.
3
4      THE VIDEOGRAPHER:  Good afternoon.  We are
5  going on the record at 2:48 p.m. on February 1st, 2021.
02:48:22PM
6  This is Media Unit 1 of the video-recorded deposition
7  of Rocco Cioffoletti, taken by counsel for plaintiff in
8  the matter of Eleanor and Rocco Cioffoletti, et al.,
9  versus Securian Financial Group, Incorporated, et al.,
10  filed in the United States District Court, District of
02:48:49PM
11  Minnesota.  Case No. 18-cv-03025-JNE-ECW.
12      This deposition is being held by Zoom.  My
13  name is Soseh Kevorkian from the firm Veritext and I'm
14  the videographer, located in Topanga, California.  Our
15  court reporter is Shelley Holmes, also from the firm
02:49:15PM
16  Veritext.
17      At this time would counsel and all present
18  please identify themselves for the record.
19      MR. SQUITIERI:  Lee Squitieri for the
20  plaintiffs, Squitieri & Fearon.
01:01:18PM
21      THE WITNESS:  Rocco Cioffoletti, plaintiff.
22      MS. HUANG:  Kathy Huang from Alston & Bird,
23  on behalf of defendants Securian Financial Group,
24  Minnesota Life Insurance Company, Securian Life
25  Insurance Company and Minnesota Mutual Companies.
01:01:34PM

1      MR. HOPKINS:  Jason Hopkins, DLA Piper, on
2  behalf of Shurwest.  And with me observing is
3  Marina Stefanova.
4      MR. MOORE:  Fletcher Moore, Squitieri &
5  Fearon, for the plaintiff.
01:01:48PM
6      MS. WIEDERHOLT:  Hello, I'm Beth Wiederholt,
7  I'm in-house counsel for the Securian defendants.
8
9      ROCCO CIOFFOLETTI,
10  having been duly administered an oath in accordance
11  with CCP 2094, was examined and testified as follows:
12
13      EXAMINATION
14  BY MS. HUANG:
15    Q  Good afternoon, Mr. Cioffoletti.  You were
02:50:24PM
16  present for your wife's deposition earlier today;
17  correct?
18    A  That's correct.
19    Q  Did you have any conversations with your wife
20  about her deposition in the break that we just had?
02:50:34PM
21    A  I did not.
22    Q  Were you whispering answers to your wife
23  during her deposition?
24    A  It wasn't specifically answers, it was
25  whether she should respond to an objected question or
02:50:50PM

1  not.
2    Q  Have you ever had your deposition taken
3  before?
4    A  I have not.
5    Q  You heard the ground rules that we've been
02:51:05PM
6  over with your wife, I can go over them really briefly.
7  You understand that your testimony here today is under
8  oath and that it is the same oath you would take if you
9  were before a judge or a jury; correct?
10    A  I understand.
02:51:23PM
11    Q  So we expect you to provide us with your best
12  testimony and your most accurate recollection.  This is
13  not a memory test, there are no right or wrong answers,
14  we only ask that you provide us with your most accurate
15  and truthful testimony.
02:51:39PM
16      Do you understand?
17    A  I understand.
18    Q  Are there any medications that you're on that
19  would prevent you from testifying truthfully today?
20    A  No medications.
02:51:53PM
21    Q  Can you think of any reason why you cannot
22  testify truthfully and accurate here today?
23    A  No.
24    Q  Mr. Cioffoletti, have you ever owned a
25  Minnesota Life Insurance Company policy?
02:52:17PM

1    A  I have not.
2    Q  What is your date of birth?
3    A  January 19th, 1948.
4    Q  Where do you currently live?
5    A  104 Country Walk Lane, Clemson, South
02:52:38PM
6  Carolina 29631.
7    Q  Do you have any children?
8    A  I do, I have two.  I have --
9    Q  What are their names?
10    A  I have a son.
02:52:59PM
11    Q  Let me finish my question and then you can
12  answer.  Let me finish the question first just so the
13  record will be cleaner that way.
14      Can you tell me the names and ages of your
15  children?
02:53:10PM
16    A  My son Michael, he is 48, and I have a
17  daughter Danielle who's 34.
18    Q  Do either of your children live with you
19  today?
20    A  They do not.
02:53:25PM
21    Q  How long have you been married to
22  Mrs. Cioffoletti?
23    A  Seven years.
24    Q  Were you previously married before?
25    A  I was.
02:53:44PM

| | |
|---|---|
| 1    Q   And who were you married to? | 1    Q   Was AT&T your first job out of college? |

1   Q   And who were you married to?
2   A   Helen Karwinski Cioffoletti.
3   Q   How long were you married to Helen?
4   A   28 years.  She passed away of cancer in 2011.
5   Q   I'm sorry to hear that.
02:54:01PM
6      Were you married to anybody else previous to
7  being married to Helen?
8   A   No.
9   Q   What is the highest level of education that
10  you attained?
02:54:18PM
11   A   I have a bachelor's degree in aeronautical
12  engineering.
13   Q   Where did you attend university?
14   A   New York Institute of Technology.
15   Q   What year did you graduate?
02:54:30PM
16   A   Two -- 2000, I wish.  1972.
17   Q   Did you do any graduate work?
18   A   I did not.
19   Q   Did you ever take any classes on accounting
20  or finance?
02:55:00PM
21   A   I did not, not specifically.  I mean, I've
22  had some finance courses at school.  But other than
23  that, no.
24   Q   When you say you had some finance courses at
25  school, was that at the New York Institute of
02:55:14PM

Page 10

1  Technology?
2   A   Yes.  It was the basic electives.
3      (Reporter clarification.)
4   Q   BY MS. HUANG:  Do you recall if that was one
5  course or more than one course?
02:55:34PM
6   A   It was just one.
7   Q   Are you currently working?
8   A   I am not.  Retired.
9   Q   What year did you retire?
10   A   I retired in 1999.  I know, it seems like a
02:55:52PM
11  long time ago.  There's a reason for that.  If you'd
12  like me to go into the details, otherwise I'll just say
13  1999.
14   Q   Well, what occupation did you have before you
15  retired?
02:56:17PM
16   A   I was a district manager for AT&T.
17   Q   And what responsibilities did you have in
18  that role?
19   A   We engineered data networks for major
20  corporations.  I was responsible for 26 employees.
02:56:32PM
21   Q   How long did you work for AT&T?
22   A   28 years.
23   Q   Who did you work for before working for AT&T?
24   A   I had odd jobs working in supermarket, that's
25  when I was in high school.
02:57:00PM

Page 11

1   Q   Was AT&T your first job out of college?
2   A   That's correct.  Western Electric at the
3  time.
4   Q   Okay.  Why did you retire in 1999?
5   A   I had 28 years of service and I had the
02:57:17PM
6  proper age.  AT&T was looking to reduce their workforce
7  and they were offering a package to those that made the
8  magic number.  And my age and years of service gave me
9  the magic number so I ended up retiring.
10   Q   What are your current sources of income?
02:57:42PM
11   A   Currently, I'm on --
12      MR. SQUITIERI:  Why current as opposed to
13  2016 when the policy was in effect?
14      MS. HUANG:  I'm just asking questions.  I can
15  ask that question next.
02:58:04PM
16      MR. SQUITIERI:  No.  What's the relevance of
17  current income?
18      THE WITNESS:  Current income is social
19  security.
20      MR. SQUITIERI:  Hold on.  Hold on,
02:58:13PM
21  Mr. Cioffoletti.
22      THE WITNESS:  Sure.
23      MR. SQUITIERI:  Counsel, what --
24      MS. HUANG:  I'd like an idea of, you know,
25  his net worth, if he's receiving a salary from
02:58:22PM

Page 12

1  anything, if he has income from anything, what assets
2  he might have.
3      MR. SQUITIERI:  All right.  I'm going to let
4  some limiting questioning proceed.  So this question is
5  what's your current income; right?
02:58:35PM
6      MS. HUANG:  Sources of income, yes.
7      MR. SQUITIERI:  Yes.  Okay.  What is your
8  current income?
9      THE WITNESS:  I'm on social security and
10  after that they deduct the Medicare, it's $1,762 a
02:58:47PM
11  month.  I also have a small annuity with AIG, and
12  that's $1,092 a month.  That's currently it.  But I do
13  substitute teach, but I haven't done it this year
14  because of COVID-19.
15   Q   BY MS. HUANG:  Did you substitute teach in
02:59:18PM
16  2016?
17   A   I did.
18   Q   Were your sources of income the same in 2016?
19   A   It did not include the annuity, just social
20  security.
02:59:33PM
21   Q   Do you recall what assets you had in 2016?
22   A   In 2016, I had some investments with Edward
23  Jones.  The total assets that were listed on the
24  particular application included mine, it wasn't all my
25  wife's.  I had approximately I want to say like
03:00:03PM

Page 13

4 (Pages 10 - 13)

1  $360,000 with Edward Jones at the time. And I was
2  drawing down about 14,000 -- I was drawing down $19,000
3  a year from that particular account to subsidize social
4  security.
5       Q  Was the Edward Jones account solely yours?
03:00:31PM
6       A  It was. Initially it was mine and when I got
7  married we had a joint account.
8       Q  Okay. Have you ever been a plaintiff in a
9  lawsuit other than this one?
10      A  I have not.
03:00:58PM
11      Q  Have you ever been a defendant in a lawsuit?
12      A  I have not.
13      Q  What did you do to prepare for today's
14  deposition?
15      A  I reviewed the documentation that was given.
03:01:12PM
16  I believe you've already gone through quite a bit of
17  that with my wife.
18         I also went through the interrogatories,
19  requests for admission statements and request for
20  production that I received from my attorney.
03:01:29PM
21      Q  Did you ever meet with your attorney in
22  preparation for today's deposition?
23      A  Not in person. We've had numerous phone
24  calls and emails. This is our first face to face.
25      Q  Has your wife been on all the calls that
03:01:53PM

Page 14

you've had with your attorney?
2       A  She has not. I mean, they were on my phone.
3  It's a cell phone. I mean, if she listened in, she
4  heard, but the conversation wasn't directly with her.
5       Q  Have you looked through all your documents
03:02:12PM
6  and gathered everything that you thought was relevant
7  to this case and provided those documents to your
8  attorney?
9       A  I did.
10      Q  Are those some of the documents that you
03:02:26PM
11  reviewed in preparation for today's deposition?
12      A  Yes.
13      Q  Do you have those documents before you? Are
14  they the same documents that your wife was looking at?
15      A  They're the same documents my wife has,
03:02:40PM
16  although I have some additional backup detail, bank
17  statements that show distribution.
18      Q  And those documents are before you today?
19      A  They are.
20      Q  I can't tell what's before you, so that's why
03:02:53PM
21  I'm asking.
22      A  Okay.
23      Q  Can you tell me what this lawsuit is about in
24  your own words?
25      A  The lawsuit is about investment money that my
03:03:11PM

Page 15

1  wife put into Christopher Dixon from Black Harbor
2  Wealth Management to purchase a life insurance policy
3  that was mainly for her retirement income. As a
4  secondary benefit of course there was life insurance
5  attached to it.
03:03:39PM
6          The lawsuit is to try and recover monies that
7  were lost, and I'm going to use this particular term,
8  "future income protection" because that's why the
9  monies have disappeared. We did get back $23,000 in
10 our first year premium and we are hoping to get back
03:04:00PM
11 the balance of the $82,000 that was invested, as well
12 as some taxes that were paid on my wife's $25,000 that
13 came out of Edward Jones that she had in an IRA that
14 was not invested in a timely manner by Mr. Dixon.
15         And also we hope to get back anything that
03:04:25PM
16 the life insurance policy may have accrued during the
17 time that we did own it.
18      Q  The 82,000 that you referenced giving to
19 Mr. Dixon to invest, was that your money or your wife's
20 money?
03:04:47PM
21      A  That was my wife's money. It was done in two
22 payments.
23      Q  And I believe she said that was money from a
24 previous marriage; is that accurate?
25      A  That's accurate.
03:05:02PM

Page 16

1       Q  Do you recall receiving the postcard from
2  Mr. Dixon talking about the dinner he was going to
3  host?
4       A  I do. As a matter of fact, we went to two
5  dinners.
03:05:26PM
6       Q  Did you and your wife have discussions about
7  meeting with Mr. Dixon?
8       A  We did have discussions, yes.
9       Q  Why did you decide to meet with Mr. Dixon?
10      A  We were looking for a financial advisor. He
03:05:40PM
11 had mailed out numerous of these invitations. And it
12 was given at Rick Erwin's, there was about 20 people
13 involved in the first one. And he came across very
14 knowledgeable in the finance area during his
15 presentations.
03:06:08PM
16      Q  Do you recall what his presentation was about
17 during the dinner that you attended or the two dinners
18 that you attended?
19      A  He gave a long background information as to
20 what he did for a living before he opened up his own
03:06:24PM
21 company. He said he made quite a bit of money in the
22 stockmarket and he decided that if he can make this
23 kind of money for someone else he was going to do it
24 for himself. So he opened up Black Harbor Wealth
25 Management. And that's the particular firm that he
03:06:42PM

Page 17

5 (Pages 14 - 17)

Page 18

1   owned and his sons were also involved in that.
2       Q   Do you recall if he mentioned Minnesota Life
3   Insurance Company during the presentations at the
4   dinners?
5       A   He did not mention it specifically during the
03:06:54PM
6   presentations, just that there was various
7   opportunities for investment.
8       Q   I think you said you went to two dinners?
9       A   Yes.
10      Q   Was that two dinners before you met with
03:07:12PM
11  Mr. Dixon in person?
12      A   No.   We went to one dinner, then we met him
13  at that particular dinner.   We met him in his office
14  after we signed up to go and speak with him.   And then
15  they sent us another one, I think they sent it by
03:07:27PM
16  mistake, but since they sent us we got a free steak
17  dinner.   Showed up -- showed up again.
18      Q   Okay.   So at the time you went to the second
19  dinner you had already met with Mr. Dixon in person in
20  his office?
03:07:44PM
21      A   Yes.
22      Q   And how many times did you meet with
23  Mr. Dixon in his office?
24      A   It was quite a few, at least four times,
25  maybe five before we actually signed any paperwork.
03:07:58PM

Page 19

1       Q   Were both you and Mrs. Cioffoletti present at
2   all those meetings?
3       A   Yes.
4       Q   Can you tell me your recollection as to what
5   was discussed during those meetings?
03:08:13PM
6       A   Mainly various ways to invest our money.   He
7   did have quite a bit of awards hanging on his walls and
8   magazine articles where he was listed as a top
9   insurance salesman.   I think Minnesota Life was one of
10  them.   Phoenix Mutual I think was another one that he
03:08:32PM
11  had gotten top agent of the year so many years in a
12  row.
13      Q   Was it your understanding that he sold
14  insurance products for different insurance companies?
15      A   Yes.   Besides annuities.
03:08:48PM
16      Q   Can you tell me what Mr. Dixon presented to
17  you in terms of options by which to invest your money?
18      A   There wasn't any stocks or bonds, he didn't
19  talk about any mutual funds, it was mainly various
20  types of insurance policies and possible annuities to
03:09:31PM
21  generate income.
22      Q   Did he present to you the products of
23  different insurance companies other than Minnesota
24  Life?
25      A   He did not.   Minnesota Life was the only
03:09:52PM

Page 20

1   actual insurance company that he presented the policy
2   for or the investment for.
3       Q   Okay.   So when he was talking to you about
4   different types of insurance policies and annuities,
5   did he mention any companies in those discussions?
03:10:07PM
6       A   He did not, except with annuity he had
7   mentioned AIG.   And that's where I ended up getting an
8   annuity from.
9       Q   Did you and Mr. Dixon discuss financial goals
10  or retirement goals during these meetings?
03:10:34PM
11      A   We did.   And my wife was still working, but
12  she didn't want to work forever.   I was already retired
13  and I needed to supplement my social security.   So I
14  had short-term goals, but my wife's goals were a little
15  bit more.
03:10:52PM
16      Q   What do you mean by your wife's goals were a
17  little bit more?
18      A   Well, she didn't need the income right away.
19      Q   So you wanted to supplement your retirement
20  income; is that correct?
03:11:03PM
21      A   That's correct.   Well, I didn't have
22  retirement income from AT&T, I took a lump sum
23  distribution back in 1998.   So I did not have a
24  pension.
25      Q   Okay.   So then you wanted to supplement your
03:11:17PM

Page 21

1   social security payments and anything you made from
2   being a substitute teacher?
3       A   That's correct.
4       Q   Did you consider taking out a life insurance
5   policy?
03:11:44PM
6       A   I did not.
7       Q   When did you first hear about FIP?
8       A   First time I actually heard about it was we
9   started getting distributions in a checking account on
10  December 1st, 2016.   And a distribution said FIP agent
03:12:14PM
11  on it and it was for $1,574.88.
12          Now, those monthly distributions were going
13  to pay my wife's Minnesota Life's premiums, year two,
14  three and so on.
15      Q   So before receiving that deposit in the
03:12:38PM
16  checking account you had never previously heard of FIP?
17      A   Did not.   Didn't know what it meant, didn't
18  know what it was until I asked him where is this coming
19  from and he said Future Income Protection.   That was
20  the first I heard of it.
03:13:04PM
21      Q   Is "him" Mr. Dixon?
22      A   Yes.
23      Q   So what makes you say that those payments
24  were meant to pay the premium years two, three and four
25  on your wife's Minnesota Life insurance policy?
03:13:13PM

6 (Pages 18 - 21)

**Page 22**

1     A    Well, the original $82,000, 15 of that went
2  to a check to Minnesota Life to cover three-quarters of
3  the first year premium.  The balance of the check went
4  to a company called AgeeFisherBarrett, didn't know who
5  that was, he didn't explain who it was, it was an
03:13:34PM
6  intermediate company.
7        A few months after that, the check was
8  cashed -- I would say the check was written in August
9  and the check was cashed September 1st, 2016.  A few
10  months later we started getting FIP distribution.  My
03:13:50PM
11  only way I could think was that AgeeFisherBarrett
12  somehow gave the money to FIP somehow through
13  Chris Dixon or by some other means.
14     Q    Did you ever ask Mr. Dixon what he was going
15  to do with the approximately 67,000 that your wife gave
03:14:09PM
16  him that didn't go to Minnesota Life Insurance Company?
17     A    He said that the money would be invested.
18  And I said, "Well, if you divide out the premium, it's
19  not going to make -- I'm not going to have enough money
20  to pay the additional three years' premium."
03:14:28PM
21        He said, "Well, where I'm putting your money
22  they're going to pay interest.  And between the
23  interest payment and your original investment you'll
24  have enough to cover the premiums for the policy.
25     Q    Okay.  So you understood that he was going to
03:14:43PM

**Page 23**

1  invest your wife's money in --
2     A    Something.  Didn't know what it was.
3     Q    In something?
4     A    Yes.
5     Q    Okay.  And you understood that that
03:14:50PM
6  investment would be separate and apart from your
7  Minnesota Life insurance policy or your wife's
8  Minnesota Life insurance policy?
9     A    I'm going to say yes, but we needed that
10  investment in order to pay the premiums on the policy.
03:15:07PM
11  So they kind of run together.  Without that investment
12  we would have never been able to take out the policy.
13  We couldn't afford it.
14     Q    Okay.  When you received the FIP payment did
15  you call Mr. Dixon up and ask him what is FIP?
03:15:24PM
16     A    I did.  And that's when he told us Future
17  Income Protection.  And that's when my wife said, "Is
18  that where the rest of my money went?"
19        And he said, "Yes."
20        And she said, "Well, why can't I get a
03:15:38PM
21  statement like every other broker gives us the
22  statement that shows where the money is, how much I
23  have left, what am I earning on it?"
24        He said that -- he just shook his head and
25  said that it wasn't that kind of investment.
03:15:49PM

**Page 24**

1        But I do recall --
2     Q    Did he tell you --
3     A    Oh, excuse me.  I do recall when we wrote the
4  check out, I was also in the Marine Corps, he had asked
5  me if I had any disability benefits or retirement
03:16:01PM
6  income from that.  And at the particular time I didn't
7  know why he wanted that information, but I found out
8  later on he wanted it so he could put that money into
9  Future Income Protection.
10     Q    Did he put any of your money into FIP?
03:16:18PM
11     A    I did not, only because I needed income right
12  away so I bought an annuity instead.
13     Q    At some point, did it come to your attention
14  that you and your wife had stopped receiving payments
15  from FIP?
03:16:46PM
16     A    Yes.  We were getting bank statements every
17  month up until -- let's see.  I believe the last one
18  was February 2019.  Oh, I take it back.  We did not get
19  any -- we did not -- our last one was February 2017 was
20  our last payment.
03:17:19PM
21     Q    And do you know approximately how much you
22  received in payments from FIP?
23     A    Total was just over $17,000.  Part of that
24  was used to pay the first year's premium, it was the
25  15,000 plus 8,000-and-change.  We had a balance FIP
03:17:38PM

**Page 25**

1  payout that we kept in our account of
2  $15,943-and-change.  When we deduct that from the
3  initial $82,000 investment and the $23,000 premium that
4  was refunded, my wife was still -- I'm going to use the
5  term "FIP loss" of over $43,000.
03:18:02PM
6     Q    The first premium payment on your wife's
7  Minnesota Life insurance policy, that came from monies
8  she already had; correct?
9     A    Part of it did.  The $15,000 did.  The $8,000
10  to pay the balance of the first year's premium came
03:18:24PM
11  from FIP distribution.
12     Q    Okay.  Did you have any idea what FIP did,
13  what it was as a company?
14     A    Other than it was just Future Income
15  Protection, I didn't know what they did or where they
03:18:41PM
16  were getting their money from.
17     Q    Did you ask Mr. Dixon what FIP did?
18     A    He tried to explain it as a pool of funds
19  generated by people like ourselves, but he didn't say
20  how the money was being moved around or invested or how
03:19:00PM
21  it was earning income.  And he also said that his wife
22  had a few hundred thousand dollars invested in it too
23  and he felt that it was safe, that's why he recommended
24  that to somebody to put the balance of my wife's money
25  in that same account.  We did not know where it was
03:19:19PM

7 (Pages 22 - 25)

1 going.
2    Q   Did you understand that FIP was an
3 independent company that had nothing to do with
4 Minnesota Life Insurance Company?
5       MR. SQUITIERI: Objection.
03:19:33PM
6    Q   BY MS. HUANG:  You can answer the question.
7    A   Okay.  I knew it was independent of Minnesota
8 Life, but I feel somehow that Minnesota Life knew we
9 were generating income to pay the premiums on that
10 policy.
03:19:54PM
11   Q   Did you ever tell anybody in Minnesota Life's
12 home office that you were receiving payments from FIP?
13   A   I did not.
14   Q   Do you know if your wife did?
15   A   I don't think she did.
03:20:15PM
16       Let me go back to that last question.  I
17 believe I told them when we asked for our premiums
18 back, when our attorney got our premiums back from
19 Minnesota Life, I did talk to one of their agents and
20 they said, "Well, we can't really discuss anything with
03:20:37PM
21 you because it's a legal matter.  Our two attorneys
22 have to talk."
23       And I explained to her, she asked me why did
24 I want to cancel this particular policy and why I
25 stopped payment.  And I told her the income from FIP
03:20:51PM

Page 26

1 stopped coming in and I couldn't afford the premiums.
2       But that was way after the fact.  That was
3 the only time I mentioned FIP to Minnesota Life.
4    Q   Okay.  And do you recall, was that in 2019?
5    A   I believe it was sometime in 2019.  I can't
03:21:07PM
6 recall when.  It was probably a few months before we
7 actually got the first year premium back.
8    Q   Okay.  I'm going to show you an exhibit.
9 Give me a sec to get it up on the screen.  These are
10 documents that your attorney provided to us.
03:21:54PM
11       Have you seen these documents before?
12   A   Yes, I have.  That was based on my bank
13 statement information.
14   Q   Okay.  So did you compile this document or
15 create this document?
03:22:09PM
16   A   I did.  And the backup detail was my actual
17 bank statements that showed the fifth distribution of
18 1574.88 for various number of months that are listed on
19 this particular piece of paper.
20   Q   Can you tell me -- so just so I am clear, you
03:22:39PM
21 created this document that I have put up on the screen?
22   A   That's correct.
23   Q   You didn't receive it from anybody?
24   A   I created the cash flow for that based on my
25 bank statement.  I did not create -- I don't think I
03:23:03PM

Page 27

1 created the interest, although I might have done that
2 just to justify that we would have had enough money to
3 pay the premium.
4       I believe on the second page of that, the
5 cash flow states 75,594, the interest 8500 and the
03:23:18PM
6 initial investment was 67,000.  That 67,000 came from
7 the AgeeFisherBarrett check that we had issued that was
8 cashed by somebody and invested.
9    Q   And did you create this document after you
10 began receiving payments from FIP?
03:23:41PM
11   A   I created it after it stopped so we could
12 justify where the money came from that we were
13 receiving.
14   Q   Okay.  So this date up here of 2016, that's
15 not when you created this document?
03:23:56PM
16   A   That is correct.  That was our first
17 distribution.
18   Q   Okay.  And do you know how you came upon the
19 interest rate of the payments that you were receiving?
20   A   I believe it might have been an interest rate
03:24:15PM
21 that was quoted by Mr. Dixon of six and a half percent.
22   Q   Was this after you contacted Mr. Dixon to ask
23 him what the FIP payments were?
24   A   Yes.
25   Q   Or when did he tell you what the interest
03:24:36PM

Page 28

1 payments -- interest rate would be?
2    A   After -- after I contacted him and said we
3 got a distribution starting in -- I think it was
4 October.  And I said, "Where is this money coming
5 from?"
03:24:54PM
6       And he said, "That's coming from Future
7 Income Protection."
8       And then he mentioned the interest on it of
9 six and a half percent would make up the difference in
10 my premium.  Because if you look at the second page I
03:25:03PM
11 only put in 6700.  The interest was supposed to make up
12 the cash flow to pay the future premiums.  And we never
13 got that far.
14   Q   Okay.  Do you still talk to Mr. Dixon?
15   A   I do not.  I haven't seen him.  I don't think
03:25:31PM
16 he wants to see me.
17   Q   When the payments stopped from FIP did you
18 call Mr. Dixon?
19   A   I did.  And we forced -- I want to use the
20 term "forced" because we went into his office
03:25:44PM
21 unannounced and we asked for a sit down as to where
22 these payments were and why did they stop.  At first he
23 said he didn't know, he would check into it and get
24 back to us and payments should start again shortly.
25       Another month went by and we still didn't get
03:26:02PM

Page 29

8 (Pages 26 - 29)

Page 30

1　a payment.  Contacted him again and that's when he was
2　all upset saying he didn't understand what was going
3　on.  Although I really think he knew, but he let on
4　that he didn't know.
5　　　Q   Did you have any conversations with Mr. Dixon
03:26:22PM
6　after that last one?
7　　　A   I did not.  Just that he --
8　　　Q   Did you ever --
9　　　A   He just said, "Sue me, I have enough
10　insurance to cover it."
03:26:37PM
11　　　Q   Did you ever find out what happened with FIP?
12　　　A   I did not, but later on it was all over the
13　news that a lot of people were placed under arrest for
14　a Ponzi-type scheme where Future Income Protection was
15　taking money from veterans.
03:26:57PM
16　　　And I believe that's why Chris Dixon asked me
17　early on if I had any Marine Corps disability or
18　retirement benefits.  So he knew up front what it was,
19　but I didn't know that until after the fact.
20　　　Q   How did you find your current attorney?
03:27:13PM
21　　　A   Chris Dixon actually when he said, "So sue
22　me," I said -- well, I didn't know any attorney.  He
23　recommended attorney.  And I was not going to take an
24　attorney that Chris Dixon recommended since he just
25　kind of ripped us off.
03:27:28PM

Page 31

1　　　I had gone online and I listed Future Income
2　Protection litigation and Mr. Squitieri's name, his law
3　firm, I think he was not there, it was someone else, I
4　think it was White Agency or something.  And then
5　somehow it was passed on to Mr. Squitieri.
03:27:49PM
6　　　Because I had gotten information from the
7　agent that I called and then later on I started getting
8　phone calls from Mr. Squitieri's agency and I didn't
9　understand where that came from.  I was confused
10　initially and then I found out that he was actually
03:28:09PM
11　handling the particular case.
12　　　MS. HUANG:  Okay.  Let's go off the record.
13　　　THE VIDEOGRAPHER:  Going off the record at
14　3:28 p.m.  This is the end of Media 1.
15　　　(A brief recess was taken.)
03:33:19PM
16　　　THE VIDEOGRAPHER:  We are on the record at
17　3:33 p.m.  This is the beginning of Media 4 in the
18　deposition of Rocco Cioffoletti.
19　　　MS. HUANG:  Mr. Cioffoletti, I don't have any
20　further questions for you at this moment.
03:33:33PM
21　　　I'm going to pass you to Mr. Hopkins.
22　　　THE WITNESS:  Okay.  Thank you.
23　　　　　EXAMINATION
24　BY MR. HOPKINS:
25　　　Q   Mr. Cioffoletti, did I understand you
03:33:39PM

Page 32

1　correctly when I heard you say that you have never
2　owned a Minnesota Life policy?
3　　　A   That's correct.
4　　　Q   You've never been a beneficiary under a
5　Minnesota Life policy either; is that right?
03:33:54PM
6　　　A   Other than the policy that was written for my
7　wife, no.
8　　　Q   So you are a beneficiary under your wife's
9　policy?
10　　　A   That's correct.
03:34:04PM
11　　　Q   But you were never an insured under a Minn
12　Life policy?
13　　　A   That is correct.
14　　　Q   And you personally never bought any FIP
15　products; is that right?
03:34:14PM
16　　　A   Not to my knowledge.
17　　　Q   Do you think Shurwest owes you any money?
18　　　A   I did not know who Shurwest even was, so I
19　can't comment on their involvement.
20　　　Q   When did you first learn about Shurwest?
03:34:29PM
21　　　A   When I saw that they were one of the
22　defendants along with Securian and Minnesota Life.
23　　　Q   First time that you heard the name Shurwest
24　was in a paper that you got from your lawyer?
25　　　A   That's correct.
03:34:53PM

Page 33

1　　　Q   Do you think Shurwest did anything wrong?
2　　　A   I couldn't comment on that.  I don't know
3　what their business was.
4　　　Q   You were in the Marine Corps?
5　　　A   Yes, sir.
03:35:06PM
6　　　Q   What was your MOS?
7　　　A   0331.  M60 machine gun.
8　　　Q   Those things will shake you up, won't they?
9　　　A   Bad ass.  Excuse me.
10　　　As long as you're not carrying the ammo they
03:35:19PM
11　won't.
12　　　A   Oh, no, not anymore.  That was many years
13　ago.
14　　　Q   So is it fair to say that you don't know what
15　Shurwest does as a company?
03:35:33PM
16　　　A   That's a fair statement, although since I
17　have this documentation I think they were some type of
18　marketing firm, but I don't know how they were involved
19　in any of this.  I don't know whether Chris Dixon knew
20　about them or not, but we were not privy to any
03:35:50PM
21　information about Shurwest.
22　　　Q   I understand.  Is it then, sir, fair to say
23　that whatever understanding you have about Shurwest
24　came from Mr. Squitieri's complaint?
25　　　A   That is correct.
03:36:08PM

9 (Pages 30 - 33)

**Page 34**

1    Q   Did you hear, sir, when I was talking to your
2  wife a little while ago, did you hear our exchange?
3    A   I did.
4    Q   Did your wife say anything that you disagreed
5  with in response to my questions?
03:36:42PM
6    A   I did not --
7        MR. SQUITIERI:  Objection to the question.
8    Q   BY MR. HOPKINS:  I'm sorry, sir, could you
9  repeat that?  Your lawyer was talking.
10   A   I did not -- she did not say anything wrong,
03:36:53PM
11  not that I can recall.  She just didn't have any
12  information that she could respond to.
13   Q   If I ask -- I'm trying to short circuit this,
14  sir.
15       If I asked you the same questions that I
03:37:04PM
16  asked your wife would you give substantially the same
17  answers?
18   A   I would, I wouldn't change anything.
19       MR. HOPKINS:  Pass the witness.
20       Thank you, sir.  I appreciate your time and
03:37:13PM
21  your service.
22       THE WITNESS:  You're welcome.  Thank you.
23       MR. SQUITIERI:  Okay.  Thanks, Rocco.  Thank
24  your wife for us.  And I'll give you a call once I wrap
25  up with the attorneys.  Okay?
03:37:25PM

**Page 35**

1        THE WITNESS:  Sounds good to me.
2        MR. SQUITIERI:  Thank you.
3        THE VIDEOGRAPHER:  We are going off the
4  record at 3:37 p.m.  And this concludes today's
5  testimony given by Rocco Cioffoletti.
03:37:39PM
6        The total number of media units used was two
7  and will be retained by Veritext.
8        (Exhibit 1 was marked for identification
9         and is attached hereto.)
10        (Time Noted:  3:47 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 36**

1              PENALTY OF PERJURY
2
3      I, ROCCO CIOFFOLETTI, do hereby declare under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition; that I have made such
6  corrections as noted herein, in ink, initialed by me,
7  or attached hereto; that my testimony as contained
8  herein, as corrected, is true and correct.
9
10      EXECUTED this _____ day of _____,
11  20__, at _____, _____.
              (City)            (State)
12
13
14      _____
              ROCCO CIOFFOLETTI
15        Volume I
16
17
18
19
20
21
22
23
24
25

**Page 37**

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      I, Rochelle Holmes, the undersigned, a Certified
3  Shorthand Reporter of the State of California, do
4  hereby certify:
5      That the foregoing proceedings were taken
6  before me via videoconference; that any witnesses in
7  the foregoing proceedings, prior to testifying, were
8  administered an oath; that a record of the proceedings
9  was made by me using machine shorthand which was
10  thereafter transcribed under my direction; that the
11  foregoing transcript is a true record of the testimony
12  given.
13      Further, that if the foregoing pertains to the
14  original transcript of a deposition in a Federal Case,
15  before completion of the proceedings, review of the
16  transcript [ ] was [ ] was not requested.
17      I further certify I am neither financially
18  interested in the action nor a relative or employee
19  of any attorney or any party to this action.
20      IN WITNESS WHEREOF, I have this date subscribed my
21  name.
22  Dated:  February 15, 2021
23
24      *Rochelle Holmes*
              Rochelle Holmes
25        CSR No. 9482, CCRR No. 0123

[& - asked]

**&**

**&**  3:6,18 6:20,22
7:4

**0**

**0123**  2:20 37:25
**03025**  1:4 2:4 6:11
**0331**  33:7

**1**

**1**  1:17,23 2:18
5:11 6:1,6 31:14
35:8
**1,092**  13:12
**1,574.88.**  21:11
**1,762**  13:10
**10022**  3:10
**104**  9:5
**12th**  3:9
**14,000**  14:2
**15**  22:1 37:22
**15,000**  24:25 25:9
**15,943**  25:2
**1574.88**  27:18
**16th**  3:20
**17,000**  24:23
**18**  1:4 2:4 6:11
**19**  13:14
**19,000**  14:2
**1900**  4:9
**1948**  9:3
**1972**  10:16
**1998**  20:23
**1999**  11:10,13 12:4
**19th**  9:3
**1:57**  5:11
**1st**  6:5 21:10 22:9

**2**

**20**  17:12 36:11
**2000**  10:16
**2011**  10:4

**2016**  12:13 13:16
13:18,21,22 21:10
22:9 28:14
**2017**  24:19
**2019**  24:18 27:4,5
**2021**  1:17 2:18 6:1
6:5 37:22
**2094**  7:11
**212**  3:11
**213.576.1123**  3:22
**2200**  4:9
**23,000**  16:9 25:3
**25,000**  16:12
**26**  11:20
**28**  10:4 11:22 12:5
**29631**  9:6
**2:48**  2:17 6:2,5

**3**

**31**  5:6
**32**  3:9
**333**  3:20
**34**  9:17
**35**  5:11
**360,000**  14:1
**37**  1:23
**3:28**  31:14
**3:33**  31:17
**3:37**  35:4
**3:47**  2:18 6:2
35:10

**4**

**4**  31:17
**421-6492**  3:11
**43,000**  25:5
**4439789**  1:22
**48**  9:16

**5**

**57th**  3:9

**6**

**67,000**  22:15 28:6
28:6
**6700**  29:11
**6742**  37:24

**7**

**7**  5:5
**75,594**  28:5
**75201-4629**  4:10

**8**

**8,000**  24:25 25:9
**82,000**  16:11,18
22:1 25:3
**8500**  28:5

**9**

**9/15/2016**  5:11
**90071-3004**  3:21
**9482**  1:21 2:20
37:25

**a**

**able**  23:12
**account**  14:3,5,7
21:9,16 25:1,25
**accounting**  10:19
**accrued**  16:16
**accurate**  8:12,14
8:22 16:24,25
**action**  37:18,19
**actual**  20:1 27:16
**additional**  15:16
22:20
**administered**  7:10
37:8
**admission**  14:19
**advisor**  17:10
**aeronautical**
10:11
**afford**  23:13 27:1

**afternoon**  6:4 7:15
**age**  12:6,8
**ageefisherbarrett**
22:4,11 28:7
**agency**  31:4,8
**agent**  19:11 21:10
31:7
**agents**  26:19
**ages**  9:14
**ago**  11:11 33:13
34:2
**aig**  13:11 20:7
**al**  6:8,9
**alston**  3:18 6:22
**alston.com**  3:23
**ammo**  33:10
**angeles**  3:21
**annuities**  19:15,20
20:4
**annuity**  13:11,19
20:6,8 24:12
**answer**  9:12 26:6
**answers**  7:22,24
8:13 34:17
**anybody**  10:6
26:11 27:23
**anymore**  33:12
**apart**  23:6
**appearances**  3:1,2
4:1,2
**application**  13:24
**appreciate**  34:20
**approximately**
13:25 22:15 24:21
**area**  17:14
**arrest**  30:13
**articles**  19:8
**asked**  21:18 24:4
26:17,23 29:21
30:16 34:15,16

Veritext Legal Solutions
866 299-5127

**[asking - cover]**

**asking** 12:14 15:21

**ass** 33:9

**assets** 13:1,21,23

**at&t** 11:16,21,23 12:1,6 20:22

**attached** 16:5 35:9 36:7

**attained** 10:10

**attend** 10:13

**attended** 17:17,18

**attention** 24:13

**attorney** 3:7,8,19 4:7,8 14:20,21 15:1,8 26:18 27:10 30:20,22,23 30:24 37:19

**attorneys** 26:21 34:25

**august** 22:8

**awards** 19:7

**b**

**b** 5:11

**bachelor's** 10:11

**back** 16:9,10,15 20:23 24:18 26:16 26:18,18 27:7 29:24

**background** 17:19

**backup** 15:16 27:16

**bad** 33:9

**balance** 16:11 22:3 24:25 25:10 25:24

**bank** 5:12 15:16 24:16 27:12,17,25

**based** 27:12,24

**basic** 11:2

**began** 28:10

**beginning** 2:17 31:17

**behalf** 1:4 2:4,16 6:23 7:2

**believe** 14:16 16:23 24:17 26:17 27:5 28:4,20 30:16

**beneficiary** 32:4,8

**benefit** 16:4

**benefits** 24:5 30:18

**best** 8:11

**beth** 4:18 7:6

**bird** 3:18 6:22

**birth** 9:2

**bit** 14:16 17:21 19:7 20:15,17

**black** 16:1 17:24

**bonds** 19:18

**bought** 24:12 32:14

**break** 7:20

**brief** 31:15

**briefly** 8:6

**broker** 23:21

**business** 33:3

**c**

**ca** 3:21

**california** 6:14 37:3

**call** 23:15 29:18 34:24

**called** 22:4 31:7

**calls** 14:24,25 31:8

**cancel** 26:24

**cancer** 10:4

**carolina** 9:6

**carrying** 33:10

**case** 1:4 2:4 6:11 15:7 31:11 37:14

**cash** 27:24 28:5 29:12

**cashed** 22:8,9 28:8

**ccp** 7:11

**ccrr** 37:25

**cell** 15:3

**certificate** 37:1

**certified** 2:19,20 37:1,2

**certify** 37:4,17

**change** 24:25 25:2 34:18

**check** 22:2,3,7,8,9 24:4 28:7 29:23

**checking** 21:9,16

**children** 9:7,15,18

**chris** 22:13 30:16 30:21,24 33:19

**christopher** 16:1

**cioffoletti** 1:16 2:16 5:3,11 6:7,8 6:21 7:9,15 8:24 9:22 10:2 12:21 19:1 31:18,19,25 35:5 36:3,14

**ciofoletti** 1:4 2:4

**circuit** 34:13

**city** 36:11

**clarification** 11:3

**classes** 10:19

**cleaner** 9:13

**clear** 27:20

**clemson** 9:5

**college** 12:1

**come** 24:13

**coming** 21:18 27:1 29:4,6

**comment** 32:19 33:2

**companies** 1:10 2:10 3:16 6:25

19:14,23 20:5

**company** 1:9,10 2:9,10 3:15,15 6:24,25 8:25 17:21 18:3 20:1 22:4,6,16 25:13 26:3,4 33:15

**compile** 27:14

**complaint** 33:24

**completion** 37:15

**concludes** 35:4

**confused** 31:9

**consider** 21:4

**contacted** 28:22 29:2 30:1

**contained** 36:7

**continued** 4:1

**conversation** 15:4

**conversations** 7:19 30:5

**corporations** 11:20

**corps** 24:4 30:17 33:4

**correct** 7:17,18 8:9 12:2 20:20,21 21:3 25:8 27:22 28:16 32:3,10,13 32:25 33:25 36:8

**corrected** 36:8

**corrections** 36:6

**correctly** 32:1

**counsel** 6:7,17 7:7 12:23

**country** 9:5

**course** 11:5,5 16:4

**courses** 10:22,24

**court** 1:1 2:1 6:10 6:15

**cover** 22:2,24 30:10

[covid - first]

covid   13:14
create   27:15,25
    28:9
created   27:21,24
    28:1,11,15
csr   1:21 37:25
current   12:10,12
    12:17,18 13:5,8
    30:20
currently   9:4 11:7
    12:11 13:12
cv   1:4 2:4 6:11

**d**

dallas   4:10
danielle   9:17
data   11:19
date   9:2 28:14
    37:20
dated   37:22
daughter   9:17
day   36:10
december   21:10
decide   17:9
decided   17:22
declare   36:3
deduct   13:10 25:2
defendant   4:4 6:7
    14:11
defendants   1:12
    2:12,17 3:14 6:23
    7:7 32:22
degree   10:11
deposit   21:15
deposition   1:16
    2:16 6:6,12 7:16
    7:20,23 8:2 14:14
    14:22 15:11 31:18
    36:5 37:14
description   5:10
detail   15:16 27:16

details   5:12 11:12
difference   29:9
different   19:14,23
    20:4
dinner   17:2,17
    18:12,13,17,19
dinners   17:5,17
    18:4,8,10
direction   37:10
directly   15:4
disability   24:5
    30:17
disagreed   34:4
disappeared   16:9
discuss   20:9 26:20
discussed   19:5
discussions   17:6,8
    20:5
distribution   15:17
    20:23 21:10 22:10
    25:11 27:17 28:17
    29:3
distributions   21:9
    21:12
district   1:1,2 2:1,2
    6:10,10 11:16
divide   22:18
dixon   16:1,14,19
    17:2,7,9 18:11,19
    18:23 19:16 20:9
    21:21 22:13,14
    23:15 25:17 28:21
    28:22 29:14,18
    30:5,16,21,24
    33:19
dla   4:6 7:1
dlapiper.com   4:11
    4:12
document   27:14
    27:15,21 28:9,15

documentation
    14:15 33:17
documents   15:5,7
    15:10,13,14,15,18
    27:10,11
dollars   25:22
drawing   14:2,2
duly   7:10

**e**

e   3:9
earlier   7:16
early   30:17
earning   23:23
    25:21
ecw   1:5 2:5 6:11
education   10:9
edward   13:22 14:1
    14:5 16:13
effect   12:13
either   9:18 32:5
eleanor   1:4 2:4
    5:11 6:8
electives   11:2
electric   12:2
emails   14:24
employee   37:18
employees   11:20
ended   12:9 20:7
engineered   11:19
engineering   10:12
erwin's   17:12
et   6:8,9
examination   5:2
    7:13 31:23
examined   7:11
exchange   34:2
excuse   24:3 33:9
executed   36:10
exhibit   5:11 27:8
    35:8

exhibits   5:9
expect   8:11
explain   22:5 25:18
explained   26:23

**f**

face   14:24,24
fact   17:4 27:2
    30:19
fair   33:14,16,22
far   29:13
fearon   3:6 6:20
    7:5
february   1:17
    2:18 6:1,5 24:18
    24:19 37:22
federal   37:14
feel   26:8
felt   25:23
fifth   27:17
filed   6:10
finance   10:20,22
    10:24 17:14
financial   1:8 2:8
    3:14 6:9,23 17:10
    20:9
financially   37:17
find   30:11,20
finish   9:11,12
fip   21:7,10,16
    22:10,12 23:14,15
    24:10,15,22,25
    25:5,11,12,17 26:2
    26:12,25 27:3
    28:10,23 29:17
    30:11 32:14
firm   6:13,15 17:25
    31:3 33:18
first   9:12 12:1
    14:24 16:10 17:13
    21:7,8,20 22:3
    24:24 25:6,10

[first - justify]

27:7 28:16 29:22
32:20,23
**five**  18:25
**fletcher**  3:8 7:4
**floor**  3:9,20
**flow**  27:24 28:5
29:12
**follows**  7:11
**forced**  29:19,20
**foregoing**  36:4
37:5,7,11,13
**forever**  20:12
**found**  24:7 31:10
**four**  18:24 21:24
**free**  18:16
**front**  30:18
**funds**  19:19 25:18
**further**  31:20
37:13,17
**future**  16:8 21:19
23:16 24:9 25:14
29:6,12 30:14
31:1

**g**

**gathered**  15:6
**generate**  19:21
**generated**  25:19
**generating**  26:9
**getting**  20:7 21:9
22:10 24:16 25:16
31:7
**give**  27:9 34:16,24
**given**  14:15 17:12
35:5 37:12
**gives**  23:21
**giving**  16:18
**go**  8:6 11:12 18:14
22:16 26:16 31:12
**goals**  20:9,10,14
20:14,16

**going**  6:5 13:3
16:7 17:2,23
21:12 22:14,19,19
22:22,25 23:9
25:4 26:1 27:8
30:2,23 31:13,21
35:3
**good**  6:4 7:15 35:1
**gotten**  19:11 31:6
**graduate**  10:15,17
**ground**  8:5
**group**  1:8 2:8 3:14
6:9,23
**gun**  33:7

**h**

**half**  28:21 29:9
**handling**  31:11
**hanging**  19:7
**happened**  30:11
**harbor**  16:1 17:24
**head**  23:24
**hear**  10:5 21:7
34:1,2
**heard**  8:5 15:4
21:8,16,20 32:1,23
**held**  6:12
**helen**  10:2,3,7
**hello**  7:6
**hereto**  35:9 36:7
**high**  11:25
**highest**  10:9
**hold**  12:20,20
**holmes**  1:20 2:19
6:15 37:2,24
**home**  26:12
**hope**  3:20 16:15
**hoping**  16:10
**hopkins**  4:7 5:6
7:1,1 31:21,24
34:8,19

**host**  17:3
**house**  7:7
**huang**  3:19 5:5
6:22,22 7:14 11:4
12:14,24 13:6,15
26:6 31:12,19
**hundred**  25:22

**i**

**idea**  12:24 25:12
**identification**  35:8
**identify**  6:18
**include**  13:19
**included**  13:24
**income**  12:10,17
12:18 13:1,5,6,8
13:18 16:3,8
19:21 20:18,20,22
21:19 23:17 24:6
24:9,11 25:14,21
26:9,25 29:7
30:14 31:1
**incorporated**  6:9
**independent**  26:3
26:7
**index**  5:1
**information**  17:19
24:7 27:13 31:6
33:21 34:12
**initial**  25:3 28:6
**initialed**  36:6
**initially**  14:6
31:10
**ink**  36:6
**institute**  10:14,25
**insurance**  1:9,10
2:9,10 3:15,15
6:24,25 8:25 16:2
16:4,16 18:3 19:9
19:14,14,20,23
20:1,4 21:4,25
22:16 23:7,8 25:7

26:4 30:10
**insured**  32:11
**interest**  22:22,23
28:1,5,19,20,25
29:1,8,11
**interested**  37:18
**intermediate**  22:6
**interrogatories**
14:18
**invest**  16:19 19:6
19:17 23:1
**invested**  16:11,14
22:17 25:20,22
28:8
**investment**  15:25
18:7 20:2 22:23
23:6,10,11,25 25:3
28:6
**investments**  13:22
**invitations**  17:11
**involved**  17:13
18:1 33:18
**involvement**  32:19
**ira**  16:13
**issued**  28:7

**j**

**j**  3:19
**january**  9:3
**jason**  4:7 7:1
**jason.hopkins**
4:11
**jne**  1:4 2:4 6:11
**job**  1:22 12:1
**jobs**  11:24
**joint**  14:7
**jones**  13:23 14:1,5
16:13
**judge**  8:9
**jury**  8:9
**justify**  28:2,12

[karwinski - number]

**k**

**karwinski**  10:2
**kathy**  3:19 6:22
**kathy.huang**  3:23
**kept**  25:1
**kevorkian**  4:16
  6:13
**kind**  17:23 23:11
  23:25 30:25
**knew**  26:7,8 30:3
  30:18 33:19
**know**  11:10 12:24
  21:17,18 22:4
  23:2 24:7,21
  25:15,25 26:14
  28:18 29:23 30:4
  30:19,22 32:18
  33:2,14,18,19
**knowledge**  32:16
**knowledgeable**
  17:14

**l**

**lane**  9:5
**larry**  1:4 2:4
**law**  31:2
**lawsuit**  14:9,11
  15:23,25 16:6
**lawyer**  32:24 34:9
**learn**  32:20
**lee**  3:7,12 6:19
**left**  23:23
**legal**  26:21
**level**  10:9
**life**  1:9,9 2:9,9
  3:14,15 6:24,24
  8:25 16:2,4,16
  18:2 19:9,24,25
  21:4,25 22:2,16
  23:7,8 25:7 26:4,8
  26:8,19 27:3 32:2

32:5,12,22
**life's**  21:13 26:11
**limiting**  13:4
**listed**  13:23 19:8
  27:18 31:1
**listened**  15:3
**litigation**  31:2
**little**  20:14,17 34:2
**live**  9:4,18
**living**  17:20
**llc**  1:10 2:10
**llp**  3:6
**located**  6:14
**long**  9:21 10:3
  11:11,21 17:19
  33:10
**look**  29:10
**looked**  15:5
**looking**  12:6 15:14
  17:10
**los**  3:21
**loss**  25:5
**lost**  16:7
**lot**  30:13
**lump**  20:22

**m**

**m60**  33:7
**machine**  33:7 37:9
**magazine**  19:8
**magic**  12:8,9
**mailed**  17:11
**major**  11:19
**management**  16:2
  17:25
**manager**  11:16
**manner**  16:14
**marina**  4:8 7:3
**marina.stefanova**
  4:12
**marine**  24:4 30:17
  33:4

**marked**  35:8
**marketing**  33:18
**marriage**  16:24
**married**  9:21,24
  10:1,3,6,7 14:7
**matter**  6:8 17:4
  26:21
**mean**  10:21 15:2,3
  20:16
**means**  22:13
**meant**  21:17,24
**media**  6:6 31:14
  31:17 35:6
**medicare**  13:10
**medications**  8:18
  8:20
**meet**  14:21 17:9
  18:22
**meeting**  17:7
**meetings**  19:2,5
  20:10
**memory**  8:13
**mention**  18:5 20:5
**mentioned**  18:2
  20:7 27:3 29:8
**met**  18:10,12,13
  18:19
**michael**  9:16
**mine**  13:24 14:6
**minn**  32:11
**minnesota**  1:2,9
  1:10 2:2,9,10 3:14
  3:16 6:11,24,25
  8:25 18:2 19:9,23
  19:25 21:13,25
  22:2,16 23:7,8
  25:7 26:4,7,8,11
  26:19 27:3 32:2,5
  32:22
**mistake**  18:16

**moment**  31:20
**monday**  1:17 2:18
**money**  15:25
  16:19,20,21,23
  17:21,23 19:6,17
  22:12,17,19,21
  23:1,18,22 24:8,10
  25:16,20,24 28:2
  28:12 29:4 30:15
  32:17
**monies**  16:6,9 25:7
**month**  13:11,12
  24:17 29:25
**monthly**  5:12
  21:12
**months**  22:7,10
  27:6,18
**moore**  3:8 7:4,4
**mos**  33:6
**moved**  25:20
**mutual**  1:10 2:10
  3:16 6:25 19:10
  19:19

**n**

**n**  4:9
**name**  6:13 31:2
  32:23 37:21
**names**  9:9,14
**need**  20:18
**needed**  20:13 23:9
  24:11
**neither**  37:17
**net**  12:25
**networks**  11:19
**never**  21:16 23:12
  29:12 32:1,4,11,14
**new**  3:10 10:14,25
**news**  30:13
**noted**  35:10 36:6
**number**  5:10 12:8
  12:9 27:18 35:6

Page 5

**[numerous - read]**

**numerous** 14:23
  17:11
**ny** 3:10

**o**

**oath** 7:10 8:8,8
  37:8
**objected** 7:25
**objection** 26:5
  34:7
**observing** 7:2
**occupation** 11:14
**october** 29:4
**odd** 11:24
**offering** 12:7
**office** 18:13,20,23
  26:12 29:20
**oh** 24:3,18 33:12
**okay** 12:4 13:7
  14:8 15:22 18:18
  20:3,25 22:25
  23:5,14 25:12
  26:7 27:4,8,14
  28:14,18 29:14
  31:12,22 34:23,25
**once** 34:24
**online** 31:1
**opened** 17:20,24
**opportunities** 18:7
**opposed** 12:12
**options** 19:17
**order** 23:10
**original** 22:1,23
  37:14
**owes** 32:17
**owned** 8:24 18:1
  32:2

**p**

**p.m.** 2:17,18 5:11
  6:2,2,5 31:14,17
  35:4,10

**package** 12:7
**page** 5:2,10 28:4
  29:10
**pages** 1:23
**paid** 16:12
**paper** 27:19 32:24
**paperwork** 18:25
**part** 24:23 25:9
**particular** 13:24
  14:3 16:7 17:25
  18:13 24:6 26:24
  27:19 31:11
**party** 37:19
**pass** 31:21 34:19
**passed** 10:4 31:5
**pay** 21:13,24
  22:20,22 23:10
  24:24 25:10 26:9
  28:3 29:12
**payment** 22:23
  23:14 24:20 25:6
  26:25 30:1
**payments** 16:22
  21:1,23 24:14,22
  26:12 28:10,19,23
  29:1,17,22,24
**payout** 25:1
**pearl** 4:9
**penalty** 36:1,4
**pension** 20:24
**people** 17:12
  25:19 30:13
**percent** 28:21 29:9
**perjury** 36:1,4
**person** 14:23
  18:11,19
**personally** 32:14
**pertains** 37:13
**phoenix** 19:10
**phone** 14:23 15:2
  15:3 31:8

**piece** 27:19
**piper** 4:6 7:1
**placed** 30:13
**plaintiff** 1:6 2:6
  6:21 7:5 14:8
**plaintiffs** 3:4 6:20
**please** 6:18
**plus** 24:25
**point** 24:13
**policies** 19:20 20:4
**policy** 8:25 12:13
  16:2,16 20:1 21:5
  21:25 22:24 23:7
  23:8,10,12 25:7
  26:10,24 32:2,5,6
  32:9,12
**ponzi** 30:14
**pool** 25:18
**possible** 19:20
**postcard** 17:1
**premium** 16:10
  21:24 22:3,18,20
  24:24 25:3,6,10
  27:7 28:3 29:10
**premiums** 21:13
  22:24 23:10 26:9
  26:17,18 27:1
  29:12
**preparation** 14:22
  15:11
**prepare** 14:13
**present** 4:18 6:17
  7:16 19:1,22
**presentation**
  17:16
**presentations**
  17:15 18:3,6
**presented** 19:16
  20:1
**prevent** 8:19

**previous** 10:6
  16:24
**previously** 9:24
  21:16
**prior** 37:7
**privy** 33:20
**probably** 27:6
**proceed** 13:4
**proceedings** 37:5
  37:7,8,15
**production** 14:20
**products** 19:14,22
  32:15
**proper** 12:6
**protection** 16:8
  21:19 23:17 24:9
  25:15 29:7 30:14
  31:2
**provide** 8:11,14
**provided** 15:7
  27:10
**purchase** 16:2
**put** 16:1 24:8,10
  25:24 27:21 29:11
**putting** 22:21

**q**

**quarters** 22:2
**question** 7:25 9:11
  9:12 12:15 13:4
  26:6,16 34:7
**questioning** 13:4
**questions** 12:14
  31:20 34:5,15
**quite** 14:16 17:21
  18:24 19:7
**quoted** 28:21

**r**

**rate** 28:19,20 29:1
**read** 36:4

Page 6

**really** 8:6 26:20 30:3
**realtime** 2:20
**reason** 8:21 11:11
**recall** 11:4 13:21 17:1,16 18:2 24:1 24:3 27:4,6 34:11
**receive** 27:23
**received** 14:20 23:14 24:22
**receiving** 12:25 17:1 21:15 24:14 26:12 28:10,13,19
**recess** 31:15
**recollection** 8:12 19:4
**recommended** 25:23 30:23,24
**record** 6:5,18 9:13 31:12,13,16 35:4 37:8,11
**recorded** 1:15 6:6
**recover** 16:6
**reduce** 12:6
**referenced** 16:18
**refunded** 25:4
**relative** 37:18
**relevance** 12:16
**relevant** 15:6
**remote** 3:2 4:2
**repeat** 34:9
**reported** 1:20
**reporter** 2:19,20 6:15 11:3 37:1,3
**request** 14:19
**requested** 37:16
**requests** 14:19
**respond** 7:25 34:12
**response** 34:5

**responsibilities** 11:17
**responsible** 11:20
**rest** 23:18
**retained** 35:7
**retire** 11:9 12:4
**retired** 11:8,10,15 20:12
**retirement** 16:3 20:10,19,22 24:5 30:18
**retiring** 12:9
**review** 37:15
**reviewed** 14:15 15:11
**rick** 17:12
**right** 8:13 13:3,5 20:18 24:11 32:5 32:15
**ripped** 30:25
**rocco** 1:4,16 2:4 2:16 5:3 6:7,8,21 7:9 31:18 34:23 35:5 36:3,14
**rochelle** 1:20 2:19 37:2,24
**role** 11:18
**row** 19:12
**rules** 8:5
**run** 23:11

**s**

**safe** 25:23
**salary** 12:25
**salesman** 19:9
**saw** 32:21
**saying** 30:2
**scheme** 30:14
**school** 10:22,25 11:25
**screen** 27:9,21

**sec** 27:9
**second** 18:18 28:4 29:10
**secondary** 16:4
**securian** 1:8,9 2:8 2:9 3:14,15 6:9,23 6:24 7:7 32:22
**security** 12:19 13:9,20 14:4 20:13 21:1
**see** 5:12 24:17 29:16
**seen** 27:11 29:15
**sent** 18:15,15,16
**separate** 23:6
**september** 22:9
**service** 12:5,8 34:21
**seven** 9:23
**sfclasslaw.com** 3:12
**shake** 33:8
**shelley** 6:15
**shook** 23:24
**short** 20:14 34:13
**shorthand** 2:19 37:1,3,9
**shortly** 29:24
**show** 15:17 27:8
**showed** 18:17,17 27:17
**shows** 23:22
**shurwest** 1:10 2:10 4:4 7:2 32:17 32:18,20,23 33:1 33:15,21,23
**signature** 37:24
**signed** 18:14,25
**similarly** 1:5 2:5
**sir** 33:5,22 34:1,8 34:14,20

**sit** 29:21
**situated** 1:5 2:5
**six** 28:21 29:9
**small** 13:11
**social** 12:18 13:9 13:19 14:3 20:13 21:1
**sold** 19:13
**solely** 14:5
**somebody** 25:24 28:8
**son** 9:10,16
**sons** 18:1
**sorry** 10:5 34:8
**soseh** 4:16 6:13
**sounds** 35:1
**sources** 12:10 13:6 13:18
**south** 3:20 9:5
**speak** 18:14
**specifically** 7:24 10:21 18:5
**squitieri** 3:6,7 6:19,19,20 7:4 12:12,16,20,23 13:3,7 26:5 31:5 34:7,23 35:2
**squitieri's** 31:2,8 33:24
**start** 29:24
**started** 21:9 22:10 31:7
**starting** 29:3
**state** 36:11 37:3
**statement** 23:21 23:22 27:13,25 33:16
**statements** 14:19 15:17 24:16 27:17
**states** 1:1 2:1 6:10 28:5

[steak - wiederholt]

| | | | |
|---|---|---|---|
| **steak** 18:16 | **tell** 9:14 15:20,23 | **top** 19:8,11 | **v** |
| **stefanova** 4:8 7:3 | 19:4,16 24:2 | **topanga** 6:14 | **various** 18:6 19:6 |
| **stockmarket** | 26:11 27:20 28:25 | **total** 13:23 24:23 | 19:19 27:18 |
| 17:22 | **term** 16:7 20:14 | 35:6 | **veritext** 6:13,16 |
| **stocks** 19:18 | 25:5 29:20 | **transcribed** 37:10 | 35:7 |
| **stop** 29:22 | **terms** 19:17 | **transcript** 36:5 | **versus** 6:9 |
| **stopped** 24:14 | **test** 8:13 | 37:11,14,16 | **veterans** 30:15 |
| 26:25 27:1 28:11 | **testified** 7:11 | **tried** 25:18 | **video** 1:15 6:6 |
| 29:17 | **testify** 8:22 | **true** 36:8 37:11 | **videoconference** |
| **stospal** 1:4 2:4 | **testifying** 8:19 | **truthful** 8:15 | 1:15 2:17 37:6 |
| **street** 3:9,20 4:9 | 37:7 | **truthfully** 8:19,22 | **videographer** 4:16 |
| **subscribed** 37:20 | **testimony** 8:7,12 | **try** 16:6 | 6:4,14 31:13,16 |
| **subsidize** 14:3 | 8:15 35:5 36:7 | **trying** 34:13 | 35:3 |
| **substantially** | 37:11 | **two** 9:8 10:16 | **volume** 1:18 5:4 |
| 34:16 | **thank** 31:22 34:20 | 16:21 17:4,17 | 36:15 |
| **substitute** 13:13 | 34:22,23 35:2 | 18:8,10 21:13,24 | **vs** 1:7 2:7 |
| 13:15 21:2 | **thanks** 34:23 | 26:21 35:6 | |
| **sue** 30:9,21 | **things** 33:8 | **tx** 4:10 | **w** |
| **suite** 4:9 | **think** 8:21 18:8,15 | **type** 30:14 33:17 | **walk** 9:5 |
| **sum** 20:22 | 19:9,10 22:11 | **types** 19:20 20:4 | **walls** 19:7 |
| **supermarket** | 26:15 27:25 29:3 | | **want** 13:25 20:12 |
| 11:24 | 29:15 30:3 31:3,4 | **u** | 26:24 29:19 |
| **supplement** 20:13 | 32:17 33:1,17 | **unannounced** | **wanted** 20:19,25 |
| 20:19,25 | **thought** 15:6 | 29:21 | 24:7,8 |
| **supposed** 29:11 | **thousand** 25:22 | **undersigned** 37:2 | **wants** 29:16 |
| **sure** 12:22 | **three** 21:14,24 | **understand** 8:7,10 | **way** 9:13 22:11 |
| | 22:2,20 | 8:16,17 26:2 30:2 | 27:2 |
| **t** | **time** 6:17 11:11 | 31:9,25 33:22 | **ways** 19:6 |
| **take** 8:8 10:19 | 12:3 14:1 16:17 | **understanding** | **we've** 8:5 14:23 |
| 23:12 24:18 30:23 | 18:18 21:8 24:6 | 19:13 33:23 | **wealth** 16:2 17:24 |
| **taken** 2:16 6:7 8:2 | 27:3 32:23 34:20 | **understood** 22:25 | **welcome** 34:22 |
| 31:15 37:5 | 35:10 | 23:5 | **went** 14:18 17:4 |
| **talk** 19:19 26:19 | **timely** 16:14 | **unit** 6:6 | 18:8,12,18 22:1,3 |
| 26:22 29:14 | **times** 18:22,24 | **united** 1:1 2:1 6:10 | 23:18 29:20,25 |
| **talking** 17:2 20:3 | **today** 7:16 8:7,19 | **units** 35:6 | **western** 12:2 |
| 34:1,9 | 8:22 9:19 15:18 | **university** 10:13 | **whereof** 37:20 |
| **taxes** 16:12 | **today's** 14:13,22 | **upset** 30:2 | **whispering** 7:22 |
| **teach** 13:13,15 | 15:11 35:4 | **use** 16:7 25:4 | **white** 31:4 |
| **teacher** 21:2 | **told** 23:16 26:17 | 29:19 | **wiederholt** 4:18 |
| **technology** 10:14 | 26:25 | | 7:6,6 |
| 11:1 | | | |

Veritext Legal Solutions
866 299-5127

**[wife - zoom]**

| wife  7:19,22 8:6 | z |
|---|---|
| 14:17,25 15:14,15 | **zoom**   3:2 4:2 6:12 |

| wife  7:19,22 8:6 | z |
|---|---|
|    14:17,25 15:14,15 | **zoom**   3:2 4:2 6:12 |
|    16:1 17:6 20:11 | |
|    22:15 23:17 24:14 | |
|    25:4,21 26:14 | |
|    32:7 34:2,4,16,24 | |
| **wife's**   7:16 13:25 | |
|    16:12,19,21 20:14 | |
|    20:16 21:13,25 | |
|    23:1,7 25:6,24 | |
|    32:8 | |
| **wish**   10:16 | |
| **witness**   5:2 6:21 | |
|    12:18,22 13:9 | |
|    31:22 34:19,22 | |
|    35:1 37:20 | |
| **witnesses**   37:6 | |
| **words**   15:24 | |
| **work**   10:17 11:21 | |
|    11:23 20:12 | |
| **workforce**   12:6 | |
| **working**   11:7,23 | |
|    11:24 20:11 | |
| **worth**   12:25 | |
| **wrap**   34:24 | |
| **written**   22:8 32:6 | |
| **wrong**   8:13 33:1 | |
|    34:10 | |
| **wrote**   24:3 | |

| y | |
|---|---|
| **year**   10:15 11:9 | |
|    13:13 14:3 16:10 | |
|    19:11 21:13 22:3 | |
|    27:7 | |
| **year's**   24:24 25:10 | |
| **years**   9:23 10:4 | |
|    11:22 12:5,8 | |
|    19:11 21:24 22:20 | |
|    33:12 | |
| **york**   3:10 10:14 | |
|    10:25 | |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT B

1           UNITED STATES DISTRICT COURT
2            DISTRICT OF MINNESOTA
3
4   ELEANOR AND ROCCO CIOFOLETTI,     )   Case No.
    and LARRY STOSPAL, on behalf of   )   18-cv-03025-JNE-
5   themselves and all others         )   ECW
    similarly situated,               )
6                                     )
             Plaintiff,               )
7                                     )
    vs.                               )
8                                     )
    SECURIAN FINANCIAL GROUP, INC.,   )
9   MINNESOTA LIFE INSURANCE          )
    COMPANY, SECURIAN LIFE            )
10  INSURANCE COMPANY, SHURWEST LLC   )
    and MINNESOTA MUTUAL COMPANIES,   )
11  INC.,                             )
                                      )
12           Defendants.              )
    _____)
13
14
15          VIDEO-RECORDED VIDEOCONFERENCE
16         DEPOSITION OF ELEANOR CIOFFOLETTI
17            Monday, February 1, 2021
18                  Volume I
19
20
21  Reported by:
    ROCHELLE HOLMES
22  CSR No. 9482
23  Job No. 4439789
24  PAGES 1 - 61
25

                                         Page 1

1     UNITED STATES DISTRICT COURT
2        DISTRICT OF MINNESOTA
3
4  ELEANOR AND ROCCO CIOFOLETTI,   )   Case No.
   and LARRY STOSPAL, on behalf of )   18-cv-03025-JNE-
5  themselves and all others       )   ECW
   similarly situated,             )
6                                  )
             Plaintiff,            )
7                                  )
   vs.                             )
8                                  )
   SECURIAN FINANCIAL GROUP, INC., )
9  MINNESOTA LIFE INSURANCE        )
   COMPANY, SECURIAN LIFE          )
10 INSURANCE COMPANY, SHURWEST LLC )
   and MINNESOTA MUTUAL COMPANIES, )
11 INC.,                           )
                                   )
12       Defendants.               )
   _____ )
13
14
15
16    Deposition of ELEANOR CIOFFOLETTI, taken on behalf
17 of Defendants, via videoconference, beginning at 1:00
18 p.m. and ending at 2:45 p.m. on Monday,
19 February 1, 2021, before ROCHELLE HOLMES, Certified
20 Shorthand Reporter No. 9482, Certified Realtime Reporter
21 No. 0123.
22
23
24
25

1  APPEARANCES (CONTINUED):
2  (ALL APPEARANCES REMOTE VIA ZOOM)
3
4  For Defendant Shurwest:
5
6     DLA PIPER
7     BY:  JASON HOPKINS, ATTORNEY
8        MARINA STEFANOVA, ATTORNEY
9     1900 N. Pearl Street, Suite 2200
10    Dallas, TX  75201-4629
11    Jason.Hopkins@dlapiper.com
12    Marina.stefanova@dlapiper.com
13
14
15
16 VIDEOGRAPHER:  SOSEH KEVORKIAN
17
18
19
20
21
22
23
24
25

1  APPEARANCES:
2  (ALL APPEARANCES REMOTE VIA ZOOM)
3
4  For Plaintiffs:
5
6     SQUITIERI & FEARON, LLP
7     BY:  LEE SQUITIERI, ATTORNEY
8        FLETCHER MOORE, ATTORNEY
9     32 E. 57th Street, 12th Floor
10    New York, NY 10022
11    (212) 421-6492
12    lee@sfclasslaw.com
13
14
15 For Defendants Securian Financial Group, Minnesota Life
16 Insurance Company, Securian Life Insurance Company and
17 Minnesota Mutual Companies:
18
19    ALSTON & BIRD
20    BY:  KATHY J. HUANG, ATTORNEY
21    333 South Hope Street, 16th Floor
22    Los Angeles, CA 90071-3004
23    213.576.1123
24    Kathy.huang@alston.com
25    (Appearing via videoconference.)

1              INDEX
2  WITNESS          EXAMINATION BY          PAGE
3  ELEANOR CIOFFOLETTI
4  Volume I
5          MS. HUANG              7
6          MR. HOPKINS            55
7
8
9            EXHIBITS
10 NUMBER       DESCRIPTION          PAGE
11 Exhibit 1     Minnesota Life insurance      32
12            application
13 Exhibit 2     Shurwest's life insurance      36
14 cover page
15 Exhibit 3     Life Insurance Policy        39
16            Illustration, July 18, 2016
17 Exhibit 4     Life Insurance Policy        40
18            Illustration, August 30, 2016
19 Exhibit 5     Policy Data Pages           42
20 Exhibit 6     FIP Payment Schedule         45
21 Exhibit 7     Letter, 10/11/2019           46
22
23
24
25

Page 6

1        Monday, February 1, 2021
2          1:00 p.m. - 2:45 p.m.
3
4        THE VIDEOGRAPHER:  Good morning -- good
5 afternoon.  We are going on the record at 1:00 p.m. on  01:00:14PM
6 February 1st, 2021.  This is Media Unit 1 of the
7 video-recorded deposition of Eleanor Cioffoletti, taken
8 by counsel for defendant in the matter of Eleanor and
9 Rocco Cioffoletti versus Securian Financial Group,
10 Incorporated, et al., filed in the U.S. District Court,  01:00:37PM
11 District of Minnesota.  Case No. 18-cv-03025-JNE-ECW.
12        This deposition is being held by Zoom.  My
13 name is Soseh Kevorkian from the firm Veritext and I'm
14 the videographer, located in Topanga, California.  Our
15 court reporter is Shelley Holmes, also from the firm  01:01:06PM
16 Veritext.
17        At this time will counsel and all present
18 please identify themselves for the record.
19        MR. SQUITIERI:  Good afternoon.
20 Lee Squitieri, Squitieri & Fearon, counsel for the  01:01:18PM
21 plaintiff.
22        MS. HUANG:  Good afternoon.  Kathy Huang from
23 Alston & Bird, on behalf of defendants Securian
24 Financial Group, Minnesota Life Insurance Company,
25 Securian Life Insurance Company and Minnesota Mutual 01:01:34PM

Page 7

1 Companies.
2        MR. HOPKINS:  Jason Hopkins, DLA Piper, on
3 behalf of Shurwest.  And with me observing is
4 Marina Stefanova.
5        MR. MOORE:  Fletcher Moore, Squitieri &  01:01:47PM
6 Fearon, on behalf of plaintiffs.
7
8        ELEANOR CIOFFOLETTI,
9 having been duly administered an oath in accordance
10 with CCP 2094, was examined and testified as follows:
11
12        EXAMINATION
13 BY MS. HUANG:
14    Q   Good afternoon, Mrs. Cioffoletti.  Can you
15 hear me?        01:02:21PM
16    A   Yes, I can.  Thank you.
17    Q   Great.  Thank you for being here today.
18        My name is Kathy Huang and I represent the
19 defendants Securian and Minnesota Life defendants.  And
20 I'll be asking you some questions first and Mr. Hopkins  01:02:31PM
21 will be asking some questions when I am done.
22    A   Okay.
23    Q   Can you state and spell your name for the
24 record?
25    A   Eleanor Cioffoletti.  The whole name spelled?
01:02:42PM

Page 8

1    Q   Yes, please.
2    A   E-L-E-A-N-O-R, C-I-O-F-F-O-L-E-T-T-I.
3    Q   What is your date of birth?
4    A   7/7/53.
5    Q   Where do you currently reside?        01:03:03PM
6    A   Clemson, South Carolina.
7    Q   And what is the street address?
8    A   104 Country Walk Lane.
9    Q   Do you own or rent your current residence?
10    A   Own.        01:03:21PM
11    Q   And how long have you lived there?
12    A   Seven and a half years.
13    Q   Have you ever had your deposition taken
14 before?
15    A   No.        01:03:41PM
16    Q   Okay.  So I'll go over some ground rules.
17        First of all, do you understand that your
18 testimony here today is under oath and that is the same
19 oath you would take if you were testifying in front of
20 a jury or a judge?        01:03:54PM
21    A   Yes, ma'am.
22    Q   Our goal today is to get your best
23 recollection of events, it's not a guessing game, it's
24 not a memory test.  I know your husband is next to you
25 and there may be questions where you think your husband
01:04:08PM

Page 9

1 may know the answer or recollect what went on better
2 than you did.  However, he will have the opportunity to
3 provide his testimony later on today.  This is your
4 chance to provide me with your best recollection.
5        Do you understand?        01:04:29PM
6    A   Yes, ma'am.
7    Q   Even though you're on video I will need you
8 to respond verbally, so yes, no or give your answer
9 versus nodding your head or making gestures.
10        Do you understand?        01:04:42PM
11    A   Yes, ma'am.
12    Q   Let me finish each question prior to
13 answering.  That will make for the cleanest record.
14 From time to time your counsel may lodge an objection.
15 You can answer the question unless he instructs you not
01:04:55PM
16 to.
17        Do you understand?
18    A   Yes, ma'am.
19    Q   If you don't understand a question that I'm
20 asking, please ask me to clarify.  If you do not ask me
01:05:04PM
21 to clarify my question I'm going to assume you
22 understood the question I asked.
23        Do you understand?
24    A   Yes, ma'am.
25    Q   I'm happy to take a break whenever you need01:05:17PM

3 (Pages 6 - 9)

1 to, just let me know, we can go off the record. Okay?
2   A   Thank you. Yes, ma'am.
3   Q   Are you on any medications that would prevent
4 you from testifying truthfully and accurately today?
5   A   No, ma'am.                    01:05:33PM
6   Q   Can you think of any other reason why you
7 cannot testify truthfully and accurately today?
8   A   No, ma'am.
9   Q   Let's start with some basic background
10 questions.                        01:05:51PM
11      You're married to Rocco; is that correct?
12   A   Yes, ma'am.
13   Q   And how long have the two of you been
14 married?
15   A   Seven years.                 01:06:01PM
16   Q   Do the two of you have any children?
17   A   Together? No.
18   Q   Okay. Do you have any children?
19   A   Yes.
20   Q   How many children do you have?        01:06:15PM
21   A   Two.
22   Q   And what are their names and ages?
23   A   Jennifer Casey Bates, 31;
24 Joshua Brandon Bates, 29.
25   Q   Do either or both of your children live with
01:06:37PM
                                    Page 10

1 you today?
2   A   No.
3   Q   Were you previously married before you were
4 married to Rocco?
5   A   Yes.                         01:06:49PM
6   Q   And who were you previously married to?
7   A   Richard Virgil Bates.
8   Q   And how long were you married to Mr. Bates?
9   A   13 years.
10      (Reporter clarification.)           01:07:02PM
11   Q   BY MS. HUANG: Were you previously married
12 before that?
13   A   No.
14   Q   What is the highest level of education you
15 attained?                         01:07:37PM
16   A   Two years of junior college.
17   Q   And did you graduate with a degree?
18   A   No.
19   Q   Did you graduate from high school?
20   A   Yes.                         01:07:54PM
21   Q   What year did you graduate from high school?
22   A   1971.
23   Q   When you were in junior college, what were
24 you studying?
25   A   My major was music.          01:08:06PM
                                    Page 11

1   Q   And after two years of junior college you had
2 no further education?
3   A   No.
4   Q   What is your current occupation?
5   A   Retail sales.                01:08:32PM
6   Q   Who is your employer?
7   A   Classic Jewelers.
8   Q   How long have you worked for Classic
9 Jewelers?
10   A   Just a few months.          01:08:59PM
11   Q   Where did you work prior to working for
12 Classic Jewelers?
13   A   Turners Jewelers.
14   Q   How long did you work there?
15   A   Ten years.                  01:09:09PM
16   Q   So in 2016 were you working at Turners
17 Jewelers?
18   A   Yes.
19   Q   Was your position then also retail sales for
20 Turners Jewelers?                 01:09:23PM
21   A   Yes, ma'am.
22   Q   Can you tell me your responsibilities as a
23 retail salesperson?
24   A   I was selling jewelry, anywhere from silver
25 to diamonds.                      01:09:40PM
                                    Page 12

1   Q   Would Turners Jewelers and Classic Jewelers
2 be considered fine jewelry purveyors?
3   A   Yes.
4   Q   Where did you work before Turners Jewelers?
5   A   Community First Bank.        01:10:02PM
6   Q   And how long did you work at Community First
7 Bank?
8   A   Five years.
9   Q   What was your position when you were at
10 Community First Bank?              01:10:16PM
11   A   Teller/head teller/teller.
12   Q   Would it be accurate to say you worked there
13 from 2005 to around 2010?
14   A   It was actually 2000 -- 2005 to 2012, so a
15 little bit over.                  01:10:59PM
16   Q   Okay. And where did you work before
17 Community First Bank?
18   A   Eckerd Drug.
19   Q   What position did you have there?
20   A   Assistant store manager/store manager.   01:11:18PM
21   Q   And how long did you work for Eckerd Drugs?
22   A   Six years.
23   Q   Do you recall where you worked before Eckerd
24 Drugs?
25   A   I was in California and I was not working. I
01:11:48PM
                                    Page 13

4 (Pages 10 - 13)

1  got married in 2004 in California and was a wife and a
2  mother.
3      Q   Is this when you were married to Mr. Bates?
4      A   Yes, ma'am.
5      Q   Do you have any background in accounting or 01:12:08PM
6  finance?
7      A   Just banking.
8      Q   Is Community First Bank the only bank that
9  you worked at?
10     A   Yes, ma'am.                    01:12:40PM
11     Q   What did you do to prepare for today's
12  deposition?
13     A   I just read the -- a little bit of the
14  material that our attorney sent us via email.
15     Q   Did you speak with your attorney over the  01:13:03PM
16  telephone or meet with him in person?
17     A   We spoke with him over the phone.
18     Q   And how many times did you speak with him?
19     A   Once.
20     Q   Do you recall for how long you spoke with  01:13:15PM
21  him?
22     A   It was probably about 30 minutes.  And that
23  was last week.
24     Q   Did you look through any documents other than
25  those that your attorney gave you in preparation for 01:13:31PM

Page 14

1  today's deposition?
2      A   No.
3      Q   Did you bring any documents with you today?
4      A   Yes.  I have a table full.
5      Q   Okay.  So I can't see what documents you have
   01:13:47PM
6  before you, can you just walk me through what you have
7  in front of you?
8      A   I have our original paperwork from signing
9  with Chris Dixon.  And then I have all the deposition
10  information.  And that's it.          01:14:13PM
11     Q   Okay.  And when you say you have the original
12  paperwork from signing with Chris Dixon, did you
13  provide those documents to your counsel?
14     A   I believe we did.
15     Q   Can you just briefly describe what that   01:14:35PM
16  paperwork looks like?
17     A   It's the orig -- it should be the original
18  paperwork that we signed with Chris Dixon for Minnesota
19  Life.  Yeah.  Minnesota Life application.  And that's
20  it.                               01:15:07PM
21     Q   Okay.
22     A   For me.
23     Q   Did you look through all the documents that
24  you think might be relevant to your case and collect
25  them and provide them to your attorney?    01:15:18PM

Page 15

1      A   Yes.
2      Q   Have you ever been a plaintiff in a lawsuit
3  other than this one?
4      A   No.
5      Q   Have you ever been a defendant in a lawsuit?
   01:15:32PM
6      A   No.
7      Q   Can you tell me in your own words what you
8  think this lawsuit is about?
9      A   It's about getting my money back from
10  something that went sour is the best way I can say it.
   01:16:02PM
11     Q   Okay.  Have you reviewed the complaint in
12  this action?
13     A   Repeat, please?
14     Q   Have you reviewed the complaint in this
15  action?                          01:16:18PM
16     A   I believe your word was complaint?
17     Q   Yes.
18     A   Okay.
19     Q   Have you reviewed it?
20     A   A little bit.                01:16:29PM
21     Q   By "a little bit," do you mean you looked it
22  over, did you read it, what do you mean by that?
23     A   I glanced at it.
24     Q   Okay.  You mentioned a Chris Dixon, can you
25  tell me who he is?                  01:16:57PM

Page 16

1      A   He is a financial advisor for his own
2  company.
3      Q   What is the name of his company?
4      A   Black Harbor Wealth Management.
5      Q   Did you come to meet Mr. Dixon at some point?
   01:17:16PM
6      A   Yes.
7      Q   And how did you come to meet Mr. Dixon?
8      A   We received postcards in the mail for a free
9  dinner about financial information, retirement.
10     Q   Do you still have a copy of that postcard by
   01:17:55PM
11  any chance?
12     A   No.
13     Q   Did you respond to the postcard?
14     A   We did.
15     Q   And how did you respond to the postcard?  Was
   01:18:06PM
16  it by telephone, by email?
17     A   It was by telephone.
18     Q   And did the postcard ask you to call
19  Chris Dixon's offices or how did you RSVP?  Or how did
20  you respond to the postcard?         01:18:25PM
21     A   It was a phone call to reserve reservations
22  for the dinner on a certain date.
23     Q   Do you recall where that dinner was held?
24     A   It was a restaurant close by called
25  Rick Erwin's.                      01:18:48PM

Page 17

5 (Pages 14 - 17)

1    Q   Do you recall on what date that dinner was
2    held?
3    A   No.
4    Q   Was the dinner in 2016?
5    A   Yes.                        01:19:01PM
6    Q   Do you recall if it was towards the beginning
7    of 2016, the middle or the end?
8    A   I think it was in spring or summer.  I'm not
9    sure.
10   Q   Okay.  So you called the number provided on 01:19:21PM
11   the postcard and RSVP'd to go to the dinner; is that
12   correct?
13   A   Yes, ma'am.
14   Q   Did you attend that dinner by yourself or
15   with Rocco?                     01:19:35PM
16   A   With Rocco.
17   Q   Do you recall how many people were at this
18   dinner, approximately?
19   A   Probably 20.
20   Q   Was there a private room for this dinner? 01:19:54PM
21   A   Yes.
22   Q   Can you tell me what went on during the
23   dinner?  Were there any presentations?  Did somebody
24   speak?
25   A   Yes.  It was held by Chris Dixon.  He gave a
01:20:07PM

Page 18

1    little speech about himself.  And then we had dinner
2    and then he went into the program with charts.  And
3    then signed everybody up.
4    Q   When Mr. Dixon introduced himself, what did
5    he tell you?  How did he introduce himself as?   01:20:35PM
6    A   That it was his company, that he was big in
7    finance in New York.  He showed us pictures of Newsweek
8    magazines, several other publications with his face and
9    description of himself.
10   Q   What other services did you understand him to
01:21:06PM
11   be providing?
12   A   Retirement.
13   Q   Retirement planning?
14   A   Yes, ma'am.
15   Q   You said he gave a presentation.  Can you  01:21:20PM
16   tell me a little bit more about this presentation that
17   he gave?
18   A   It was explaining if you had X amount of
19   dollars and there were charts where it goes, how much
20   you could potentially earn in a certain amount of time.
01:21:34PM
21   Q   Did he have a PowerPoint presentation?
22   A   Yes.
23   Q   Did he give out brochures or any marketing
24   material?
25   A   He did, but I didn't keep it.        01:21:56PM

Page 19

1    Q   When he showed this presentation on where
2    your money could grow, do you recall what were the
3    options that he was providing people with?
4    A   It was -- I really can't recall.  But I just
5    know it was various places to put your money that would
01:22:16PM
6    be secure and grow.
7    Q   You said after his presentation he was
8    signing people up, what do you mean by that?
9    A   He had one of his assistants go around and
10   ask what date and time would be comfortable for them to
01:22:45PM
11   come in for a meeting.
12   Q   Okay.  During this presentation were there
13   any references to Minnesota Life Insurance Company?
14   A   No.
15   Q   Did you sign up for a date and time to meet 01:23:03PM
16   with Mr. Dixon?
17   A   We did.
18   Q   Do you recall when you first met with
19   Mr. Dixon that date that year?
20   A   I want to say August or September.       01:23:20PM
21   Q   Is that 2016?
22   A   Yes.
23   Q   Did you go to his offices to meet with him?
24   A   Yes.
25   Q   Were these offices the Black Harbor Wealth 01:23:40PM

Page 20

1    Management offices?
2    A   Yes.
3    Q   Was there signage that said Black Harbor or
4    any indication as to what the offices were?
5    A   Yes, ma'am.                 01:23:53PM
6    Q   And that's yes, there's signage?
7    A   Yes.
8    Q   Do you recall if it was a big office, a small
9    office or what the office looked like?
10   A   It was a small storefront in downtown Seneca.
01:24:06PM
11   Q   Was it a standalone storefront?
12   A   No.
13   Q   Was it a storefront for a larger office
14   building?
15   A   It's an old complex down there, so it's two 01:24:25PM
16   story and they just had the one story, street level.
17   Q   Okay.  And at the street level there was a
18   Black Harbor Wealth Management sign?
19   A   Yes, ma'am.
20   Q   Did you and Rocco both go together to meet 01:24:48PM
21   with Mr. Dixon that first time?
22   A   Every time, yes.
23   Q   And how many times did you meet with
24   Mr. Dixon, if you recall?
25   A   I want to say at least three times before we
01:25:02PM

Page 21

6 (Pages 18 - 21)

Page 22

1 signed any paperwork. It could have been four.
2 Q And every time you met with Mr. Dixon was it
3 in his Black Harbor Wealth Management offices?
4 A Yes, ma'am.
5 Q When you were in his offices, did you ever 01:25:20PM
6 see any signage referring to Minnesota Life Insurance
7 Company?
8 A No.
9 Q Can you tell me what you and Mr. Dixon
10 discussed at your first meeting? 01:25:36PM
11 A Well, I had a certain amount of money from my
12 previous marriage and Rocco had a certain amount of
13 money from his. And so Chris was discussing with us,
14 with me, where I would best be suited and safe to put
15 my money. And that's where he would be putting his --
01:26:09PM
16 that's where he put his wife's money. So he felt that
17 if it was safe enough for his wife, it would be safe
18 enough for me.
19 Q Do you recall approximately how much money
20 you had at that point that you were discussing with 01:26:28PM
21 Mr. Dixon?
22 MR. SQUITIERI: Object to the form of the
23 question.
24 Mrs. Cioffoletti, you can answer to the
25 extent of how much you were considering investing, do01:26:40PM

Page 23

1 not give out your financial information about your
2 total net worth or liquid assets for this question,
3 please.
4 Thank you.
5 THE WITNESS: Can you repeat the question, 01:26:55PM
6 please?
7 Q BY MS. HUANG: Sure. When you and Mr. Dixon
8 were discussing what to do with some of the money that
9 you had, my question is, approximately how much in
10 funds did you have that you were discussing with 01:27:11PM
11 Mr. Dixon?
12 A It was around 80,000.
13 Q Was that the money from your previous
14 marriage?
15 A Yes. 01:27:24PM
16 Q Do you recall -- I think you said that Rocco
17 was also discussing putting some of his money with
18 Mr. Dixon, do you recall how much he was thinking about
19 putting with Mr. Dixon?
20 A I'm not sure. 01:27:39PM
21 Q So what did Mr. Dixon tell you about where
22 you should put your money?
23 A Well, after all the conversations that we
24 had, he said Minnesota Life would be the best and I
25 would be putting in a certain amount every month. I'm
01:28:02PM

Page 24

1 a little hazy on that part. I would be putting in a
2 certain amount and then after three years I would be
3 getting a certain amount.
4 Q Was this in a life insurance policy?
5 A This was with Minnesota Life, yes. 01:28:33PM
6 Q And was this part of your retirement planning
7 strategy?
8 A Yes.
9 Q When Mr. Dixon suggested that you put your
10 money in a life insurance policy, did he provide you 01:28:55PM
11 with different companies and their products or just
12 Minnesota Life?
13 A No. Just Minnesota Life.
14 Q Did he tell you anything about Minnesota
15 Life? 01:29:14PM
16 A He did, but I don't remember. I'm being
17 honest. I don't get involved in that stuff. I just
18 wanted it safe.
19 Q So you don't recall if there was a reason
20 that he suggested a Minnesota Life insurance policy? 01:29:39PM
21 A The only thing that really sticks in my head
22 is that that's what he was putting his wife's in and he
23 felt secure enough with that that he would pass it on
24 to me. Because we didn't want to get stuck in a
25 situation like rolled gold or whatever it was that went
01:30:00PM

Page 25

1 under where they took everybody's money and nobody
2 recouped anything.
3 Q Do you recall when in your three or four
4 meetings with Mr. Dixon he suggested the Minnesota Life
5 insurance policy? 01:30:21PM
6 A It was probably the third or fourth when we
7 decided that we were convinced that that was the way to
8 go.
9 Q Okay. And in that first couple of meetings,
10 what were those meetings about? 01:30:38PM
11 A Just trying to figure out where best to put
12 my money.
13 Q Did you and Mr. Dixon talk about your
14 financial goals or retirement goals?
15 A Not really. I just wanted my money in a 01:30:52PM
16 safe, secure place that I could comfortably live if
17 something should happen to Rocco or myself. And that
18 my kids would be taken care of and my grandkids.
19 Q During those meetings before you decided upon
20 a Minnesota Life insurance policy, did Mr. Dixon 01:31:22PM
21 present other products or suggest other ways you could
22 invest your money?
23 A No. I think we were pretty set on Minnesota
24 Life. I don't recall hearing any other companies.
25 Q Okay. What was your impression of Mr. Dixon
01:31:47PM

7 (Pages 22 - 25)

1  in 2016 when you were meeting with him?
2      MR. SQUITIERI:  Object to the form of the
3  question.
4      You can answer.
5      THE WITNESS:  Well, we felt him out pretty 01:31:59PM
6  well and I had just come out of a situation where I had
7  been taken advantage of, so to speak, with a renter.  A
8  con artist is more like it.  So we were pretty careful.
9  And he was pretty sincere.
10     And my husband grilled him and questioned him  01:32:29PM
11 and counteracted with him in regards to some of the
12 statements he made.  And he just didn't want me to get
13 hurt.
14     Q   Did you do any online research about
15 Mr. Dixon?                          01:32:53PM
16     A   No.
17     Q   Did you ask any of your friends if they knew
18 Mr. Dixon or had any impression about his reputation?
19     A   No.
20     Q   Do you have any other friends who use  01:33:08PM
21 Mr. Dixon for their retirement or financial planning
22 services?
23     A   No.
24     Q   You said that you had just gotten out of a
25 situation where you were taken advantage of by a  01:33:24PM

Page 26

1  renter.
2      Can you explain that a little bit more?
3      A   Before Rocco and I got married I had a home
4  in Seneca and I needed to sell it and the market was
5  not good.  So I decided to rent it.  And we'd met this  01:33:40PM
6  man several times in various situations, mostly eating
7  out or whatever, and he was from England and he said he
8  needed a place to live.  And we discussed pricing and
9  everything.  And everything was fine.
10     He ended up giving me a deposit and then not  01:34:09PM
11 paying me any rent for several months.  Then I had to
12 evict him and that became a problem.  And then he
13 rented other places from other people.  And I finally
14 got him evicted and I was the only one to get my money.
15     Q   Okay.  So going into meeting with Mr. Dixon,  01:34:32PM
16 you would say that you were pretty careful about who
17 you wanted to work with?
18     A   Yes, ma'am.
19     Q   Other than your husband grilling him and
20 being careful about his statements, did you do any  01:34:50PM
21 research about Mr. Dixon?
22     A   No, ma'am.
23     Q   Did you ever look into his company, Black
24 Harbor Wealth Management?
25     A   No.  Just the information that we saw on  01:35:08PM

Page 27

1  the -- on like the Newsweek magazine article, that he
2  was a New York stockbroker and decided to come to South
3  Carolina and open up his business.
4      Q   And that Newsweek article, is that the one
5  that he showed during the dinner and you attended -- 01:35:27PM
6      A   Yes.
7      Q   -- or did you see it in a different place?
8      A   No.  It was there and he also had it in his
9  office, in the waiting room.
10     Q   You understood that Mr. Dixon owned Black  01:35:40PM
11 Harbor Wealth Management; correct?
12     A   Yes.
13     Q   And that was his independent business?
14     A   Yes.
15         MR. SQUITIERI:  Objection.        01:36:24PM
16     Q   BY MS. HUANG:  And that business was not
17 owned or run by Minnesota Life Insurance Company, did
18 you understand that?
19     A   Yes.
20         MR. SQUITIERI:  Objection.        01:36:34PM
21     Q   BY MS. HUANG:  Did Mr. Dixon ever explain to
22 you his relationship with Minnesota Life Insurance
23 Company?
24     A   No.
25     Q   When he suggested a Minnesota Life insurance  01:36:47PM

Page 28

1  policy, did he show you any brochures or marketing
2  material about the policy he was suggesting for you?
3      A   Maybe growth, but I couldn't be definite
4  about that.
5      Q   So you can't remember if you did or did not 01:37:12PM
6  see any marketing materials or brochures on the
7  Minnesota Life insurance policy that you ended up
8  purchasing?
9      A   No, no marketing or brochures.
10     Q   So then everything that you understood about  01:37:37PM
11 your Minnesota Life insurance policy, did it come from
12 Mr. Dixon?
13     A   Yes.
14     Q   Do you recall what he told you about your
15 Minnesota Life insurance policy?  For instance, what 01:37:52PM
16 the benefits might be or what you're planning to use it
17 for?
18         MR. SQUITIERI:  Objection; compound.
19         You can answer.
20         THE WITNESS:  My only real connection was  01:38:03PM
21 after three years I would start to see a benefit.
22     Q   BY MS. HUANG:  Okay.
23     A   Every month.
24     Q   And was that benefit -- did he explain that
25 benefit would be a withdrawal from the policy in the 01:38:21PM

Page 29

8 (Pages 26 - 29)

1  form of a loan?
2     A  No.
3     Q  Did you have any understanding as to how you
4  would see a benefit after three years?
5     A  No.                              01:38:48PM
6     Q  What was your understanding as to what you
7  would be getting from the policy after three years?
8     A  I think it was around seven -- 700 a month
9  after three years.
10    Q  Okay.  So you would be receiving funds in the
01:39:06PM
11 amount of about 700 a month after three years was your
12 understanding?
13    A  Yes.
14    Q  And the purpose of that was to supplement
15 your income?                          01:39:21PM
16    A  Yes, ma'am.
17    Q  Are you familiar with a company called Future
18 Income Payments, otherwise known as FIP?
19    A  I am now.
20    Q  Well, when did you first become aware of a 01:39:50PM
21 company named FIP?
22    A  It was in the news.
23    Q  Was this recently?
24    A  No.  This was I would say year and a half,
25 maybe two years.                      01:40:18PM

Page 30

1     Q  Did Mr. Dixon ever talk to you about FIP?
2     A  No.
3     Q  So when you met with Mr. Dixon it was to
4  discuss a Minnesota Life insurance policy --
5     A  Yes.                            01:40:40PM
6     Q  -- not FIP?
7     A  No FIP.
8     Q  So just so I'm clear, was the first time you
9  learned about FIP I think you said one to two years ago
10 through the news?                     01:40:55PM
11    A  Repeat?
12    Q  Was the first time that you learned about FIP
13 approximately one to two years ago through the news?
14    A  Yes.
15    Q  And you don't have an investment with FIP? 01:41:07PM
16    A  No.
17    Q  I'm going to show you an exhibit, I'm going
18 to try to do it through screen share.  Let me know if
19 you cannot see it.  Give me a second to get it
20 uploaded.                             01:41:33PM
21       Can you see the document that I'm trying to
22 show you?
23    A  Yes.
24    Q  I think I provided this to your counsel.  I
25 don't know if you had a chance to look at it before 01:42:14PM

Page 31

1  your deposition.  I'm happy to scroll through it on the
2  screen if you'd like.
3     A  I've got it in front of me as well.
4     Q  Oh, great.  Wonderful.
5       I believe this is your Minnesota Life     01:42:28PM
6  insurance application; is that correct?
7     A  Yes, ma'am.
8       (Exhibit 1 was marked for identification
9       and is attached hereto.)
10    Q  BY MS. HUANG:  If you go to the last page, it
01:42:41PM
11 says part 3 of the application.
12    A  Uh-huh.
13    Q  Is that your signature there under "Proposed
14 insured signature"?
15    A  It is.                           01:42:57PM
16    Q  And did you fill in the date, the city and
17 state?
18    A  I did not.
19    Q  Do you recall signing this application?
20    A  Not really, but that is my signature except01:43:09PM
21 for the date and city and state.
22    Q  Okay.  Do you recall discussing this
23 application with Mr. Dixon?
24    A  Not really.
25    Q  Let's go to the first page.         01:43:33PM

Page 32

1     A  Okay.
2     Q  It says that your occupation is sales in
3  2016.
4       Was that accurate?
5     A  Yes.                            01:43:47PM
6     Q  It says that your earned income was $71,560,
7  again, this is back in 2016.
8       Was that an accurate statement?
9     A  Not for sales.  That's probably combined.
10    Q  Okay.  And can you tell me what income you 01:44:05PM
11 had other than sales?
12    A  In 2016, it would have -- in 2016, I wasn't
13 on social security so it was just sales.
14    Q  Okay.  Did you have any income from any
15 rental properties or other investments?        01:44:29PM
16    A  Not in -- I had one other rental in 2016,
17 yes.
18    Q  And do you think that might have been
19 accounted for in your earned income?
20    A  It could have been.               01:44:54PM
21    Q  Do you see where it says total net worth, it
22 says 946,851, do you know if that was an accurate
23 statement in 2016?
24    A  I'm not sure.
25    Q  Okay.  Do you think it's in the ballpark? 01:45:19PM

Page 33

9 (Pages 30 - 33)

1     A  I'm thinking this could have been combined
2  with Rocco.
3     Q  Okay.  And what about the liquid net worth,
4  it says 458,000, was that an accurate statement in
5  2016?                            01:45:43PM
6     A  I don't know what liquid net worth means.
7     Q  Okay.  Do you recall looking over this
8  application and what was filled in before you signed
9  it?
10     A  I'm thinking all I know about is my signature
01:45:55PM
11  on the back.
12     Q  Is it your habit to sign things without
13  reading them?
14        MR. SQUITIERI:  Objection.
15     Q  BY MS. HUANG:  You can answer the question. 01:46:21PM
16     A  Not really.  I was trusting my husband to
17  guide me as far as yes, go ahead and sign it.
18     Q  Okay.  Do you recall what assets you had in
19  2016?
20     A  I had --                 01:46:41PM
21     Q  Did you have a house that you owned?  Did you
22  have investments in stocks?  Did you have income
23  property, rental?
24     A  I did have the income rental.  I had two
25  properties -- actually three properties.  And then my 01:46:58PM

Page 34

1  job.  And that was it.
2     Q  And the three properties that you had, were
3  they single-family residences, townhouses or condos?
4     A  Single-family.
5     Q  Were they all in South Carolina?   01:47:21PM
6     A  Yes.
7     Q  Do you recall if in 2016 they were all rented
8  out?
9     A  The two properties -- let's see.  I was
10  living -- I was living in the one and then I had one 01:47:41PM
11  house rental and I may have had a townhouse and a lot.
12  I'm not sure.  As far as the dates, I'm not sure about
13  the townhouse.  I may have still had it.
14     Q  Do you know approximately the value of the
15  single-family residence that you were renting out in 01:48:18PM
16  2016?
17     A  One rental was around 200,000, the townhouse
18  was probably 50,000, the lot was probably 10,000,
19  15,000.
20     Q  And do you know the value of the house that 01:48:49PM
21  you were living in in 2016?
22     A  350,000.
23     Q  Do you recall if in 2016 you had any savings?
24  Savings in the bank?
25     A  I did, but as far as a figure, I couldn't 01:49:13PM

Page 35

1  tell you right offhand.
2     Q  Do you know if it was less than 50,000?
3     A  I don't know.
4     Q  Okay.  Do you know in 2016 if you had any
5  stocks?                            01:49:45PM
6     A  No.
7     Q  Do you know if in 2016 that you had any other
8  investments or assets that we haven't discussed yet?
9     A  No.
10     Q  In 2016, did you have other life insurance 01:50:03PM
11  policies?
12     A  No.
13     Q  I'm going to show you another exhibit.  This
14  is Exhibit 2.
15        Do you see it on your screen?         01:50:51PM
16     A  Not yet.
17     Q  Do you see it now?
18     A  Yes.
19     Q  This is a Shurwest Life Insurance cover page.
20        Have you ever seen this document before?  01:51:12PM
21     A  No.
22        (Exhibit 2 was marked for identification
23        and is attached hereto.)
24     Q  BY MS. HUANG:  And I have just a couple
25  questions on it.  It says, "Please provide a complete 01:51:17PM

Page 36

1  breakdown of liquid net worth."
2        It says, "Ed Jones, 434,233."
3        Does that refresh your recollection at all as
4  to whether you had an investment with Ed Jones?
5     A  Edward Jones, yes.  That was with Rocco.   01:51:41PM
6  That's combined with Rocco.
7     Q  Okay.  So you do recall having this
8  investment with Ed Jones, but it was with you and
9  Rocco's combined assets?
10     A  Yes.                        01:51:57PM
11     Q  And thus far you've been telling me about the
12  assets that you individually owned?
13     A  No.
14     Q  In 2016?
15     A  No.  I had the rentals and the property.  I 01:52:06PM
16  honestly forgot about Edward Jones.
17     Q  Okay.  And it says here there's 24,000 in
18  cash.
19        Does that sound like the amount that might
20  have been in your savings account at that point?   01:52:31PM
21     A  Yes.
22     Q  Do you recall -- did you have any involvement
23  in the Edward Jones account or did you use one of their
24  brokers to manage it?
25        MR. SQUITIERI:  Object to the form.      01:52:55PM

Page 37

10 (Pages 34 - 37)

1    Q   BY MS. HUANG:  You can answer.
2    A   Repeat the question?
3    Q   My question is, when you invested money with
4    Edward Jones, did you use one of their advisors or did
5    you or Rocco manage that investment?        01:53:09PM
6    A   It was through an advisor, but Rocco handled
7    it.
8    Q   Did you ever interact with that advisor?
9    A   Occasionally, but not very often.
10   Q   Okay.  I'm going to show you another exhibit.
01:53:35PM
11       Can you see the document I'm trying to show
12   you on your screen?
13   A   Yes, ma'am.
14   Q   So it says life insurance policy
15   illustration.  It says that it's prepared for you by 01:54:17PM
16   Mr. Dixon in July of 2016.
17       Do you recall receiving this illustration
18   from Mr. Dixon?
19       MR. SQUITIERI:  Object to the form.  It says
20   "presented by," not "prepared by."        01:54:35PM
21       You can answer.
22   Q   BY MS. HUANG:  If I read it wrong, it was
23   prepared for Mrs. Cioffoletti, presented by Mr. Dixon?
24   A   Vaguely.
25       (Exhibit 3 was marked for identification  01:54:54PM

Page 38

1       and is attached hereto.)
2    Q   BY MS. HUANG:  Did Mr. Dixon go through this
3    document with you?
4    A   If he did, I don't remember.
5    Q   Okay.  I scrolled down to the second page. 01:55:03PM
6    It looks like under the premium outlaid column it says
7    $29,322, it looks like that you were planning to put in
8    premiums of about $29,000 for three years under this
9    illustration.
10       Does that sound familiar to you?        01:55:29PM
11   A   Yes.
12   Q   And after year six when you would be age
13   68 you were planning to take out about $7,536 a year,
14   does that sound...
15   A   I thought it was before 68, but -- I thought
01:55:56PM
16   it was when I was 67 that I would start receiving
17   something.  You'd have to break that down monthly
18   because I don't know.
19   Q   Okay.  So I think broken down monthly it
20   would be about $700 a month.        01:56:14PM
21   A   Okay.
22   Q   Does that sound familiar to you?
23   A   Yes, ma'am.
24   Q   And do you understand in looking at this
25   illustration that it was just a projection and that it
01:56:28PM

Page 39

1    was not guaranteed?
2    A   It was -- I don't know if it was a projection
3    or not.  That's what we were -- that's what I was
4    counting on.
5    Q   Okay.  And did you understand that you would
01:56:46PM
6    have to put in what is listed under the premium outlay
7    in order to take out a lesser amount?
8    A   Yes.
9    Q   Okay.  I'm going to show you Exhibit 4.
10       Mrs. Cioffoletti, do you see the document I'm
01:57:58PM
11   trying to show you on your screen?
12   A   Yes.
13   Q   Okay.  So this is another illustration, it's
14   dated August 30th, 2016, so it came after the
15   illustration that I just showed you.        01:58:09PM
16       Do you recall seeing this illustration or
17   going over it with Mr. Dixon?
18   A   Again, vaguely.
19       (Exhibit 4 was marked for identification
20       and is attached hereto.)        01:58:20PM
21   Q   BY MS. HUANG:  Okay.  And it looks like in
22   this illustration the premium outlays went down, so now
23   it looks like you're planning on putting $23,130 in for
24   four years as opposed to the larger amount for three
25   years and then taking out money when you turn age 68.01:58:43PM

Page 40

1       Do you recall discussing changing the number
2    of years the premiums were paid into the policy?
3    A   I don't recall that.  But I knew I was going
4    to start receiving money, but I only remember three
5    years.  I don't remember four.        01:59:03PM
6    Q   Okay.  And do you recall discussing paying
7    less premium rather than more as was in the first
8    illustration?
9    A   Yes.
10   Q   And do you recall why you were discussing  01:59:15PM
11   putting in less premium?
12   A   Not really.  Honestly, the only thing that
13   sticks in my head is the three years and around $700.
14   Q   Okay.  How were you planning to pay for the
15   policy premiums?        01:59:39PM
16   A   It was -- I believe it was coming from around
17   the 80,000 that he had taken.
18   Q   Can you explain that a little further, did
19   you give Mr. Dixon $80,000 to manage?
20   A   Yes.        02:00:06PM
21   Q   Do you recall if that was in the form of a
22   check or ACH deposit?
23   A   It would have been a check.
24   Q   Do you recall who that check was made out to?
25   A   Originally -- I have it in front of me.  02:00:21PM

Page 41

11 (Pages 38 - 41)

1 Originally AgeeFisherBarrett, LLC got 67,000 and then
2 Minnesota Life got 15,000. Those were two separate
3 checks.
4     Q   Okay. So the $15,000 check to Minnesota
5 Life, was that to pay for the first year of policy   02:00:49PM
6 premiums?
7     A   Yes, ma'am.
8     Q   And can you tell me who AgeeFisherBarrett,
9 LLC is?
10    A   I can't tell you.              02:00:58PM
11    Q   Is that a name of a company given to you by
12 Mr. Dixon?
13    A   Yes.
14    Q   So you understood that money to be going to
15 Mr. Dixon to manage in some way?              02:01:08PM
16    A   Yes.
17    Q   Okay. I'm going to show you Exhibit 5.
18 These are documents that your attorney gave us, so they
19 came from your possession. It looks like the cover
20 page of your policy and some policy data pages.   02:01:42PM
21    A   Yes.
22    Q   Do these documents look familiar to you?
23    A   They do.
24        (Exhibit 5 was marked for identification
25        and is attached hereto.)              02:01:51PM

Page 42

1     Q   BY MS. HUANG: Do you recall receiving your
2 policy?
3     A   Yes. I have it right in front of me.
4     Q   Okay. And was that a stack of papers as
5 opposed to the three pages that I'm putting in front of
  02:02:03PM
6 you?
7     A   Yes.
8     Q   Okay. So when you received your policy, did
9 you read through it, look through it, take a look at it
10 in any way?              02:02:16PM
11        MR. SQUITIERI: Object to the form.
12        THE WITNESS: No, not really, we just filed
13 it.
14    Q   BY MS. HUANG: Okay. Did you understand that
15 you had 30 days within which you could have returned 02:02:29PM
16 your policy if you were not happy with it?
17    A   No.
18    Q   So this is the cover page of your policy,
19 correct, the document that I have on the screen?
20    A   Yes, ma'am.              02:02:46PM
21    Q   Did you ever read the statement on the
22 left-hand side where it says, "If you are not satisfied
23 with it you may return the policy to us or our agent
24 within 30 days after you receive it"?
25    A   I am now.              02:03:00PM

Page 43

1     Q   Okay. But you didn't know at the point when
2 you got your policy that you had that option?
3     A   No. I had heard of Minnesota Life before,
4 but I didn't investigate it. I just knew they'd been
5 around for a long time.              02:03:19PM
6     Q   Okay. So other than what Mr. Dixon told you
7 about Minnesota Life, you didn't do any independent
8 research into that company on your own?
9     A   No, ma'am.
10    Q   So it looks like your policy was issued   02:03:32PM
11 September 8th of 2016. If you look on that second page
12 on the policy data page it says the face amount was
13 about $400,000.
14        Does that look accurate to you?
15    A   Yes.              02:03:46PM
16    Q   And that the plan premium was about
17 $23,129.52 annually?
18    A   Yes, ma'am.
19    Q   And did you understand that in order to be
20 able to take out the $700 after three years you would02:04:00PM
21 have to put in that plan premium annually?
22    A   Yes, ma'am.
23        MR. SQUITIERI: Objection to the question.
24    Q   BY MS. HUANG: I'm going to show you the next
25 exhibit. I think this is Exhibit 6. These documents02:04:19PM

Page 44

1 also came to us through your attorney.
2        Did you provide these documents to
3 Mr. Squitieri?
4     A   Yes. My husband did.
5        (Exhibit 6 was marked for identification   02:05:03PM
6        and is attached hereto.)
7     Q   BY MS. HUANG: Okay. And it looks like -- I
8 just want to go through the documents really quickly.
9 I think they're out of order.
10        That your initial premium was $15,000,   02:05:10PM
11 correct, and that was paid for through a check to
12 Minnesota Life?
13    A   Yes.
14    Q   From the funds you already had?
15    A   Yes. That was a separate check.   02:05:21PM
16    Q   Okay. And the next payment date, it says on
17 June of 2017 you made a premium payment of a little bit
18 more than $8,000.
19        Does that sound accurate to you?
20    A   I guess so. I didn't write out the check. 02:05:45PM
21    Q   Okay. And do you know where the funds for
22 that premium payment came from?
23    A   It would have been our joint checking
24 account.
25    Q   And it says that the total premium you paid02:06:01PM

Page 45

Veritext Legal Solutions
866 299-5127

1    while you had this policy, at least through the date of
2    September 7, 2018, was about $23,000.
3         Does that sound accurate to you?
4    A    Yes, I guess.
5    Q    Was it you or was it your husband who was  02:06:23PM
6    responsible for making the premium payments on this
7    policy?
8    A    I left it all to my husband.
9    Q    Okay.  Would you say that your husband
10   handled more of the finances, your joint finances than  02:06:42PM
11   you did?
12   A    Yes.
13   Q    I'm going to show you Exhibit 7.  This is a
14   letter dated October 11th, 2019.
15        Have you seen this letter before,        02:07:32PM
16   Mrs. Cioffoletti?
17   A    Yeah, it looks familiar.
18        (Exhibit 7 was marked for identification
19        and is attached hereto.)
20   Q    BY MS. HUANG:  Okay.  It says, "Pursuant to 02:07:45PM
21   your request, Minnesota Life is rescinding Policy
22   No. 2797407W," and that there is a payment of
23   $23,129.52 being returned to you.
24   A    Yes, ma'am.
25   Q    So you understood that on or around this date
     02:08:13PM

Page 46

1    your policy was being refunded, that all the premiums
2    you paid on the policy were being returned to you?
3    A    Yes.
4    Q    And did you or your husband call Minnesota
5    Life or contact Minnesota Life asking to rescind your 02:08:30PM
6    policy?
7    A    My husband did.
8    Q    And do you have any knowledge of those
9    conversations about rescinding your policy?
10   A    Just that he's been in contact with them and
     02:08:49PM
11   that that's what they were going to do.
12   Q    Okay.  So it looks like you've received a
13   refund of all the premiums that you paid on this
14   policy; correct?
15   A    Yes, ma'am.                           02:09:03PM
16   Q    Can you explain to me what damages you're
17   seeking from this lawsuit?
18   A    It would be the rest of the money that I gave
19   to Chris Dixon.  So about $48,084.80.
20   Q    Okay.  And how did you come upon that number?
     02:09:33PM
21   A    It's the payments we made to Minnesota Life.
22   Yeah.  It's the payments from December 2016 to
23   February 1st, 2018 of 1574.88.
24   Q    And who were these payments to?
25   A    I didn't make this out, so I can't tell you.
     02:10:42PM

Page 47

1    Q    Okay.  But you did receive the premiums that
2    you paid to Minnesota Life back from Minnesota Life;
3    correct?
4    A    Yes.
5        MR. SQUITIERI:  Objection; vague.          02:10:57PM
6    Q    BY MS. HUANG:  Are you seeking anything else
7    in damages besides the money that you provided to
8    Mr. Dixon?
9    A    Yes.  The taxes I had to pay.
10   Q    Okay.  And what taxes did you have to pay? 02:11:12PM
11   A    $4,708.
12   Q    Do you know what those taxes were for?
13   A    My accountant, when I did our taxes, it had
14   to do with an IRA.  And I ended up having to pay the
15   taxes because Chris said it was my accountant that 02:11:47PM
16   didn't understand what he was doing.
17   Q    Okay.  And so those taxes aren't for your
18   Minnesota Life insurance policy?
19       MR. SQUITIERI:  Objection.
20   Q    BY MS. HUANG:  Do you think those taxes are 02:12:10PM
21   for your Minnesota Life insurance policy?
22   A    No.
23   Q    Okay.  Are you seeking anything else in
24   damages besides the monies you paid to Mr. Dixon to
25   invest, the 47,000 approximately in taxes that you  02:12:24PM

Page 48

1    owed, is there anything else that you're seeking in
2    damages?
3        MR. SQUITIERI:  Objection.
4    Q    BY MS. HUANG:  Mrs. Cioffoletti, this is your
5    testimony.  Is there anything else that I'm missing or
     02:12:56PM
6    that you're claiming in damages?
7    A    Just the $48,084.80.
8    Q    Okay.  And that's the total amount you're
9    claiming in damages?
10       MR. SQUITIERI:  Objection.             02:13:13PM
11   Q    BY MS. HUANG:  You can answer.
12   A    Yes, that's the total.
13   Q    Okay.  I believe you referred to a -- sorry.
14   Go ahead.
15   A    Again, my husband is more involved in this 02:13:32PM
16   than I am.  I'm just frustrated about losing money and
17   what happened and how it happened.  I don't want any
18   more than what's due me and I really don't know how,
19   when, where and why.
20   Q    Okay.  I believe you said that you have an 02:13:53PM
21   accountant.
22        Did you have an accountant in 2016?
23   A    Yes.
24   Q    And did you ever talk to your accountant
25   about your Minnesota Life insurance policy?    02:14:06PM

Page 49

13 (Pages 46 - 49)

| | |
|---|---|
| 1   A   No. | 1   to invest for you? |
| 2   Q   Did you ever talk to your accountant about | 2   A   Yes. |
| 3   what Mr. Dixon was doing with investing your money? | 3     MS. HUANG: I'm sorry, Mr. Cioffoletti, I |
| 4   A   No. | 4   think I can hear you. This is Mrs. Cioffoletti's |
| 5   Q   Do you still have your accountant?    02:14:21PM | 5   deposition. And I will ask you questions in yours and 02:18:00PM |
| 6   A   No. | 6   you'll have a chance to tell me what you recall then. |
| 7   Q   Do you have a different accountant? | 7   Thank you. |
| 8   A   My husband. | 8   Q   BY MS. HUANG: So after the money stopped |
| 9   Q   Do you still talk to Mr. Dixon? | 9   being deposited in your account, is that when you |
| 10   A   No.       02:14:38PM | 10   thought something was going awry with your investments 02:18:13PM |
| 11   Q   And when did you stop talking to Mr. Dixon? | 11   with Mr. Dixon? |
| 12   A   When all this started. The exact date, I | 12   A   I mean, I thought something was wrong earlier |
| 13   couldn't give you, but... | 13   because we never received any statements like a bank |
| 14   Q   I don't know what "all this" is, can you | 14   would issue or -- I never got anything in the mail or |
| 15   explain that a little bit further?    02:14:56PM | 15   email stating what was going on.    02:18:34PM |
| 16   A   When we found out that my investment was | 16   Q   Okay. So then the only way you knew that |
| 17   gone. | 17   Mr. Dixon had invested your money in any way was that |
| 18   Q   And that's the money that you gave to | 18   you were receiving payments that were deposited into |
| 19   Mr. Dixon, the 67,000, approximately? | 19   your bank account? |
| 20   A   Around $80,000, yes.    02:15:13PM | 20   A   Yes, ma'am.     02:18:50PM |
| 21   Q   Okay. But I think you said that 15,000 of | 21   Q   And at some point those payments stopped? |
| 22   that was paid policy premiums; is that correct? | 22   A   Yes, ma'am. |
| 23   A   Yes. | 23   Q   Did you contact Mr. Dixon when those payments |
| 24   Q   And Minnesota Life gave you back your policy | 24   stopped? |
| 25   premiums, so it would be --    02:15:28PM | 25   A   I did not.     02:19:01PM |
| Page 50 | Page 52 |

| | |
|---|---|
| 1   A   We're talking about 60-some-odd thousand. | 1   Q   And did you think those payments had anything |
| 2   Q   Okay. The monies that you gave Mr. Dixon to | 2   to do with Minnesota Life Insurance Company? |
| 3   invest aside from your Minnesota Life insurance policy? | 3     MR. SQUITIERI: Objection. |
| 4   A   Yes, ma'am. | 4     THE WITNESS: Again, Rocco handled |
| 5   Q   And how did you find out that Mr. Dixon no 02:15:43PM | 5   everything, so I don't know.    02:19:17PM |
| 6   longer had the monies you gave him to invest? | 6   Q   BY MS. HUANG: Did you have any reason to |
| 7   A   We stopped getting checks. | 7   believe those payments had anything to do with |
| 8   Q   Okay. So at some point you were receiving | 8   Minnesota Life Insurance Company? |
| 9   checks from Mr. Dixon? | 9   A   I don't know. |
| 10   A   No, not from Mr. Dixon. I've got a deposit, | 10     MR. SQUITIERI: Object to the form of the 02:19:31PM |
| 02:16:08PM | 11   question. |
| 11   December 1st of 2016 that said FIP, agent ALT, LLC, | 12   Q   BY MS. HUANG: When the payments stopped |
| 12   2272 for me for 1574.88. | 13   being deposited into your bank account, did you ever |
| 13   Q   Okay. And did you have any understanding as | 14   call anybody at Minnesota Life's home office to tell |
| 14   to what FIP was? | 15   them that certain payments had stopped coming into your |
| 15   A   No.      02:16:54PM | 02:19:46PM |
| 16   Q   And this money appeared in your bank account | 16   bank account? |
| 17   on a regular basis? | 17   A   I did not. |
| 18   A   That was the last one I got. | 18   Q   Do you currently own any other life |
| 19   Q   Okay. | 19   insurance? |
| 20   A   February 1st, 2018 was the last one I got. 02:17:14PM | 20   A   No.      02:20:00PM |
| 21   Q   And do you recall when you got the first | 21   Q   Do you have any complaints about your |
| 22   payment of about $1500 in your account? | 22   Minnesota Life policy while it was in force? |
| 23   A   December 1st, 2016. | 23     MR. SQUITIERI: Objection. |
| 24   Q   And is it your understanding that these | 24     THE WITNESS: Not -- |
| 25   payments are related to the money you gave to Mr. Dixon | 25   Q   BY MS. HUANG: I can --    02:20:35PM |
| 02:17:36PM | |
| Page 51 | Page 53 |

1     A   -- really.
2     Q   -- rephrase it if it's confusing.  Okay.
3         MS. HUANG:  I don't have any further
4  questions for you.  I think Mr. Hopkins has some
5  questions.  Thank you for your time.          02:20:57PM
6         THE WITNESS:  Okay.
7         MR. SQUITIERI:  Fletcher, I'm going to jump
8  on that court conference.  I'm going to mute audio and
9  video so you take over with the objections.
10        MR. MOORE:  Sounds good.  I'm on it.     02:21:11PM
11        MR. SQUITIERI:  Okay.  Don't be shy.
12        All right.  Before we start another
13  questioning, Mr. and Mrs. Cioffoletti, you may have
14  heard me say I'm getting off the call to go on a call
15  with the court.  My associate Fletcher Moore is going02:21:25PM
16  to take over defending.
17        We've been going about an hour and
18  20 minutes, which is usually people's break time.  Now
19  they're going to start with another questioner.  So if
20  you want to take five minutes, even ten, now is the  02:21:37PM
21  time to do it.
22        THE WITNESS:  Okay.
23        MR. SQUITIERI:  So I'll leave you and if you
24  request on the record for a little break, they'll be
25  happy to give it to you, like I said, between five and
     02:21:47PM
                                                    Page 54

1  ten minutes should do it.
2         THE WITNESS:  Okay.  Thank you.
3         THE VIDEOGRAPHER:  Going off the record at
4  2:21 p.m.
5         This is the end of Media 1.          02:21:59PM
6         (A brief recess was taken.)
7         THE VIDEOGRAPHER:  We're on the record at
8  2:39 p.m.
9         This is the beginning of Media 2 in the
10  deposition of Eleanor Cioffoletti.          02:40:01PM
11              EXAMINATION
12  BY MR. HOPKINS:
13    Q   Ms. Cioffoletti, when was the first time you
14  heard of Shurwest?
15    A   I actually never heard of Shurwest.     02:40:16PM
16    Q   As you sit here today, you've never heard of
17  Shurwest?
18    A   No.
19    Q   You don't know what Shurwest is?
20    A   No.                                    02:40:29PM
21    Q   Do you know whether Shurwest is a defendant
22  in this case?
23    A   No.
24        MR. MOORE:  Objection; calls for legal
25  conclusion.                                  02:40:43PM
                                                    Page 55

1     Q   BY MR. HOPKINS:  I'm sorry, I didn't hear
2  your answer.  Your lawyer was talking.
3         Could you please repeat it?
4     A   No.
5     Q   Is it fair to say then that you've never   02:40:52PM
6  talked to anybody that works for Shurwest?
7     A   I have not.
8     Q   And Shurwest never communicated with you --
9     A   No.
10    Q   -- is that true?                        02:41:09PM
11    A   No.
12    Q   Shurwest never recommended that you invest
13  with FIP, did it?
14    A   No.
15    Q   Shurwest never recommended FIP as a funding02:41:20PM
16  mechanism for IUL policy, did it?
17        MR. MOORE:  Object to the form.
18        THE WITNESS:  No.
19    Q   BY MR. HOPKINS:  You did not rely on any
20  statement made by Shurwest in connection with your  02:41:39PM
21  investment in FIP, did you?
22    A   No.
23    Q   Shurwest did not provide financial advice or
24  retirement planning services to you, did it?
25        MR. MOORE:  Object to form.             02:42:00PM
                                                    Page 56

1         THE WITNESS:  No.
2     Q   BY MR. HOPKINS:  Do you know what an
3  interrogatory is, ma'am?
4         MR. MOORE:  Objection.
5         MR. HOPKINS:  What's the objection?     02:42:12PM
6         MR. MOORE:  Calls for legal conclusion.
7         MR. HOPKINS:  I asked her what she knows.
8         MR. MOORE:  You asked her if she knew what an
9  interrogatory was.
10        MR. HOPKINS:  Are you admitted to practice in
    02:42:26PM
11  this court, Fletcher?
12        MR. MOORE:  No, I'm not.
13    Q   BY MR. HOPKINS:  Ms. Cioffoletti, do you know
14  what an interrogatory is?
15    A   It's a question or questions.           02:42:41PM
16    Q   Have you seen interrogatories in this case?
17    A   I haven't looked at them.
18    Q   Have you provided responses to any
19  interrogatories that were asked of you?
20    A   No.                                    02:42:57PM
21    Q   Did I understand you correctly when you were
22  talking to Ms. Huang to testify that you did not
23  purchase any FIP product?
24    A   I did not.
25    Q   Is it fair to say that Shurwest never sold 02:43:29PM
                                                    Page 57

15 (Pages 54 - 57)

**Page 58**

1  you an FIP product?

2      A   They did not.

3      Q   They also never marketed or promoted FIP

4  products to you; is that right?

5      A   No.                                    02:43:43PM

6      Q   Do you think Shurwest owes you any money?

7      A   I don't know who Shurwest is.

8      Q   When you were talking to Ms. Huang a little

9  earlier was your husband whispering answers to you?

10     A   Not really.                            02:44:19PM

11     Q   Was he whispering anything to you?

12     A   As far as an answer he would say, "You don't

13  have to" or "No."

14     Q   I'm sorry.  He would say what?

15     A   "You don't have to answer" when there was an

    02:44:36PM

16  objection.  I'm not sure whether to answer or not, so

17  he said no.

18     Q   Were the answers that you gave to Ms. Huang

19  based on your personal information or were they based

20  on -- your personal knowledge or were they based on  02:44:58PM

21  information that your husband provided you while he was

22  whispering to you?

23     A   My personal knowledge.

24     Q   Did your husband's whispering influence your

25  answers in any way?                          02:45:11PM

---

**Page 59**

1      A   No.

2          MR. HOPKINS:  Pass the witness.

3          MS. HUANG:  I have no further questions of

4  Mrs. Cioffoletti.

5          THE WITNESS:  Thank you.              02:45:34PM

6          THE VIDEOGRAPHER:  We're going off the record

7  at 2:45 p.m.  And this concludes today's testimony of

8  Eleanor Cioffoletti.

9          The total number of media used was two and

10  will be retained by Veritext.                02:45:45PM

11         (Time Noted:  2:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 60**

1                PENALTY OF PERJURY

2

3      I, ELEANOR CIOFFOLETTI, do hereby declare under

4  penalty of perjury that I have read the foregoing

5  transcript of my deposition; that I have made such

6  corrections as noted herein, in ink, initialed by me,

7  or attached hereto; that my testimony as contained

8  herein, as corrected, is true and correct.

9

10      EXECUTED this _____ day of _____,

11  20___, at _____, _____.

            (City)              (State)

12

13

14      _____

                ELEANOR CIOFFOLETTI

15              Volume I

16

17

18

19

20

21

22

23

24

25

---

**Page 61**

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2      I, Rochelle Holmes, the undersigned, a Certified

3  Shorthand Reporter of the State of California, do

4  hereby certify:

5      That the foregoing proceedings were taken

6  before me via videoconference; that any witnesses in

7  the foregoing proceedings, prior to testifying, were

8  administered an oath; that a record of the proceedings

9  was made by me using machine shorthand which was

10  thereafter transcribed under my direction; that the

11  foregoing transcript is a true record of the testimony

12  given.

13     Further, that if the foregoing pertains to the

14  original transcript of a deposition in a Federal Case,

15  before completion of the proceedings, review of the

16  transcript [ ] was [X] was not requested.

17     I further certify I am neither financially

18  interested in the action nor a relative or employee

19  of any attorney or any party to this action.

20     IN WITNESS WHEREOF, I have this date subscribed my

21  name:  February 17, 2021.

22

23

24      *Rochelle Holmes*
            Rochelle Holmes

25          CSR No. 9482, CCRR No. 0123

---

16 (Pages 58 - 61)

[& - advisor]

| & | | | |
|---|---|---|---|
| **&** 3:6,19 6:20,23 7:5 | | | |

**0**

**0123** 2:21 61:25
**03025** 1:4 2:4 6:11

**1**

**1** 1:17,24 2:19 5:11 6:1,6 32:8 55:5
**10,000** 35:18
**10/11/2019** 5:21
**10022** 3:10
**104** 8:8
**11th** 46:14
**12th** 3:9
**13** 11:9
**15,000** 35:19 42:2 42:4 45:10 50:21
**1500** 51:22
**1574.88.** 47:23 51:12
**16th** 3:21
**17** 61:21
**18** 1:4 2:4 5:16 6:11
**1900** 4:9
**1971** 11:22
**1st** 6:6 47:23 51:11 51:20,23

**2**

**2** 5:13 36:14,22 55:9
**20** 18:19 54:18 60:11
**200,000** 35:17
**2000** 13:14
**2004** 14:1
**2005** 13:13,14

**2010** 13:13
**2012** 13:14
**2016** 5:16,18 12:16 18:4,7 20:21 26:1 33:3,7,12,12,16,23 34:5,19 35:7,16,21 35:23 36:4,7,10 37:14 38:16 40:14 44:11 47:22 49:22 51:11,23
**2017** 45:17
**2018** 46:2 47:23 51:20
**2019** 46:14
**2021** 1:17 2:19 6:1 6:6 61:21
**2094** 7:10
**212** 3:11
**213.576.1123** 3:23
**2200** 4:9
**2272** 51:12
**23,000** 46:2
**23,129.52** 44:17 46:23
**23,130** 40:23
**24,000** 37:17
**2797407w** 46:22
**29** 10:24
**29,000** 39:8
**29,322** 39:7
**2:21** 55:4
**2:39** 55:8
**2:45** 2:18 6:2 59:7 59:11

**3**

**3** 5:15 32:11 38:25
**30** 5:18 14:22 43:15,24
**30th** 40:14
**31** 10:23

**32** 3:9 5:11
**333** 3:21
**350,000** 35:22
**36** 5:13
**39** 5:15

**4**

**4** 5:17 40:9,19
**4,708** 48:11
**40** 5:17
**400,000** 44:13
**42** 5:19
**421-6492** 3:11
**434,233** 37:2
**4439789** 1:23
**45** 5:20
**458,000** 34:4
**46** 5:21
**47,000** 48:25
**48,084.80.** 47:19 49:7

**5**

**5** 5:19 42:17,24
**50,000** 35:18 36:2
**55** 5:6
**57th** 3:9

**6**

**6** 5:20 44:25 45:5
**60** 51:1
**61** 1:24
**67** 39:16
**67,000** 42:1 50:19
**6742** 61:24
**68** 39:13,15
**68.01:58:43pm** 40:25

**7**

**7** 5:5,21 46:2,13,18
**7,536** 39:13

**7/7/53** 8:4
**700** 30:8,11 39:20 41:13 44:20
**71,560** 33:6
**75201-4629** 4:10

**8**

**8,000** 45:18
**80,000** 23:12 41:17 41:19 50:20
**8th** 44:11

**9**

**90071-3004** 3:22
**946,851** 33:22
**9482** 1:22 2:20 61:25

**a**

**able** 44:20
**account** 37:20,23 45:24 51:16,22 52:9,19 53:13,16
**accountant** 48:13 48:15 49:21,22,24 50:2,5,7
**accounted** 33:19
**accounting** 14:5
**accurate** 13:12 33:4,8,22 34:4 44:14 45:19 46:3
**accurately** 10:4,7
**ach** 41:22
**action** 16:12,15 61:18,19
**address** 8:7
**administered** 7:9 61:8
**admitted** 57:10
**advantage** 26:7,25
**advice** 56:23
**advisor** 17:1 38:6 38:8

Page 1

advisors 38:4
afternoon 6:5,19
6:22 7:14
age 39:12 40:25
ageefisherbarrett
42:1,8
agent 43:23 51:11
ages 10:22
ago 31:9,13
ahead 34:17 49:14
al 6:10
alston 3:19 6:23
alston.com 3:24
alt 51:11
amount 19:18,20
22:11,12 23:25
24:2,3 30:11
37:19 40:7,24
44:12 49:8
angeles 3:22
annually 44:17,21
answer 9:1,8,15
22:24 26:4 29:19
34:15 38:1,21
49:11 56:2 58:12
58:15,16
answering 9:13
answers 58:9,18
58:25
anybody 53:14
56:6
appearances 3:1,2
4:1,2
appeared 51:16
appearing 3:25
application 5:12
15:19 32:6,11,19
32:23 34:8
approximately
18:18 22:19 23:9
31:13 35:14 48:25

50:19
are02:12:10pm
48:20
article 28:1,4
artist 26:8
aside 51:3
asked 9:22 57:7,8
57:19
asking 7:20,21
9:20 47:5
assets 23:2 34:18
36:8 37:9,12
assistant 13:20
assistants 20:9
associate 54:15
assume 9:21
attached 32:9
36:23 39:1 40:20
42:25 45:6 46:19
60:7
attained 11:15
attend 18:14
attended 28:5
attorney 3:7,8,20
4:7,8 14:14,15,25
15:25 42:18 45:1
61:19
audio 54:8
august 5:18 20:20
40:14
aware 30:20
awry 52:10

**b**

back 16:9 33:7
34:11 48:2 50:24
background 10:9
14:5
ballpark 33:25
bank 13:5,7,10,17
14:8,8 35:24
51:16 52:13,19

53:13,16
banking 14:7
based 58:19,19,20
basic 10:9
basis 51:17
bates 10:23,24
11:7,8 14:3
beginning 2:17
18:6 55:9
behalf 1:4 2:4,16
6:23 7:3,6
believe 15:14
16:16 32:5 41:16
49:13,20 53:7
benefit 29:21,24
29:25 30:4
benefits 29:16
best 8:22 9:4 16:10
22:14 23:24 25:11
better 9:1
big 19:6 21:8
bird 3:19 6:23
birth 8:3
bit 13:15 14:13
16:20,21 19:16
27:2 45:17 50:15
black 17:4 20:25
21:3,18 22:3
27:23 28:10
brandon 10:24
break 9:25 39:17
54:18,24
breakdown 37:1
brief 55:6
briefly 15:15
bring 15:3
brochures 19:23
29:1,6,9
broken 39:19
brokers 37:24

building 21:14
business 28:3,13
28:16

**c**

c 8:2
ca 3:22
california 6:14
13:25 14:1 61:3
call 17:18,21 47:4
53:14 54:14,14
called 17:24 18:10
30:17
calls 55:24 57:6
care 25:18
careful 26:8 27:16
27:20
carolina 8:6 28:3
35:5
case 1:4 2:4 6:11
15:24 55:22 57:16
61:14
casey 10:23
cash 37:18
ccp 7:10
ccrr 61:25
certain 17:22
19:20 22:11,12
23:25 24:2,3
53:15
certificate 61:1
certified 2:19,20
61:1,2
certify 61:4,17
chance 9:4 17:11
31:25 52:6
changing 41:1
charts 19:2,19
check 41:22,23,24
42:4 45:11,15,20
checking 45:23

Page 2

[checks - dixon]

**checks** 42:3 51:7,9
**children** 10:16,18
  10:20,25
**chris** 15:9,12,18
  16:24 17:19 18:25
  22:13 47:19 48:15
**cioffoletti** 1:16
  2:16 5:3 6:7,9 7:8
  7:14,25 22:24
  38:23 40:10 46:16
  49:4 52:3 54:13
  55:10,13 57:13
  59:4,8 60:3,14
**cioffoletti's** 52:4
**ciofoletti** 1:4 2:4
**city** 32:16,21
  60:11
**claiming** 49:6,9
**clarification** 11:10
**clarify** 9:20,21
**classic** 12:7,8,12
  13:1
**cleanest** 9:13
**clear** 31:8
**clemson** 8:6
**close** 17:24
**collect** 15:24
**college** 11:16,23
  12:1
**column** 39:6
**combined** 33:9
  34:1 37:6,9
**come** 17:5,7 20:11
  26:6 28:2 29:11
  47:20
**comfortable** 20:10
**comfortably** 25:16
**coming** 41:16
  53:15
**communicated**
  56:8

**community** 13:5,6
  13:10,17 14:8
**companies** 1:10
  2:10 3:17 7:1
  24:11 25:24
**company** 1:9,10
  2:9,10 3:16,16
  6:24,25 17:2,3
  19:6 20:13 22:7
  27:23 28:17,23
  30:17,21 42:11
  44:8 53:2,8
**complaint** 16:11
  16:14,16
**complaints** 53:21
**complete01:51:...**
  36:25
**completion** 61:15
**complex** 21:15
**compound** 29:18
**con** 26:8
**concludes** 59:7
**conclusion** 55:25
  57:6
**condos** 35:3
**conference** 54:8
**confusing** 54:2
**connection** 29:20
  56:20
**considered** 13:2
**considering** 22:25
**contact** 47:5,10
  52:23
**contained** 60:7
**continued** 4:1
**conversations**
  23:23 47:9
**convinced** 25:7
**copy** 17:10
**correct** 10:11
  18:12 28:11 32:6

43:19 45:11 47:14
  48:3 50:22 60:8
**corrected** 60:8
**corrections** 60:6
**correctly** 57:21
**counsel** 6:8,17,20
  9:14 15:13 31:24
**counteracted**
  26:11
**counting** 40:4
**country** 8:8
**couple** 25:9 36:24
**court** 1:1 2:1 6:10
  6:15 54:8,15
  57:11
**cover** 5:14 36:19
  42:19 43:18
**csr** 1:22 61:25
**current** 8:9 12:4
**currently** 8:5
  53:18
**cv** 1:4 2:4 6:11

**d**

**dallas** 4:10
**damages** 47:16
  48:7,24 49:2,6,9
**data** 5:19 42:20
  44:12
**date** 8:3 17:22
  18:1 20:10,15,19
  32:16,21 45:16
  46:1,25 50:12
  61:20
**dated** 40:14 46:14
**dates** 35:12
**day** 60:10
**days** 43:15,24
**december** 47:22
  51:11,23
**decided** 25:7,19
  27:5 28:2

**declare** 60:3
**defendant** 4:4 6:8
  16:5 55:21
**defendants** 1:12
  2:12,17 3:15 6:23
  7:19,19
**defending** 54:16
**definite** 29:3
**degree** 11:17
**deposit** 27:10
  41:22 51:10
**deposited** 52:9,18
  53:13
**deposition** 1:16
  2:16 6:7,12 8:13
  14:12 15:1,9 32:1
  52:5 55:10 60:5
  61:14
**describe** 15:15
**description** 5:10
  19:9
**diamonds** 12:25
**different** 24:11
  28:7 50:7
**dinner** 17:9,22,23
  18:1,4,11,14,18,20
  18:23 19:1 28:5
**direction** 61:10
**discuss** 31:4
**discussed** 22:10
  27:8 36:8
**discussing** 22:13
  22:20 23:8,10,17
  32:22 41:1,6,10
**district** 1:1,2 2:1,2
  6:10,11
**dixon** 15:9,12,18
  16:24 17:5,7
  18:25 19:4 20:16
  20:19 21:21,24
  22:2,9,21 23:7,11

[dixon - future]

23:18,19,21 24:9
25:4,13,20,25
26:15,18,21 27:15
27:21 28:10,21
29:12 31:1,3
32:23 38:16,18,23
39:2 40:17 41:19
42:12,15 44:6
47:19 48:8,24
50:3,9,11,19 51:2
51:5,9,10,25 52:11
52:17,23
**dixon's** 17:19
**dla** 4:6 7:2
**dlapiper.com** 4:11
4:12
**do01:26:40pm**
22:25
**document** 31:21
36:20 38:11 39:3
40:10 43:19
**documents** 14:24
15:3,5,13,23 42:18
42:22 45:2,8
**documents02:04...**
44:25
**doing** 48:16 50:3
**dollars** 19:19
**downtown** 21:10
**drug** 13:18
**drugs** 13:21,24
**due** 49:18
**duly** 7:9

**e**

**e** 3:9 8:2,2,2
**earlier** 52:12 58:9
**earn** 19:20
**earned** 33:6,19
**eating** 27:6
**eckerd** 13:18,21
13:23

**ecw** 1:5 2:5 6:11
**ed** 37:2,4,8
**education** 11:14
12:2
**edward** 37:5,16,23
38:4
**either** 10:25
**eleanor** 1:4,16 2:4
2:16 5:3 6:7,8 7:8
7:25 55:10 59:8
60:3,14
**email** 14:14 17:16
52:15
**employee** 61:18
**employer** 12:6
**ended** 27:10 29:7
48:14
**england** 27:7
**erwin's** 17:25
**et** 6:10
**events** 8:23
**everybody** 19:3
**everybody's** 25:1
**evict** 27:12
**evicted** 27:14
**exact** 50:12
**examination** 5:2
7:12 55:11
**examined** 7:10
**except01:43:09pm**
32:20
**executed** 60:10
**exhibit** 5:11,13,15
5:17,19,20,21
31:17 32:8 36:13
36:14,22 38:10,25
40:9,19 42:17,24
44:25,25 45:5
46:13,18
**exhibits** 5:9

**explain** 27:2 28:21
29:24 41:18 47:16
50:15
**explaining** 19:18
**extent** 22:25

**f**

**f** 8:2,2
**face** 19:8 44:12
**fair** 56:5 57:25
**familiar** 30:17
39:10,22 42:22
46:17
**family** 35:3,4,15
**far** 34:17 35:12,25
37:11 58:12
**fearon** 3:6 6:20
7:6
**february** 1:17
2:19 6:1,6 47:23
51:20 61:21
**federal** 61:14
**felt** 22:16 24:23
26:5
**figure** 25:11 35:25
**filed** 6:10 43:12
**fill** 32:16
**filled** 34:8
**finally** 27:13
**finance** 14:6 19:7
**finances** 46:10,10
**financial** 1:8 2:8
3:15 6:9,24 17:1,9
23:1 25:14 26:21
56:23
**financially** 61:17
**find** 51:5
**fine** 13:2 27:9
**finish** 9:12
**fip** 5:20 30:18,21
31:1,6,7,9,12,15
51:11,14 56:13,15

56:21 57:23 58:1
58:3
**firm** 6:13,15
**first** 7:20 8:17
13:5,6,10,17 14:8
20:18 21:21 22:10
25:9 30:20 31:8
31:12 32:25 41:7
42:5 51:21 55:13
**five** 13:8 54:20,25
**fletcher** 3:8 7:5
54:7,15 57:11
**floor** 3:9,21
**follows** 7:10
**force** 53:22
**foregoing** 60:4
61:5,7,11,13
**forgot** 37:16
**form** 22:22 26:2
30:1 37:25 38:19
41:21 43:11 53:10
56:17,25
**found** 50:16
**four** 22:1 25:3
40:24 41:5
**fourth** 25:6
**free** 17:8
**friends** 26:17,20
**front** 8:19 15:7
32:3 41:25 43:3,5
**frustrated** 49:16
**full** 15:4
**funding02:41:20...**
56:15
**funds** 23:10 30:10
45:14,21
**further** 12:2 41:18
50:15 54:3 59:3
61:13,17
**future** 30:17

[game - interrogatory]

**g**

**game**  8:23
**gestures**  9:9
**getting**  16:9 24:3
  30:7 51:7 54:14
**give**  9:8 19:23 23:1
  31:19 41:19 50:13
  54:25
**given**  42:11 61:12
**giving**  27:10
**glanced**  16:23
**go**  8:16 10:1 18:11
  20:9,23 21:20
  25:8 32:10,25
  34:17 39:2 45:8
  49:14 54:14
**goal**  8:22
**goals**  25:14,14
**goes**  19:19
**going**  6:5 9:21
  27:15 31:17,17
  36:13 38:10 40:9
  40:17 41:3 42:14
  42:17 44:24 46:13
  47:11 52:10,15
  54:7,8,17,19 55:3
  59:6
**going02:21:25pm**
  54:15
**gold**  24:25
**good**  6:4,4,19,22
  7:14 27:5 54:10
**gotten**  26:24
**graduate**  11:17,19
  11:21
**grandkids**  25:18
**great**  7:17 32:4
**grilled**  26:10
**grilling**  27:19
**ground**  8:16

**group**  1:8 2:8 3:15
  6:9,24
**grow**  20:2,6
**growth**  29:3
**guaranteed**  40:1
**guess**  45:20 46:4
**guessing**  8:23
**guide**  34:17

**h**

**habit**  34:12
**half**  8:12 30:24
**hand**  43:22
**handled**  38:6
  46:10 53:4
**happen**  25:17
**happened**  49:17
  49:17
**happy**  9:25 32:1
  43:16 54:25
**harbor**  17:4 20:25
  21:3,18 22:3
  27:24 28:11
**hazy**  24:1
**head**  9:9 13:11
  24:21 41:13
**hear**  7:15 52:4
  56:1
**heard**  44:3 54:14
  55:14,15,16
**hearing**  25:24
**held**  6:12 17:23
  18:2,25
**hereto**  32:9 36:23
  39:1 40:20 42:25
  45:6 46:19 60:7
**high**  11:19,21
**highest**  11:14
**holmes**  1:21 2:19
  6:15 61:2,24
**home**  27:3 53:14

**honest**  24:17
**honestly**  37:16
  41:12
**hope**  3:21
**hopkins**  4:7 5:6
  7:2,2,20 54:4
  55:12 56:1,19
  57:2,5,7,10,13
  59:2
**hour**  54:17
**house**  34:21 35:11
  35:20
**huang**  3:20 5:5
  6:22,22 7:13,18
  11:11 23:7 28:16
  28:21 29:22 32:10
  34:15 36:24 38:1
  38:22 39:2 40:21
  43:1,14 44:24
  45:7 46:20 48:6
  48:20 49:4,11
  52:3,8 53:6,12,25
  54:3 57:22 58:8
  58:18 59:3
**huh**  32:12
**hurt**  26:13
**husband**  8:24,25
  26:10 27:19 34:16
  45:4 46:5,8,9 47:4
  47:7 49:15 50:8
  58:9,21
**husband's**  58:24

**i**

**i01:52:06pm**
  37:15
**identification**  32:8
  36:22 38:25 40:19
  42:24 45:5 46:18
**identify**  6:18
**illustration**  5:16
  5:18 38:15,17

  39:9,25 40:13,15
  40:16,22 41:8
**impression**  25:25
  26:18
**income**  30:15,18
  33:6,10,14,19
  34:22,24
**incorporated**  6:10
**independent**  28:13
  44:7
**index**  5:1
**indication**  21:4
**individually**  37:12
**influence**  58:24
**information**  15:10
  17:9 23:1 27:25
  58:19,21
**initial**  45:10
**initialed**  60:6
**ink**  60:6
**instance**  29:15
**instructs**  9:15
**insurance**  1:9,10
  2:9,10 3:16,16
  5:11,13,15,17 6:24
  6:25 20:13 22:6
  24:4,10,20 25:5,20
  28:17,22,25 29:7
  29:11,15 31:4
  32:6 36:10,19
  38:14 48:18,21
  49:25 51:3 53:2,8
  53:19
**insured**  32:14
**interact**  38:8
**interested**  61:18
**interrogatories**
  57:16,19
**interrogatory**
  57:3,9,14

[introduce - management]

introduce  19:5
introduced  19:4
invest  25:22 48:25
    51:3,6 52:1 56:12
invested  38:3
    52:17
investigate  44:4
investing  22:25
    50:3
investment  31:15
    37:4,8 38:5 50:16
    56:21
investments  33:15
    34:22 36:8 52:10
involved  24:17
    49:15
involvement  37:22
ira  48:14
issue  52:14
issued  44:10
iul  56:16

**j**

j  3:20
jason  4:7 7:2
jason.hopkins
    4:11
jennifer  10:23
jewelers  12:7,9,12
    12:13,17,20 13:1,1
    13:4
jewelry  12:24 13:2
jne  1:4 2:4 6:11
job  1:23 35:1
joint  45:23 46:10
jones  37:2,4,5,8,16
    37:23 38:4
joshua  10:24
judge  8:20
july  5:16 38:16
jump  54:7

june  45:17
junior  11:16,23
    12:1
jury  8:20

**k**

kathy  3:20 6:22
    7:18
kathy.huang  3:24
keep  19:25
kevorkian  4:16
    6:13
kids  25:18
knew  26:17 41:3
    44:4 52:16 57:8
know  8:24 9:1
    10:1 20:5 31:18
    31:25 33:22 34:6
    34:10 35:14,20
    36:2,3,4,7 39:18
    40:2 44:1 45:21
    48:12 49:18 50:14
    53:5,9 55:19,21
    57:2,13 58:7
knowledge  47:8
    58:20,23
known  30:18
knows  57:7

**l**

l  8:2,2
lane  8:8
larger  21:13 40:24
larry  1:4 2:4
lawsuit  16:2,5,8
    47:17
lawyer  56:2
learned  31:9,12
leave  54:23
lee  3:7,12 6:20
left  43:22 46:8

legal  55:24 57:6
lesser  40:7
letter  5:21 46:14
    46:15
level  11:14 21:16
    21:17
life  1:9,9 2:9,9
    3:15,16 5:11,13,15
    5:17 6:24,25 7:19
    15:19,19 20:13
    22:6 23:24 24:4,5
    24:10,12,13,15,20
    25:4,20,24 28:17
    28:22,25 29:7,11
    29:15 31:4 32:5
    36:10,19 38:14
    42:2,5 44:3,7
    45:12 46:21 47:5
    47:5,21 48:2,2,18
    48:21 49:25 50:24
    51:3 53:2,8,18,22
life's  53:14
liquid  23:2 34:3,6
    37:1
listed  40:6
little  13:15 14:13
    16:20,21 19:1,16
    24:1 27:2 41:18
    45:17 50:15 54:24
    58:8
live  10:25 25:16
    27:8
lived  8:11
living  35:10,10,21
llc  1:10 2:10 42:1
    42:9 51:11
llp  3:6
loan  30:1
located  6:14
lodge  9:14

long  8:11 10:13
    11:8 12:8,14 13:6
    13:21 14:20 44:5
longer  51:6
look  14:24 15:23
    27:23 31:25 42:22
    43:9,9 44:11,14
looked  16:21 21:9
    57:17
looking  34:7 39:24
looks  15:16 39:6,7
    40:21,23 42:19
    44:10 45:7 46:17
    47:12
los  3:22
losing  49:16
lot  35:11,18

**m**

ma'am  8:21 9:6,11
    9:18,24 10:2,5,8
    10:12 12:21 14:4
    14:10 18:13 19:14
    21:5,19 22:4
    27:18,22 30:16
    32:7 38:13 39:23
    42:7 43:20 44:9
    44:18,22 46:24
    47:15 51:4 52:20
    52:22 57:3
machine  61:9
magazine  28:1
magazines  19:8
mail  17:8 52:14
major  11:25
making  9:9 46:6
man  27:6
manage  37:24
    38:5 41:19 42:15
management  17:4
    21:1,18 22:3
    27:24 28:11

[manager - okay]

manager   13:20,20
marina   4:8 7:4
marina.stefanova
   4:12
marked   32:8
   36:22 38:25 40:19
   42:24 45:5 46:18
market   27:4
marketed   58:3
marketing   19:23
   29:1,6,9
marriage   22:12
   23:14
married   10:11,14
   11:3,4,6,8,11 14:1
   14:3 27:3
material   14:14
   19:24 29:2
materials   29:6
matter   6:8
mean   16:21,22
   20:8 52:12
means   34:6
mechanism   56:16
media   6:6 55:5,9
   59:9
medications   10:3
meet   14:16 17:5,7
   20:23 21:20,23
meet01:23:03pm
   20:15
meeting   20:11
   22:10 26:1 27:15
meetings   25:4,9,10
   25:19
memory   8:24
mentioned   16:24
met   20:18 22:2
   27:5 31:3
middle   18:7

minnesota   1:2,9
   1:10 2:2,9,10 3:15
   3:17 5:11 6:11,24
   6:25 7:19 15:18
   15:19 20:13 22:6
   23:24 24:5,12,13
   24:14,20 25:4,20
   25:23 28:17,22,25
   29:7,11,15 31:4
   32:5 42:2,4 44:3,7
   45:12 46:21 47:4
   47:5,21 48:2,2,18
   48:21 49:25 50:24
   51:3 53:2,8,14,22
minutes   14:22
   54:18,20 55:1
missing   49:5
monday   1:17 2:18
   6:1
money   16:9 20:2,5
   22:11,13,15,16,19
   23:8,13,17,22
   24:10 25:1,12,15
   25:22 27:14 38:3
   40:25 41:4 42:14
   47:18 48:7 49:16
   50:3,18 51:16,25
   52:8,17 58:6
monies   48:24 51:2
   51:6
month   23:25
   29:23 30:8,11
   39:20
monthly   39:17,19
months   12:10
   27:11
moore   3:8 7:5,5
   54:10,15 55:24
   56:17,25 57:4,6,8
   57:12

morning   6:4
mother   14:2
music   11:25
mute   54:8
mutual   1:10 2:10
   3:17 6:25
my01:46:58pm
   34:25

**n**

n   4:9 8:2
name   6:13 7:18,23
   7:25 17:3 42:11
   61:21
named   30:21
names   10:22
need   9:7
need01:05:17pm
   9:25
needed   27:4,8
neither   61:17
net   23:2 33:21
   34:3,6 37:1
never   52:13,14
   55:15,16 56:5,8,12
   56:15 57:25 58:3
new   3:10 19:7
   28:2
news   30:22 31:10
   31:13
newsweek   19:7
   28:1,4
nodding   9:9
not01:37:12pm
   29:5
noted   59:11 60:6
number   5:10
   18:10 41:1 47:20
   59:9
ny   3:10

**o**

o   8:2,2,2
oath   7:9 8:18,19
   61:8
object   22:22 26:2
   37:25 38:19 43:11
   53:10 56:17,25
objection   9:14
   28:15,20 29:18
   34:14 44:23 48:5
   48:19 49:3,10
   53:3,23 55:24
   57:4,5 58:16
objections   54:9
observing   7:3
occasionally   38:9
occupation   12:4
   33:2
october   46:14
odd   51:1
offhand   36:1
office   21:8,9,9,13
   28:9 53:14
offices   17:19 20:23
   20:25 21:1,4 22:3
   22:5
oh   32:4
okay   7:22 8:16
   10:1,18 13:16
   15:5,11,21 16:11
   16:18,24 18:10
   20:12 21:17 25:9
   25:25 27:15 29:22
   30:10 32:22 33:1
   33:10,14,25 34:3,7
   34:18 36:4 37:7
   37:17 38:10 39:5
   39:19,21 40:5,9,13
   40:21 41:6,14
   42:4,17 43:4,8,14
   44:1,6 45:7,16,21

**[okay - property]**

46:9,20 47:12,20
48:1,10,17,23 49:8
49:13,20 50:21
51:2,8,13,19 52:16
54:2,6,11,22 55:2
**old**  21:15
**on01:19:21pm**
18:10
**once**  14:19
**online**  26:14
**open**  28:3
**opportunity**  9:2
**opposed**  40:24
43:5
**option**  44:2
**options**  20:3
**or01:12:08pm**
14:5
**order**  40:7 44:19
45:9
**orig**  15:17
**original**  15:8,11
15:17 61:14
**originally**  41:25
42:1
**outlaid**  39:6
**outlay**  40:6
**outlays**  40:22
**owed**  49:1
**owes**  58:6
**owned**  28:10,17
34:21 37:12

**p**

**p.m.**  2:18,18 6:2,2
6:5 55:4,8 59:7,11
**page**  5:2,10,14
32:10,25 36:19
39:5 42:20 43:18
44:11,12
**pages**  1:24 5:19
42:20 43:5

**paid**  41:2 45:11
47:2,13 48:2,24
50:22
**paid02:06:01pm**
45:25
**papers**  43:4
**paperwork**  15:8
15:12,16,18 22:1
**part**  24:1,6 32:11
**party**  61:19
**pass**  24:23 59:2
**pay**  41:14 42:5
48:9,10,14
**paying**  27:11 41:6
**payment**  5:20
45:16,17,22 46:22
51:22
**payments**  30:18
46:6 47:21,22,24
51:25 52:18,21,23
53:1,7,12,15
**pearl**  4:9
**penalty**  60:1,4
**people**  18:17 20:3
20:8 27:13
**people's**  54:18
**perjury**  60:1,4
**person**  14:16
**personal**  58:19,20
58:23
**pertains**  61:13
**phone**  14:17 17:21
**pictures**  19:7
**piper**  4:6 7:2
**place**  25:16 27:8
28:7
**places**  20:5 27:13
**plaintiff**  1:6 2:6
6:21 16:2
**plaintiffs**  3:4 7:6

**plan**  44:16,21
**planning**  19:13
24:6 26:21 29:16
39:7,13 40:23
41:14 56:24
**please**  6:18 8:1
9:20 16:13 23:3,6
36:25 56:3
**point**  17:5 22:20
37:20 44:1 51:8
52:21
**policies**  36:11
**policy**  5:15,17,19
24:4,10,20 25:5,20
29:1,2,7,11,15,25
30:7 31:4 38:14
41:2,15 42:5,20,20
43:2,8,16,18,23
44:2,10,12 46:1,7
46:21 47:1,2,6,9
47:14 48:18,21
49:25 50:22,24
51:3 53:22 56:16
**position**  12:19
13:9,19
**possession**  42:19
**postcard**  17:10,13
17:15,18,20 18:11
**postcards**  17:8
**potentially**  19:20
**powerpoint**  19:21
**practice**  57:10
**premium**  39:6
40:6,22 41:7,11
44:16,21 45:10,17
45:22,25 46:6
**premiums**  39:8
41:2,15 42:6 47:1
47:13 48:1 50:22
50:25

**preparation**  14:25
**prepare**  14:11
**prepared**  38:15,20
38:23
**present**  6:17 25:21
**presentation**
19:15,16,21 20:1,7
20:12
**presentations**
18:23
**presented**  38:20
38:23
**pretty**  25:23 26:5
26:8,9 27:16
**prevent**  10:3
**previous**  22:12
23:13
**previously**  11:3,6
11:11
**pricing**  27:8
**prior**  9:12 12:11
61:7
**private**  18:20
**probably**  14:22
18:19 25:6 33:9
35:18,18
**problem**  27:12
**proceedings**  61:5
61:7,8,15
**product**  57:23
58:1
**products**  24:11
25:21 58:4
**program**  19:2
**projection**  39:25
40:2
**promoted**  58:3
**properties**  33:15
34:25,25 35:2,9
**property**  34:23
37:15

Page 8

[proposed - rochelle]

**proposed** 32:13
**provide** 9:3,4
  15:13,25 24:10
  36:25 45:2 56:23
**provided** 18:10
  31:24 48:7 57:18
  58:21
**providing** 19:11
  20:3
**publications** 19:8
**purchase** 57:23
**purchasing** 29:8
**purpose** 30:14
**pursuant** 46:20
**purveyors** 13:2
**put** 20:5 22:14,16
  23:22 24:9 25:11
  39:7 40:6 44:21
**putting** 22:15
  23:17,19,25 24:1
  24:22 40:23 41:11
  43:5

**q**

**question** 9:12,15
  9:19,21,22 22:23
  23:2,5,9 26:3 38:2
  38:3 44:23 53:11
  57:15
**question.01:46:2...**
  34:15
**questioned** 26:10
**questioner** 54:19
**questioning** 54:13
**questions** 7:20,21
  8:25 10:10 36:25
  52:5 54:4,5 57:15
  59:3
**quickly** 45:8

**r**

**r** 8:2
**read** 14:13 16:22
  38:22 43:9,21
  60:4
**reading** 34:13
**real** 29:20
**really** 20:4 24:21
  25:15 32:20,24
  34:16 41:12 43:12
  45:8 49:18 54:1
  58:10
**realtime** 2:20
**reason** 10:6 24:19
  53:6
**recall** 13:23 14:20
  17:23 18:1,6,17
  20:2,4,18 21:8,24
  22:19 23:16,18
  24:19 25:3,24
  29:14 32:19,22
  34:7,18 35:7,23
  37:7,22 38:17
  40:16 41:1,3,6,10
  41:21,24 43:1
  51:21 52:6
**receive** 43:24 48:1
**received** 17:8 43:8
  47:12 52:13
**receiving** 30:10
  38:17 39:16 41:4
  43:1 51:8 52:18
**recess** 55:6
**recollect** 9:1
**recollection** 8:23
  9:4 37:3
**recommended**
  56:12,15
**record** 6:5,18 7:24
  9:13 10:1 54:24
  55:3,7 59:6 61:8

61:11
**recorded** 1:15 6:7
**recouped** 25:2
**references** 20:13
**referred** 49:13
**referring** 22:6
**refresh** 37:3
**refund** 47:13
**refunded** 47:1
**regards** 26:11
**regular** 51:17
**related** 51:25
**relationship** 28:22
**relative** 61:18
**relevant** 15:24
**rely** 56:19
**remember** 24:16
  29:5 39:4 41:4,5
**remote** 3:2 4:2
**rent** 8:9 27:5,11
**rental** 33:15,16
  34:23,24 35:11,17
**rentals** 37:15
**rented** 27:13 35:7
**renter** 26:7 27:1
**renting** 35:15
**repeat** 16:13 23:5
  31:11 38:2 56:3
**rephrase** 54:2
**reported** 1:21
**reporter** 2:20,20
  6:15 11:10 61:1,3
**represent** 7:18
**reputation** 26:18
**request** 46:21
  54:24
**requested** 61:16
**rescind** 47:5
**rescinding** 46:21
  47:9

**research** 26:14
  27:21 44:8
**reservations** 17:21
**reserve** 17:21
**reside** 8:5
**residence** 8:9
  35:15
**residences** 35:3
**respond** 9:8 17:13
  17:15,20
**responses** 57:18
**responsibilities**
  12:22
**responsible** 46:6
**rest** 47:18
**restaurant** 17:24
**retail** 12:5,19,23
**retained** 59:10
**retirement** 17:9
  19:12,13 24:6
  25:14 26:21 56:24
**return** 43:23
**returned** 43:15
  46:23 47:2
**review** 61:15
**reviewed** 16:11,14
  16:19
**richard** 11:7
**rick** 17:25
**right** 36:1 43:3
  54:12 58:4
**rocco** 1:4 2:4 6:9
  10:11 11:4 18:15
  18:16 21:20 22:12
  23:16 25:17 27:3
  34:2 37:5,6 38:5,6
  53:4
**rocco's** 37:9
**rochelle** 1:21 2:19
  61:2,24

[rolled - subscribed]

**rolled** 24:25
**room** 18:20 28:9
**rsvp** 17:19
**rsvp'd** 18:11
**rules** 8:16
**run** 28:17

**s**

**safe** 22:14,17,17
24:18 25:16
**sales** 12:5,19 33:2
33:9,11,13
**salesperson** 12:23
**satisfied** 43:22
**savings** 35:23,24
37:20
**saw** 27:25
**says** 32:11 33:2,6
33:21,22 34:4
36:25 37:2,17
38:14,15,19 39:6
43:22 44:12 45:16
45:25 46:20
**schedule** 5:20
**school** 11:19,21
**screen** 31:18 32:2
36:15 38:12 40:11
43:19
**scroll** 32:1
**scrolled** 39:5
**second** 31:19 39:5
44:11
**secure** 20:6 24:23
25:16
**securian** 1:8,9 2:8
2:9 3:15,16 6:9,23
6:25 7:19
**security** 33:13
**see** 15:5 22:6 28:7
29:6,21 30:4
31:19,21 33:21
35:9 36:15,17

**38:11 40:10**
**seeing** 40:16
**seeking** 47:17 48:6
48:23 49:1
**seen** 36:20 46:15
57:16
**sell** 27:4
**selling** 12:24
**seneca** 21:10 27:4
**sent** 14:14
**separate** 42:2
45:15
**september** 20:20
44:11 46:2
**services** 19:10
26:22 56:24
**set** 25:23
**seven** 8:12 10:15
30:8
**sfclasslaw.com**
3:12
**share** 31:18
**shelley** 6:15
**shorthand** 2:20
61:1,3,9
**show** 29:1 31:17
31:22 36:13 38:10
38:11 40:9,11
42:17 44:24 46:13
**showed** 19:7 20:1
28:5 40:15
**shurwest** 1:10
2:10 4:4 7:3 36:19
55:14,15,17,19,21
56:6,8,12,15,20,23
57:25 58:6,7
**shurwest's** 5:13
**shy** 54:11
**side** 43:22
**sign** 20:15 21:18
34:12,17

**signage** 21:3,6
22:6
**signature** 32:13,14
32:20 34:10 61:24
**signed** 15:18 19:3
22:1 34:8
**signing** 15:8,12
20:8 32:19
**silver** 12:24
**similarly** 1:5 2:5
**sincere** 26:9
**single** 35:3,4,15
**sit** 55:16
**situated** 1:5 2:5
**situation** 24:25
26:6,25
**situations** 27:6
**six** 13:22 39:12
**small** 21:8,10
**social** 33:13
**sold** 57:25
**somebody** 18:23
**sorry** 49:13 52:3
56:1 58:14
**soseh** 4:16 6:13
**sound** 37:19 39:10
39:14,22 45:19
46:3
**sounds** 54:10
**sour** 16:10
**south** 3:21 8:6
28:2 35:5
**speak** 14:15,18
18:24 26:7
**speech** 19:1
**spell** 7:23
**spelled** 7:25
**spoke** 14:17,20
**spring** 18:8
**squitieri** 3:6,7
6:19,20,20 7:5

**22:22 26:2 28:15**
28:20 29:18 34:14
37:25 38:19 43:11
44:23 45:3 48:5
48:19 49:3,10
53:3,10,23 54:7,11
54:23
**stack** 43:4
**standalone** 21:11
**start** 10:9 29:21
39:16 41:4 54:12
54:19
**started** 50:12
**state** 7:23 32:17,21
60:11 61:3
**statement** 33:8,23
34:4 43:21 56:20
**statements** 26:12
27:20 52:13
**states** 1:1 2:1
**stating** 52:15
**stefanova** 4:8 7:4
**sticks** 24:21 41:13
**stockbroker** 28:2
**stocks** 34:22 36:5
**stop** 50:11
**stopped** 51:7 52:8
52:21,24 53:12,15
**store** 13:20,20
**storefront** 21:10
21:11,13
**story** 21:16,16
**stospal** 1:4 2:4
**strategy** 24:7
**street** 3:9,21 4:9
8:7 21:16,17
**stuck** 24:24
**studying** 11:24
**stuff** 24:17
**subscribed** 61:20

Veritext Legal Solutions
866 299-5127

[suggest - vs]

| | | | |
|---|---|---|---|
| **suggest** 25:21 | **test** 8:24 | **times** 14:18 21:23 | **undersigned** 61:2 |
| **suggested** 24:9,20 | **testified** 7:10 | 21:25 27:6 | **understand** 8:17 |
| 25:4 28:25 | **testify** 10:7 57:22 | **to02:07:45pm** | 9:5,10,17,19,23 |
| **suggesting** 29:2 | **testifying** 8:19 | 46:20 | 19:10 28:18 39:24 |
| **suite** 4:9 | 10:4 61:7 | **today** 7:17 8:18,22 | 40:5 43:14 44:19 |
| **suited** 22:14 | **testimony** 8:18 9:3 | 9:3 10:4,7 11:1 | 48:16 57:21 |
| **summer** 18:8 | 49:5 59:7 60:7 | 15:3 55:16 | **understanding** |
| **supplement** 30:14 | 61:11 | **today's** 14:11 15:1 | 30:3,6,12 51:13,24 |
| **sure** 18:9 23:7,20 | **thank** 7:16,17 10:2 | 59:7 | **understood** 9:22 |
| 33:24 35:12,12 | 23:4 52:7 54:5 | **told** 29:14 44:6 | 28:10 29:10 42:14 |
| 58:16 | 55:2 59:5 | **topanga** 6:14 | 46:25 |

| | | | |
|---|---|---|---|
| **t** | **that01:48:49pm** | **total** 23:2 33:21 | **unit** 6:6 |
| | 35:20 | 45:25 49:8,12 | **united** 1:1 2:1 |
| **t** 8:2,2 | **thing** 24:21 41:12 | 59:9 | **uploaded** 31:20 |
| **table** 15:4 | **things** 34:12 | **townhouse** 35:11 | **use** 26:20 29:16 |
| **take** 8:19 9:25 | **think** 8:25 10:6 | 35:13,17 | 37:23 38:4 |
| 39:13 40:7 43:9 | 15:24 16:8 18:8 | **townhouses** 35:3 | **usually** 54:18 |
| 44:20 54:9,16,20 | 23:16 25:23 30:8 | **transcribed** 61:10 | |
| **taken** 2:16 6:7 | 31:9,24 33:18,25 | **transcript** 60:5 | **v** |
| 8:13 25:18 26:7 | 39:19 44:25 45:9 | 61:11,14,16 | |
| 26:25 41:17 55:6 | 48:20 50:21 52:4 | **true** 56:10 60:8 | **vague** 48:5 |
| 61:5 | 53:1 54:4 58:6 | 61:11 | **vaguely** 38:24 |
| **talk** 25:13 31:1 | **thinking** 23:18 | **trusting** 34:16 | 40:18 |
| 49:24 50:2,9 | 34:1,10 | **truthfully** 10:4,7 | **value** 35:14,20 |
| **talked** 56:6 | **third** 25:6 | **try** 31:18 | **various** 20:5 27:6 |
| **talking** 50:11 51:1 | **thought** 39:15,15 | **trying** 25:11 31:21 | **verbally** 9:8 |
| 56:2 57:22 58:8 | 52:10,12 | 38:11 40:11 | **veritext** 6:13,16 |
| **taxes** 48:9,10,12 | **thousand** 51:1 | **turn** 40:25 | 59:10 |
| 48:13,15,17,20,25 | **three** 21:25 24:2 | **turners** 12:13,16 | **versus** 6:9 9:9 |
| **telephone** 14:16 | 25:3 29:21 30:4,7 | 12:20 13:1,4 | **video** 1:15 6:7 9:7 |
| 17:16,17 | 30:9,11 34:25 | **two** 10:13,16,21 | 54:9 |
| **tell** 12:22 16:7,25 | 35:2 39:8 40:24 | 11:16 12:1 30:25 | **videoconference** |
| 18:22 19:5,16 | 41:4,13 43:5 | 31:9,13 34:24 | 1:15 2:17 3:25 |
| 22:9 23:21 24:14 | 44:20 | 35:9 42:2 59:9 | 61:6 |
| 33:10 36:1 42:8 | **time** 6:17 9:14,14 | **two01:24:25pm** | **videographer** 4:16 |
| 42:10 47:25 52:6 | 19:20 20:10,15 | 21:15 | 6:4,14 55:3,7 59:6 |
| 53:14 | 21:21,22 22:2 | **tx** 4:10 | **virgil** 11:7 |
| **teller** 13:11,11,11 | 31:8,12 44:5 54:5 | | **volume** 1:18 5:4 |
| **telling** 37:11 | 54:18,21 55:13 | **u** | 60:15 |
| **ten** 12:15 54:20 | 59:11 | | **vs** 1:7 2:7 |
| 55:1 | | **u.s.** 6:10 | |
| | | **uh** 32:12 | |

[waiting - zoom]

| w | |
|---|---|

**waiting** 28:9
**walk** 8:8 15:6
**want** 20:20 21:25
  24:24 26:12 45:8
  49:17 54:20
**wanted** 24:18
  25:15 27:17
**way** 16:10 25:7
  42:15 43:10 52:16
  52:17 58:25
**ways** 25:21
**we've** 54:17
**wealth** 17:4 20:25
  21:18 22:3 27:24
  28:11
**week** 14:23
**went** 9:1 16:10
  18:22 19:2 24:25
  40:22
**whereof** 61:20
**whispering** 58:9
  58:11,22,24
**wife** 14:1 22:17
**wife's** 22:16 24:22
**withdrawal** 29:25
**witness** 5:2 23:5
  26:5 29:20 43:12
  53:4,24 54:6,22
  55:2 56:18 57:1
  59:2,5 61:20
**witnesses** 61:6
**wonderful** 32:4
**word** 16:16
**words** 16:7
**work** 12:11,14
  13:4,6,16,21 27:17
**worked** 12:8 13:12
  13:23 14:9
**working** 12:11,16
  13:25

**works** 56:6
**worth** 23:2 33:21
  34:3,6 37:1
**would02:04:00pm**
  44:20
**write** 45:20
**wrong** 38:22 52:12

| x | |
|---|---|

**x** 19:18 61:16

| y | |
|---|---|

**yeah** 15:19 46:17
  47:22
**year** 11:21 30:24
  39:12,13 42:5
**years** 8:12 10:15
  11:9,16 12:1,15
  13:8,22 24:2
  29:21 30:4,7,9,11
  30:25 31:9,13
  39:8 40:24,25
  41:2,5,13 44:20
**york** 3:10 19:7
  28:2
**your02:08:30pm**
  47:5

| z | |
|---|---|

**zoom** 3:2 4:2 6:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT C

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MINNESOTA
 3                        - - -
 4
 5
 6   ELEANOR AND ROCCO CIOFOLETTI,  ) Case No.
     and LARRY STOSPAL, on behalf   ) 18-cv-03025-JNE-ECW
 7   of themselves and all others   )
     similarly situated,            )
 8              Plaintiff,          )
                vs.                 )
 9   SECURIAN FINANCIAL GROUP,      )
     INC., MINNESOTA LIFE INSURANCE )
10   COMPANY, SECURIAN LIFE         )
     INSURANCE COMPANY, SHURWEST    )
11   LLC and MINNESOTA MUTUAL       )
     COMPANIES, INC.,               )
12              Defendants.         )
      - - - - - - - - - - -         )
13
14
15
16   VIDEOTAPED DEPOSITION THROUGH THE ZOOM PLATFORM OF:
17                   LARRY STOSPAL
18             WEDNESDAY, JANUARY 27, 2021
19                    2:24 P.M.
20
21
22
23   Reported by:
24   TERI J. NELSON
25   CSR NO. 7682, RPR
```

Page 1

1    Videotaped Deposition through the Zoom
2  platform of LARRY STOSPAL, the witness, taken on
3  behalf of Defendants Securian Financial Group, Inc.,
4  Minnesota Life Insurance Company, Securian Life
5  Insurance Company and Minnesota Mutual Companies,
6  Inc., on Wednesday, January 27, 2021, 2:24 P.M.,
7  before Teri J. Nelson, CSR No. 7682, RPR, pursuant
8  to Notice.
9
10  APPEARANCES OF COUNSEL:
11
12  FOR PLAINTIFF:
13       SQUITIERI & FEARON, LLP
14       BY:  LEE SQUITIERI, ESQ.
15       32 East 57th Street
16       12th Floor
17       New York, New York 10022
18       212-421-6492
19       lee@sfclasslaw.com
20
21
22
23
24
25

Page 2

1  APPEARANCES (Continued):
2
3  FOR THE DEFENDANTS SECURIAN FINANCIAL GROUP, INC.,
4  MINNESOTA LIFE INSURANCE COMPANY, SECURIAN LIFE
5  INSURANCE COMPANY AND MINNESOTA MUTUAL COMPANIES,
6  INC.:
7       ALSTON & BIRD, LLP
8       BY:  KATHY J. HUANG, ESQ.
9       333 South Hope Street
10      16th Floor
11      Los Angeles, California 90071
12      213-576-1000
13      kathy.huang@alston.com
14
15  FOR DEFENDANT SHURWEST, LLC:
16      DLA PIPER LLP
17      BY:  JASON HOPKINS, ESQ.
18         MARINA STEFANOVA, ESQ.
19      1900 North Pearl Street
20      Suite 2200
21      Dallas, Texas 75201
22      214-743-4546
23      jason.hopkins@dlapiper.com
24      marina.stefanova@dlapiper.com
25

Page 3

1  APPEARANCES (Continued):
2
3  ALSO PRESENT:
4       Beth Wiederholt, Esq., Securian Financial
5       Group
6       Jennifer Williams, Videographer, Veritext
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            I N D E X
2
3  WITNESS         EXAMINATION           PAGE
4  LARRY STOSPAL
5       By Ms. Huang:          9
6       By Mr. Hopkins:        105
7
8         E X H I B I T S
9  NO.     DESCRIPTION            PAGE
10  Exhibit 1   Seven-page document, the first    53
11       page of which is entitled
12       "Application Part 1, Individual
13       Life Insurance," Bates stamped
14       ML0000322-ML0000327 and
15       ML0000370
16  Exhibit 2   16-page document, the first page   54
17       of which is entitled "FIP, LLC,
18       Qualified Purchase Agreement,
19       August 2016
20  Exhibit 3   36-page document, the first page   65
21       of which is entitled "Life
22       Insurance Policy Illustration,
23       Eclipse Indexed Universal Life"
24       dated December 8, 2016
25

Page 5

2 (Pages 2 - 5)

| | E X H I B I T S | |
|---|---|---|
| 1 | | |
| 2 | NO.        DESCRIPTION           | PAGE |
| 3 | Exhibit 4   36-page document, the first page | 71 |
| 4 | of which is entitled "Life | |
| 5 | Insurance Policy Illustration, | |
| 6 | Eclipse Indexed Universal Life" | |
| 7 | dated January 17, 2017, Bates | |
| 8 | stamped ML0000431-ML0000466 | |
| 9 | Exhibit 5   23-page document, the first page | 74 |
| 10 | of which is entitled "Your | |
| 11 | Policy Information," Bates | |
| 12 | stamped ML0000497-ML0000519 | |
| 13 | Exhibit 6   Two-page document, the first | 90 |
| 14 | page of which is a letter from | |
| 15 | Securian Financial to Larry | |
| 16 | Stospal dated November 12, 2019 | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 6

1    MR. SQUITIERI:  Good afternoon.

2    Counsel for the Plaintiff and for the

3  witness today is Lee Squitieri of Squitieri &

4  Fearon.

5    MS. HUANG:  Good afternoon.

6    This is Kathy Huang from Alston & Bird on

7  behalf of Defendant Securian Financial Group,

8  Minnesota Life Insurance Company, Securian Life

9  Insurance Company and Minnesota Mutual Companies.

10    MR. HOPKINS:  Jason Hopkins, DLA Piper, on

11  behalf of Shurwest.

12    MS. STEFANOVA:  And Marina Stefanova on

13  behalf of Shurwest.

14    MS. WIEDERHOLT:  And I'm Beth Wiederholt.

15  I'm in-house counsel for Securian Financial Group.

16    THE VIDEOGRAPHER:  Thank you.

17    Will the court reporter please swear in the

18  witness.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

Page 8

1        WEDNESDAY, JANUARY 27, 2021,

2            2:24 P.M.

3

4    THE VIDEOGRAPHER:  Good afternoon.

5    We are on the record at 2:24 Central time

6  on January 27th, 2021.

7    Audio and video recording will take place

8  unless all parties agree to go off the record.

9    This is media one of the video-recorded

10  deposition of Larry Stospal taken by counsel for

11  Defendant in the matter of Eleanor and Rocco

12  Ciofoletti versus Securian Financial Group, et al.,

13  filed in the U.S. District Court for the District of

14  Minnesota, case number 18-cv-03025-JNE-ECW.

15    This deposition is being held remotely via

16  zoom.

17    My name is Jennifer Williams from Veritext.

18  I'm the videographer.

19    The court reporter is Teri Nelson from

20  Veritext.

21    I am not related to any party in this

22  action, nor am I financially interested in the

23  outcome.

24    Counsel will now state their appearances

25  and affiliations for the record.

Page 7

1        LARRY STOSPAL,

2    having been first duly sworn, was

3    examined and testified as follows:

4

5        EXAMINATION

6

7  BY MS. HUANG:

8    Q.  Good afternoon, Mr. Stospal.

9    Thank you for being patient while we sort

10  all this out.

11    Can you please state and spell your name

12  for the record?

13    A.  Sure.

14    Larry Stospal, L-a-r-r-y, last name

15  Stospal, S-t-o-s-p-a-l.

16    Q.  My name is Kathy Huang.

17    You heard me introduce myself earlier.

18    I'll be taking the bulk of your deposition,

19  and then Jason will be asking the rest of the

20  questions.

21    We're here today to take your testimony

22  relating to the lawsuits filed against our clients.

23    Have you taken your dep- -- have you had

24  your deposition taken before?

25    A.  No.

Page 9

3 (Pages 6 - 9)

1    Q. Okay. So I'll go over some ground rules.
2        Do you understand that your testimony here
3  today is under oath and that it's the same oath you
4  would take if you were testifying in front of a
5  judge or a jury?
6    A. Yes.
7    Q. We ask that you respond verbally rather
8  than shaking or nodding your head.
9        Okay?
10   A. Yes.
11   Q. Let me finish each question I ask prior to
12 you answering.
13       That way, the record will be more clear.
14       Is that okay?
15   A. Yes.
16   Q. If you don't understand a question I'm
17 asking, please let me know, I am happy to rephrase
18 or clarify, but if you answer the question, I'm
19 going to assume that you understood what I was
20 asking.
21       Okay?
22   A. Yes.
23   Q. I'm happy to break whenever you need one.
24       Just let us know.
25       From time to time, your counsel may be

1  interposing objections.
2        You can still answer the question unless he
3  instructs you not to.
4        Okay?
5    A. Yes.
6    Q. Are you on any medications that would
7  prevent you from testifying truthfully today?
8    A. No.
9    Q. Is there any other reason why you would not
10 be able to testify truthfully and fully today?
11   A. No.
12   Q. What is your date of birth?
13   A. August 16th, 1979.
14   Q. What is your current address?
15   A. 1172 Sequoia Trail, Canyon Lake, Texas.
16   Q. How long have you lived at that address?
17   A. A year and two months.
18   Q. Where did you live previous to living at
19 that address?
20   A. In San Antonio, Texas.
21   Q. And that's where you lived when you applied
22 for the life insurance application from Minnesota
23 Life?
24   A. No.
25       It was at a previous address before that.

1    Q. And what was that address?
2    A. I don't have the address offhand.
3        It was in an apartment complex.
4        I can get that to Lee, if you'd like.
5    Q. Okay. And the address where you currently
6  reside, do you own or rent there?
7    A. I own.
8    Q. Is that a house or a condo?
9    A. House.
10   Q. Are you married?
11   A. No.
12   Q. Have you ever been married?
13   A. Yes.
14   Q. Do you have any children?
15   A. No.
16   Q. Did you attend college?
17   A. Yes.
18   Q. What is the highest level of education that
19 you attained?
20   A. Undergraduate degree.
21   Q. What was your undergraduate degree in?
22   A. Business and health care management.
23   Q. What year did you graduate from college?
24   A. 2004.
25   Q. What university did you attend?

1    A. Marshall University.
2    Q. As part of obtaining your degree, did you
3  take any business courses?
4    A. Yes.
5    Q. And what types of business courses did you
6  take?
7    A. Business and health care administration
8  courses.
9    Q. Did those courses include any accounting
10 courses?
11   A. Yes.
12   Q. Would that have been basic accounting
13 courses or higher level accounting courses?
14   A. Basic accounting courses.
15   Q. What is your current occupation?
16   A. Medical -- medical sales.
17   Q. Do you sell devices or pharmaceuticals,
18 drugs?
19   A. Devices -- devices as well as point of care
20 testing.
21   Q. And who are you employed by?
22   A. MedTech/MedCare.
23   Q. How long have you been employed by them?
24   A. Six years.
25   Q. So from 2014 to the present?

4 (Pages 10 - 13)

| | |
|---|---|
| 1    A.  Correct. | 1        MR. SQUITIERI:  -- when I say "objection," |
| 2       That would have been September of 2014. | 2  if -- if that's all I say -- |
| 3    Q.  Do you have a position title? | 3        THE WITNESS:  Yep. |
| 4    A.  Territory sales manager. | 4        MR. SQUITIERI:  -- go ahead and answer. |
| 5    Q.  Did you begin at that level, or have you | 5        I try to throw it in there quick so I don't |
| 6  been promoted in the last six years? | 6  interrupt you. |
| 7    A.  Yes, I -- I began as a surgery center | 7        THE WITNESS:  Okay. |
| 8  representative. | 8        Would you like me -- so am I supposed to |
| 9    Q.  Prior to your job at MedTech, where did you | 9  answer the question? |
| 10  work previously? | 10       I'm sorry. |
| 11    A.  BB&T Bank. | 11       MR. SQUITIERI:  Yes. |
| 12    Q.  And what was your position there? | 12       When I -- when all I say is "objection," |
| 13    A.  Merchant sales consultant for Texas. | 13  you can go ahead and answer. |
| 14    Q.  What does that mean? | 14       THE WITNESS:  Okay. |
| 15    A.  Credit card processing, ACH, working with | 15       MR. SQUITIERI:  If I should say "Don't |
| 16  corporate -- corporate bankers as well as commercial | 16  answer the question" or "Wait a minute" -- |
| 17  bankers' business needs. | 17       THE WITNESS:  Sure. |
| 18    Q.  And how long did you work at BB&T Bank? | 18       MR. SQUITIERI:  -- that means you hold up, |
| 19    A.  Five years, three months. | 19  but when I just say "objection," and I get it out |
| 20    Q.  So from about 2009 to two -- 2014? | 20  there quick, it's because I don't want to interrupt |
| 21    A.  Approximately, yes, I -- I believe so.  I | 21  you, and you should proceed to answer the question. |
| 22  don't have the calendar in front of me, but yes. | 22       THE WITNESS:  Okay.  Thank you. |
| 23    Q.  And before you took that position at BB&T | 23       Repeat the question again, please, ma'am. |
| 24  Bank, where did you work? | 24  BY MS. HUANG: |
| 25    A.  I was in Washington, D.C., I -- I had just | 25    Q.  Sure. |
| Page 14 | Page 16 |
| 1  graduated, let's see, it was 2004, I worked for a | 1        The question is:  Do you consider yourself |
| 2  company prior -- well, I'm -- let me rephrase that. | 2  a fairly savvy person in finance and accounting? |
| 3        I worked for Sunrise Senior Living, a | 3    A.  No, not in finance and accounting 'cause it |
| 4  health care. | 4  was not my spec- -- specialty. |
| 5    Q.  And what position did you hold there? | 5    Q.  Well, would you consider yourself to have |
| 6    A.  Community relations director. | 6  at least a background in accounting? |
| 7    Q.  And what were your responsibilities in that | 7        MR. SQUITIERI:  Objection. |
| 8  position? | 8        THE WITNESS:  It would be -- it would be |
| 9    A.  So I -- I managed the community for | 9  beginning accounting.  Definitely did not get a CPA |
| 10  assisted living and Reminiscence Neighborhood, well, | 10  degree whatsoever.  It's very vague in accounting. |
| 11  Alzheimer's care patients.  My role and | 11  I was happy to get through those courses at the |
| 12  responsibility was to make sure I -- I worked with | 12  time. |
| 13  different coordinators and planners to promote our | 13  BY MS. HUANG: |
| 14  senior living community as a place for mom and dad | 14    Q.  But you do have a -- you did take courses |
| 15  based on their elder care needs. | 15  on accounting, and you do have some background with |
| 16    Q.  Okay.  And was that your first position out | 16  regards to accounting; correct? |
| 17  of university? | 17    A.  Correct, beginning accounting, correct. |
| 18    A.  In terms of career-wise, yes. | 18    Q.  Did you do anything to prepare for today's |
| 19       Prior, I had some temp jobs getting out of | 19  deposition? |
| 20  school. | 20    A.  Yes. |
| 21    Q.  Would you consider yourself a fairly savvy | 21    Q.  And what did you do to prepare for today's |
| 22  person in finance and accounting? | 22  deposition? |
| 23       MR. SQUITIERI:  Objection. | 23    A.  Worked with my attorney directly. |
| 24       What -- Larry -- | 24    Q.  Did you meet by telephone or in person with |
| 25       MS. HUANG:  Okay. | 25  your attorneys? |
| Page 15 | Page 17 |

5 (Pages 14 - 17)

1    A. Zoom. Zoom.
2    Q. On Zoom?
3       Okay. And how many times did you meet with
4 your attorneys?
5    A. Through the whole entire process or just
6 this --
7    Q. Just to prepare for this deposition.
8    A. Probably 15, 16 different episodes, at
9 least, maybe more, I mean very detailed.
10   Q. Was that over the last few weeks?
11   A. No.
12      This has been over the last few years,
13 about --
14      Lee, you'd have to answer that question.
15      I'm not certain the --
16      MR. SQUITIERI: You just need to answer as
17 best you can.
18      THE WITNESS: Okay. Got you.
19      MR. SQUITIERI: So if you mean a -- a few
20 months, if you mean a few years, just whatever you
21 remember.
22      THE WITNESS: I -- I believe it's been
23 maybe a little over a year, approximately.
24 BY MS. HUANG:
25   Q. Okay. So you've met with your attorneys

Page 18

1 about 15 times over the last year.
2    A. Yes.
3    Q. What about in the recent weeks in order to
4 prepare for this deposition, how many times did you
5 meet with them?
6    A. Three.
7    Q. Were they all over Zoom?
8    A. Yes.
9    Q. Did you collect any documents in
10 preparation for this deposition?
11   A. Yes.
12   Q. And what documents did you collect?
13   A. FIP-related documents. Lee has already had
14 the documents in his hands specific. This was
15 preparation for the beginning of this deposition
16 that was supposed to be taking place since I believe
17 last year, so in -- in terms of the universal life
18 insurance policy and any documents that was executed
19 specifically related to this matter.
20   Q. So you went through your files, and you
21 collected all documents related to FIP and to your
22 Minnesota Life UL policy and provided those to your
23 counsel?
24   A. Correct.
25   Q. Did you go through your E-mails and provide

Page 19

1 any E-mails that were related to FIP or your
2 universal life policy?
3    A. Yes.
4    Q. Did you review any documents in preparation
5 for today's deposition?
6    A. Yes.
7    Q. And what documents were those?
8    A. Questions just preparing for this matter.
9    Q. I'm sorry.
10      I didn't hear what you said.
11   A. I said just questions related to this
12 matter for preparation.
13   Q. Oh, okay.
14      Something provided by your counsel to you?
15   A. Correct.
16   Q. Did you look at any documents, other
17 documents, so for instance, documents related to the
18 FIP purchase or your universal life policy, in
19 preparing for this deposition?
20   A. Not in the re- -- not recently, but we have
21 previously, those specific documents, yes, documents
22 relating to some court-related documents that was
23 sent over from Lee that we discussed.
24   Q. Did you ever review the complaint in this
25 matter?

Page 20

1    A. Yes.
2    Q. Tell me in your own words what you think
3 this lawsuit is about.
4    A. Fraud, specifically. I got placed into a
5 fraud Ponzi scheme by my Minnesota Life
6 representative that stated that he would fund --
7 this would be a great vehicle to fund my premiums in
8 the -- a specific policy. Unfortunately, I was a
9 victim of this matter. It's unfortunately that I
10 put a 401(k) that was supposed to be growing
11 tremendously in -- into a fund that was -- was
12 fun- -- that was run by an ex-convict by the name of
13 Scott Kohn.
14   Q. Okay. And other than this lawsuit, have
15 you ever been a plaintiff in another lawsuit?
16   A. No.
17   Q. Have you ever been a defendant in a
18 lawsuit?
19   A. No.
20   Q. Do you know an individual named Michael
21 Cook?
22   A. Yes.
23   Q. Tell me who he is.
24   A. He was my representative for Minnesota
25 Life, he set me up with the universal life indexed

Page 21

6 (Pages 18 - 21)

1 fund recommended by and advised the FIP policy
2 specifically, and that's how I -- I know him as an
3 individual.
4     Q. Okay. How did you meet Mr. Cook?
5     A. I -- I met him in -- in San Antonio at a
6 function by -- with medical representatives, and
7 I -- I met him through -- it was a -- I can't
8 remember, it was a happy hour with medical
9 representatives, and he -- I heard his story and
10 what he does for a living, I had a need specifically
11 to have a retirement portfolio, he sounded like a
12 great advisor. That's how I met him.
13     Q. Was he presenting at this function?
14     A. No.
15     Q. So when you said you heard his story, did
16 you -- was he telling the story to you personally at
17 this function?
18     A. Yes. It was a one-on-one conversation.
19     Q. And how did he introduce himself?
20     A. So at the function -- so there -- it was
21 medical representatives, I was at a function with
22 med- -- it was a McKesson meeting, McKesson
23 Medical-Surgical, and he was the -- the husband of
24 the regional manager specifically, and that's how I
25 met him, through -- through medical sales function.

Page 22

1     Q. Okay. So he was an attendee/guest, and you
2 ended up talking to him at this function.
3     A. Correct.
4     Q. And what did he tell you that he did for a
5 living?
6     A. He was an advisor for Minnesota Life, and
7 he -- financial advisor to set a pathway for his --
8 of his clients having a long-term relationship to
9 impact their financial needs for -- for the
10 individual and their family, and the -- the
11 conversations that I had with him, he sold himself
12 very well, I researched him online as well, and he
13 had a good background, he was on several different
14 talk shows as well, and I trusted him.
15     Q. Okay. So when you first met him, he told
16 you he was a financial advisor in those words, or
17 did he tell you he was an insurance agent?
18     A. I can't remember, so I can't answer that
19 question. I -- I don't know the answer to that
20 because it was way too long.
21     Q. Okay. Well, what made you think that he
22 was a financial advisor from Minnesota Life?
23     A. Well, not a financial advisor, but -- a
24 financial advisor, but he's a representative for --
25 for Minnesota Life.

Page 23

1     Q. Okay. So never told you he was a financial
2 advisor from Minnesota Life, but rather that he was
3 a representative from Minnesota Life.
4     A. Yeah, he's a representative, but financial
5 advisor, he was a financial advisor --
6         I can't answer that question thoroughly
7 because I don't remember.
8     Q. Okay. I'm just trying to get an
9 understanding as to what you thought he was.
10     A. Sure.
11     Q. So if he told you he was an insurance
12 agent, I'd like to know that.
13         If --
14     A. Sure.
15     Q. If he told you he was a financial advisor,
16 I'd like to know that.
17     A. Yeah.
18         So let's just say I don't remember exactly
19 the -- the question. I just know him being -- he
20 would help financially secure retirement, and it was
21 through a universal life indexed fund specifically,
22 right, but I don't remember the words verbatim
23 that -- from that timeline.
24     Q. Okay. And did he tell you that he worked
25 for a variety of insurance companies, or did he just

Page 24

1 specifically mention Minnesota Life?
2     A. Minnesota Life.
3     Q. And he didn't tell you whether he worked
4 with any other insurance companies.
5     A. No.
6     Q. Okay. And you don't recall him saying he
7 was a financial advisor for Minnesota Life.
8     A. I don't -- I don't remember. I don't
9 remember exactly. It's been way too long. I'd love
10 to give you my fresh memory here, but unfortunately,
11 I don't remember the actual statement.
12     Q. Okay. So you met Mr. Cook at this
13 function.
14         What happens next?
15         Did you give him a call, or did he give you
16 a call?
17     A. No, I actually called him.
18         We set a meeting, it was at his office, and
19 we -- we just discussed just having a secure future
20 in -- in terms of a -- a universal indexed fund, and
21 so I had a universal indexed fund planted, I believe
22 it's called a 401(k) reboot, I believe that's what
23 it was called, but we set a -- a meeting
24 specifically at his office, and then we started the
25 conversations in -- in terms of the universal life

Page 25

7 (Pages 22 - 25)

```
 1  indexed policy first.
 2      Q.  Do you recall what year you met Mr. Cook?
 3      A.  Gosh.
 4          I think it was 2016.
 5      Q.  And did you meet with him in person shortly
 6  after you met him at the function --
 7      A.  Yes.
 8      Q.  -- the medical function?
 9      A.  Yes.
10      Q.  You keep saying "IUL fund."
11          Can you tell me what you mean by that, the
12  indexed universal life fund?
13          I think you referenced it a few times now.
14          Can you tell me what you mean by that?
15      A.  Yeah.
16          It's a life insurance policy, of course.
17          I mean I'm not the expert with the policy
18  whatsoever, so I rely on my Minnesota Life
19  representative to go over --
20          Like let's say, for example, I'm a
21  specialist when it comes to cardiology equipment;
22  correct?
23          I have no idea when it comes to finances in
24  terms of a universal life, and that's why I rely on
25  an advisor to help me with my needs.
                                                Page 26
```

```
 1          I'm not supposed to understand it fully.
 2          They're supposed to understand it.  That's
 3  why we pay them.
 4      Q.  Right.
 5          And I'm just trying to get an understanding
 6  of what you understand.
 7          So when you say "indexed universal life
 8  fund," you're referring specifically to an indexed
 9  universal life policy, or are you referring to
10  something else?
11      A.  No, a policy.
12      Q.  Okay.  So you met with Mr. Cook at his
13  office.
14          Can you tell me what went on during that
15  meeting?
16      A.  Yeah.  Sure.
17          We just discussed a universal life indexed
18  fund that would -- that -- that I could grow and --
19  and -- and specifically help for my retirement for
20  the future, right, I was allocating $1,000 a month
21  in that specific fund at the beginning, and of
22  course he had some graphs and -- with information
23  that I gave him specifically on how much that I
24  would start funding the policy.
25          And of course when it -- when it comes to
                                                Page 27
```

```
 1  specific finances and -- and life indexed fund --
 2  universal life indexed fund like that, I'm not going
 3  to fully understand it, correct, but that's -- like
 4  I said, that's why I rely on an advisor specifically
 5  to help me do that process.
 6      Q.  Let's break that down a little bit.
 7          So you met with Mr. Cook in his office.
 8          You did not have life insurance at that
 9  time, or did you?
10      A.  No.
11      Q.  And did you have a retirement plan at that
12  time?
13      A.  Yes.
14      Q.  And what was that retirement plan?
15      A.  It was with BB&T Bank.  I was -- I was
16  fully vested with BB&T Bank and had a 401(k) with --
17  with the financial institution.
18      Q.  Do you recall how much you had in your
19  401(k) at the time you met with Mr. Cook?
20      A.  Yes.
21          It was -- I have it here.
22          It was $26,320 in that 401(k) with -- that
23  was listed with the bank.
24      Q.  Did you have any other retirement funds?
25      A.  I had some stocks, but nothing affiliated
                                                Page 28
```

```
 1  with Mike.
 2      Q.  Okay.  Do you know how much you had in
 3  stock at that point?
 4      A.  I'm not sure.
 5      Q.  So you met with Mr. Cook in his office to
 6  talk about --
 7          What did you talk about?
 8          A retirement plan?
 9      A.  Yes.
10      Q.  Okay.  And -- and I think you said
11  something --
12          How did the idea of obtaining a life
13  insurance policy come up?
14      A.  Well, he asked me what -- what I looked
15  into the -- the future in -- in terms of what my
16  goals were as a whole, and he projected a plan that
17  sounded very, very good and very secure for the
18  future and allocating a certain amount of money
19  specifically at the beginning and increasing, and
20  then he intro- -- introduced the -- after that
21  meeting prior, he int- -- introduced the FIP
22  opportunity.
23      Q.  Okay.  What did you tell him your goals
24  were for the future?
25      A.  Financially sound, being able to -- in
                                                Page 29
```

1 terms of re- -- retirement, in -- in -- in terms of
2 having an opportunity to have secure growth with
3 my -- with family as well as finances, just like
4 everyone else, what -- what they want out of life in
5 terms of planning for the future.
6     I mean that's -- that's pretty much pretty
7 concrete conversation we had.
8     Q. Did you -- did you have a goal in mind as
9 to when you wanted to retire?
10     A. Well, tomorrow would be great, but that's
11 not going to happen.
12     Well, in terms of, like, being 60, 60 years
13 old, that was -- that was my ideal age.
14     Q. Okay. So you and Mr. Cook talked about
15 being financially secure, having finances for your
16 retirement, possibly retiring around 60, and then
17 did he present you with some ideas as to how you
18 could do that?
19     A. Yeah, he did.
20     He -- he presented the universal life
21 indexed fund.
22     Of course at the beginning, I didn't
23 understand it well because that's not my job to
24 understand it.
25     I -- I believed in hiring an -- an advisor

Page 30

1 specifically on a univer- -- from Minnesota Life
2 to -- to know the right answers because that's what
3 he did for a living, that's his career, and I'm not
4 expected to know all the answers on -- on -- on a --
5 on a specific topic like that.
6     Q. Okay. So when he mentioned -- you keep
7 saying "fund," but was he suggesting that you apply
8 for an indexed universal life policy?
9     A. Yes.
10     Q. And what did he tell you the benefits would
11 be for applying for such a policy?
12     A. Okay. Well, one of the benefits is the
13 funds, specifically on the -- on my target date of
14 retirement, there was an illustration, and I shared
15 this with my attorney Lee as well, specifically on
16 how much money after a certain amount of time that
17 you put into the actual fund, what you'd be
18 allocated yearly when you -- when you hit your
19 target date of retirement.
20     Q. Okay. So did he tell you that if you put
21 in a certain amount of premiums every year, you
22 could grow the account value to a certain amount
23 over a span of time?
24     A. Yes.
25     Q. Okay. And then at some point in time, did

Page 31

1 you have a plan as to what you were going to do with
2 the account value of your policy?
3     A. Well, no, 'cause we were in beginning
4 stages, of course. When we had this meeting I
5 haven't had this -- this policy for long term. It's
6 been short term.
7     Of course, I had ran into the FIP
8 opportunity, which that definitely crashed our
9 relationship.
10     Q. Okay. But when you applied for this
11 indexed universal life policy from Minnesota Life,
12 was the plan to hold it for a long time or for a
13 short period of time?
14     A. Long term.
15     Q. Okay. And what was the plan with the
16 policy long term?
17     Were you going to take pol- -- policy loans
18 from the policy?
19     A. Yeah.
20     So we were going to put -- put the --
21 the -- so for -- the FIP policy was going to pay for
22 the -- the premiums, that was the objective, that
23 was the goal, that's what he illustrated to me
24 specifically. He said "This is a safe, secure
25 policy," and of course that was the conversation

Page 32

1 that -- what we had.
2     Q. When he was explaining an indexed universal
3 life policy to you, did he explain that it was
4 tied -- it would be tied or account -- one of its
5 accounts could be tied to -- to the market, to the
6 stock market in -- in some way?
7     A. I don't remember that conversation.
8     Q. Okay. Did you understand that your -- that
9 an indexed universal life policy would have two
10 accounts, one as a fixed account, and the other is
11 an indexed account?
12     A. So the conversations I had, it was
13 pretty -- it's pretty -- pretty basic.
14     So bottom line, I -- I trusted him, right,
15 and so when -- when I trusted -- trust the guy that
16 I met and was recommended as well, I -- I -- I knew
17 him through medical sales specifically 'cause
18 he's -- he's been in the circle, I -- I didn't -- I
19 didn't want to have any type of worry in -- in -- in
20 terms of -- of having a good trust and a bond of
21 what they're going to be doing with -- with the
22 money that I invest.
23     Q. I understand that.
24     I'm just trying to figure out what you
25 thought the indexed universal life policy was going

Page 33

9 (Pages 30 - 33)

1 to do for you in the long run.
2    A.  Well, of course it -- it was going to
3 secure my retirement.  That's what it was going to
4 do.  That was the goal.  That was the objective.
5    Q.  Okay.  And did you understand that you had
6 to put in a certain amount of premiums in order for
7 it to grow at a certain rate?
8    A.  Yes, of course.  I mean $100 is not going
9 to do -- do it for a universal -- of course you have
10 to allocate -- just you have to invest in -- in what
11 you're putting into the actual fund for it to grow
12 on a -- on amount, and of course we were working on
13 a plan to allocate within five -- I think it was a
14 five-year plan, don't hold me to that 'cause I don't
15 remember specifically, but putting the -- a plan
16 together that was going to be a good vehicle for the
17 future.
18    Q.  Okay.  And did Mr. Cook ever explain to you
19 that if you don't put in the amount of premiums, a
20 certain amount of premiums, that it wouldn't grow at
21 the rate that you wanted it to grow at?
22    A.  Yes.
23       That's common sense.
24    Q.  Okay.  And did he explain to you that after
25 a certain number of years you would be able to take

1 out interest-free policy loans from your indexed
2 universal life policy?
3    A.  Yes.
4    Q.  Okay.  And was the plan to use those policy
5 loans during retirement to supplement your -- your
6 income in any way?
7    A.  I can't -- well, based on the policy, I
8 can't remember -- like this -- this was a -- a -- a
9 new policy, so we were -- I was starting the process
10 for the universal indexed policy, so I -- I don't
11 remember the conversation.
12    Q.  Did you understand that when designed
13 properly with the right funding strategy it's
14 entirely appropriate to use an indexed universal
15 life policy as part of a retirement plan, retirement
16 savings strategy?
17    A.  Yes.
18    Q.  How many times did you meet with Mr. Cook
19 before you applied for the Minnesota Life policy?
20    A.  Probably twice.
21    Q.  Did Mr. Cook introduce to you any other
22 products that he thought you should be looking into?
23    A.  Yes.
24       FIP.
25    Q.  And what is FIP?

1    A.  A fraud Ponzi scheme by -- created by Scott
2 Kohn.
3    Q.  What was FIP when he told you about it?
4       What did he tell you about FIP?
5    A.  So this is what he explained to me.
6       So FIP was designed in -- in terms -- he
7 had this illustration on his board and had circled
8 several different loans for -- for -- for people
9 specifically and basically funding these loans at a
10 higher interest for -- that's what -- that was told
11 to me specifically, and of course I trust him, I --
12 I thought it was a -- a -- a good move, and then
13 un- -- unfortunately, it was a deal that fell apart,
14 and I lost a significant amount of money.
15    Q.  Okay.  So when you say "funding loans at a
16 higher interest," do you mean you were going to give
17 money to FIP, or what do you mean by "funding loans
18 at a higher interest"?
19    A.  Yes.
20       So -- so I -- so this FIP agreement, this
21 policy, I put $26,320 into it.  That -- that's the
22 number that I put into it.
23    Q.  Okay.  And what were you expecting back?
24    A.  A return.
25    Q.  Was it a monthly return?

1       A yearly return?
2       And what -- did -- did he tell you there
3 was going to be a certain interest rate paid?
4    A.  So he didn't -- he didn't go over that
5 specific portion, no, but he said this -- this would
6 be an excellent tool to invest in because other --
7 other -- not advisors, but other Minnesota Life
8 agents recommended this policy specifically.
9    Q.  You keep saying "policy."
10       Did you understand your investment with FIP
11 was not --
12    A.  Yes.
13    Q.  -- for -- well, was not in the form of a
14 policy --
15    A.  Yes.
16    Q.  -- but it was actually in a -- okay.
17    A.  Yes.
18    Q.  It was an investment where it would pay you
19 a certain amount of interest in return for what you
20 invested with them?
21    A.  Correct.
22    Q.  And was that on a monthly basis?
23    A.  I didn't have the details to that.
24    Q.  Okay.  And did he ever tell you what the
25 interest rate would be on your investment?

1     A. No.
2     Q. Did you ever ask him?
3     A. No.
4        He -- he said it was a good policy.
5        You see, I rely -- like I said, and I'll
6  repeat it again, I rely on a professional that is
7  looking out for my financial well needs and being,
8  right, in terms of retirement funds, that is not my
9  specialty, so you -- you trust a specific individual
10 to look out for your best interest and your future,
11 and unfortunately, it didn't work like that.
12    Q. Okay. FIP is Future Income Payments;
13 correct?
14    A. Yes.
15    Q. Did you receive any documents from FIP?
16    A. Yes.
17    Q. And what were those documents?
18    A. It was the -- the contract or agreement
19 that I signed that was given to Lee.
20    Q. Okay. And this agreement was for you to
21 provide FIP with about $26,000 in exchange for some
22 return.
23    A. Correct, it's -- investment.
24    Q. Okay. And you don't know specifically how
25 much you were supposed to receive back for your
                                            Page 38

1  investment.
2     A. I -- I don't recall. I don't.
3     Q. Okay. And do you recall if you received
4  funds from FIP on a monthly or a yearly basis?
5     A. No.
6        Based on -- this investment, Mike Cook
7  was managing that specific investment, so I trusted
8  him, and unfortunately, it didn't work out.
9     Q. Did you see any monies paid to you from
10 FIP?
11    A. No.
12    Q. So you wrote a check for $26,000,
13 approximately, gave it to Mr. Cook, and he
14 presumably gave it to FIP?
15    A. Correct.
16       And it was the attention of Scott Kohn on
17 the paperwork that was -- when he sent it in.
18    Q. And you don't recall ever receiving any
19 payment or any monies from FIP in return?
20    A. Zero. Nothing.
21    Q. Did you have to set up any accounts with
22 regards to FIP?
23    A. No, just -- just the document I signed, and
24 I forwarded that to Lee.
25    Q. Okay. And what was the plan with FIP, at
                                            Page 39

1  least according to what --
2        What did Mr. Cook tell you the plan with
3  FIP was to be?
4     A. Well, with FIP, it was to pay for my
5  premiums for my life insurance policy, the universal
6  life indexed policy. That was the goal. It sounded
7  great.
8     Q. Okay. So you were going to invest money in
9  FIP, they were going to provide you with some sort
10 of return, and you were going to take that money and
11 pay your life insurance premiums with that money.
12    A. Correct.
13    Q. And did you do that?
14    A. I'm sorry?
15    Q. Did you do that?
16       So for instance, in the first year of your
17 policy, did you pay for the policy premiums with
18 money from FIP?
19    A. Mike handled that specific -- I -- I don't
20 think we -- we didn't -- I didn't receive anything
21 specifically because the -- the funding fell apart,
22 I mean the -- the whole fraud scheme just fell
23 apart, so I didn't --
24    Q. Okay.
25    A. -- receive anything specifically.
                                            Page 40

1     Q. So you didn't receive any payments from
2  FIP, to your knowledge.
3     A. No.
4     Q. I believe you said you met with Mr. Cook
5  twice before you applied for your universal life
6  policy from Minnesota Life.
7        When did Mr. Cook introduce to you the idea
8  of FIP?
9     A. I believe -- I -- I believe it was
10 December 19th, 2016.
11    Q. And how do you have that date before you?
12    A. Because I signed the FIP agreement.
13       Lee has it.
14    Q. Okay.
15       Okay. So when he introduced to you the
16 idea of FIP, he just told you what he thought it was
17 and what you would presumably get back from
18 investing in FIP?
19       Did he present you with any documents?
20    A. No.
21       Just the FIP -- FIP agreement.
22    Q. Okay. So did he tell you about FIP on the
23 same day he gave you the FIP purchase agreement?
24    A. No.
25       There was -- I didn't sign it right off --
                                            Page 41

11 (Pages 38 - 41)

1 right offhand, I think I was traveling, I can't
2 remember specifically, but it was -- it was pretty
3 quick -- pretty quick that I signed -- signed the
4 document to -- to -- for the purchase agreement.
5    Q. And what did Mr. Cook tell you about first,
6 the indexed universal life policy or the FIP
7 investment?
8    A. The universal -- my univ-- my -- I had -- I had
9 my policy with Minnesota Life first.
10    Q. Oh, before you signed the FIP purchase
11 agreement?
12    A. Correct.
13    Q. When Mr. Cook introduced to you the idea of
14 an indexed universal life policy, did he only
15 mention that product from Minnesota Life or from
16 other insurance carriers as well?
17    A. No, just Minnesota Life.
18    Q. And did you ask him about other insurance
19 products from any other carriers?
20    A. No.
21       I thought he was the Minnesota Life
22 representative, period. That's what he labeled
23 himself as.
24    Q. Did you see any documents where he
25 introduced himself as the Minnesota Life

Page 42

1    Q. Did he show you any marketing brochures
2 from Minnesota Life?
3    A. I can't remember.  I -- I don't remember.
4    Q. How did you decide which product to apply
5 for?
6    A. Well, I went based off his recommendation.
7    Q. Did you do any background research on
8 Mr. Cook?
9    A. I knew him within the community --
10       Yes, I researched him online, yes, as well.
11       I mean he -- he was well established, and
12 he -- and he's been on some different talk shows as
13 well, that was on his website at the time, and I
14 don't remember what his website is, it -- it's been
15 a long time, but yeah, he was -- seemed like he knew
16 exactly, competent and -- and very knowledgeable in
17 his industry, so I trusted him.
18    Q. So you did a Google search and other
19 research prior to meeting with him?
20    A. Yes.
21    Q. Okay.  Did you ask around the community to
22 your friends or anybody else about Mr. Cook?
23    A. Yes.
24    Q. And what did they tell you?
25    A. Well, he -- he's in the arena of the

Page 44

1 representative --
2    A. I signed --
3    Q. -- a business card of the sort?
4    A. Well, I don't remember what his business
5 card stated, but I mean I -- I have a -- a policy
6 from Minnesota Life, and he's the one that
7 recommended it.
8    Q. Okay.  Just wondering if he ever told you
9 he was an insurance agent for many different
10 insurance carriers.
11    A. No.
12       He -- I think he -- far as I know, that's
13 the only one he introduced, and that's who he
14 represented.
15    Q. Okay.  Did he show you any documents before
16 you applied for your indexed universal life policy
17 from Minnesota Life?
18    A. Yes.
19       He -- he went over the graph, like I stated
20 earlier, in -- in terms of like if -- if I funded a
21 certain amount of monthly -- monthly towards the
22 actual policy in terms of long term on how -- what
23 the growth would be specifically.
24       That's -- that's -- that's the -- the
25 conversation we had.

Page 43

1 medical sales representatives, so I -- I never heard
2 anything negative whatsoever, and he was willing to
3 do the right -- he would do the best to his ability
4 to serve his clients and meet their needs.
5       I mean that -- that was my perception and
6 what I saw.
7    Q. So you --
8       MR. SQUITIERI:  Counsel, excuse me.
9       In a prior question, you said "Mr. Phipps,"
10 and I -- I -- I think you may have meant
11 Mr. Somebody else, so I have an objection, but go
12 forward.
13       MS. HUANG:  I'm sorry if I misspoke.
14       I'm talking about Mr. Cook.
15    Q. You understand who I'm talking about;
16 correct, Mr. Stospal?
17    A. Yes.
18    Q. Okay.
19       MR. SQUITIERI:  Okay.  I guess I
20 misunderstood.
21       Sorry.
22 BY MS. HUANG:
23    Q. Did you ask around the medical community as
24 to what Mr. Cook's reputation was?
25    A. It -- it was positive.

Page 45

12 (Pages 42 - 45)

1    Q. And what was your impression of Mr. Cook?
2    A. Nice guy, knowledgeable, been in the
3 industry for a long time, willing to go above and
4 beyond to serve his clients for -- that was my
5 perception of him, and I thought it would be a good
6 fit because I -- I needed to look at some -- look at
7 my financial future, and -- and he made some
8 recommendations, and that's -- that's pretty much
9 it.
10   Q. Okay. So when you met with him, you met
11 with him at his offices?
12      Did you meet with him anywhere else?
13   A. No.
14      At his office.
15   Q. And how many times did you meet with
16 Mr. Cook?
17   A. Gosh, what did I say earlier?
18      I -- I met with him, like -- I can't
19 remember.
20      It was three or four times.
21   Q. In total?
22   A. I think so.
23      I -- I wish I could give you the answer
24 'cause I -- it's hard to remember from years back,
25 you know.

1    Q. Right.
2       And in the first meeting, did you apply for
3 any product, FIP or the indexed universal life
4 product, or were you just talking at that time?
5    A. No, it was talking.
6    Q. Okay. And it was in the second meeting
7 where you filled out the application for your
8 indexed universal life policy from Minnesota Life?
9    A. Yes.
10   Q. And was that the same meeting where you
11 filled out the purchase agreement for FIP?
12   A. No.
13   I --
14   Q. Was that in a --
15   A. I already had my -- my universal life
16 indexed policy with Minnesota Life. That was a -- a
17 done deal.
18      This happened -- I -- I can't remember
19 the -- the timeline specifically, I can definitely
20 look at it, but I -- I can't remember when I signed
21 that actual agree -- the universal life, I thought I
22 had the dates, but yeah, that was done -- completed
23 first.
24   Q. Okay. And based on your recollection,
25 the -- the discussion about FIP happened after you

1 applied for your Minnesota Life policy?
2    A. No.
3    Q. Okay. Can you fill -- can you clarify the
4 timeline of -- of when you applied for everything?
5    A. Sure.
6       Let's see here. Let me see if I can find
7 it here, if that's okay.
8       I don't have the exact date. I don't
9 re- -- recall.
10      I -- I can get -- get it to Lee, and he
11 can -- I can get you the information.
12   Q. Okay. But so I am clear, did you apply for
13 your FIP investment -- or did you sign the purchase
14 agreement for your FIP investment before or after
15 you applied for your universal life policy?
16   A. No.
17      My universal life indexed policy with
18 Minnesota Life came first. That was the first thing
19 that was -- that -- that I -- that I executed.
20      It -- it didn't happen -- I had it -- I
21 opened the account with GoldStar eventually to
22 transfer some funding, my 401(k), and that's --
23 that's one other piece, but this was -- it was -- I
24 don't exactly remember the timeline, but this
25 wasn't -- this -- FIP wasn't introduced until later.

1    Q. Okay. So at the point in which you applied
2 for your universal life policy, how did you think
3 you were going to pay for the premiums?
4    A. Well, I just got started on it, you know, I
5 was paying -- I mean I have a job, right, so I mean
6 I have in- -- investments and -- as well, so I was
7 looking for different ways, and then he brought up a
8 solution and recommended FIP.
9    Q. Okay. But prior to Mr. Cook bringing up
10 FIP, did you have some idea of how you were going to
11 pay for your universal life policy?
12      Was that with your income and your savings?
13   A. Well, it's not my -- it's -- it's my income
14 that -- from my job, of course.
15      There's no other -- other option; right?
16   Q. Okay. But I'm just trying to understand.
17      It sounds like, based on your recollection,
18 the Minnesota Life policy was a done deal before you
19 applied for FIP, so I would assume if you applied
20 for a policy, and you knew you had to pay premiums,
21 you had some idea of how you would want to pay those
22 premiums --
23      MR. SQUITIERI: Object.
24 BY MS. HUANG:
25   Q. -- at the time you applied.

1     MR. SQUITIERI: She's going to ask a
2 question.
3 BY MS. HUANG:
4     Q. Is that correct?
5     THE WITNESS: I'm sorry, Lee.
6     What did you say?
7     MR. SQUITIERI: I was talking to counsel
8 and said she has to put it in the form of a question
9 so that you know what to answer.
10     THE WITNESS: Go ahead, please.
11     Ask the question again?
12 BY MS. HUANG:
13     Q. Sure.
14     You told me that your Minnesota Life policy
15 was a done deal before the idea of FIP was
16 introduced to you; is that correct?
17     A. Correct.
18     Q. So at the time that you applied for this
19 policy, you knew that you would have to pay some
20 premiums; correct?
21     A. Correct.
22     Q. And it was -- must have been disclosed
23 somewhere how much in premiums you were supposed to
24 pay; is that correct?
25     A. No.

Page 50

1     It was based -- I don't remember the
2 conversation there, you know.
3     So I was -- I started paying $1,000 a month
4 in terms of that specific policy.
5     I can't answer the question correctly
6 because I can't recall the an- -- the answer to
7 answer your question.
8     Q. Okay. But you knew you'd have to pay some
9 amount in premiums in order to keep your policy in
10 force.
11     A. Yes, of course.
12     Q. Okay. And so where did you think those
13 funds were going to come from?
14     A. Well, at the beginning, I knew that my
15 Minnesota right -- life representative was going to
16 come up with different ideas, right, and I was going
17 to go ahead and start the universal life indexed
18 policy, you know, do a little sacrifice here, right,
19 to get the policy going, I was looking at the
20 long-term game, not the short-term game, and I knew
21 he was going to come up with different ideas and
22 different solutions 'cause that's his job, right, so
23 in other words, so at the beginning, I was --
24 that's -- that -- that's what the plan was. I was
25 using my -- my own income.

Page 51

1     Q. Okay. Before you applied for your
2 universal life policy from Minnesota Life, did you
3 do any research into Minnesota Life?
4     A. I knew it was a -- I knew Minnesota Life
5 was a sound company, very, very secure, you know,
6 and did some research in -- in terms of reviews.
7 The reviews were -- were solid; right? I knew about
8 Minnesota Life in -- in general, I did.
9     Q. Okay. But did you go on Google and do some
10 more research into them, or you just -- based on
11 your general knowledge of Minnesota Life, you felt
12 comfortable applying for a policy?
13     A. Yeah, general -- general knowledge as well
14 as Michael Cook, I -- I trusted, based on his
15 advice.
16     Q. Mr. Stospal, can you see the exhibit that
17 I'm introducing on your screen?
18     A. No.
19     MS. HUANG: Let's go off the record for a
20 moment.
21     THE VIDEOGRAPHER: We're going off the
22 record.
23     The time is 3:21.
24     (There was a discussion off the record.)
25     (A recess was taken.)

Page 52

1     THE VIDEOGRAPHER: We're back on the
2 record.
3     The time is 3:37.
4     (Whereupon, Defendants' Exhibit 1 was
5     marked for identification.)
6 BY MS. HUANG:
7     Q. Mr. Stospal, I'm showing you Exhibit 1.
8     This is your application for a life
9 insurance policy from Minnesota Life.
10     Does this look familiar to you?
11     A. Yes.
12     Q. And did you complete this application?
13     A. Yes.
14     Q. Is that your handwriting on this
15 application?
16     A. Yes.
17     Q. And if you scroll all the way to the last
18 page of the exhibit, is that your signature?
19     A. Okay. On the first page here, that is not
20 my handwriting.
21     Q. Okay. Let's take this one at a time.
22     If you scroll to the very, very last page
23 of this application, my question is: Did you sign
24 this application?
25     Is that your signature?

Page 53

14 (Pages 50 - 53)

1    A. Yes.
2    Q. Okay. And it's dated 12/19/2016?
3    A. Yes.
4    Q. Okay. Is that your handwriting?
5    A. Yes.
6    Q. Okay. And I believe you told me that your
7 FIP purchase agreement was dated that same date,
8 December 19, 2016; is that correct?
9    A. I can't remember.
10    I -- I think -- yes, somewhere in between.
11    Q. So at the point you were applying for your
12 Minnesota Life policy, you had already learned about
13 FIP; is that correct?
14    A. I don't remember.
15    Q. Okay. We'll come back to this exhibit.
16    Let me introduce Exhibit 2.
17    (Whereupon, Defendants' Exhibit 2 was
18    marked for identification.)
19 BY MS. HUANG:
20    Q. Mr. Stospal, can you see on your screen
21 Exhibit 2?
22    A. No.
23    Which file is it underneath so I can open
24 it?
25    Q. It should be in the folder labeled as

Page 54

1    MR. SQUITIERI: The page that says "In
2 witness whereof"; right?
3    MS. HUANG: Yes.
4    MR. SQUITIERI: Okay.
5 BY MS. HUANG:
6    Q. Let me know when you get to that page,
7 Mr. Stospal.
8    A. Okay. I'm sorry.
9    Which page is this again?
10    MR. SQUITIERI: It's -- it's the third from
11 the last, up at the top right, tiny you see "p. 10,"
12 and the page starts with "In witness whereof."
13    So it's the third from the last, and it
14 says "Page 10" up at the top right.
15    THE WITNESS: Okay. I see it.
16 BY MS. HUANG:
17    Q. Okay. It says under "IRA owner printed
18 name," your name, Mr. Stospal, and there's a
19 signature.
20    Is that your signature, Mr. Stospal?
21    A. Yes. Um-hum.
22    Q. Okay. And there's a date.
23    It says "December 19, 2016"?
24    A. Yep.
25    Q. Okay. So you remember filling this page

Page 56

1 Exhibit 2 now.
2    A. I see -- okay. I see shared exhibit share,
3 there's a drop-down.
4    Hold on just a moment here.
5    It's kind of -- kind of going slow here.
6    Okay. I -- I don't see it.
7    Q. What exhibits do you see in that folder?
8    A. I -- I see the -- the date modified.
9    Hold on just a second.
10    Let me see the -- okay. The FIP purchasing
11 agreement.
12    Q. Yes.
13    That would be Exhibit 2.
14    A. Yes.
15    Q. And if you could scroll through Exhibit 2,
16 does this look familiar to you?
17    A. Yes.
18    Q. And is this the purchase agreement you were
19 telling me about with FIP?
20    A. Yes.
21    Q. And if you scroll all the way to the -- let
22 me see, to page 13, I think the -- the third to last
23 page, the signature page, can you scroll to that
24 page for me, please?
25    A. Hold on just a moment here.

Page 55

1 out to enter into the purchase agreement with FIP?
2    A. I -- yes. I -- I don't remember the time,
3 but yes.
4    Q. But do you have any reason to believe that
5 this date is inaccurate?
6    A. I'm not sure when I signed it. I remember
7 the date was filled out by my -- my advisor, but I
8 don't remember the day I signed it.
9    Q. Okay. Well, the date here, it says
10 "December 19, 2016," and that is, in fact, the same
11 date that is on your application for your Minnesota
12 Life policy; correct?
13    A. Yeah, that's -- that's what it lines up,
14 yes.
15    Q. Okay. So does that refresh your
16 recollection that you were considering the two, the
17 FIP investment and your Minnesota Life policy,
18 around the same time?
19    A. Yes.
20    I -- I remember that the advisor said that
21 this would fund the premiums, so it goes hand in
22 hand, yes.
23    Q. Okay. So if you could turn back to
24 Exhibit 1 --
25    A. Okay.

Page 57

1    Q. -- which is your application, and scroll
2 down to page 4, there's a section that says "Premium
3 information"?
4       Do you see that?
5    A. Yes.
6    Q. And it says "Source of funds," there are
7 two boxes checked, it says "Earnings" and "Savings."
8    A. Yes.
9    Q. There's no disclosure of the FIP investment
10 there, is there?
11   A. I don't see it.
12   Q. Okay. Is there a reason why you didn't
13 disclose the FIP investment to Minnesota Life when
14 you applied for the policy?
15      MR. SQUITIERI: Object.
16      THE WITNESS: Was there -- there -- was
17 there a reason to?
18 BY MS. HUANG:
19   Q. Well, it's asking you -- I think this
20 application's asking you for the source of funds.
21   A. I didn't --
22   Q. It looks like --
23   A. I didn't --
24   Q. -- earnings and savings are checked off --
25   A. I didn't fill that out.

Page 58

1    Q. -- but you did not disclose --
2    A. I didn't fill that out --
3    Q. Okay.
4    A. -- that part out.
5    Q. Well, did you read -- did you read over the
6 application before you signed it?
7    A. I'm pretty sure I did -- I did.
8       I -- of course I had my advisor, not the
9 advisor, but the Minnesota Life representative fill
10 this out.
11   Q. Okay. But you read over the application
12 before you signed it; correct?
13   A. Right, but this has nothing to do with the
14 actual -- if FIP was on the policy or not. It has
15 nothing to do with it.
16      It -- it's how it was portrayed by my
17 life -- Minnesota Life advisor stating on -- on what
18 it would be -- so the policies go hand in hand based
19 on funding the premiums.
20      Makes sense; right?
21      MR. HOPKINS: Objection. Non-responsive.
22 BY MS. HUANG:
23   Q. Okay. So at the time you applied for your
24 Minnesota Life policy, you had some idea you were
25 going to invest in FIP; correct?

Page 59

1    A. I'm sorry.
2       Repeat that again?
3    Q. At the time you applied for your Minnesota
4 Life insurance policy, you had some idea you were
5 going to invest in FIP; correct?
6    A. I -- I don't recall.
7    Q. Well, the date of the FIP purchase
8 agreement and the date of the Minnesota Life
9 application, they're dated the same date; is that
10 correct?
11   A. Yes.
12      I remember Mike Cook told me this would be
13 a good -- a vehicle to fund my premiums, I do
14 remember that, and that was --
15      MR. HOPKINS: Objection. Non- --
16 BY MS. HUANG:
17   Q. Okay.
18   A. That was quite clear.
19      MR. HOPKINS: Objection. Non-responsive.
20 BY MS. HUANG:
21   Q. Okay. So he told you it would be a good
22 vehicle to fund your premiums.
23      And on your life insurance application, it
24 doesn't say anything about a FIP -- FIP investment;
25 correct?

Page 60

1    A. Is it supposed to?
2    Q. Well, under the source of funds, you did
3 not write down "FIP investment" --
4      MR. SQUITIERI: Counsel --
5 BY MS. HUANG:
6    Q. -- or disclose anything other than earnings
7 and savings to be used to fund your policy; correct?
8    A. So I didn't fill that portion out, so my --
9 my advisor didn't place -- it -- it doesn't say, but
10 of course evidently it was executed the same day to
11 go hand in hand to fund -- fund my premiums. It's
12 obvious.
13   Q. And presumably you read through the policy
14 before you signed it -- or the application before
15 you signed it; right?
16   A. I'm sure I did.
17   Q. Okay.
18   A. This was years ago.
19   Q. On the first page of your application, it
20 says that your earned income is 145,000, and that
21 would be in 2016.
22      Is that -- was that an accurate statement?
23   A. Sure.
24   Q. And it says your total net worth is 187,000
25 in 2016.

Page 61

16 (Pages 58 - 61)

1     Was that an accurate statement?
2     A. Sure.
3     Q. And it says your liquid net worth was
4  42,000 in -- in 2016.
5        Was that an accurate statement?
6     A. Yes.
7     Q. And do you recall what assets constituted
8  your liquid net worth?
9     A. Well, let's see here.
10       My net worth, paid-off house.
11    Q. Okay.
12    A. Real estate, I mean.
13    Q. Was this back in 2016?
14    A. I -- I can't re- -- recall.  I mean I -- I
15  don't remember.
16    Q. Okay.  Well, my question is basically what
17  assets com- -- comprised of the net worth that you
18  put down on your application?
19    A. I didn't place that -- I didn't put that
20  down.
21       I don't remember.
22       I remember my Minnesota Life advisor put --
23  put this down, and I think they -- I can't remember
24  if they were -- they were estimates.  I believe they
25  were.

Page 62

1     Q. Okay.  And what was the number based off
2  of, then?
3     A. The question that he gave me told me to
4  give him an estimate, and I gave him an estimate.  I
5  mean that's basically what it all boils down to.
6     Q. Okay.  So you gave him an estimate of your
7  total net worth.
8        What assets were -- was that estimate based
9  off of?
10    A. In- -- investments that I currently have.
11    Q. And did you have any reason to believe that
12  that estimate was inaccurate?
13    A. No.
14    Q. And it says later on in that page that
15  you're applying for the Eclipse IUL policy and that
16  the base -- base amount you were applying for was
17  $900,000.
18    A. That's correct.
19    Q. Is that accurate?
20    A. That's correct.
21    Q. Okay.  So you understood that was what you
22  were applying for --
23    A. Yes.
24    Q. -- when you filled out this application.
25    A. Correct.

Page 63

1     Q. Okay.  And it -- and it says the total
2  annual plan premium is $19,050.
3        Were you aware that was the total annual
4  plan premium --
5     A. I don't remember --
6     Q. -- for the product you were applying for?
7     A. I don't remember because I haven't -- I
8  don't remember the ac- -- exact amount.  I -- I
9  don't.  I don't remember.
10    Q. That's fine.
11       Do you remember it being an amount in that
12  ballpark or --
13    A. I -- I don't remember.
14    Q. I -- I don't -- I don't want to give you an
15  inaccurate answer.
16    Q. Were you told what the plan premium should
17  look like, would look like?
18    A. Yeah.
19       I remember it was -- the number was
20  900,000, I remember that, but I don't -- I mean
21  that's what I do remember.
22    Q. Okay.  And did you have some idea of -- of
23  how much you were going to pay in premiums every
24  year for this policy?
25    A. I don't recall what the number was.

Page 64

1     Q. Do you think you knew at the time that you
2  applied for this policy?
3     A. Yes.
4     Q. And you were fine with what the plan
5  premium was going to be?
6     A. Sure --
7     Q. Okay.
8     A. -- because it could be changed at any time
9  in terms of -- of what -- what you wanted to put
10  into the policy.
11       (Whereupon, Defendants' Exhibit 3 was
12       marked for identification.)
13  BY MS. HUANG:
14    Q. Okay.  So I've introduced Exhibit 3.
15       Let me know when it's open on your screen.
16       Lee, just so you know, it is the
17  illustration dated in December.
18    A. I can see it.
19    Q. Okay.  Great.
20       If you could scroll through this real
21  quickly and just tell me if you've ever seen this
22  document before.
23    A. Yes, I've seen this document.
24       I don't know -- like the numbers, I don't
25  remember if this is exact 'cause I don't have it

Page 65

17 (Pages 62 - 65)

1 right in front of me.
2     Of course I sent it to Lee directly.
3     Q. Okay. And do you recall, is this a
4 document that Mr. Cook showed you?
5     A. Yes.
6     Q. And do you know what this document is?
7     A. Yes.
8        MR. SQUITIERI: Excuse me.
9 BY MS. HUANG:
10    Q. Can you tell me what you think this
11 document is supposed to show?
12    A. Gives you a snapshot of -- of your -- your
13 policy, that's what it does, that's based on --
14 based on your -- the years placed
15 into -- into the -- into your policy.
16    Q. Okay. Did Mr. Cook ever use the word
17 "illustration" with you?
18    A. Yes.
19    Q. And did you understand that this was an
20 illustration?
21    A. I can't recall.
22    Q. Okay. Did he, when showing you this
23 document, tell you that this document shows
24 projections based on certain assumptions and that
25 these aren't guaranteed values?

Page 66

1     Q. Did Mr. Cook explain to you what this
2 column is supposed to represent?
3     A. No.
4     Q. Do you have any understanding as to what
5 premium outlay is?
6     A. I don't recall.
7        Let's see.
8        I know it's your accumulation of value over
9 a certain period of time.
10    Q. Okay. Did Mr. Cook ever tell you that if
11 you put in premiums that are in the premium outlay
12 column, then the numbers on the right-hand side are
13 the projections based off of that -- that premium
14 that you're supposed to put in?
15    A. No, he didn't go -- elaborate on that
16 specific piece.
17    Q. Okay. If you scroll to -- so he never told
18 you that you had to put in a certain amount of
19 premium in -- in order to get a certain amount of
20 value out of your policy?
21    A. Right, yeah, that's common sense, he did
22 tell me that, but he never labeled it as a "premium
23 outlay."
24    Q. Okay. But he did tell you, you know, for
25 year one, you need to put in, say, $19,050 in order

Page 68

1     A. I can't recall.
2     Q. What did he tell you this document was
3 supposed to show you?
4     A. A projection.
5     Q. Okay. So he did tell you these are
6 projections, not anything guaranteed.
7     A. He said "If you stick to the plan in terms
8 of" -- "and" -- "and listen to what I state, this
9 is" -- "this is" -- "would be your" -- "the future
10 earnings."
11    Q. Okay. And do you see in that first column
12 on the second page, it says "Premium outlay"?
13       Do you see that column?
14    A. No, not yet.
15       Hold on just a second.
16       Okay. Which page is this?
17       I'm sorry.
18    Q. Page 2.
19       You'll -- you'll have to rotate it.
20    A. Okay. Give me just a second here.
21       Okay. Page -- okay. Now what am I looking
22 for?
23    Q. Just the column that says "Premium outlay."
24    A. "Premium outlay."
25       Okay. I see it.

Page 67

1 to get a certain value --
2     A. Sure.
3     Q. -- in order to have a certain value
4 accumulate in your policy.
5     A. Sure.
6     Q. Okay. And -- and do you understand that in
7 year two, you needed to put a little bit more than
8 what you -- this is just a projection, but this
9 projection shows you would need to put in more than
10 what you need -- what you put in in year one;
11 correct?
12    A. Yes.
13    Q. Okay. And it goes on through the various
14 years, and it -- on the left-hand column, it says
15 what year, and in the second column, it says what
16 age you were, so I assume that when you applied for
17 this policy you were 37 years old --
18    A. Yes.
19    Q. -- correct?
20    A. I --
21    Q. And if you keep scrolling down, it looks
22 like this illustration, and -- and we all know it's
23 just a projection, that it planned for you to
24 withdraw a certain amount of money when you hit age
25 67.

Page 69

1    A. Yes.
2    Q. Is that accurate?
3       Did he go over this -- this concept with
4 you, that you needed to put in a certain amount of
5 premium over the -- a number of years, and then when
6 you hit a certain age, you could withdraw --
7    A. Yes.
8    Q. -- what it shows here, which is 144,000,
9 approximately?
10   A. Yes.
11   Q. So you understood that concept.
12   A. Yeah, I understood that concept, yes.
13   Q. And you understood that, you know, based on
14 this projection, in order to withdraw $144,000 at
15 age 67, you need to put in a certain amount of
16 premium every year.
17   A. Yes.
18   Q. Okay. And you understood this is just a
19 projection, and -- and nothing here is guaranteed,
20 especially that -- that these values are not
21 guaranteed.
22   A. Correct.
23   Q. Do you recall if you and Mr. Cook discussed
24 anything else about this particular illustration?
25   A. No.

1    So yes, he went over this.
2 BY MS. HUANG:
3    Q. Okay. And you'll see that similar to the
4 previous illustration, there are numbers in the
5 premium outlay column, and it sort of tells you what
6 you should put in every year in order to hit a
7 certain accumulation value.
8    Do you see that?
9    A. Yes.
10   Q. And it's your understanding, again, that
11 these were just projections and that nothing was
12 guaranteed?
13   A. Yes.
14      MR. SQUITIERI: Objection.
15 BY MS. HUANG:
16   Q. And if you scroll to the second page,
17 you'll see that, again, it looks like at age 67,
18 there is a planned withdrawal that will be taken,
19 about 158,000 would -- under the "Policy loan"
20 column?
21      Do you see that?
22   A. Yes.
23   Q. So was the plan, then, to use your
24 Minnesota Life policy to accumulate value in your
25 policy and to take withdrawals from the policy,

1       (Whereupon, Defendants' Exhibit 4 was
2       marked for identification.)
3 BY MS. HUANG:
4    Q. So I'm introducing Exhibit 4.
5       It should show up on your screen shortly.
6       And Lee, for your benefit, it's the January
7 illustration.
8       Do you have that on your screen,
9 Mr. Stospal?
10   A. Yes, I do.
11   Q. Okay. If you could just scroll through,
12 and let me know if you've ever seen this
13 illustration before.
14   A. Yes.
15   Q. And did you and Mr. -- Mr. Cook discuss
16 this illustration?
17   A. I'm sure we did.
18       I mean it --
19      MR. SQUITIERI: Well, just tell her -- she
20 just wants to know what you remember, and then --
21      THE WITNESS: Sure.
22      MR. SQUITIERI: -- depending on the answer,
23 she might ask you a follow-up question.
24      THE WITNESS: Yeah.
25       I understand.

1 loans from it, when you hit a certain retirement
2 age?
3    A. I don't remember the conversation.
4    Q. Okay. Do you recall why there were more
5 than one illustration?
6    A. No.
7    Q. Do you recall discussing taking policy
8 loans when you hit a certain retirement age from
9 your universal life policy?
10   A. Yes.
11   Q. And what was the -- what was going to be
12 the purpose of those policy loans?
13   A. At the age of 67 for funding retirement.
14   Q. I'm sorry.
15      Say that again.
16      I couldn't hear you.
17   A. At the age of 67 for retirement.
18   Q. Okay. So you do remember discussing with
19 Mr. Cook that you could use your Minnesota Life
20 insurance policy to accumulate value, and when you
21 reached a certain retirement age, you could withdraw
22 money for your retirement from that policy.
23   A. Yes.
24   Q. And did you -- did Mr. Cook ever tell you
25 that the withdrawals up to the amount in premiums

1 that you put in would be taxed?
2    A. I don't recall.
3    Q. But the plan to --
4    A. I believe it was -- it was already
5 pre-taxed, from my understanding.
6    Q. Okay. Did you discuss that the policy
7 loans would be low interest policy loans from your
8 policy to supplement your retirement income?
9    A. No, we -- no, we didn't discuss that.
10    Q. Okay. But you did discuss that at some
11 point, when you hit a certain retirement age, the
12 plan was to withdraw monies from your -- from the
13 accumulated value in your policy.
14    A. Correct.
15        (Whereupon, Defendants' Exhibit 5 was
16        marked for identification.)
17 BY MS. HUANG:
18    Q. So I'm introducing Exhibit 5.
19    Lee, for your benefit, it's the policy.
20        Mr. Stospal, let me know when you have that
21 open on your screen.
22    A. Okay.
23    Q. Okay. If you could scroll through this
24 document, and let me know if you've seen this
25 document before.

Page 74

1    A. Yes.
2        I mean I -- I went through it, yes, but
3 it's not something that you look -- look through
4 after hours on a regular basis.
5    Q. Right.
6        And on that second page, do you see on the
7 left-hand column, it says "If you are not satisfied
8 with it, you may return the policy to us or our
9 agent within 30 days after you receive it."
10        Do you see where it states that?
11    A. Yeah -- yeah, I see it.
12    Q. Did you ever return the policy after you
13 received it?
14    A. No.
15    Q. And so at the point in which you received
16 the policy, you didn't have any issues with it.
17    A. No, no issues.
18    Q. Did you ever have any issues with your life
19 insurance policy from Minnesota Life?
20    A. No, not until the FIP situation happened.
21        MR. SQUITIERI: Counsel, I'll object to
22 this exhibit. I -- I don't think this is the
23 policy, right, because the policy would include,
24 although it may include data pages, et cetera, it
25 would include terms and conditions, it would

Page 76

1    A. I don't remember seeing this document.
2    Q. If you go to page 2, it says "Eclipse
3 Flexible Premium Indexed Adjustable Life Policy,"
4 and the insured is your name?
5    A. Okay.
6    Q. It says a policy number with a policy date
7 of February 14, 2017.
8        Do you see that?
9    A. Yep.
10    Q. So does that refresh your recollection that
11 this document is a copy of your policy from
12 Minnesota Life?
13    A. I don't know -- well, I need to confirm the
14 policy number.
15        I don't have it in front of me.
16    Q. Okay. But when you scroll through this
17 document, you don't recall ever seeing this document
18 before?
19    A. I -- I don't remember. This is -- it's
20 been several years, so I -- I don't remember.
21    Q. Do you recall receiving a copy of your
22 policy from Mr. Cook?
23    A. Yes.
24    Q. Do you recall looking through your policy
25 when you received it from Mr. Cook?

Page 75

1 include -- so I'm objecting. I mean your questions
2 are your questions, and his answers are his answers,
3 but I will object to this as the policy.
4        MS. HUANG: Your objection is noted.
5        MR. SQUITIERI: Okay.
6 BY MS. HUANG:
7    Q. So just so I'm clear, Mr. Stospal, you
8 never had any issues with your policy until
9 something went wrong with FIP; is that correct?
10    A. That is correct --
11        MR. SQUITIERI: Same objection.
12        THE WITNESS: -- because I lost trust with
13 my Minnesota Life agent.
14 BY MS. HUANG:
15    Q. Right.
16        But I'm asking about the policy in and of
17 itself.
18        Did it perform according to what you
19 expected?
20    A. Yes.
21        I mean it -- it -- it's a fairly new
22 policy, so it -- it's -- it's just starting,
23 correct, and you know, it takes time when you --
24 when you fund this policy over time.
25        So I mean I was perfectly fine with the

Page 77

20 (Pages 74 - 77)

1 policy, but definitely time -- time value needed to
2 be longer within the policy, of course.
3    Q. So you had the policy for about two years;
4 is that right?
5    A. Yes, I believe so.
6    Q. Okay. And so there were no problems with
7 the policy during the two years that you had it.
8    A. No.
9       MR. SQUITIERI: Objection.
10 BY MS. HUANG:
11    Q. Let's go back to Exhibit 2.
12       That would be the FIP purchase agreement.
13    A. Okay.
14    Q. Will you scroll through this agreement and
15 let me know if you see Minnesota Life anywhere in
16 this agreement?
17    A. I see my Minnesota Life agent's signature.
18    Q. Okay. But do you see any reference to
19 Minnesota Life Insurance Company in this agreement?
20    A. No.
21    Q. Did you understand that FIP, LLC was an
22 entity entirely separate from Minnesota Life
23 Insurance Company?
24       MR. SQUITIERI: Objection.
25 BY MS. HUANG:

Page 78

1    Q. You can answer the question.
2    A. Oh, okay.
3       I'm -- I'm looking through this.
4       I did not know the affiliation.
5    Q. Well, did anyone tell you that Minnesota
6 Life Insurance Company and FIP were the same
7 company?
8    A. They didn't tell me it was the same -- he
9 didn't tell me it was the -- Michael Cook didn't
10 tell me it was the same company, but he -- he is the
11 agent of Minnesota Life, meaning that would help be
12 a vehicle to fund premiums. It just made sense. I
13 figured it was a recommendation by Minnesota Life.
14 I mean it made sense.
15    Q. Did you understand that FIP, LLC is an
16 entity that's different from Minnesota Life, though?
17       MR. SQUITIERI: Objection.
18       THE WITNESS: I didn't -- I didn't -- I
19 didn't know the affiliation. I just -- the -- the
20 agent of -- that -- from -- that funded my Minnesota
21 Life policy as a whole recommended it, so I assumed
22 it was a part of it.
23 BY MS. HUANG:
24    Q. A part of what?
25    A. FIP. FIP. It was a recommendation.

Page 79

1       I mean the way I look at it, how can, like,
2 a Minnesota Life agent be affiliated and recommend
3 an ex-con establishing a policy to fund your
4 premiums?
5       It makes no sense.
6    Q. Did you do any investigation, any
7 independent investigation into FIP before you signed
8 the purchase agreement?
9    A. No.
10    Q. So you didn't Google FIP or ask --
11    A. Nope.
12    Q. -- anybody about FIP.
13    A. I didn't.
14       I trusted my advisor. That's his -- or --
15 that -- or my agent. That was his job. That's his
16 job.
17       You know, I mean I don't -- I don't have to
18 be an expert.
19    Q. You weren't concerned that you were giving
20 money over to an entity that you hadn't done any due
21 diligence on.
22    A. No.
23       'Cause I trusted him.
24    Q. Was your decision to invest in FIP based
25 solely upon Mr. Cook's recommendation?

Page 80

1    A. Yes.
2    Q. How did you determine how much to invest in
3 FIP?
4    A. I had a 401(k) with BB&T Bank, and
5 that's -- he said it would be a great idea, I
6 trusted him, and so that's -- that's -- that's --
7 that's the funding I used.
8    Q. Did you liquidate your 401(k) account with
9 BB&T Bank?
10    A. Yes.
11    Q. And you put that money with GoldStar, I
12 think you said it was?
13    A. Yes.
14       Originally.
15    I -- I don't remember the timeline on it,
16 but then it was going to the FIP policy.
17    Q. What do you mean by "FIP policy"?
18    A. Or the FIP agreement.
19    Q. Do you mean FIP investment?
20    A. Yeah, investment.
21    Q. Okay. So the money went from your 401(k)
22 account, which you liquidated, to GoldStar and then
23 to FIP to be invested; is that correct?
24    A. Yes.
25    Q. And I think you told me that you never saw

Page 81

1 any returns from your investment?
2     A. No.
3     Q. Do you believe that's because Mr. Cook
4 managed that, or is it that you didn't receive
5 anything from FIP whatsoever?
6     A. No, 'cause he managed it.
7     Q. Did you talk to Mr. Cook about the returns
8 on your investment with FIP?
9     A. I don't recall.
10     Q. You never asked him if you were making any
11 money on your FIP investment.
12     A. No, 'cause it just -- the FIP investment,
13 it -- it is like -- it was a very short term for
14 when I signed the agreement, so I didn't expect big,
15 large growth numbers.
16     Q. So I guess I'm not entirely clear on the
17 arrangement.
18         When you invested in FIP, the FIP returns
19 went directly into your GoldStar account or to
20 Mr. Cook?
21     A. I don't -- I don't have that -- I don't
22 have clarification on that.
23     Q. Okay. So you invested in FIP, and you
24 never saw that money again.
25     A. Correct.

Page 82

1     Q. And you never asked Mr. Cook "What happened
2 to my money?"
3     A. Of course I did.
4         And I'll explain to you how I found out.
5         I ended up getting an E-mail from him
6 directly that stated "Sign this document," and I had
7 no idea what it was.
8         I didn't sign it, for sure.
9         I called him directly, and -- and how I
10 found out, he -- he told me about the FIP Ponzi
11 scheme, I -- I -- I -- well, I Googled it, he didn't
12 tell me, I Goog- -- I Googled it, how I found out,
13 and then let's just say the conversation wasn't that
14 great between our interaction.
15     Q. Okay. So the only time you Googled FIP was
16 after you -- after Mr. Cook informed you that it was
17 a Ponzi scheme.
18     A. No, he didn't inform me.
19         I found out -- I don't remember exactly how
20 I found out.
21         He sent a collection letter from -- from an
22 attorney collection agency.
23         I -- I don't know what his goal was, but
24 I -- I found out it was FIP fraud, and he was trying
25 to get me to execute a document and not give me any

Page 83

1 clarification or tell me what I was signing,
2 assuming that, like, I wouldn't read it, I guess.
3     Q. Okay. And you didn't sign that document.
4     A. No, I don't -- I don't believe I did.
5     Q. Did you produce that E-mail and those
6 documents to your counsel?
7     A. Yes.
8     Q. And that was the first time you found out
9 that FIP was not what it was represented to be.
10     A. Absolutely.
11     Q. And before that, you don't know if you were
12 receiving any payments from FIP whatsoever.
13     A. No, I have never received any.
14     Q. You have never received any payments from
15 FIP, or you don't know because they went to
16 Mr. Cook.
17     A. No, I didn't see any. I mean I didn't -- I
18 never got clarification. I -- I've never seen any
19 type of funding from FIP.
20     Q. Did you ask Mr. Cook if you received any
21 payments from FIP for your investment?
22     A. Yes.
23     Q. And what did he say?
24     A. "No."
25     Q. He said you didn't receive any payments

Page 84

1 from FIP for your investment.
2     A. Correct.
3     Q. Did you ask Mr. Cook how he found out that
4 FIP was no longer operating?
5     A. No, I didn't ask him.
6         I found out for myself.
7         When I had that conversation, that pretty
8 much ended our relationship.
9     Q. Okay. So just so I'm clear, Mr. Cook sent
10 you an E-mail with some documents that you were
11 supposed to sign.
12     A. Correct.
13     Q. And then Googled FIP and found out that
14 there were allegations it's a Ponzi scheme.
15     A. Yes.
16         I don't remember how I found -- found out
17 about FIP.
18         I found out after he sent the collection.
19         It didn't say anything regarding FIP
20 specifically. It was very hidden the way he
21 presented it to me. I didn't get -- I didn't
22 receive a phone call whatsoever.
23         I mean you invest $26,000, I don't care if
24 you invest $4,000, I mean it's -- it's a bad
25 scenario for all the parties involved.

Page 85

22 (Pages 82 - 85)

1     Q.  Right.
2       So when you -- after Mr. Cook sent the
3 E-mail, did you call him --
4     A.  Yes.
5     Q.  -- or how did you engage with him?
6     A.  Yeah, I -- I called him.
7     Q.  Okay.  And what went on during your
8 telephone conversation?
9     A.  No, we -- we talked about FIP, and he --
10 and he -- and he said that he hired a -- he's going
11 to hire a collection attorney to get back the
12 funding, and I ta- -- I -- I don't know the details
13 to it, and that's when I did my due diligence and
14 started the process of getting my own attorney.
15     Q.  Okay.  And when you found out that FIP was
16 no longer operating, did you tell anybody else about
17 your discovery?
18     A.  Yeah, of course.
19       My family.
20     Q.  Did you call anybody in the Minnesota Life
21 home office and tell them that FIP was no longer
22 operating?
23     A.  No.
24     Q.  Did you ever tell anyone in the Minnesota
25 Life home office that you invested in FIP?

Page 86

1 home office to tell them that FIP was no longer
2 operating --
3     A.  No.
4       I called --
5     Q.  -- or to ask them questions about FIP.
6     A.  No.
7       I called an attorney.  That's the right
8 thing to do.  Why would I have to discuss this
9 with -- with an agent from Minnesota Life that's my
10 agent?  I called an attorney immediately.
11     Q.  My question is whether you called anyone in
12 the home office of Minnesota Life.
13     A.  No.
14       I have no reason to.
15       I called -- I contacted the agent when I
16 found out.
17     Q.  So did you understand that FIP and
18 Minnesota Life were not the same entity?
19     A.  Right, but my advi- -- my agent recommended
20 it from Minnesota Life to fund the premiums, so
21 you'd think it goes hand in hand.
22     Q.  Okay.  So your agent recommended FIP to
23 fund the Minnesota Life policy.
24     A.  Correct.
25     Q.  That's what -- and -- and based upon

Page 88

1     A.  No, because I -- I wouldn't have any reason
2 to because any Minnesota Life questions that I had,
3 I -- I -- I gave -- I sent it to Mike Cook because
4 he's the agent.
5     Q.  Okay.  So all of your Minnesota Life
6 questions you directed towards Mike Cook, and you
7 didn't contact anybody in the home office about it.
8     A.  No.
9       He's the representative.  He's the face of
10 the company.
11       MR. SQUITIERI:  Objection.
12 BY MS. HUANG:
13     Q.  Okay.  And all -- all of your FIP-related
14 questions you directed towards Mr. Cook and didn't
15 contact anyone in Minnesota Life's home office about
16 FIP.
17       MR. SQUITIERI:  Objection.
18       THE WITNESS:  So I didn't have questions to
19 ask about FIP whatsoever.
20       I found out about the fraud, and then
21 that's like -- that's when we just had the events
22 that occurred.
23 BY MS. HUANG:
24     Q.  Okay.  But once you found out about the
25 fraud, you didn't call anybody in the Minnesota Life

Page 87

1 that --
2       MR. SQUITIERI:  Hold on.
3       Wait for the question.
4       MS. HUANG:  Strike that.
5     Q.  Other than the fact that your agent
6 recommended FIP to fund the Minnesota Life policy,
7 did you have any reason to believe that Minnesota
8 Life had any involvement with FIP?
9     A.  I thought it did because it came from the
10 recommendation of my Minnesota Life agent.  I
11 thought it was --
12     Q.  Right.
13       And my question is:  Aside from it being a
14 recommendation of your agent, did you have any
15 reason to believe that Minnesota Life was in any way
16 affiliated with FIP?
17     A.  No -- no.
18       It just came from my agent.
19       That -- that's it.
20     Q.  Was the plan for your FIP investment to put
21 all of the proceeds into your policy, or were you
22 going to do something else with the proceeds?
23     A.  No, it was going all into the policy for --
24 that's what was my understanding for that -- that --
25 what -- what we were going to do.

Page 89

23 (Pages 86 - 89)

1    Q.  Do you recall when you found out that FIP
2  was no longer operating?
3    A.  I can -- it's -- would -- I don't have the
4  date offhand.  I sent it to Lee when I received the
5  collection letter from -- from -- from Michael Cook,
6  and I don't remember the date.
7      Lee -- Lee definitely has it.
8      (Whereupon, Defendants' Exhibit 6 was
9      marked for identification.)
10 BY MS. HUANG:
11   Q.  I'm introducing Exhibit 6.
12     Let me know when it opens on your screen.
13     You'll probably have to rotate it.
14     Lee, it is the rescission letter.
15   A.  Yes, I see it.
16   Q.  Okay.  Have you seen this letter before,
17 Mr. Stospal?
18   A.  Yes.
19     Lee sent it to me.
20   Q.  Okay.  And do you recall whether you asked
21 for your policy to be rescinded or if the offer came
22 to you from Minnesota Life?
23   A.  Lee and I discussed it.
24     MR. SQUITIERI:  All right.  Don't tell them
25 what we said.

Page 90

1      THE WITNESS:  I don't remember what we
2  said, Lee, but I thought we discussed it.
3      MR. SQUITIERI:  All right.  Don't give away
4  too much content 'cause that's attorney-client
5  privilege on --
6      You know, where -- you need -- where you're
7  recalling something that you and I talked about, be
8  as brief as possible.
9      THE WITNESS:  You got it.
10     MR. SQUITIERI:  Okay?
11     Just a very broad subject.
12 BY MS. HUANG:
13   Q.  Okay.  So the first time that you -- strike
14 that.
15     Did you ever call Minnesota Life asking to
16 rescind your policy?
17   A.  No.
18   Q.  Did you ever contact anybody at Minnesota
19 Life's home office asking to rescind your policy?
20   A.  No.
21   Q.  So an offer came from Minnesota Life to you
22 offering to rescind your policy; is that correct?
23   A.  Yes.
24     This was based on my attorney.  We had
25 discussions.

Page 91

1    Q.  Okay.  So when the offer came through, it
2  looks like you accepted it, based upon this letter;
3  is that correct?
4    A.  Yes.
5    Q.  So your policy is no longer in force --
6    A.  Correct.
7    Q.  -- is that correct?
8      And you received a refund of all of your
9  premiums; is that correct?
10   A.  Correct.  Correct.
11   Q.  And it looks like the premiums you put into
12 the policy were $22,000; is that correct?
13   A.  Correct.
14   Q.  And -- and you received all of that money
15 back from Minnesota Life.
16   A.  Correct.
17   Q.  Can you tell me what damages you're seeking
18 in this case?
19   A.  Sure.
20     Damages of fraud in terms of the -- the FIP
21 in- -- investment that I put in, I was looking at
22 growth for my actual -- my policy, my Minnesota Life
23 policy, long -- long-term growth, and that --
24 that's -- that's what I'm looking for and receiving
25 my investment back as well.

Page 92

1    Q.  Receiving your FIP investment back?
2    A.  Yes, that my Minnesota Life agent
3  recommended.
4    Q.  Is it accurate to state that absent your
5  FIP payments, you would not be able to pay the
6  premiums on your Minnesota Life policy?
7    A.  Say that again, please.
8    Q.  Absent your -- the FIP investment and the
9  payments that you thought you were going to get from
10 FIP, is it accurate to state you would not be able
11 to pay the premiums on your Minnesota Life policy?
12   A.  Well, I was sacrificing in terms of paying
13 the long -- the -- the -- the -- the goal.
14     The game -- the game that was put together
15 by my Minnesota Life agent was to start -- start
16 with the -- with -- with what I was funding my
17 policy towards, and FIP was going to alleviate the
18 pressure in -- in terms of funding the premium,
19 which made sense.
20   Q.  Okay.  But if -- but you did have the
21 monies to pay for the premiums otherwise, then.
22     So you could have paid for the premiums on
23 your Minnesota Life insurance policy, but FIP would
24 have made the payment of those premiums easier.
25     MR. SQUITIERI:  Objection.

Page 93

24 (Pages 90 - 93)

1      THE WITNESS:  Not necessarily easier.
2      It was just how the package was put
3  together and placed by the Minnesota Life agent.
4  BY MS. HUANG:
5      Q.  So you didn't want to use your savings or
6  your stock proceeds to pay for the Minnesota Life
7  policy premiums.
8      MR. SQUITIERI:  Objection.
9      THE WITNESS:  I didn't -- I didn't -- I
10  didn't think about it.
11      You know, I knew I wanted to have a -- a
12  gain in -- in -- in terms for financial freedom in
13  the future when you retire, everybody does, right,
14  and -- and this was a -- a -- a structured plan that
15  was placed by Minnesota Life agent, which made
16  perfect sense.
17  BY MS. HUANG:
18      Q.  Okay.  And after you found out that FIP was
19  no longer operating, did you keep your Minnesota
20  Life policy in force for a while?
21      A.  Of course I contacted an attorney, right,
22  and yes, it -- it was -- it was still active, but I
23  was in pursuant of getting -- getting -- taking
24  legal action and defending my rights 'cause of -- of
25  fraud.

1      Q.  But your first thought after finding out
2  about FIP wasn't "I can't afford my policy
3  anymore" --
4      A.  No.
5      My -- my --
6      MR. SQUITIERI:  Objection.
7  BY MS. HUANG:
8      Q.  -- "let me cancel it."
9      A.  My -- my first thought was "I'm not doing
10  business with a bunch of crooks."  That's what my
11  first thought was.
12      Why would I want to do business with --
13  keep a policy active when a Minnesota Life agent
14  tells me specifically to -- he introduced a
15  universal life indexed policy and -- and FIP
16  together.
17      It -- it just didn't make sense.
18      I'm not going to do business with a bunch
19  of fraud crooks, period.
20      That's why I cancelled.
21      I'd rather have an ethical company that I'm
22  going to work with that's going to look out for my
23  best interests so I don't have to be on this call
24  today.
25      Q.  Okay.  Do you own any other life insurance

1  presently?
2      A.  No.
3      Q.  And when's the last time you spoke with
4  Mr. Cook?
5      A.  Since -- since -- I don't -- it's -- it's
6  been a long, long time.
7      Q.  Did you speak to him after -- after that
8  telephone call you had subsequent to the E-mail that
9  he sent you notifying you or trying to get you to
10  sign the document regarding FIP collections?
11      A.  Yes, I -- I spoke to him again, and he
12  recommended another attorney after that
13  specifically, and -- and then I did my own due
14  diligence, my research 'cause I'm not going to go
15  with a recommendation specifically that's not going
16  to be out for my best interest.
17      Q.  And after that, did you speak with
18  Mr. Cook?
19      A.  I don't believe so.
20      Q.  And you're not in contact with Mr. Cook
21  nowadays?
22      A.  No.
23      Q.  And have you spoken to Mr. Cook in
24  connection with this lawsuit?
25      A.  No.

1      MS. HUANG:  Let's go off the record.
2      THE VIDEOGRAPHER:  We're going off the
3  record.
4      The time is 4:31.
5      (There was a discussion off the record.)
6      (A recess was taken.)
7      THE VIDEOGRAPHER:  We're back on the
8  record.
9      The time is 4:43.
10      MR. SQUITIERI:  Central time.
11      THE VIDEOGRAPHER:  Correct.
12      MS. HUANG:  Okay.  I'm ready whenever
13  everybody is if they can hear me.
14      THE VIDEOGRAPHER:  I went back on the
15  record already.
16      MS. HUANG:  Oh, okay.
17      I had to dial in.
18      Q.  Mr. Stospal, I noticed that during this
19  deposition, you were looking at some papers in front
20  of you.
21      Can you tell me what those papers are?
22      A.  Why do you ask?
23      MR. SQUITIERI:  During the course of a
24  deposition --
25      MS. HUANG:  Because I --

1      MR. SQUITIERI:  -- if she -- if an attorney
2  thinks that the witness is referring to documents to
3  help with the answer, the attorney is entitled to
4  know what those documents are.
5      So I guess what Ms. Huang means the first
6  question is:  Have you been referring to any
7  documents to help you testify --
8      THE WITNESS:  No.
9      I'm taking my own -- I'm taking my own --
10      MR. SQUITIERI:  Hold it.  Hold it.  Hold
11  it.  Hold it.
12      Let -- have you been referring to any
13  documents to help you answer the questions?
14      THE WITNESS:  I have some dates listed,
15  that's it, but I'm taking my own notes.
16      MR. SQUITIERI:  Okay.
17      All right.  Go ahead, Ms. Huang.
18  BY MS. HUANG:
19      Q.  Okay.  And the dates that you listed, was
20  that from going through your documents and putting
21  down dates you thought were relevant in your note
22  pad?
23      A.  No.
24      I was looking at dates based on -- based on
25  matching up to see if that policy date was correct,

Page 98

1      A.  That's it.
2      Q.  Okay.  And you didn't refer to any other
3  documents other than the exhibits I showed you
4  during the deposition.
5      A.  Nope.
6      Q.  Mr. Stospal, have you ever invested in the
7  stock market?
8      A.  Yes.
9      Q.  Do you maintain your own online trading
10  account, or do you go through a financial advisor or
11  a brokerage?
12      A.  No.
13      When -- when I worked for BB&T Bank, we had
14  our own -- own 401(k), so I had a -- a financial
15  advisor at -- at the time that made the dec- --
16  made -- made the decisions on correct policy -- or
17  the correct funding.
18      Q.  And is that for -- that -- did that
19  financial advisor make decisions for you on your
20  401(k) or on a separate account?
21      A.  No, 401(k).
22      Q.  And the financial advisor didn't give you
23  any other advice other than on your 401(k).
24      A.  No, it was 401(k) only.
25      Q.  Okay.  And you didn't invest in stocks

Page 100

1  just to -- just to verify.
2      Q.  I'm unclear as to where those dates came
3  from.
4      Are -- are you looking at documents during
5  this deposition and -- and writing down dates --
6      A.  Yeah.
7      Q.  -- or the exhibits that I showed you?
8      A.  Yeah.  Yeah.
9      I'm just taking notes.
10      That's it.
11      Q.  Okay.  But you don't have any other
12  documents before you other than that note pad that
13  you're taking notes in?
14      A.  No.
15      I have the universal life indexed policy
16  illustration.
17      That's all I have in front of me.  That's
18  it.
19      Q.  And is that the December one or the
20  January one?
21      A.  It doesn't say.
22      Oh, it's December.
23      Q.  And you don't have any other documents
24  besides the illustration and your note pad before
25  you?

Page 99

1  separate and apart from your 401(k)?
2      A.  Well, I had some employee stock purchase
3  plan that -- that I accrued.
4      Q.  Is that stock in BB&T Bank?
5      A.  Yes.
6      Q.  And it was to vest over a certain period of
7  time?
8      A.  It was shares that I won -- won through
9  President's Club and went through --
10      Q.  Okay.  Did you ever -- I'm sorry.
11      Go ahead.
12      A.  No.
13      It was through President's Club that I --
14  that I -- that I won shares of stock that went into
15  employee stock purchase type of plan.
16      Q.  And what's the President's Club?
17      A.  It's basically best of the best of -- in --
18  in the -- within BB&T Bank based on performance.
19      Q.  Okay.  And as a result of being in the
20  President's Club -- Club you were awarded shares of
21  stock?
22      A.  Yes.
23      Q.  Did you invest in the stock market in any
24  other way?
25      A.  No.

Page 101

26 (Pages 98 - 101)

1    Q. So you never had a TD Ameritrade account or
2 E-Trade or any of those accounts where you can do
3 online banking -- or sorry, online investing?
4    A. Nope.
5       I don't -- I don't believe in --
6    Q. Did --
7    A. -- stocks.
8       Just real estate.
9    Q. Okay. So I was going to ask you if you had
10 any other investments.
11      It sounds like you have real estate
12 investments?
13   A. I do.
14   Q. Can you tell me more about those real
15 estate investments?
16      What investments do you have?
17   A. Just lots.
18   Q. I'm sorry.
19      Did you say "a lot of investments" --
20   A. Lots.
21   Q. -- or "lots"?
22   A. L-o-t-s, lots, land.
23   Q. Okay. So you're invested in land.
24   A. Yes.
25   Q. And did you have those investments in 2016?

Page 102

1    A. I can't -- I -- I -- I -- I think -- I'm
2 not sure.
3       I got to look at the date on it.
4    Q. The financial advisor you're referring to
5 that you had as part of BB&T, was that a financial
6 advisor affiliated with BB&T?
7    A. Yes.
8    Q. Did you ever consult with that financial
9 advisor about a retirement plan?
10   A. No.
11      Just the 401(k) plan, making sure that we
12 picked the right choices based on BB&T portfolio,
13 what was offered.
14   Q. And when you and Mr. Cook met, and Mr. Cook
15 pro- -- proposed a plan for you with an IUL policy,
16 did you ever think about asking that BB&T Bank
17 financial advisor for his thoughts on that plan?
18   A. No. No.
19      That -- I -- I was living in -- in
20 Charlotte, North Carolina at the time, and then I
21 was using -- then moved to Texas through an
22 acquisition through the F -- FDIC with BB&T that
23 they acquired, and so that advisor was in Charlotte,
24 North Carolina at the time and then been no contact
25 ever since.

Page 103

1    Q. Okay. And other than Mr. Cook, did you
2 work with anybody else on investments or retirement
3 plans?
4    A. No.
5    Q. Do you have a CPA or an accountant?
6    A. Yes.
7    Q. And did you have that C --
8       Which one do you have?
9       Is it a CPA?
10   A. Yes.
11   Q. Did you have that CPA back in 2016?
12   A. Yes.
13   Q. Did you ever talk to the CPA about the plan
14 regarding your Minnesota Life policy and your FIP --
15 FIP investment?
16   A. Never.
17      MR. SQUITIERI: Yes or no.
18      THE WITNESS: No.
19      MS. HUANG: I don't have any more questions
20 for now.
21      I will let Jason go ahead and conduct his
22 questioning.
23      MR. HOPKINS: Thank you.
24 //
25 //

Page 104

1                EXAMINATION
2
3 BY MR. HOPKINS:
4    Q. Mr. Stospal, my name's Jason Hopkins.
5       I'm an attorney -- I'm an attorney at DLA
6 Piper, and I represent Shurwest.
7       Do you understand who I am and who I
8 represent?
9    A. Yes, sir.
10   Q. Have you communicated with anyone during
11 the course of this deposition?
12   A. No.
13   Q. I saw you typing on your phone.
14      Were you texting someone?
15   A. Yes.
16      It's a work-related question, so I'm trying
17 to multi-task while I spend two hours with you
18 lovely people.
19   Q. So you have communicated with someone
20 during the course of this deposition; right?
21   A. Yes.
22      I had a customer ask me a question
23 specifically.
24      MR. SQUITIERI: That's it.
25      He'll ask you another question.

Page 105

27 (Pages 102 - 105)

1    Don't worry.
2        THE WITNESS: Okay. Good.
3  BY MR. HOPKINS:
4    Q. How many people have you communicated with
5  during the course of the deposition?
6    A. About -- about this lawsuit spe- --
7  specific?
8    Q. About anything.
9    A. I don't understand your question.
10    Q. How many people have you communicated with
11  while this deposition was ongoing?
12    A. Today, you mean?
13        MR. SQUITIERI: No. No.
14        During the deposition.
15  BY MR. HOPKINS:
16    Q. During this deposition.
17        MR. SQUITIERI: You know, go back to --
18        THE WITNESS: Oh.
19        No.
20        Just my attorney.
21  BY MR. HOPKINS:
22    Q. Your attorney, and you just said you talked
23  to a customer; right?
24        I'm trying to figure out who you were
25  talking to on that phone when you were typing away.

Page 106

1        MR. SQUITIERI: Well, he wasn't talking to
2  anybody on the phone.
3        He was --
4        MR. HOPKINS: Lee, we're not doing that.
5        MR. SQUITIERI: -- doing the --
6        MR. HOPKINS: No -- none of these speaking
7  objections.
8        Lodge your objection for the record.
9        MR. SQUITIERI: I -- I -- I got you, but be
10  a little more specific so we can stay on track.
11        THE WITNESS: Yeah.
12        I'm not following you.
13  BY MR. HOPKINS:
14    Q. Mr. Stospal -- Mr. Stospal, who were you
15  texting with?
16    A. A customer of mine.
17    Q. Just one --
18    A. I answered a question.
19    Q. Just one customer?
20    A. Yes, just one, one question, one customer.
21    Q. Have you communicated with your lawyer
22  other than during a break during this deposition?
23    A. Nope.
24    Q. I thought I heard you a minute ago testify
25  that your lawyer had given you answers to questions

Page 107

1  he thought you might be asked?
2        Did I misunderstand?
3    A. Well, this is -- this is a -- a privileged
4  conversation between me and my attorney.
5    Q. No.
6        I'm just asking you if I misunderstood
7  that.
8        Did you say that, or did I misunderstand
9  what you said?
10    A. Of -- of course we -- we have discussed the
11  case --
12        MR. SQUITIERI: No, no, no.
13        Hold on. Hold -- Larry, Larry, Larry.
14        There's an attorney-client privilege to
15  take, you don't have to answer questions about what
16  he talked about, but what he wants to know is in
17  your prior testimony, did you say that I gave you
18  answers to the question?
19        Okay?
20        Now, it's on the written record --
21        THE WITNESS: Sure.
22        MR. SQUITIERI: -- so tell him what you
23  remember saying on that subject when --
24        THE WITNESS: Sure.
25        Well, he didn't give me answers to

Page 108

1  questions.
2        He -- he -- just preparation --
3        MR. SQUITIERI: Okay.
4        THE WITNESS: -- that's it --
5        MR. SQUITIERI: Okay.
6        THE WITNESS: -- of what to expect, the
7  expectations.
8  BY MR. HOPKINS:
9    Q. Are you alleging that you suffered damages
10  by virtue of the purchase of your IUL policy
11  separate and apart from the FIP investment?
12    A. Yes.
13        If you lost $26,000, wouldn't you?
14    Q. $26,000.
15        That was the purchase price of your FIP
16  investment; right?
17    A. That's correct.
18    Q. I need you to listen to my question,
19  please, sir.
20        This is a very specific question.
21        Are you alleging damages arising from the
22  purchase of the IUL policy separate and apart from
23  the FIP investment?
24    A. Yes.
25    Q. What damages are you alleging that

Page 109

28 (Pages 106 - 109)

1 arised --
2     A. Well --
3     Q. -- separate and apart from the FIP
4 investment?
5     A. -- the damages I'm alleging here is the
6 growth -- the growth of the opportunity that was
7 funded into the policy; right?
8         I lost $26,000, a little over $26,000.
9         That could have been money growing
10 specifically.
11         You know, if you think about it, there's a
12 lot of stress, specifically when -- when you -- you
13 put an investment, you lose 26 grand.
14     I mean the -- I would say there's quite a
15 few damages, don't you think?
16     Q. You keep talking about the $26,000.
17         Did you not under- -- understand my
18 question?
19         I'm asking you about other than FIP
20 damages, what damages are you alleging arising from
21 your purchase of the IUL?
22     MR. SQUITIERI: Asked and answered.
23     THE WITNESS: I'm sorry, Lee.
24     What did you say?
25     MR. SQUITIERI: It's an objection. It's
*Page 110*

1 called asked and answered.
2     THE WITNESS: Oh, okay.
3     Well, I lost -- lost my policy, for one, I
4 have to start all over now from the beginning,
5 right, so it's going to take a lot of time, a lot of
6 effort and now a lot more research, so time is
7 money.
8 BY MR. HOPKINS:
9     Q. Okay. So you lost your policy, right,
10 that's one -- one element of -- of non-FIP damages
11 you're alleging; right?
12     A. Correct.
13     Q. Didn't you make a request that your policy
14 be rescinded?
15     A. Absolutely. Yes.
16     Q. Okay. So you asked for your policy to be
17 rescinded, and then when it was rescinded, you are
18 now alleging a claim for damages because it was
19 rescinded; is that right?
20     MR. SQUITIERI: Objection.
21     THE WITNESS: I don't understand your
22 question.
23 BY MR. HOPKINS:
24     Q. You said that you lost your policy, and
25 you're seeking damages as a result; right?
*Page 111*

1     A. Correct.
2     Q. But you asked for your policy to be
3 rescinded; right?
4     A. I did because I lost trust in Minnesota
5 Life as well as through my agent.
6         I will not do business with dealing with
7 fraud on any type of policy that was recommended,
8 period.
9     MR. HOPKINS: Objection. Non-responsive to
10 everything after "I did."
11     Q. You -- you also said a minute ago that you
12 were alleging as non-FIP damages the fact that you
13 had to, quote, "start all over."
14         What do you mean by that?
15     A. It was a loss. It was a financial loss.
16         That's what I mean.
17     Q. What was a loss?
18     A. Are -- are -- are you not present from what
19 I'm stating?
20         I lost $26,000.
21     MR. HOPKINS: He -- he's allowed to ask
22 you follow-up even if you and others perhaps seem to
23 think that the answer was implicit again, so --
24     MR. HOPKINS: Thanks, Lee.
25     I appreciate it.
*Page 112*

1     Q. Mr. Stospal, you said you had to start all
2 over when I -- you -- that was your answer that you
3 gave in response to my question "What damages other
4 than FIP have you suffered"; right?
5     A. Right.
6     Q. You said "I had to start all over"; right?
7     A. Right. Correct.
8     Q. And when I asked you to elaborate on what
9 you meant by "start all over," you said "$26,000";
10 right?
11     A. Yeah.
12         It's a loss.
13     Q. That --
14     A. You lose $26,000, that can be --
15     MR. SQUITIERI: Just let him ask a
16 question.
17     THE WITNESS: Okay. Go ahead.
18 BY MR. HOPKINS:
19     Q. That's the FIP loss; right?
20     A. Correct.
21     Q. Correct?
22         Other than the FIP loss, what damages are
23 you seeking in this case?
24     MR. SQUITIERI: Asked and answered.
25     THE WITNESS: I'm sorry, Lee.
*Page 113*

29 (Pages 110 - 113)

1    What did you say?
2        MR. SQUITIERI:  I said that that question
3  was asked, and you answered it.
4        THE WITNESS:  Okay.
5  BY MR. HOPKINS:
6    Q.  Answer it again, please.
7    A.  I -- I told you.
8        In terms of my -- my policy specifically,
9  it -- I would have had an -- the investment in my
10  universal life insurance policy; right?  There could
11  have been growth, continued growth.  You know, I
12  don't have specific projections on what that could
13  have been specifically, but I know it's time,
14  energy, effort wasted.
15    Q.  Okay.  So are you saying that you could
16  have invested the 20 whatever thousand dollars that
17  you paid to Minn Life and -- and earned a premium on
18  that over the -- over time?
19        Is that what you're saying?
20    A.  It -- it was -- I could -- it could have
21  been a couple different variables there.
22        In terms of your inve- -- your initial
23  investment, the investment could have increased, I
24  could have added more funding to it, it -- it -- it
25  could have been a mixed portfolio.

1    This is a conversation that I would have
2  had with the agent and not with you.
3    Q.  Okay.  So everything you just said you were
4  speculating about, right, 'cause you haven't done
5  that analysis to figure it out; right?
6        MR. SQUITIERI:  Objection.
7        THE WITNESS:  Yeah.
8        Because -- because -- I'm --
9        MR. SQUITIERI:  You asked him what he
10  thought.
11        He told you.
12        THE WITNESS:  Right.
13        Because fraud happened in this case, and
14  that's why we're all here today; correct?
15        MR. SQUITIERI:  No, you don't get to ask
16  questions?
17        MR. HOPKINS:  Object to -- object.
18  Non-responsive to everything after "right."
19    Q.  So other than the $26,000 FIP loss, you
20  can't put a dollar figure on any other element of
21  damages you are seeking in this case.
22        Do I have that right?
23    A.  Correct.
24        I'll consult with my attorney on that.
25    Q.  Have you ever smoked marijuana?

1    A.  No.
2    Q.  Have you ever been to the hospital?
3    A.  Yes.
4    Q.  For what?
5    A.  ACL, soccer.
6    Q.  Is that the only time you've ever been to
7  the hospital?
8    A.  Tonsillectomy.
9        I'm in the hospital every day.
10        That's what I do for a living.
11    Q.  Do you get annual physicals?
12    A.  Yes.
13    Q.  Do you have a doctor?
14    A.  Not specific.
15    Q.  Who do you get your annual physicals from?
16    A.  Just -- just depends.
17    Q.  Different person every year?
18    A.  Possibly.
19        I mean it's a network full of physicians
20  that I work with every single day, right, there's --
21  so -- I have a lot of --
22        MR. SQUITIERI:  Just -- just answer the
23  question.  Just answer the question.
24        That's all.
25        THE WITNESS:  Yeah.

1        No -- nobody -- I don't have one physician
2  I go to every single year, no.
3  BY MR. HOPKINS:
4    Q.  Have you ever used any illegal drugs other
5  than marijuana?
6    A.  No.
7        MR. SQUITIERI:  Objection.
8        He didn't say he used marijuana.
9        He said he did not use --
10        MR. HOPKINS:  Lee, we're not doing speaking
11  objections.
12        MR. SQUITIERI:  Well, we're not doing --
13        THE WITNESS:  Yeah.
14        I've never done drugs, period.
15        MR. SQUITIERI:  We're not doing --
16        MR. HOPKINS:  Thank you.
17        MR. SQUITIERI:  -- when did you stop
18  beating your wife either.
19        MR. HOPKINS:  Lee, stop it.  Lee, we're not
20  doing that.
21        THE WITNESS:  No drugs.
22  BY MR. HOPKINS:
23    Q.  Did you review the -- the complaint in this
24  lawsuit before it was filed?
25    A.  Yes.

1    Q. Have you ever been convicted of a crime?
2    A. No.
3    Q. Have you ever been charged with a crime?
4    A. No.
5    Q. When did you first hear the word
6 "Shurwest"?
7    A. I -- through my Minnesota Life agent.
8    Q. When?
9    A. I don't -- I can't recall the date
10 specifically.  I just -- I -- I don't remember the
11 conversation.  I don't.
12    Q. What is Shurwest?
13    A. A marketing -- a marketing firm that
14 markets to specific agents.
15    Q. Where did you arrive at that understanding
16 that you just gave me?
17    A. I looked it up.
18    Q. Where?
19    A. Online, just to find -- learn more about
20 the company.
21    Q. When did you do that?
22    A. I can't remember.
23    Q. Before or after you filed the lawsuit?
24    A. It was -- I believe it was before.
25    Q. Why did you decide "Hey, I want to go look

1 up Shurwest on the Internet"?
2    A. Because it seems like Shurwest is tied into
3 this lawsuit.
4    Q. So you didn't decide to look up Shurwest
5 until the lawsuit papers existed, then; is that
6 right?
7    A. Right.
8    Q. Had you heard the name "Shurwest" before
9 you read the complaint in this case?
10    A. Yes.
11    Q. In what context?
12    A. Through my agent.
13    Q. What did he tell you?
14    A. He -- I don't remember the details to it.
15    I just remember in terms of how he learned
16 about the -- the product FIP.
17    Q. So you sued Shurwest based on one
18 conversation with who you're calling your Minnesota
19 Life agent, and you can't recall the details of that
20 conversation?
21    MR. SQUITIERI:  Objection.
22 BY MR. HOPKINS:
23    Q. Is that right?
24    A. I'm sorry.
25    Say that again.

1    Q. At the time you authorized the filing of
2 this complaint, had you talked to anyone other than
3 who you're calling your Minnesota Life agent about
4 Shurwest?
5    A. Yes.
6    I -- I -- I contacted my attorney.
7    Q. Okay.  Other than your lawyer and that one
8 conversation with your Minnesota Life agent, had you
9 talked to anyone about Shurwest prior to authorizing
10 the filing of the complaint in this case?
11    A. No, I didn't contact anybody else.
12    Q. And that one conversation you had with your
13 Minnesota Life agent you can't remember the
14 specifics about.
15    A. I just -- I just remember how it was tied
16 in terms of like how it was marketed.  That's all I
17 remember.
18    I don't remember the details of the
19 conversation.
20    My -- my goal was not to learn about
21 Shurwest in the meeting that I had with my agent
22 specifically.
23    My -- we're looking on a long-term plan for
24 growth based -- for my financial outcome for my
25 future.

1    That's -- that was the objection of -- of
2 our meetings.
3    Q. Who at Shurwest have you talked to?
4    A. No one.
5    Q. You've never talked to anybody at Shurwest?
6    A. Nope.
7    Q. Do you have a contract with Shurwest?
8    A. No, I don't.
9    Q. Have you ever seen a piece of paper that
10 had Shurwest's name on it?
11    A. No.
12    Q. You didn't buy your FIP product from
13 Shurwest, did you?
14    A. That -- no.
15    That -- that would be -- that came directly
16 from my agent.
17    MR. HOPKINS:  Objection.  Non-responsive to
18 everything after "no."
19    Q. You bought your FIP product from FIP;
20 right?
21    A. It came from my Minnesota Life agent, I
22 bought it from him, Michael Cook.
23    Q. Michael Cook sold you an FIP investment?
24    A. My Minnesota Life agent Michael Cook sold
25 me the investment.

1    Q. That's what you think that FIP purchase
2 agreement that we looked at earlier says?
3    A. Well, that's what -- what -- that's what
4 happened.
5    Q. Have you ever called Shurwest's office?
6    A. No.
7    Q. Anybody from Shurwest's office ever called
8 you?
9    A. No.
10    Q. Do you know where Shurwest's office is?
11    A. No.
12    Q. Did anybody at Shurwest ever ask you to pay
13 them money?
14    A. No.
15    Q. Have you ever paid any money to Shurwest?
16    A. No.
17    Q. You agree with me that Shurwest isn't
18 mentioned anywhere in that FIP purchase agreement
19 that we looked at earlier; right?
20    A. I did not see it, no.
21        MR. SQUITIERI: Document speaks for itself.
22 BY MR. HOPKINS:
23    Q. Did you read that agreement before you
24 signed it?
25    A. Yes.

Page 122

1    Q. The FIP purchase agreement, you read that
2 before you signed it?
3    A. I did.
4        I went through it with my Minnesota Life
5 agent.
6    Q. Did you review the risk disclosures in it?
7    A. Every investment has a risk.
8        I don't remember, and I don't recall.
9    Q. You don't know if you read the risk
10 disclosures in the agreement you signed?
11    A. I'm --
12        MR. SQUITIERI: Asked and answered.
13        THE WITNESS: I don't remember. I'm --
14 I'm -- I don't remember.
15 BY MR. HOPKINS:
16    Q. You didn't talk to anybody at Shurwest
17 about the risk disclosures in the FIP purchase
18 agreement, did you?
19    A. No.
20    Q. Have you seen interrogatories in this case?
21    A. Explain.
22    Q. Do you know what an interrogatory is?
23    A. No, I don't.
24    Q. Have you given responses to interrogatories
25 in this case?

Page 123

1    A. Explain what it is, then I'll tell you.
2    Q. Did you provide answers to written
3 questions that Shurwest gave to your lawyer?
4    A. No.
5    Q. Did you look up information on the Internet
6 prior to purchasing FIP products?
7    A. No.
8    Q. So any sworn statement to the contrary
9 would be false?
10    A. No, I didn't look it up on the Internet.
11    Q. You decided to purchase FIP products based
12 upon information provided by your advisor; right?
13    A. Yeah, my agent.
14    Q. Not information provided by Shurwest;
15 right?
16    A. Correct.
17    Q. Because nobody at Shurwest has ever talked
18 to you; right?
19    A. No.
20    Q. Is this the first time you've ever sued
21 somebody you've never talked to?
22        MR. SQUITIERI: Objection.
23        Is this the first time you ever sued
24 anybody?
25 BY MR. HOPKINS:

Page 124

1    Q. That you never talked to.
2    A. This is the -- the answer is I've never
3 sued -- I have never sued anybody because I -- I've
4 never had fraud in a lawsuit like this, I never had
5 to, very ethical.
6    Q. Well, you know you don't have a claim for
7 fraud against Shurwest; right?
8    A. Correct.
9    Q. So then why are you talking about fraud?
10        I represent Shurwest.
11    A. Well, I'm just telling you the overall
12 picture.
13    Q. So you sued Shurwest, even though you never
14 talked to anybody at Shurwest.
15    A. Yes.
16    Q. What do you think Shurwest did wrong?
17    A. Well, from my understanding, that --
18 marketed a product to my Minnesota Life agent,
19 making a recommendation for FIP, that's my
20 understanding, but I wasn't in -- I wasn't in those
21 conversations.
22    Q. So you don't have any personal knowledge of
23 what you just said?
24    A. No, I have personal knowledge of what --
25 what my advisors -- or my agent stated.

Page 125

32 (Pages 122 - 125)

1    Q.  Where did you get the understanding that
2  you just said?
3    A.  Through the meetings.
4    I had meetings, multiple meetings with him
5  before I made this de- -- decision.
6    Q.  What decision?
7    A.  Of in- -- investing in FIP.
8    Q.  Do you know what claims you have pending
9  against Shurwest?
10   A.  Yes.
11   Q.  What?
12   A.  The -- claims that my attorn- --
13 attorney positioned in the case.
14   Q.  Do you know what they are?
15   A.  Yes.
16   I -- I'd have to review them again.
17   It's a lot of information to take in.
18   Q.  Do you know how many claims you have
19 pending against Shurwest?
20   A.  Not off the top of my head.
21   That's my attorney's job.
22   Q.  Do you think that Shurwest assisted
23 Minnesota Life in Minnesota Life's alleged breach of
24 their fiduciary duty to you?
25   A.  Yes.

Page 126

1    Q.  How?
2    A.  Well, there's a reason why you're here
3  today.
4    This would -- all -- this -- this would
5  have been all positioned all through the -- the
6  agents that Shur- -- Shurwest potentially marketed
7  it to.  I mean that's my understanding.
8    I mean, like, it's -- it's funny how you
9  can Google FIP and notice that the creator of FIP
10 was an ex-con, and I mean how -- how can someone
11 recommend -- even recommend a policy that has an
12 ex-con's name tied to it?
13   Q.  Did you Google FIP?
14   A.  Yes, after I found out about the -- what
15 happened.
16   Q.  Not before?
17   A.  No.
18   Q.  So the sworn interrogatory response that
19 says you looked up information on the Internet is
20 incorrect; right?
21   MR. SQUITIERI:  He didn't sign those.
22   MR. HOPKINS:  Lee, did you submit
23 interrogatory responses that your client had not
24 reviewed?
25   MR. SQUITIERI:  No, but I submitted

Page 127

1  interrogatory responses that my clients have not
2  signed.
3    MR. HOPKINS:  Okay.  So your violation of
4  the Civil Procedure rules lets him out of the fact
5  that we have demonstrably false interrogatory
6  responses?
7    MR. SQUITIERI:  No.
8    I -- I --
9    MR. HOPKINS:  Okay.
10   MR. SQUITIERI:  You're cross-examining him.
11 BY MR. HOPKINS:
12   Q.  All you had to have done was Google FIP,
13 and you wouldn't have these problems, would you,
14 sir?
15   MR. SQUITIERI:  Objection.
16   THE WITNESS:  I'll -- I'll give you the
17 answer to it, though.
18 BY MR. HOPKINS:
19   Q.  Please.
20   A.  It's my Minnesota Life agent who
21 recommended that I trusted.
22   It's not my responsibility.
23   You go based off a recommendation by a
24 professional so you don't have to worry about
25 situations like this who protect -- protect your

Page 128

1  assets.
2    Q.  Shurwest never communicated with you about
3  FIP; right?
4    A.  No.
5    MR. SQUITIERI:  Asked and answered.
6  BY MR. HOPKINS:
7    Q.  No, it's not right, or no, they did not?
8    A.  You've already asked this question.
9    Q.  I know.
10   I'm phrasing it slightly different because
11 these are requests for admission responses that your
12 lawyer sent that I don't think are accurate.
13   Is this statement true:  Shurwest never
14 communicated with any Plaintiff about FIP.
15   A.  With me, no.
16   Q.  Is this statement true:  Shurwest never
17 recommended that you invest with FIP.
18   A.  No, they didn't -- I didn't get that
19 communicated to me.  The answer is no.
20   Q.  So the answer -- that didn't happen, and
21 the statement is true; right?
22   A.  Okay.  I just want some clarification here
23 in terms of what you're asking and not twisting, but
24 being straightforward so I can understand the
25 question.

Page 129

Veritext Legal Solutions
866 299-5127

1    Q. Okay.  I -- I -- my -- my goal here is not
2 to twist anything.
3       I want to be abundantly clear.
4    A. Okay.
5    Q. Let's start over.
6       I'm going to give you a statement, and I
7 want to -- I want you to tell me if it's true or
8 false.
9       Okay?
10   A. Okay.
11   Q. Shurwest never communicated with you about
12 FIP.
13   A. No.
14   Q. Is that true or false?
15   A. That's true.
16   Q. Shurwest never recommended that you invest
17 with FIP.
18      Is that true or false?
19   A. Well, not to me specific based on a
20 one-on-one conversation with sur- -- Shurwest.
21   Q. So that statement is true.
22   A. Correct.
23   Q. How about this one:  Shurwest did not
24 recommend FIP as a funding mechanism for IUL
25 policies through your advisors.

Page 130

1       He's got to ask you a question.  Larry,
2 he's going to ask you a question.
3       Go ahead.
4 BY MR. HOPKINS:
5    Q. Do you have personal knowledge as to
6 whether Shurwest ever recommended FIP as a funding
7 mechanism to your Minnesota Life agent?
8       MR. SQUITIERI:  Asked and answered.
9       THE WITNESS:  I -- from what I recall, it
10 was yes, but off the top of my head, I -- I got to
11 think back on how that -- that was delivered from
12 him.
13      It -- it's been a long time since I had a
14 conversation.
15 BY MR. HOPKINS:
16   Q. Is this statement true or false:  You did
17 not rely on any statement made by Shurwest in
18 connection with your investment in FIP.
19   A. True.
20   Q. Is this statement true:  You relied on
21 statements made by your advisor in connection with
22 your investment with FIP.
23   A. Yes.  True.
24   Q. Is this statement true:  Shurwest did not
25 provide financial advice or retirement planning

Page 132

1    A. No, it did come from my advisor.
2    Q. Okay.  You're talking about recommendations
3 that came from your -- your Minnesota Life agent to
4 you; right?
5    A. Correct.
6    Q. I'm talking about recommendations that came
7 from Shurwest to that Minnesota Life agent, do you
8 know of -- do you have personal knowledge that
9 Shurwest recommended FIP to your Minnesota Life
10 agent?
11   A. He told me specifically, that's where --
12 that's where it all started from, Michael Cook.
13   Q. Michael Cook told you that Shurwest
14 recommended to him that you use FIP as the funding
15 mechanism.
16   A. Okay, Jason, this happened couple years --
17 years back, right, and I'm trying to recall all the
18 details here, so I re- -- these are the
19 conversations that I had specifically with my
20 Minnesota Life agent.
21   Q. I understand.
22      I'm trying to get at what is -- what the
23 substance of those communications were.
24   A. Man, I wish I could give you more --
25      MR. SQUITIERI:  Hold on.

Page 131

1 services to you.
2    A. True.
3       MR. HOPKINS:  Pass the witness.
4       MR. SQUITIERI:  Okay.
5       Thanks, Larry.
6       MR. HOPKINS:  Kathy, anything else?
7       MS. HUANG:  I don't have any further
8 questions.
9       MR. SQUITIERI:  I don't have any questions
10 for my witness.
11      This deposition is closed.
12      Larry, you can sign off, and I think I got
13 to take care of a couple of things with the lawyers,
14 and then I'll call you on the phone.
15      THE WITNESS:  Thank you for your time.
16      MR. SQUITIERI:  Okay.
17      THE VIDEOGRAPHER:  Okay.  This concludes --
18      MS. HUANG:  Thank you for your time.
19      THE VIDEOGRAPHER:  -- today's testimony
20 given by Larry Stospal.
21      We are off the record at 5:20 Central time.
22      (There was a discussion off the record.)
23      (Deposition adjourned at 5:20 P.M.)
24
25

Page 133

34 (Pages 130 - 133)

1  STATE OF CALIFORNIA      )
2                          ) ss.
3  COUNTY OF LOS ANGELES    )
4
5
6        I, LARRY STOSPAL, declare under the
7  penalties of perjury under the State of California
8  that the foregoing is true and correct.
9        Executed on this _____ day of _____,
10  2021, at _____, California.
11
12
13
14

        _____
15        LARRY STOSPAL
16
17
18
19
20
21
22
23
24
25

                                        Page 134

1  STATE OF CALIFORNIA      )
2                          ) ss.
3  COUNTY OF LOS ANGELES    )
4
5        I, TERI J. NELSON, CSR NO. 7682, RPR, in
6  and for the State of California, do hereby certify:
7        That, prior to being examined, the witness
8  named in the foregoing deposition was by me duly
9  sworn to testify the truth, the whole truth, and
10  nothing but the truth;
11        That said deposition was recorded
12  stenographically by me at the time and date therein
13  named, and thereafter transcribed, and the same is a
14  true, correct and complete transcript of said
15  proceedings.
16        I further certify that I am not interested
17  in the event of the action.
18        WITNESS MY HAND this 9th day of February,
19  2021.
20
21
22
23
24        TERI J. NELSON
25        CSR No. 7682, RPR

                                        Page 135

                                        35 (Pages 134 - 135)

[& - address]

| & | | | |
|---|---|---|---|

**&**  2:13 3:7 8:3,6

**0**

**03025**  1:6 7:14

**1**

**1**  5:10,12 53:4,7
57:24
**1,000**  27:20 51:3
**10**  56:11,14
**100**  34:8
**10022**  2:17
**105**  5:6
**1172**  11:15
**12**  6:16
**12/19/2016**  54:2
**12th**  2:16
**13**  55:22
**14**  75:7
**144,000**  70:8,14
**145,000**  61:20
**15**  18:8 19:1
**158,000**  72:19
**16**  5:16 18:8
**16th**  3:10 11:13
**17**  6:7
**18**  1:6 7:14
**18461**  135:23
**187,000**  61:24
**19**  54:8 56:23
57:10
**19,050**  64:2 68:25
**1900**  3:19
**1979**  11:13
**19th**  41:10

**2**

**2**  5:16 54:16,17,21
55:1,13,15 67:18
75:2 78:11
**20**  114:16

**2004**  12:24 15:1
**2009**  14:20
**2014**  13:25 14:2,20
**2016**  5:19,24 26:4
41:10 54:8 56:23
57:10 61:21,25
62:4,13 102:25
104:11
**2017**  6:7 75:7
**2019**  6:16
**2021**  1:18 2:6 7:1
7:6 134:10 135:19
**212-421-6492**  2:18
**213-576-1000**  3:12
**214-743-4546**  3:22
**22,000**  92:12
**2200**  3:20
**23**  6:9
**26**  110:13
**26,000**  38:21 39:12
85:23 109:13,14
110:8,8,16 112:20
113:9,14 115:19
**26,320**  28:22 36:21
**27**  1:18 2:6 7:1
**27th**  7:6
**2:24**  1:19 2:6 7:2,5

**3**

**3**  5:20 65:11,14
**30**  76:9
**32**  2:15
**333**  3:9
**36**  5:20 6:3
**37**  69:17
**3:21**  52:23
**3:37**  53:3

**4**

**4**  6:3 58:2 71:1,4
**4,000**  85:24

**401**  21:10 25:22
28:16,19,22 48:22
81:4,8,21 100:14
100:20,21,23,24
101:1 103:11
**42,000**  62:4
**4:31**  97:4
**4:43**  97:9

**5**

**5**  6:9 74:15,18
**53**  5:10
**54**  5:16
**57th**  2:15
**5:20**  133:21,23

**6**

**6**  6:13 90:8,11
**60**  30:12,12,16
**65**  5:20
**67**  69:25 70:15
72:17 73:13,17

**7**

**71**  6:3
**74**  6:9
**75201**  3:21
**7682**  1:25 2:7
135:5,25

**8**

**8**  5:24

**9**

**9**  5:5
**90**  6:13
**900,000**  63:17
64:20
**90071**  3:11
**9th**  135:18

**a**

**ability**  45:3
**able**  11:10 29:25
34:25 93:5,10

**absent**  93:4,8
**absolutely**  84:10
111:15
**abundantly**  130:3
**ac**  64:8
**accepted**  92:2
**account**  31:22
32:2 33:4,10,11
48:21 81:8,22
82:19 100:10,20
102:1
**accountant**  104:5
**accounting**  13:9
13:12,13,14 15:22
17:2,3,6,9,10,15
17:16,17
**accounts**  33:5,10
39:21 102:2
**accrued**  101:3
**accumulate**  69:4
72:24 73:20
**accumulated**
74:13
**accumulation**  68:8
72:7
**accurate**  61:22
62:1,5 63:19 70:2
93:4,10 129:12
**ach**  14:15
**acl**  116:5
**acquired**  103:23
**acquisition**  103:22
**action**  7:22 94:24
135:17
**active**  94:22 95:13
**actual**  25:11 31:17
34:11 43:22 47:21
59:14 92:22
**added**  114:24
**address**  11:14,16
11:19,25 12:1,2,5

Page 1

[adjourned - arrangement]

**adjourned** 133:23
**adjustable** 75:3
**administration**
  13:7
**admission** 129:11
**advi** 88:19
**advice** 52:15
  100:23 132:25
**advised** 22:1
**advisor** 22:12 23:6
  23:7,16,22,23,24
  24:2,5,5,15 25:7
  26:25 28:4 30:25
  57:7,20 59:8,9,17
  61:9 62:22 80:14
  100:10,15,19,22
  103:4,6,9,17,23
  124:12 131:1
  132:21
**advisors** 37:7
  125:25 130:25
**affiliated** 28:25
  80:2 89:16 103:6
**affiliation** 79:4,19
**affiliations** 7:25
**afford** 95:2
**afternoon** 7:4 8:1
  8:5 9:8
**age** 30:13 69:16,24
  70:6,15 72:17
  73:2,8,13,17,21
  74:11
**agency** 83:22
**agent** 23:17 24:12
  43:9 76:9 77:13
  79:11,20 80:2,15
  87:4 88:9,10,15,19
  88:22 89:5,10,14
  89:18 93:2,15
  94:3,15 95:13
  112:5 115:2 118:7

119:12,19 120:3,8
  120:13,21 121:16
  121:21,24 123:5
  124:13 125:18,25
  128:20 131:3,7,10
  131:20 132:7
**agent's** 78:17
**agents** 37:8 118:14
  127:6
**ago** 61:18 107:24
  112:11
**agree** 7:8 47:21
  122:17
**agreement** 5:18
  36:20 38:18,20
  41:12,21,23 42:4
  42:11 47:11 48:14
  54:7 55:11,18
  57:1 60:8 78:12
  78:14,16,19 80:8
  81:18 82:14 122:2
  122:18,23 123:1
  123:10,18
**ahead** 16:4,13
  50:10 51:17 98:17
  101:11 104:21
  113:17 132:3
**al** 7:12
**allegations** 85:14
**alleged** 126:23
**alleging** 109:9,21
  109:25 110:5,20
  111:11,18 112:12
**alleviate** 93:17
**allocate** 34:10,13
**allocated** 31:18
**allocating** 27:20
  29:18
**allowed** 112:21
**alston** 3:7 8:6

**alston.com** 3:13
**alzheimer's** 15:11
**ameritrade** 102:1
**amount** 29:18
  31:16,21,22 34:6
  34:12,19,20 36:14
  37:19 43:21 51:9
  63:16 64:8,11
  68:18,19 69:24
  70:4,15 73:25
**analysis** 115:5
**angeles** 3:11 134:3
  135:3
**annual** 64:2,3
  116:11,15
**answer** 10:18 11:2
  16:4,9,13,16,21
  18:14,16 23:18,19
  24:6 46:23 50:9
  51:5,6,7 64:15
  71:22 79:1 98:3
  98:13 108:15
  112:23 113:2
  114:6 116:22,23
  125:2 128:17
  129:19,20
**answered** 107:18
  110:22 111:1
  113:24 114:3
  123:12 129:5
  132:8
**answering** 10:12
**answers** 31:2,4
  77:2,2 107:25
  108:18,25 124:2
**antonio** 11:20 22:5
**anybody** 44:22
  80:12 86:16,20
  87:7,25 91:18
  104:2 107:2
  120:11 121:5

122:7,12 123:16
  124:24 125:3,14
**anymore** 95:3
**apart** 36:13 40:21
  40:23 101:1
  109:11,22 110:3
**apartment** 12:3
**appearances** 2:10
  3:1 4:1 7:24
**application** 5:12
  11:22 47:7 53:8
  53:12,15,23,24
  57:11 58:1 59:6
  59:11 60:9,23
  61:14,19 62:18
  63:24
**application's**
  58:20
**applied** 11:21
  32:10 35:19 41:5
  43:16 48:1,4,15
  49:1,19,19,25
  50:18 52:1 58:14
  59:23 60:3 65:2
  69:16
**apply** 31:7 44:4
  47:2 48:12
**applying** 31:11
  52:12 54:11 63:15
  63:16,22 64:6
**appreciate** 112:25
**appropriate** 35:14
**approximately**
  14:21 18:23 39:13
  70:9
**arena** 44:25
**arised** 110:1
**arising** 109:21
  110:20
**arrangement**
  82:17

Veritext Legal Solutions
866 299-5127

**[arrive - care]**

**arrive** 118:15
**aside** 89:13
**asked** 29:14 82:10
  83:1 90:20 108:1
  110:22 111:1,16
  112:2 113:8,24
  114:3 115:9
  123:12 129:5,8
  132:8
**asking** 9:19 10:17
  10:20 58:19,20
  77:16 91:15,19
  103:16 108:6
  110:19 129:23
**assets** 62:7,17 63:8
  129:1
**assisted** 15:10
  126:22
**assume** 10:19
  49:19 69:16
**assumed** 79:21
**assuming** 84:2
**assumptions** 66:24
**attained** 12:19
**attend** 12:16,25
**attendee** 23:1
**attention** 39:16
**attorn** 126:12
**attorney** 17:23
  31:15 83:22 86:11
  86:14 88:7,10
  91:4,24 94:21
  96:12 98:1,3
  105:5,5 106:20,22
  108:4,14 115:24
  120:6 126:13
**attorney's** 126:21
**attorneys** 17:25
  18:4,25
**audio** 7:7

**august** 5:19 11:13
**authorized** 120:1
**authorizing** 120:9
**awarded** 101:20
**aware** 64:3

**b**

**b** 5:8 6:1
**back** 36:23 38:25
  41:17 46:24 53:1
  54:15 57:23 62:13
  78:11 86:11 92:15
  92:25 93:1 97:7
  97:14 104:11
  106:17 131:17
  132:11
**background** 17:6
  17:15 23:13 44:7
**bad** 85:24
**ballpark** 64:12
**bank** 14:11,18,24
  28:15,16,23 81:4,9
  100:13 101:4,18
  103:16
**bankers** 14:16,17
**banking** 102:3
**base** 63:16,16
**based** 15:15 35:7
  39:6 44:6 47:24
  49:17 51:1 52:10
  52:14 59:18 63:1
  63:8 66:13,14,14
  66:24 68:13 70:13
  80:24 88:25 91:24
  92:2 98:24,24
  101:18 103:12
  119:17 120:24
  124:11 128:23
  130:19
**basic** 13:12,14
  33:13

**basically** 36:9
  62:16 63:5 101:17
**basis** 37:22 39:4
  76:4
**bates** 5:13 6:7,11
**bb&t** 14:11,18,23
  28:15,16 81:4,9
  100:13 101:4,18
  103:5,6,12,16,22
**beating** 117:18
**began** 14:7
**beginning** 17:9,17
  19:15 27:21 29:19
  30:22 32:3 51:14
  51:23 111:4
**behalf** 1:6 2:3 8:7
  8:11,13
**believe** 14:21
  18:22 19:16 25:21
  25:22 41:4,9,9
  54:6 57:4 62:24
  63:11 74:4 78:5
  82:3 84:4 89:7,15
  96:19 102:5
  118:24
**believed** 30:25
**benefit** 71:6 74:19
**benefits** 31:10,12
**best** 18:17 38:10
  45:3 95:23 96:16
  101:17,17
**beth** 4:4 8:14
**beyond** 46:4
**big** 82:14
**bird** 3:7 8:6
**birth** 11:12
**bit** 28:6 69:7
**board** 36:7
**boils** 63:5
**bond** 33:20

**bottom** 33:14
**bought** 121:19,22
**boxes** 58:7
**breach** 126:23
**break** 10:23 28:6
  107:22
**brief** 91:8
**bringing** 49:9
**broad** 91:11
**brochures** 44:1
**brokerage** 100:11
**brought** 49:7
**bulk** 9:18
**bunch** 95:10,18
**business** 12:22
  13:3,5,7 14:17
  43:3,4 95:10,12,18
  112:6
**buy** 121:12

**c**

**c** 104:7
**calendar** 14:22
**california** 3:11
  134:1,7,10 135:1,6
**call** 25:15,16 85:22
  86:3,20 87:25
  91:15 95:23 96:8
  133:14
**called** 25:17,22,23
  83:9 86:6 88:4,7
  88:10,11,15 111:1
  122:5,7
**calling** 119:18
  120:3
**cancel** 95:8
**cancelled** 95:20
**canyon** 11:15
**card** 14:15 43:3,5
**cardiology** 26:21
**care** 12:22 13:7,19
  15:4,11,15 85:23

**[care - cook]**

133:13
**career** 15:18 31:3
**carolina** 103:20,24
**carriers** 42:16,19
43:10
**case** 1:6 7:14
92:18 108:11
113:23 115:13,21
119:9 120:10
123:20,25 126:13
**cause** 17:3 32:3
33:17 34:14 46:24
51:22 65:25 80:23
82:6,12 91:4
94:24 96:14 115:4
**center** 14:7
**central** 7:5 97:10
133:21
**certain** 18:15
29:18 31:16,21,22
34:6,7,20,25 37:3
37:19 43:21 66:24
68:9,18,19 69:1,3
69:24 70:4,6,15
72:7 73:1,8,21
74:11 101:6
**certify** 135:6,16
**cetera** 76:24
**changed** 65:8
**charged** 118:3
**charlotte** 103:20
103:23
**check** 39:12
**checked** 58:7,24
**children** 12:14
**choices** 103:12
**ciofoletti** 1:6 7:12
**circle** 33:18
**circled** 36:7
**civil** 128:4

**claim** 111:18
125:6
**claims** 126:8,12,18
**clarification** 82:22
84:1,18 129:22
**clarify** 10:18 48:3
**clear** 10:13 48:12
60:18 77:7 82:16
85:9 130:3
**client** 91:4 108:14
127:23
**clients** 9:22 23:8
45:4 46:4 128:1
**closed** 133:11
**club** 101:9,13,16
101:20,20
**collect** 19:9,12
**collected** 19:21
**collection** 83:21
83:22 85:18 86:11
90:5
**collections** 96:10
**college** 12:16,23
**column** 67:11,13
67:23 68:2,12
69:14,15 72:5,20
76:7
**com** 62:17
**come** 29:13 51:13
51:16,21 54:15
131:1
**comes** 26:21,23
27:25
**comfortable** 52:12
**commercial** 14:16
**common** 34:23
68:21
**communicated**
105:10,19 106:4
106:10 107:21
129:2,14,19

130:11
**communications**
131:23
**community** 15:6,9
15:14 44:9,21
45:23
**companies** 1:11
2:5 3:5 8:9 24:25
25:4
**company** 1:10,10
2:4,5 3:4,5 8:8,9
15:2 52:5 78:19
78:23 79:6,7,10
87:10 95:21
118:20
**competent** 44:16
**complaint** 20:24
117:23 119:9
120:2,10
**complete** 53:12
135:14
**completed** 47:22
**complex** 12:3
**comprised** 62:17
**con** 80:3 127:10
**con's** 127:12
**concept** 70:3,11,12
**concerned** 80:19
**concludes** 133:17
**concrete** 30:7
**conditions** 76:25
**condo** 12:8
**conduct** 104:21
**confirm** 75:13
**connection** 96:24
132:18,21
**consider** 15:21
17:1,5
**considering** 57:16
**constituted** 62:7

**consult** 103:8
115:24
**consultant** 14:13
**contact** 87:7,15
91:18 96:20
103:24 120:11
**contacted** 88:15
94:21 120:6
**content** 91:4
**context** 119:11
**continued** 3:1 4:1
114:11
**contract** 38:18
121:7
**contrary** 124:8
**conversation**
22:18 30:7 32:25
33:7 35:11 43:25
51:2 73:3 83:13
85:7 86:8 108:4
115:1 118:11
119:18,20 120:8
120:12,19 130:20
132:14
**conversations**
23:11 25:25 33:12
125:21 131:19
**convict** 21:12
**convicted** 118:1
**cook** 21:21 22:4
25:12 26:2 27:12
28:7,19 29:5
30:14 34:18 35:18
35:21 39:6,13
40:2 41:4,7 42:5
42:13 44:8,22
45:14 46:1,16
49:9 52:14 60:12
66:4,16 68:1,10
70:23 71:15 73:19
73:24 75:22,25

[cook - determine]

79:9 82:3,7,20
83:1,16 84:16,20
85:3,9 86:2 87:3,6
87:14 90:5 96:4
96:18,20,23
103:14,14 104:1
121:22,23,24
131:12,13
**cook's** 45:24 80:25
**coordinators**
15:13
**copy** 75:11,21
**corporate** 14:16
14:16
**correct** 14:1 17:16
17:17,17 19:24
20:15 23:3 26:22
28:3 37:21 38:13
38:23 39:15 40:12
42:12 45:16 50:4
50:16,17,20,21,24
54:8,13 57:12
59:12,25 60:5,10
60:25 61:7 63:18
63:20,25 69:11,19
70:22 74:14 77:9
77:10,23 81:23
82:25 85:2,12
88:24 91:22 92:3
92:6,7,9,10,10,12
92:13,16 97:11
98:25 100:16,17
109:17 111:12
112:1 113:7,20,21
115:14,23 124:16
125:8 130:22
131:5 134:8
135:14
**correctly** 51:5
**counsel** 2:10 7:10
7:24 8:2,15 10:25

19:23 20:14 45:8
50:7 61:4 76:21
84:6
**county** 134:3
135:3
**couple** 114:21
131:16 133:13
**course** 26:16
27:22,25 30:22
32:4,7,25 34:2,8,9
34:12 36:11 49:14
51:11 59:8 61:10
66:2 78:2 83:3
86:18 94:21 97:23
105:11,20 106:5
108:10
**courses** 13:3,5,8,9
13:10,13,13,14
17:11,14
**court** 1:1 7:13,19
8:17 20:22
**cpa** 17:9 104:5,9
104:11,13
**crashed** 32:8
**created** 36:1
**creator** 127:9
**credit** 14:15
**crime** 118:1,3
**crooks** 95:10,19
**cross** 128:10
**csr** 1:25 2:7 135:5
135:25
**current** 11:14
13:15
**currently** 12:5
63:10
**customer** 105:22
106:23 107:16,19
107:20
**cv** 1:6 7:14

**d**

**d** 5:1
**d.c.** 14:25
**dad** 15:14
**dallas** 3:21
**damages** 92:17,20
109:9,21,25 110:5
110:15,20,20
111:10,18,25
112:12 113:3,22
115:21
**data** 76:24
**date** 11:12 31:13
31:19 41:11 48:8
54:7 55:8 56:22
57:5,7,9,11 60:7,8
60:9 75:6 90:4,6
98:25 103:3 118:9
135:12
**dated** 5:24 6:7,16
54:2,7 60:9 65:17
**dates** 47:22 98:14
98:19,21,24 99:2,5
**day** 41:23 57:8
61:10 116:9,20
134:9 135:18
**days** 76:9
**de** 126:5
**deal** 36:13 47:17
49:18 50:15
**dealing** 112:6
**dec** 100:15
**december** 5:24
41:10 54:8 56:23
57:10 65:17 99:19
99:22
**decide** 44:4 118:25
119:4
**decided** 124:11
**decision** 80:24
126:5,6

**decisions** 100:16
100:19
**declare** 134:6
**defendant** 3:15
7:11 8:7 21:17
**defendants** 1:12
2:3 3:3 53:4 54:17
65:11 71:1 74:15
90:8
**defending** 94:24
**definitely** 17:9
32:8 47:19 78:1
90:7
**degree** 12:20,21
13:2 17:10
**delivered** 132:11
**demonstrably**
128:5
**dep** 9:23
**depending** 71:22
**depends** 116:16
**deposition** 1:16
2:1 7:10,15 9:18
9:24 17:19,22
18:7 19:4,10,15
20:5,19 97:19,24
99:5 100:4 105:11
105:20 106:5,11
106:14,16 107:22
133:11,23 135:8
135:11
**description** 5:9
6:2
**designed** 35:12
36:6
**detailed** 18:9
**details** 37:23
86:12 119:14,19
120:18 131:18
**determine** 81:2

5CASE 0:18-cv-03025-JNE-ECW   Doc. 188   Filed 03/10/21   Page 97 of 127

**[devices - expected]**

**devices** 13:17,19
13:19
**dial** 97:17
**different** 15:13
18:8 23:13 36:8
43:9 44:12 49:7
51:16,21,22 79:16
114:21 116:17
129:10
**diligence** 80:21
86:13 96:14
**directed** 87:6,14
**directly** 17:23
66:2 82:19 83:6,9
121:15
**director** 15:6
**disclose** 58:13
59:1 61:6
**disclosed** 50:22
**disclosure** 58:9
**disclosures** 123:6
123:10,17
**discovery** 86:17
**discuss** 71:15 74:6
74:9,10 88:8
**discussed** 20:23
25:19 27:17 70:23
90:23 91:2 108:10
**discussing** 73:7,18
**discussion** 47:25
52:24 97:5 133:22
**discussions** 91:25
**district** 1:1,2 7:13
7:13
**dla** 3:16 8:10
105:5
**dlapiper.com** 3:23
3:24
**doctor** 116:13
**document** 5:10,16
5:20 6:3,9,13

39:23 42:4 65:22
65:23 66:4,6,11,23
66:23 67:2 74:24
74:25 75:1,11,17
75:17 83:6,25
84:3 96:10 122:21
**documents** 19:9
19:12,13,14,18,21
20:4,7,16,17,17,21
20:21,22 38:15,17
41:19 42:24 43:15
84:6 85:10 98:2,4
98:7,13,20 99:4,12
99:23 100:3
**doing** 33:21 95:9
107:4,5 117:10,12
117:15,20
**dollar** 115:20
**dollars** 114:16
**drop** 55:3
**drugs** 13:18 117:4
117:14,21
**due** 80:20 86:13
96:13
**duly** 9:2 135:8
**duty** 126:24

**e**

**e** 5:1,8 6:1 19:25
20:1 83:5 84:5
85:10 86:3 96:8
102:2
**earlier** 9:17 43:20
46:17 122:2,19
**earned** 61:20
114:17
**earnings** 58:7,24
61:6 67:10
**easier** 93:24 94:1
**east** 2:15
**eclipse** 5:23 6:6
63:15 75:2

**ecw** 1:6 7:14
**education** 12:18
**effort** 111:6
114:14
**either** 117:18
**elaborate** 68:15
113:8
**elder** 15:15
**eleanor** 1:6 7:11
**element** 111:10
115:20
**employed** 13:21
13:23
**employee** 101:2,15
**ended** 23:2 83:5
85:8
**energy** 114:14
**engage** 86:5
**enter** 57:1
**entire** 18:5
**entirely** 35:14
78:22 82:16
**entitled** 5:11,17,21
6:4,10 98:3
**entity** 78:22 79:16
80:20 88:18
**episodes** 18:8
**equipment** 26:21
**especially** 70:20
**esq** 2:14 3:8,17,18
4:4
**established** 44:11
**establishing** 80:3
**estate** 62:12 102:8
102:11,15
**estimate** 63:4,4,6
63:8,12
**estimates** 62:24
**et** 7:12 76:24
**ethical** 95:21
125:5

**event** 135:17
**events** 87:21
**eventually** 48:21
**everybody** 94:13
97:13
**evidently** 61:10
**ex** 21:12 80:3
127:10,12
**exact** 48:8 64:8
65:25
**exactly** 24:18 25:9
44:16 48:24 83:19
**examination** 5:3
9:5 105:1
**examined** 9:3
135:7
**examining** 128:10
**example** 26:20
**excellent** 37:6
**exchange** 38:21
**excuse** 45:8 66:8
**execute** 83:25
**executed** 19:18
48:19 61:10 134:9
**exhibit** 5:10,16,20
6:3,9,13 52:16
53:4,7,18 54:15,16
54:17,21 55:1,2,13
55:15 57:24 65:11
65:14 71:1,4
74:15,18 76:22
78:11 90:8,11
**exhibits** 55:7 99:7
100:3
**existed** 119:5
**expect** 82:14 109:6
**expectations**
109:7
**expected** 31:4
77:19

Page 6

Veritext Legal Solutions
866 299-5127

[expecting - function]

expecting 36:23
expert 26:17 80:18
explain 33:3 34:18
34:24 68:1 83:4
123:21 124:1
explained 36:5
explaining 33:2

**f**

f 103:22
face 87:9
fact 57:10 89:5
112:12 128:4
fairly 15:21 17:2
77:21
false 124:9 128:5
130:8,14,18
132:16
familiar 53:10
55:16
family 23:10 30:3
86:19
far 43:12
fdic 103:22
fearon 2:13 8:4
february 75:7
135:18
fell 36:13 40:21,22
felt 52:11
fiduciary 126:24
figure 33:24
106:24 115:5,20
figured 79:13
file 54:23
filed 7:13 9:22
117:24 118:23
files 19:20
filing 120:1,10
fill 48:3 58:25 59:2
59:9 61:8
filled 47:7,11 57:7
63:24

filling 56:25
finance 15:22 17:2
17:3
finances 26:23
28:1 30:3,15
financial 1:9 2:3
3:3 4:4 6:15 7:12
8:7,15 23:7,9,16
23:22,23,24 24:1,4
24:5,15 25:7
28:17 38:7 46:7
94:12 100:10,14
100:19,22 103:4,5
103:8,17 112:15
120:24 132:25
financially 7:22
24:20 29:25 30:15
find 48:6 118:19
finding 95:1
fine 64:10 65:4
77:25
finish 10:11
fip 5:17 19:13,21
20:1,18 22:1
29:21 32:7,21
35:24,25 36:3,4,6
36:17,20 37:10
38:12,15,21 39:4
39:10,14,19,22,25
40:3,4,9,18 41:2,8
41:12,16,18,21,21
41:22,23 42:6,8,10
47:3,11,25 48:13
48:14,25 49:8,10
49:19 50:15 54:7
54:13 55:10,19
57:1,17 58:9,13
59:14,25 60:5,7,24
60:24 61:3 76:20
77:9 78:12,21
79:6,15,25,25 80:7

80:10,12,24 81:3
81:16,17,18,19,23
82:5,8,11,12,18,18
82:23 83:10,15,24
84:9,12,15,19,21
85:1,4,13,17,19
86:9,15,21,25
87:13,16,19 88:1,5
88:17,22 89:6,8,16
89:20 90:1 92:20
93:1,5,8,10,17,23
94:18 95:2,15
96:10 104:14,15
109:11,15,23
110:3,19 111:10
112:12 113:4,19
113:22 115:19
119:16 121:12,19
121:19,23 122:1
122:18 123:1,17
124:6,11 125:19
126:7 127:9,9,13
128:12 129:3,14
129:17 130:12,17
130:24 131:9,14
132:6,18,22
firm 118:13
first 5:10,16,20
6:3,9,13 9:2 15:16
23:15 26:1 40:16
42:5,9 47:2,23
48:18,18 53:19
61:19 67:11 84:8
91:13 95:1,9,11
98:5 118:5 124:20
124:23
fit 46:6
five 14:19 34:13
34:14
fixed 33:10

flexible 75:3
floor 2:16 3:10
folder 54:25 55:7
follow 71:23
112:22
following 107:12
follows 9:3
force 51:10 92:5
94:20
foregoing 134:8
135:8
form 37:13 50:8
forward 45:12
forwarded 39:24
found 83:4,10,12
83:19,20,24 84:8
85:3,6,13,16,16,18
86:15 87:20,24
88:16 90:1 94:18
127:14
four 46:20
fraud 21:4,5 36:1
40:22 83:24 87:20
87:25 92:20 94:25
95:19 112:7
115:13 125:4,7,9
free 35:1
freedom 94:12
fresh 25:10
friends 44:22
front 10:4 14:22
66:1 75:15 97:19
99:17
full 116:19
fully 11:10 27:1
28:3,16
fun 21:12
function 22:6,13
22:17,20,21,25
23:2 25:13 26:6,8

**[fund - hire]**

**fund** 21:6,7,11
22:1 24:21 25:20
25:21 26:10,12
27:8,18,21 28:1,2
30:21 31:7,17
34:11 57:21 60:13
60:22 61:7,11,11
77:24 79:12 80:3
88:20,23 89:6
**funded** 43:20
79:20 110:7
**funding** 27:24
35:13 36:9,15,17
40:21 48:22 59:19
73:13 81:7 84:19
86:12 93:16,18
100:17 114:24
130:24 131:14
132:6
**funds** 28:24 31:13
38:8 39:4 51:13
58:6,20 61:2
**funny** 127:8
**further** 133:7
135:16
**future** 25:19 27:20
29:15,18,24 30:5
34:17 38:10,12
46:7 67:9 94:13
120:25

**g**

**gain** 94:12
**game** 51:20,20
93:14,14
**general** 52:8,11,13
52:13
**getting** 15:19 83:5
86:14 94:23,23
**give** 25:10,15,15
36:16 46:23 63:4
64:14 67:20 83:25

91:3 100:22
108:25 128:16
130:6 131:24
**given** 38:19
107:25 123:24
133:20
**gives** 66:12
**giving** 80:19
**go** 7:8 10:1 16:4
16:13 19:25 26:19
37:4 45:11 46:3
50:10 51:17 52:9
52:19 59:18 61:11
68:15 70:3 75:2
78:11 96:14 97:1
98:17 100:10
101:11 104:21
106:17 113:17
117:2 118:25
128:23 132:3
**goal** 30:8 32:23
34:4 40:6 83:23
93:13 120:20
130:1
**goals** 29:16,23
**goes** 57:21 69:13
88:21
**going** 10:19 28:2
30:11 32:1,17,20
32:21 33:21,25
34:2,3,8,16 36:16
37:3 40:8,9,10
49:3,10 50:1
51:13,15,16,19,21
52:21 55:5 59:25
60:5 64:23 65:5
73:11 81:16 86:10
89:22,23,25 93:9
93:17 95:18,22,22
96:14,15 97:2
98:20 102:9 111:5

130:6 132:2
**goldstar** 48:21
81:11,22 82:19
**good** 7:4 8:1,5 9:8
23:13 29:17 33:20
34:16 36:12 38:4
46:5 60:13,21
106:2
**goog** 83:12
**google** 44:18 52:9
80:10 127:9,13
128:12
**googled** 83:11,12
83:15 85:13
**gosh** 26:3 46:17
**graduate** 12:23
**graduated** 15:1
**grand** 110:13
**graph** 43:19
**graphs** 27:22
**great** 21:7 22:12
30:10 40:7 65:19
81:5 83:14
**ground** 10:1
**group** 1:9 2:3 3:3
4:5 7:12 8:7,15
**grow** 27:18 31:22
34:7,11,20,21
**growing** 21:10
110:9
**growth** 30:2 43:23
82:15 92:22,23
110:6,6 114:11,11
120:24
**guaranteed** 66:25
67:6 70:19,21
72:12
**guess** 45:19 82:16
84:2 98:5
**guest** 23:1

**guy** 33:15 46:2

**h**

**h** 5:8 6:1
**hand** 57:21,22
59:18,18 61:11,11
68:12 69:14 76:7
88:21,21 135:18
**handled** 40:19
**hands** 19:14
**handwriting**
53:14,20 54:4
**happen** 30:11
48:20 129:20
**happened** 47:18
47:25 76:20 83:1
115:13 122:4
127:15 131:16
**happens** 25:14
**happy** 10:17,23
17:11 22:8
**hard** 46:24
**he'll** 105:25
**head** 10:8 126:20
132:10
**health** 12:22 13:7
15:4
**hear** 20:10 73:16
97:13 118:5
**heard** 9:17 22:9,15
45:1 107:24 119:8
**held** 7:15
**help** 24:20 26:25
27:19 28:5 79:11
98:3,7,13
**hey** 118:25
**hidden** 85:20
**higher** 13:13
36:10,16,18
**highest** 12:18
**hire** 86:11

**[hired - invest]**

**hired**  86:10
**hiring**  30:25
**hit**  31:18 69:24
    70:6 72:6 73:1,8
    74:11
**hold**  15:5 16:18
    32:12 34:14 55:4
    55:9,25 67:15
    89:2 98:10,10,10
    98:11 108:13,13
    131:25
**home**  86:21,25
    87:7,15 88:1,12
    91:19
**hope**  3:9
**hopkins**  3:17 5:6
    8:10,10 59:21
    60:15,19 104:23
    105:3,4 106:3,15
    106:21 107:4,6,13
    109:8 111:8,23
    112:9,24 113:18
    114:5 115:17
    117:3,10,16,19,22
    119:22 121:17
    122:22 123:15
    124:25 127:22
    128:3,9,11,18
    129:6 132:4,15
    133:3,6
**hospital**  116:2,7,9
**hour**  22:8
**hours**  76:4 105:17
**house**  8:15 12:8,9
    62:10
**huang**  3:8 5:5 8:5
    8:6 9:7,16 15:25
    16:24 17:13 18:24
    45:13,22 49:24
    50:3,12 52:19
    53:6 54:19 56:3,5

56:16 58:18 59:22
    60:16,20 61:5
    65:13 66:9 71:3
    72:2,15 74:17
    77:4,6,14 78:10,25
    79:23 87:12,23
    89:4 90:10 91:12
    94:4,17 95:7 97:1
    97:12,16,25 98:5
    98:17,18 104:19
    133:7,18
**hum**  56:21
**husband**  22:23

**i**

**idea**  26:23 29:12
    41:7,16 42:13
    49:10,21 50:15
    59:24 60:4 64:22
    81:5 83:7
**ideal**  30:13
**ideas**  30:17 51:16
    51:21
**identification**  53:5
    54:18 65:12 71:2
    74:16 90:9
**illegal**  117:4
**illustrated**  32:23
**illustration**  5:22
    6:5 31:14 36:7
    65:17 66:17,20
    69:22 70:24 71:7
    71:13,16 72:4
    73:5 99:16,24
**immediately**  88:10
**impact**  23:9
**implicit**  112:23
**impression**  46:1
**inaccurate**  57:5
    63:12 64:15
**include**  13:9 76:23
    76:24,25 77:1

**income**  35:6 38:12
    49:12,13 51:25
    61:20 74:8
**incorrect**  127:20
**increased**  114:23
**increasing**  29:19
**independent**  80:7
**indexed**  5:23 6:6
    21:25 24:21 25:20
    25:21 26:1,12
    27:7,8,17 28:1,2
    30:21 31:8 32:11
    33:2,9,11,25 35:1
    35:10,14 40:6
    42:6,14 43:16
    47:3,8,16 48:17
    51:17 75:3 95:15
    99:15
**individual**  5:12
    21:20 22:3 23:10
    38:9
**industry**  44:17
    46:3
**inform**  83:18
**information**  6:11
    27:22 48:11 58:3
    124:5,12,14
    126:17 127:19
**informed**  83:16
**initial**  114:22
**instance**  20:17
    40:16
**institution**  28:17
**instructs**  11:3
**insurance**  1:9,10
    2:4,5 3:4,5 5:13
    5:22 6:5 8:8,9
    11:22 19:18 23:17
    24:11,25 25:4
    26:16 28:8 29:13
    40:5,11 42:16,18

43:9,10 53:9 60:4
    60:23 73:20 76:19
    78:19,23 79:6
    93:23 95:25
    114:10
**insured**  75:4
**int**  29:21
**interaction**  83:14
**interest**  35:1 36:10
    36:16,18 37:3,19
    37:25 38:10 74:7
    96:16
**interested**  7:22
    135:16
**interests**  95:23
**internet**  119:1
    124:5,10 127:19
**interposing**  11:1
**interrogatories**
    123:20,24
**interrogatory**
    123:22 127:18,23
    128:1,5
**interrupt**  16:6,20
**intro**  29:20
**introduce**  9:17
    22:19 35:21 41:7
    54:16
**introduced**  29:20
    29:21 41:15 42:13
    42:25 43:13 48:25
    50:16 65:14 95:14
**introducing**  52:17
    71:4 74:18 90:11
**inve**  114:22
**invest**  33:22 34:10
    37:6 40:8 59:25
    60:5 80:24 81:2
    85:23,24 100:25
    101:23 129:17
    130:16

Veritext Legal Solutions
866 299-5127

[invested - life]

**invested**  37:20
81:23 82:18,23
86:25 100:6
102:23 114:16
**investigation**  80:6
80:7
**investing**  41:18
102:3 126:7
**investment**  37:10
37:18,25 38:23
39:1,6,7 42:7
48:13,14 57:17
58:9,13 60:24
61:3 81:19,20
82:1,8,11,12 84:21
85:1 89:20 92:21
92:25 93:1,8
104:15 109:11,16
109:23 110:4,13
114:9,23,23
121:23,25 123:7
132:18,22
**investments**  49:6
63:10 102:10,12
102:15,16,19,25
104:2
**involved**  85:25
**involvement**  89:8
**ira**  56:17
**issues**  76:16,17,18
77:8
**iul**  26:10 63:15
103:15 109:10,22
110:21 130:24

**j**

**j**  1:24 2:7 3:8
135:5,24
**january**  1:18 2:6
6:7 7:1,6 71:6
99:20

**jason**  3:17 8:10
9:19 104:21 105:4
131:16
**jason.hopkins**
3:23
**jennifer**  4:6 7:17
**jne**  1:6 7:14
**job**  14:9 30:23
49:5,14 51:22
80:15,16 126:21
**jobs**  15:19
**judge**  10:5
**jury**  10:5

**k**

**k**  21:10 25:22
28:16,19,22 48:22
81:4,8,21 100:14
100:20,21,23,24
101:1 103:11
**kathy**  3:8 8:6 9:16
133:6
**kathy.huang**  3:13
**keep**  26:10 31:6
37:9 51:9 69:21
94:19 95:13
110:16
**kind**  55:5,5
**knew**  33:16 44:9
44:15 49:20 50:19
51:8,14,20 52:4,4
52:7 65:1 94:11
**know**  10:17,24
21:20 22:2 23:19
24:12,16,19 29:2
31:2,4 38:24
43:12 46:25 49:4
50:9 51:2,18 52:5
56:6 65:15,16,24
66:6 68:8,24
69:22 70:13 71:12
71:20 74:20,24

75:13 77:23 78:15
79:4,19 80:17
83:23 84:11,15
86:12 90:12 91:6
94:11 98:4 106:17
108:16 110:11
114:11,13 122:10
123:9,22 125:6
126:8,14,18 129:9
131:8
**knowledge**  41:2
52:11,13 125:22
125:24 131:8
132:5
**knowledgeable**
44:16 46:2
**kohn**  21:13 36:2
39:16

**l**

**l**  9:14,15 102:22
**labeled**  42:22
54:25 68:22
**lake**  11:15
**land**  102:22,23
**large**  82:15
**larry**  1:6,17 2:2
5:4 6:15 7:10 9:1
9:14 15:24 108:13
108:13,13 132:1
133:5,12,20 134:6
134:15
**lawsuit**  21:3,14,15
21:18 96:24 106:6
117:24 118:23
119:3,5 125:4
**lawsuits**  9:22
**lawyer**  107:21,25
120:7 124:3
129:12
**lawyers**  133:13

**learn**  118:19
120:20
**learned**  54:12
119:15
**lee**  2:14,19 8:3
12:4 18:14 19:13
20:23 31:15 38:19
39:24 41:13 48:10
50:5 65:16 66:2
71:6 74:19 90:4,7
90:7,14,19,23 91:2
107:4 110:23
112:24 113:25
117:10,19,19
127:22
**left**  69:14 76:7
**legal**  94:24
**letter**  6:14 83:21
90:5,14,16 92:2
**level**  12:18 13:13
14:5
**life**  1:9,10 2:4,4
3:4,4 5:13,21,23
6:4,6 8:8,8 11:22
11:23 19:17,22
20:2,18 21:5,25,25
23:6,22,25 24:2,3
24:21 25:1,2,7,25
26:12,16,18,24
27:7,9,17 28:1,2,8
29:12 30:4,20
31:1,8 32:11,11
33:3,9,25 35:2,15
35:19 37:7 40:5,6
40:11 41:5,6 42:6
42:9,14,15,17,21
42:25 43:6,16,17
44:2 47:3,8,8,15
47:16,21 48:1,15
48:17,18 49:2,11
49:18 50:14 51:15

[life - medical]

51:17 52:2,2,3,4,8
52:11 53:8,9
54:12 57:12,17
58:13 59:9,17,17
59:24 60:4,8,23
62:22 72:24 73:9
73:19 75:3,12
76:18,19 77:13
78:15,17,19,22
79:6,11,13,16,21
80:2 86:20,25
87:2,5,25 88:9,12
88:18,20,23 89:6,8
89:10,15 90:22
91:15,21 92:15,22
93:2,6,11,15,23
94:3,6,15,20 95:13
95:15,25 99:15
104:14 112:5
114:10,17 118:7
119:19 120:3,8,13
121:21,24 123:4
125:18 126:23
128:20 131:3,7,9
131:20 132:7
**life's**  87:15 91:19
126:23
**line**  33:14
**lines**  57:13
**liquid**  62:3,8
**liquidate**  81:8
**liquidated**  81:22
**listed**  28:23 98:14
98:19
**listen**  67:8 109:18
**little**  18:23 28:6
51:18 69:7 107:10
110:8
**live**  11:18
**lived**  11:16,21

**living**  11:18 15:3
15:10,14 22:10
23:5 31:3 103:19
116:10
**llc**  1:11 3:15 5:17
78:21 79:15
**llp**  2:13 3:7,16
**loan**  72:19
**loans**  32:17 35:1,5
36:8,9,15,17 73:1
73:8,12 74:7,7
**lodge**  107:8
**long**  11:16 13:23
14:18 23:8,20
25:9 32:5,12,14,16
34:1 43:22 44:15
46:3 51:20 92:23
92:23 93:13 96:6
96:6 120:23
132:13
**longer**  78:2 85:4
86:16,21 88:1
90:2 92:5 94:19
**look**  20:16 38:10
46:6,6 47:20
53:10 55:16 64:17
64:17 76:3,3 80:1
95:22 103:3
118:25 119:4
124:5,10
**looked**  29:14
118:17 122:2,19
127:19
**looking**  35:22 38:7
49:7 51:19 67:21
75:24 79:3 92:21
92:24 97:19 98:24
99:4 120:23
**looks**  58:22 69:21
72:17 92:2,11

**los**  3:11 134:3
135:3
**lose**  110:13 113:14
**loss**  112:15,15,17
113:12,19,22
115:19
**lost**  36:14 77:12
109:13 110:8
111:3,3,9,24 112:4
112:20
**lot**  102:19 110:12
111:5,5,6 116:21
126:17
**lots**  102:17,20,21
102:22
**love**  25:9
**lovely**  105:18
**low**  74:7

**m**

**ma'am**  16:23
**mail**  83:5 84:5
85:10 86:3 96:8
**mails**  19:25 20:1
**maintain**  100:9
**making**  82:10
103:11 125:19
**man**  131:24
**managed**  15:9
82:4,6
**management**
12:22
**manager**  14:4
22:24
**managing**  39:7
**marijuana**  115:25
117:5,8
**marina**  3:18 8:12
**marina.stefanova**
3:24
**marked**  53:5
54:18 65:12 71:2

74:16 90:9
**market**  33:5,6
100:7 101:23
**marketed**  120:16
125:18 127:6
**marketing**  44:1
118:13,13
**markets**  118:14
**married**  12:10,12
**marshall**  13:1
**matching**  98:25
**matter**  7:11 19:19
20:8,12,25 21:9
**mckesson**  22:22
22:22
**mean**  14:14 18:9
18:19,20 26:11,14
26:17 30:6 34:8
36:16,17 40:22
43:5 44:11 45:5
49:5,5 62:12,14
63:5 64:20 71:18
76:2 77:1,21,25
79:14 80:1,17
81:17,19 84:17
85:23,24 106:12
110:14 112:14,16
116:19 127:7,8,10
**meaning**  79:11
**means**  16:18 98:5
**meant**  45:10 113:9
**mechanism**
130:24 131:15
132:7
**med**  22:22
**medcare**  13:22
**media**  7:9
**medical**  13:16,16
22:6,8,21,23,25
26:8 33:17 45:1
45:23

**[medications - north]**

medications  11:6
medtech  13:22
  14:9
meet  17:24 18:3
  19:5 22:4 26:5
  35:18 45:4 46:12
  46:15
meeting  22:22
  25:18,23 27:15
  29:21 32:4 44:19
  47:2,6,10 120:21
meetings  121:2
  126:3,4,4
memory  25:10
mention  25:1
  42:15
mentioned  31:6
  122:18
merchant  14:13
met  18:25 22:5,7
  22:12,25 23:15
  25:12 26:2,6
  27:12 28:7,19
  29:5 33:16 41:4
  46:10,10,18
  103:14
michael  21:20
  52:14 79:9 90:5
  121:22,23,24
  131:12,13
mike  29:1 39:6
  40:19 60:12 87:3
  87:6
mind  30:8
mine  107:16
minn  114:17
minnesota  1:2,9
  1:11 2:4,5 3:4,5
  7:14 8:8,9 11:22
  19:22 21:5,24
  23:6,22,25 24:2,3

25:1,2,7 26:18
31:1 32:11 35:19
37:7 41:6 42:9,15
42:17,21,25 43:6
43:17 44:2 47:8
47:16 48:1,18
49:18 50:14 51:15
52:2,3,4,8,11 53:9
54:12 57:11,17
58:13 59:9,17,24
60:3,8 62:22
72:24 73:19 75:12
76:19 77:13 78:15
78:17,19,22 79:5
79:11,13,16,20
80:2 86:20,24
87:2,5,15,25 88:9
88:12,18,20,23
89:6,7,10,15 90:22
91:15,18,21 92:15
92:22 93:2,6,11,15
93:23 94:3,6,15,19
95:13 104:14
112:4 118:7
119:18 120:3,8,13
121:21,24 123:4
125:18 126:23,23
128:20 131:3,7,9
131:20 132:7
minute  16:16
  107:24 112:11
misspoke  45:13
misunderstand
  108:2,8
misunderstood
  45:20 108:6
mixed  114:25
ml0000322  5:14
ml0000327  5:14
ml0000370  5:15

ml0000431  6:8
ml0000466  6:8
ml0000497  6:12
ml0000519  6:12
modified  55:8
mom  15:14
moment  52:20
  55:4,25
money  29:18
  31:16 33:22 36:14
  36:17 40:8,10,11
  40:18 69:24 73:22
  80:20 81:11,21
  82:11,24 83:2
  92:14 110:9 111:7
  122:13,15
monies  39:9,19
  74:12 93:21
month  27:20 51:3
monthly  36:25
  37:22 39:4 43:21
  43:21
months  11:17
  14:19 18:20
move  36:12
moved  103:21
multi  105:17
multiple  126:4
mutual  1:11 2:5
  3:5 8:9

**n**

n  5:1
name  7:17 9:11,14
  9:16 21:12 56:18
  56:18 75:4 119:8
  121:10 127:12
name's  105:4
named  21:20
  135:8,13
necessarily  94:1

need  10:23 18:16
  22:10 68:25 69:9
  69:10 70:15 75:13
  91:6 109:18
needed  46:6 69:7
  70:4 78:1
needs  14:17 15:15
  23:9 26:25 38:7
  45:4
negative  45:2
neighborhood
  15:10
nelson  1:24 2:7
  7:19 135:5,24
net  61:24 62:3,8
  62:10,17 63:7
network  116:19
never  24:1 45:1
  68:17,22 77:8
  81:25 82:10,24
  83:1 84:13,14,18
  84:18 102:1
  104:16 117:14
  121:5 124:21
  125:1,2,3,4,4,13
  129:2,13,16
  130:11,16
new  2:17,17 35:9
  77:21
nice  46:2
nodding  10:8
non  59:21 60:15
  60:19 111:10
  112:9,12 115:18
  121:17
nope  80:11 100:5
  102:4 107:23
  121:6
north  3:19 103:20
  103:24

[note - paperwork]

**note** 98:21 99:12
    99:24
**noted** 77:4
**notes** 98:15 99:9
    99:13
**notice** 2:8 127:9
**noticed** 97:18
**notifying** 96:9
**november** 6:16
**nowadays** 96:21
**number** 7:14
    34:25 36:22 63:1
    64:19,25 70:5
    75:6,14
**numbers** 65:24
    68:12 72:4 82:15

**o**

**o** 9:15 102:22
**oath** 10:3,3
**object** 49:23 58:15
    76:21 77:3 115:17
    115:17
**objecting** 77:1
**objection** 15:23
    16:1,12,19 17:7
    45:11 59:21 60:15
    60:19 72:14 77:4
    77:11 78:9,24
    79:17 87:11,17
    93:25 94:8 95:6
    107:8 110:25
    111:20 112:9
    115:6 117:7
    119:21 121:1,17
    124:22 128:15
**objections** 11:1
    107:7 117:11
**objective** 32:22
    34:4
**obtaining** 13:2
    29:12

**obvious** 61:12
**occupation** 13:15
**occurred** 87:22
**offer** 90:21 91:21
    92:1
**offered** 103:13
**offering** 91:22
**offhand** 12:2 42:1
    90:4
**office** 25:18,24
    27:13 28:7 29:5
    46:14 86:21,25
    87:7,15 88:1,12
    91:19 122:5,7,10
**offices** 46:11
**oh** 20:13 42:10
    79:2 97:16 99:22
    106:18 111:2
**okay** 10:1,9,14,21
    11:4 12:5 15:16
    15:25 16:7,14,22
    18:3,18,25 20:13
    21:14 22:4 23:1
    23:15,21 24:1,8,24
    25:6,12 27:12
    29:2,10,23 30:14
    31:6,12,20,25
    32:10,15 33:8
    34:5,18,24 35:4
    36:15,23 37:16,24
    38:12,20,24 39:3
    39:25 40:8,24
    41:14,15,22 43:8
    43:15 44:21 45:18
    45:19 46:10 47:6
    47:24 48:3,7,12
    49:1,9,16 51:8,12
    52:1,9 53:19,21
    54:2,4,6,15 55:2,6
    55:10 56:4,8,15,17
    56:22,25 57:9,15

    57:23,25 58:12
    59:3,11,23 60:17
    60:21 61:17 62:11
    62:16 63:1,6,21
    64:1,22 65:7,14,19
    66:3,16,22 67:5,11
    67:16,20,21,21,25
    68:10,17,24 69:6
    69:13 70:18 71:11
    72:3 73:4,18 74:6
    74:10,22,23 75:5
    75:16 77:5 78:6
    78:13,18 79:2
    81:21 82:23 83:15
    84:3 85:9 86:7,15
    87:5,13,24 88:22
    90:16,20 91:10,13
    92:1 93:20 94:18
    95:25 97:12,16
    98:16,19 99:11
    100:2,25 101:10
    101:19 102:9,23
    104:1 106:2
    108:19 109:3,5
    111:2,9,16 113:17
    114:4,15 115:3
    120:7 128:3,9
    129:22 130:1,4,9
    130:10 131:2,16
    133:4,16,17
**old** 30:13 69:17
**once** 87:24
**ongoing** 106:11
**online** 23:12 44:10
    100:9 102:3,3
    118:19
**open** 54:23 65:15
    74:21
**opened** 48:21
**opens** 90:12

**operating** 85:4
    86:16,22 88:2
    90:2 94:19
**opportunity** 29:22
    30:2 32:8 110:6
**option** 49:15
**order** 19:3 34:6
    51:9 68:19,25
    69:3 70:14 72:6
**originally** 81:14
**outcome** 7:23
    120:24
**outlay** 67:12,23,24
    68:5,11,23 72:5
**overall** 125:11
**owner** 56:17

**p**

**p** 9:15 56:11
**p.m.** 1:19 2:6 7:2
    133:23
**package** 94:2
**pad** 98:22 99:12
    99:24
**page** 5:3,9,10,11
    5:16,16,20,20 6:2
    6:3,3,9,9,13,14
    53:18,19,22 55:22
    55:23,23,24 56:1,6
    56:9,12,14,25 58:2
    61:19 63:14 67:12
    67:16,18,21 72:16
    75:2 76:6
**pages** 76:24
**paid** 37:3 39:9
    62:10 93:22
    114:17 122:15
**paper** 121:9
**papers** 97:19,21
    119:5
**paperwork** 39:17

Page 13

**[part - premium]**

part  5:12 13:2
  35:15 59:4 79:22
  79:24 103:5
particular  70:24
parties  7:8 85:25
party  7:21
pass  133:3
pathway  23:7
patient  9:9
patients  15:11
pay  27:3 32:21
  37:18 40:4,11,17
  49:3,11,20,21
  50:19,24 51:8
  64:23 93:5,11,21
  94:6 122:12
paying  49:5 51:3
  93:12
payment  39:19
  93:24
payments  38:12
  41:1 84:12,14,21
  84:25 93:5,9
pearl  3:19
penalties  134:7
pending  126:8,19
people  36:8
  105:18 106:4,10
perception  45:5
  46:5
perfect  94:16
perfectly  77:25
perform  77:18
performance
  101:18
period  32:13
  42:22 68:9 95:19
  101:6 112:8
  117:14
perjury  134:7

person  15:22 17:2
  17:24 26:5 116:17
personal  125:22
  125:24 131:8
  132:5
personally  22:16
pharmaceuticals
  13:17
phipps  45:9
phone  85:22
  105:13 106:25
  107:2 133:14
phrasing  129:10
physicals  116:11
  116:15
physician  117:1
physicians  116:19
picked  103:12
picture  125:12
piece  48:23 68:16
  121:9
piper  3:16 8:10
  105:6
place  7:7 15:14
  19:16 61:9 62:19
placed  21:4 66:14
  94:3,15
plaintiff  1:8 2:12
  8:2 21:15 129:14
plan  28:11,14 29:8
  29:16 32:1,12,15
  34:13,14,15 35:4
  35:15 39:25 40:2
  51:24 64:2,4,16
  65:4 67:7 72:23
  74:3,12 89:20
  94:14 101:3,15
  103:9,11,15,17
  104:13 120:23
planned  69:23
  72:18

planners  15:13
planning  30:5
  132:25
plans  104:3
planted  25:21
platform  1:16 2:2
please  8:17 9:11
  10:17 16:23 50:10
  55:24 93:7 109:19
  114:6 128:19
point  13:19 29:3
  31:25 49:1 54:11
  74:11 76:15
pol  32:17
policies  59:18
  130:25
policy  5:22 6:5,11
  19:18,22 20:2,18
  21:8 22:1 26:1,16
  26:17 27:9,11,24
  29:13 31:8,11
  32:2,5,11,16,17,18
  32:21,25 33:3,9,25
  35:1,2,4,7,9,10,15
  35:19 36:21 37:8
  37:9,14 38:4 40:5
  40:6,17,17 41:6
  42:6,9,14 43:5,16
  43:22 47:8,16
  48:1,15,17 49:2,11
  49:18,20 50:14,19
  51:4,9,18,19 52:2
  52:12 53:9 54:12
  57:12,17 58:14
  59:14,24 60:4
  61:7,13 63:15
  64:24 65:2,10
  66:13,15 68:20
  69:4,17 72:19,24
  72:25,25 73:7,9,12
  73:20,22 74:6,7,8

74:13,19 75:3,6,6
  75:11,14,22,24
  76:8,12,16,19,23
  76:23 77:3,8,16,22
  77:24 78:1,2,3,7
  79:21 80:3 81:16
  81:17 88:23 89:6
  89:21,23 90:21
  91:16,19,22 92:5
  92:12,22,23 93:6
  93:11,17,23 94:7
  94:20 95:2,13,15
  98:25 99:15
  100:16 103:15
  104:14 109:10,22
  110:7 111:3,9,13
  111:16,24 112:2,7
  114:8,10 127:11
ponzi  21:5 36:1
  83:10,17 85:14
portfolio  22:11
  103:12 114:25
portion  37:5 61:8
portrayed  59:16
position  14:3,12
  14:23 15:5,8,16
positioned  126:13
  127:5
positive  45:25
possible  91:8
possibly  30:16
  116:18
potentially  127:6
pre  74:5
premium  58:2
  64:2,4,16 65:5
  67:12,23,24 68:5
  68:11,13,19,22
  70:5,16 72:5 75:3
  93:18 114:17

**[premiums - recall]**

**premiums**  21:7
31:21 32:22 34:6
34:19,20 40:5,11
40:17 49:3,20,22
50:20,23 51:9
57:21 59:19 60:13
60:22 61:11 64:23
68:11 73:25 79:12
80:4 88:20 92:9
92:11 93:6,11,21
93:22,24 94:7
**preparation**  19:10
19:15 20:4,12
109:2
**prepare**  17:18,21
18:7 19:4
**preparing**  20:8,19
**present**  4:3 13:25
30:17 41:19
112:18
**presented**  30:20
85:21
**presenting**  22:13
**presently**  96:1
**president's**  101:9
101:13,16,20
**pressure**  93:18
**presumably**  39:14
41:17 61:13
**pretty**  30:6,6
33:13,13,13 42:2,3
46:8 59:7 85:7
**prevent**  11:7
**previous**  11:18,25
72:4
**previously**  14:10
20:21
**price**  109:15
**printed**  56:17
**prior**  10:11 14:9
15:2,19 29:21

44:19 45:9 49:9
108:17 120:9
124:6 135:7
**privilege**  91:5
108:14
**privileged**  108:3
**pro**  103:15
**probably**  18:8
35:20 90:13
**problems**  78:6
128:13
**procedure**  128:4
**proceed**  16:21
**proceedings**
135:15
**proceeds**  89:21,22
94:6
**process**  18:5 28:5
35:9 86:14
**processing**  14:15
**produce**  84:5
**product**  42:15
44:4 47:3,4 64:6
119:16 121:12,19
125:18
**products**  35:22
42:19 124:6,11
**professional**  38:6
128:24
**projected**  29:16
**projection**  67:4
69:8,9,23 70:14,19
**projections**  66:24
67:6 68:13 72:11
114:12
**promote**  15:13
**promoted**  14:6
**properly**  35:13
**proposed**  103:15
**protect**  128:25,25

**provide**  19:25
38:21 40:9 124:2
132:25
**provided**  19:22
20:14 124:12,14
**purchase**  5:18
20:18 41:23 42:4
42:10 47:11 48:13
54:7 55:18 57:1
60:7 78:12 80:8
101:2,15 109:10
109:15,22 110:21
122:1,18 123:1,17
124:11
**purchasing**  55:10
124:6
**purpose**  73:12
**pursuant**  2:7
94:23
**put**  21:10 31:17,20
32:20,20 34:6,19
36:21,22 50:8
62:18,19,22,23
65:9 68:11,14,18
68:25 69:7,9,10
70:4,15 72:6 74:1
81:11 89:20 92:11
92:21 93:14 94:2
110:13 115:20
**putting**  34:11,15
98:20

**q**

**qualified**  5:18
**question**  10:11,16
10:18 11:2 16:9
16:16,21,23 17:1
18:14 23:19 24:6
24:19 45:9 50:2,8
50:11 51:5,7
53:23 62:16 63:3
71:23 79:1 88:11

89:3,13 98:6
105:16,22,25
106:9 107:18,20
108:18 109:18,20
110:18 111:22
113:3,16 114:2
116:23,23 129:8
129:25 132:1,2
**questioning**
104:22
**questions**  9:20
20:8,11 77:1,2
87:2,6,14,18 88:5
98:13 104:19
107:25 108:15
109:1 115:16
124:3 133:8,9
**quick**  16:5,20 42:3
42:3
**quickly**  65:21
**quite**  60:18 110:14
**quote**  112:13

**r**

**r**  9:14,14
**ran**  32:7
**rate**  34:7,21 37:3
37:25
**reached**  73:21
**read**  59:5,5,11
61:13 84:2 119:9
122:23 123:1,9
**ready**  97:12
**real**  62:12 65:20
102:8,11,14
**reason**  11:9 57:4
58:12,17 63:11
87:1 88:14 89:7
89:15 127:2
**reboot**  25:22
**recall**  25:6 26:2
28:18 39:2,3,18

[recall - return]

48:9 51:6 60:6
62:7,14 64:25
66:3,21 67:1 68:6
70:23 73:4,7 74:2
75:17,21,24 82:9
90:1,20 118:9
119:19 123:8
131:17 132:9
**recalling** 91:7
**receive** 38:15,25
40:20,25 41:1
76:9 82:4 84:25
85:22
**received** 39:3
75:25 76:13,15
84:13,14,20 90:4
92:8,14
**receiving** 39:18
75:21 84:12 92:24
93:1
**recess** 52:25 97:6
**recollection** 47:24
49:17 57:16 75:10
**recommend** 80:2
127:11,11 130:24
**recommendation**
44:6 79:13,25
80:25 89:10,14
96:15 125:19
128:23
**recommendations**
46:8 131:2,6
**recommended**
22:1 33:16 37:8
43:7 49:8 79:21
88:19,22 89:6
93:3 96:12 112:7
128:21 129:17
130:16 131:9,14
132:6

**record** 7:5,8,25
9:12 10:13 52:19
52:22,24 53:2
97:1,3,5,8,15
107:8 108:20
133:21,22
**recorded** 7:9
135:11
**recording** 7:7
**refer** 100:2
**reference** 78:18
**referenced** 26:13
**referring** 27:8,9
98:2,6,12 103:4
**refresh** 57:15
75:10
**refund** 92:8
**regarding** 85:19
96:10 104:14
**regards** 17:16
39:22
**regional** 22:24
**regular** 76:4
**related** 7:21 19:13
19:19,21 20:1,11
20:17,22 87:13
105:16
**relating** 9:22
20:22
**relations** 15:6
**relationship** 23:8
32:9 85:8
**relevant** 98:21
**relied** 132:20
**rely** 26:18,24 28:4
38:5,6 132:17
**remember** 18:21
22:8 23:18 24:7
24:18,22 25:8,9,11
33:7 34:15 35:8
35:11 42:2 43:4

44:3,3,14 46:19,24
47:18,20 48:24
51:1 54:9,14
56:25 57:2,6,8,20
60:12,14 62:15,21
62:22,23 64:5,7,8
64:9,11,13,19,20
64:21 65:25 71:20
73:3,18 75:1,19,20
81:15 83:19 85:16
90:6 91:1 108:23
118:10,22 119:14
119:15 120:13,15
120:17,18 123:8
123:13,14
**reminiscence**
15:10
**remotely** 7:15
**rent** 12:6
**repeat** 16:23 38:6
60:2
**rephrase** 10:17
15:2
**reported** 1:23
**reporter** 7:19 8:17
**represent** 68:2
105:6,8 125:10
**representative**
14:8 21:6,24
23:24 24:3,4
26:19 42:22 43:1
51:15 59:9 87:9
**representatives**
22:6,9,21 45:1
**represented** 43:14
84:9
**reputation** 45:24
**request** 111:13
**requests** 129:11
**rescind** 91:16,19
91:22

**rescinded** 90:21
111:14,17,17,19
112:3
**rescission** 90:14
**research** 44:7,19
52:3,6,10 96:14
111:6
**researched** 23:12
44:10
**reside** 12:6
**respond** 10:7
**response** 113:3
127:18
**responses** 123:24
127:23 128:1,6
129:11
**responsibilities**
15:7
**responsibility**
15:12 128:22
**responsive** 59:21
60:19 112:9
115:18 121:17
**rest** 9:19
**result** 101:19
111:25
**retire** 30:9 94:13
**retirement** 22:11
24:20 27:19 28:11
28:14,24 29:8
30:1,16 31:14,19
34:3 35:5,15,15
38:8 73:1,8,13,17
73:21,22 74:8,11
103:9 104:2
132:25
**retiring** 30:16
**return** 36:24,25
37:1,19 38:22
39:19 40:10 76:8
76:12

Veritext Legal Solutions
866 299-5127

[returns - shurwest]

returns   82:1,7,18
review   20:4,24
   117:23 123:6
   126:16
reviewed   127:24
reviews   52:6,7
right   24:22 27:4
   27:20 31:2 33:14
   35:13 38:8 41:25
   42:1 45:3 47:1
   49:5,15 51:15,16
   51:18,22 52:7
   56:2,11,14 59:13
   59:20 61:15 66:1
   68:12,21 76:5,23
   77:15 78:4 86:1
   88:7,19 89:12
   90:24 91:3 94:13
   94:21 98:17
   103:12 105:20
   106:23 109:16
   110:7 111:5,9,11
   111:19,25 112:3
   113:4,5,6,7,10,19
   114:10 115:4,5,12
   115:18,22 116:20
   119:6,7,23 121:20
   122:19 124:12,15
   124:18 125:7
   127:20 129:3,7,21
   131:4,17
rights   94:24
risk   123:6,7,9,17
rocco   1:6 7:11
role   15:11
rotate   67:19 90:13
rpr   1:25 2:7 135:5
   135:25
rules   10:1 128:4
run   21:12 34:1

**s**

s   5:8 6:1 9:15,15
   102:22
sacrifice   51:18
sacrificing   93:12
safe   32:24
sales   13:16 14:4,13
   22:25 33:17 45:1
san   11:20 22:5
satisfied   76:7
savings   35:16
   49:12 58:7,24
   61:7 94:5
savvy   15:21 17:2
saw   45:6 81:25
   82:24 105:13
saying   25:6 26:10
   31:7 37:9 108:23
   114:15,19
says   56:1,14,17,23
   57:9 58:2,6,7
   61:20,24 62:3
   63:14 64:1 67:12
   67:23 69:14,15
   75:2,6 76:7 122:2
   127:19
scenario   85:25
scheme   21:5 36:1
   40:22 83:11,17
   85:14
school   15:20
scott   21:13 36:1
   39:16
screen   52:17 54:20
   65:15 71:5,8
   74:21 90:12
scroll   53:17,22
   55:15,21,23 58:1
   65:20 68:17 71:11
   72:16 74:23 75:16
   78:14

scrolling   69:21
search   44:18
second   47:6 55:9
   67:12,15,20 69:15
   72:16 76:6
section   58:2
secure   24:20 25:19
   29:17 30:2,15
   32:24 34:3 52:5
securian   1:9,10
   2:3,4 3:3,4 4:4
   6:15 7:12 8:7,8,15
see   15:1 38:5 39:9
   42:24 48:6,6
   52:16 54:20 55:2
   55:2,6,7,8,10,22
   56:11,15 58:4,11
   62:9 65:18 67:11
   67:13,25 68:7
   72:3,8,17,21 75:8
   76:6,10,11 78:15
   78:17,18 84:17
   90:15 98:25
   122:20
seeing   75:1,17
seeking   92:17
   111:25 113:23
   115:21
seen   65:21,23
   71:12 74:24 84:18
   90:16 121:9
   123:20
sell   13:17
senior   15:3,14
sense   34:23 59:20
   68:21 79:12,14
   80:5 93:19 94:16
   95:17
sent   20:23 39:17
   66:2 83:21 85:9
   85:18 86:2 87:3

90:4,19 96:9
   129:12
separate   78:22
   100:20 101:1
   109:11,22 110:3
september   14:2
sequoia   11:15
serve   45:4 46:4
services   133:1
set   21:25 23:7
   25:18,23 39:21
seven   5:10
sfclasslaw.com
   2:19
shaking   10:8
share   55:2
shared   31:14 55:2
shares   101:8,14,20
short   32:6,13
   51:20 82:13
shortly   26:5 71:5
show   43:15 44:1
   66:11 67:3 71:5
showed   66:4 99:7
   100:3
showing   53:7
   66:22
shows   23:14 44:12
   66:23 69:9 70:8
shur   127:6
shurwest   1:10
   3:15 8:11,13
   105:6 118:6,12
   119:1,2,4,8,17
   120:4,9,21 121:3,5
   121:7,13 122:12
   122:15,17 123:16
   124:3,14,17 125:7
   125:10,13,14,16
   126:9,19,22 127:6
   129:2,13,16

Page 17

[shurwest - stocks]

130:11,16,20,23
131:7,9,13 132:6
132:17,24
**shurwest's** 121:10
122:5,7,10
**side** 68:12
**sign** 41:25 48:13
53:23 83:6,8 84:3
85:11 96:10
127:21 133:12
**signature** 53:18,25
55:23 56:19,20
78:17 135:23
**signed** 38:19 39:23
41:12 42:3,3,10
43:2 47:20 57:6,8
59:6,12 61:14,15
80:7 82:14 122:24
123:2,10 128:2
**significant** 36:14
**signing** 84:1
**similar** 72:3
**similarly** 1:7
**single** 116:20
117:2
**sir** 105:9 109:19
128:14
**situated** 1:7
**situation** 76:20
**situations** 128:25
**six** 13:24 14:6
**slightly** 129:10
**slow** 55:5
**smoked** 115:25
**snapshot** 66:12
**soccer** 116:5
**sold** 23:11 121:23
121:24
**solely** 80:25
**solid** 52:7

**solution** 49:8
**solutions** 51:22
**somebody** 45:11
124:21
**sorry** 16:10 20:9
40:14 45:13,21
50:5 56:8 60:1
67:17 73:14
101:10 102:3,18
110:23 113:25
119:24
**sort** 9:9 40:9 43:3
72:5
**sound** 29:25 52:5
**sounded** 22:11
29:17 40:6
**sounds** 49:17
102:11
**source** 58:6,20
61:2
**south** 3:9
**span** 31:23
**spe** 106:6
**speak** 96:7,17
**speaking** 107:6
117:10
**speaks** 122:21
**spec** 17:4
**specialist** 26:21
**specialty** 17:4 38:9
**specific** 19:14
20:21 21:8 27:21
28:1 31:5 37:5
38:9 39:7 40:19
51:4 68:16 106:7
107:10 109:20
114:12 116:14
118:14 130:19
**specifically** 19:19
21:4 22:2,10,24
24:21 25:1,24

27:8,19,23 28:4
29:19 31:1,13,15
32:24 33:17 34:15
36:9,11 37:8
38:24 40:21,25
42:2 43:23 47:19
85:20 95:14 96:13
96:15 105:23
110:10,12 114:8
114:13 118:10
120:22 131:11,19
**specifics** 120:14
**speculating** 115:4
**spell** 9:11
**spend** 105:17
**spoke** 96:3,11
**spoken** 96:23
**squitieri** 2:13,14
8:1,3,3 15:23 16:1
16:4,11,15,18 17:7
18:16,19 45:8,19
49:23 50:1,7 56:1
56:4,10 58:15
61:4 66:8 71:19
71:22 72:14 76:21
77:5,11 78:9,24
79:17 87:11,17
89:2 90:24 91:3
91:10 93:25 94:8
95:6 97:10,23
98:1,10,16 104:17
105:24 106:13,17
107:1,5,9 108:12
108:22 109:3,5
110:22,25 111:20
112:21 113:15,24
114:2 115:6,9,15
116:22 117:7,12
117:15,17 119:21
122:21 123:12
124:22 127:21,25

128:7,10,15 129:5
131:25 132:8
133:4,9,16
**ss** 134:2 135:2
**stages** 32:4
**stamped** 5:13 6:8
6:12
**start** 27:24 51:17
93:15,15 111:4
112:13 113:1,6,9
130:5
**started** 25:24 49:4
51:3 86:14 131:12
**starting** 35:9
77:22
**starts** 56:12
**state** 7:24 9:11
67:8 93:4,10
134:1,7 135:1,6
**stated** 21:6 43:5
43:19 83:6 125:25
**statement** 25:11
61:22 62:1,5
124:8 129:13,16
129:21 130:6,21
132:16,17,20,24
**statements** 132:21
**states** 1:1 76:10
**stating** 59:17
112:19
**stay** 107:10
**stefanova** 3:18
8:12,12
**stenographically**
135:12
**stick** 67:7
**stock** 29:3 33:6
94:6 100:7 101:2
101:4,14,15,21,23
**stocks** 28:25
100:25 102:7

[stop - thought]

stop   117:17,19
story   22:9,15,16
stospal   1:6,17 2:2
    5:4 6:16 7:10 9:1
    9:8,14,15 45:16
    52:16 53:7 54:20
    56:7,18,20 71:9
    74:20 77:7 90:17
    97:18 100:6 105:4
    107:14,14 113:1
    133:20 134:6,15
straightforward
    129:24
strategy   35:13,16
street   2:15 3:9,19
stress   110:12
strike   89:4 91:13
structured   94:14
subject   91:11
    108:23
submit   127:22
submitted   127:25
subsequent   96:8
substance   131:23
sued   119:17
    124:20,23 125:3,3
    125:13
suffered   109:9
    113:4
suggesting   31:7
suite   3:20
sunrise   15:3
supplement   35:5
    74:8
supposed   16:8
    19:16 21:10 27:1
    27:2 38:25 50:23
    61:1 66:11 67:3
    68:2,14 85:11
sur   130:20

sure   9:13 15:12
    16:17,25 24:10,14
    27:16 29:4 48:5
    50:13 57:6 59:7
    61:16,23 62:2
    65:6 69:2,5 71:17
    71:21 83:8 92:19
    103:2,11 108:21
    108:24
surgery   14:7
surgical   22:23
swear   8:17
sworn   9:2 124:8
    127:18 135:9

## t

t   5:8 6:1 9:15
    102:22
ta   86:12
take   7:7 9:21 10:4
    13:3,6 17:14
    32:17 34:25 40:10
    53:21 72:25
    108:15 111:5
    126:17 133:13
taken   2:2 7:10
    9:23,24 52:25
    72:18 97:6
takes   77:23
talk   23:14 29:6,7
    44:12 82:7 104:13
    123:16
talked   30:14 86:9
    91:7 106:22
    108:16 120:2,9
    121:3,5 124:17,21
    125:1,14
talking   23:2 45:14
    45:15 47:4,5 50:7
    106:25 107:1
    110:16 125:9
    131:2,6

target   31:13,19
task   105:17
taxed   74:1,5
td   102:1
telephone   17:24
    86:8 96:8
tell   21:2,23 23:4
    23:17 24:24 25:3
    26:11,14 27:14
    29:23 31:10,20
    36:4 37:2,24 40:2
    41:22 42:5 44:24
    65:21 66:10,23
    67:2,5 68:10,22,24
    71:19 73:24 79:5
    79:8,9,10 83:12
    84:1 86:16,21,24
    88:1 90:24 92:17
    97:21 102:14
    108:22 119:13
    124:1 130:7
telling   22:16 55:19
    125:11
tells   72:5 95:14
temp   15:19
teri   1:24 2:7 7:19
    135:5,24
term   23:8 32:5,6
    32:14,16 43:22
    51:20,20 82:13
    92:23 120:23
terms   15:18 19:17
    25:20,25 26:24
    29:15 30:1,1,5,12
    33:20 36:6 38:8
    43:20,22 51:4
    52:6 65:9 67:7
    76:25 92:20 93:12
    93:18 94:12 114:8
    114:22 119:15
    120:16 129:23

territory   14:4
testified   9:3
testify   11:10 98:7
    107:24 135:9
testifying   10:4
    11:7
testimony   9:21
    10:2 108:17
    133:19
testing   13:20
texas   3:21 11:15
    11:20 14:13
    103:21
texting   105:14
    107:15
thank   8:16 9:9
    16:22 104:23
    117:16 133:15,18
thanks   112:24
    133:5
thing   48:18 88:8
things   133:13
think   21:2 23:21
    26:4,13 29:10
    34:13 40:20 42:1
    43:12 45:10 46:22
    49:2 51:12 54:10
    55:22 58:19 62:23
    65:1 66:10 76:22
    81:12,25 88:21
    94:10 103:1,16
    110:11,15 112:23
    122:1 125:16
    126:22 129:12
    132:11 133:12
thinks   98:2
third   55:22 56:10
    56:13
thoroughly   24:6
thought   24:9
    33:25 35:22 36:12

Veritext Legal Solutions
866 299-5127

[thought - values]

41:16 42:21 46:5
47:21 89:9,11
91:2 93:9 95:1,9
95:11 98:21
107:24 108:1
115:10
**thoughts** 103:17
**thousand** 114:16
**three** 14:19 19:6
46:20
**throw** 16:5
**tied** 33:4,4,5 119:2
120:15 127:12
**time** 7:5 10:25,25
17:12 28:9,12,19
31:16,23,25 32:12
32:13 44:13,15
46:3 47:4 49:25
50:18 52:23 53:3
53:21 57:2,18
59:23 60:3 65:1,8
68:9 77:23,24
78:1,1 83:15 84:8
91:13 96:3,6 97:4
97:9,10 100:15
101:7 103:20,24
111:5,6 114:13,18
116:6 120:1
124:20,23 132:13
133:15,18,21
135:12
**timeline** 24:23
47:19 48:4,24
81:15
**times** 18:3 19:1,4
26:13 35:18 46:15
46:20
**tiny** 56:11
**title** 14:3
**today** 8:3 9:21
10:3 11:7,10

95:24 106:12
115:14 127:3
**today's** 17:18,21
20:5 133:19
**told** 23:15 24:1,11
24:15 36:3,10
41:16 43:8 50:14
54:6 60:12,21
63:3 64:16 68:17
81:25 83:10 114:7
115:11 131:11,13
**tomorrow** 30:10
**tonsillectomy**
116:8
**tool** 37:6
**top** 56:11,14
126:20 132:10
**topic** 31:5
**total** 46:21 61:24
63:7 64:1,3
**track** 107:10
**trade** 102:2
**trading** 100:9
**trail** 11:15
**transcribed**
135:13
**transcript** 135:14
**transfer** 48:22
**traveling** 42:1
**tremendously**
21:11
**true** 129:13,16,21
130:7,14,15,18,21
132:16,19,20,23
132:24 133:2
134:8 135:14
**trust** 33:15,20
36:11 38:9 77:12
112:4
**trusted** 23:14
33:14,15 39:7

44:17 52:14 80:14
80:23 81:6 128:21
**truth** 135:9,9,10
**truthfully** 11:7,10
**try** 16:5
**trying** 24:8 27:5
33:24 49:16 83:24
96:9 105:16
106:24 131:17,22
**turn** 57:23
**twice** 35:20 41:5
**twist** 130:2
**twisting** 129:23
**two** 6:13 11:17
14:20 33:9 57:16
58:7 69:7 78:3,7
105:17
**type** 33:19 84:19
101:15 112:7
**types** 13:5
**typing** 105:13
106:25

| u |
|---|

**u.s.** 7:13
**ul** 19:22
**um** 56:21
**un** 36:13
**unclear** 99:2
**undergraduate**
12:20,21
**underneath** 54:23
**understand** 10:2
10:16 27:1,2,6
28:3 30:23,24
33:8,23 34:5
35:12 37:10 45:15
49:16 66:19 69:6
71:25 78:21 79:15
88:17 105:7 106:9
110:17 111:21
129:24 131:21

**understanding**
24:9 27:5 68:4
72:10 74:5 89:24
118:15 125:17,20
126:1 127:7
**understood** 10:19
63:21 70:11,12,13
70:18
**unfortunately**
21:8,9 25:10
36:13 38:11 39:8
**united** 1:1
**univ** 42:8
**univer** 31:1
**universal** 5:23 6:6
19:17 20:2,18
21:25 24:21 25:20
25:21,25 26:12,24
27:7,9,17 28:2
30:20 31:8 32:11
33:2,9,25 34:9
35:2,10,14 40:5
41:5 42:6,8,14
43:16 47:3,8,15,21
48:15,17 49:2,11
51:17 52:2 73:9
95:15 99:15
114:10
**university** 12:25
13:1 15:17
**use** 35:4,14 66:16
72:23 73:19 94:5
117:9 131:14

| v |
|---|

**vague** 17:10
**value** 31:22 32:2
68:8,20 69:1,3
72:7,24 73:20
74:13 78:1
**values** 66:25 70:20

Veritext Legal Solutions
866 299-5127

[variables - zoom]

variables 114:21
variety 24:25
various 69:13
vehicle 21:7 34:16
 60:13,22 79:12
verbally 10:7
verbatim 24:22
verify 99:1
veritext 4:6 7:17
 7:20
versus 7:12
vest 101:6
vested 28:16
victim 21:9
video 7:7,9
videographer 4:6
 7:4,18 8:16 52:21
 53:1 97:2,7,11,14
 133:17,19
videotaped 1:16
 2:1
violation 128:3
virtue 109:10
vs 1:8

**w**

wait 16:16 89:3
want 16:20 30:4
 33:19 49:21 64:14
 94:5 95:12 118:25
 129:22 130:3,7,7
wanted 30:9 34:21
 65:9 94:11
wants 71:20
 108:16
washington 14:25
wasted 114:14
way 10:13 23:20
 25:9 33:6 35:6
 53:17 55:21 80:1
 85:20 89:15
 101:24

ways 49:7
website 44:13,14
wednesday 1:18
 2:6 7:1
weeks 18:10 19:3
went 19:20 27:14
 43:19 44:6 72:1
 76:2 77:9 81:21
 82:19 84:15 86:7
 97:14 101:9,14
 123:4
whatsoever 17:10
 26:18 45:2 82:5
 84:12 85:22 87:19
when's 96:3
whereof 56:2,12
wiederholt 4:4
 8:14,14
wife 117:18
williams 4:6 7:17
willing 45:2 46:3
wise 15:18
wish 46:23 131:24
withdraw 69:24
 70:6,14 73:21
 74:12
withdrawal 72:18
withdrawals
 72:25 73:25
witness 2:2 5:3 8:3
 8:18 16:3,7,14,17
 16:22 17:8 18:18
 18:22 50:5,10
 56:2,12,15 58:16
 71:21,24 77:12
 79:18 87:18 91:1
 91:9 94:1,9 98:2,8
 98:14 104:18
 106:2,18 107:11
 108:21,24 109:4,6
 110:23 111:2,21

113:17,25 114:4
 115:7,12 116:25
 117:13,21 123:13
 128:16 132:9
 133:3,10,15 135:7
 135:18
won 101:8,8,14
wondering 43:8
word 66:16 118:5
words 21:2 23:16
 24:22 51:23
work 14:10,18,24
 38:11 39:8 95:22
 104:2 105:16
 116:20
worked 15:1,3,12
 17:23 24:24 25:3
 100:13
working 14:15
 34:12
worry 33:19 106:1
 128:24
worth 61:24 62:3
 62:8,10,17 63:7
write 61:3
writing 99:5
written 108:20
 124:2
wrong 77:9 125:16
wrote 39:12

**x**

x 5:1,8 6:1

**y**

y 9:14
yeah 24:4,17
 26:15 27:16 30:19
 32:19 44:15 47:22
 52:13 57:13 64:18
 68:21 70:12 71:24
 76:11,11 81:20

86:6,18 99:6,8,8
 107:11 113:11
 115:7 116:25
 117:13 124:13
year 11:17 12:23
 18:23 19:1,17
 26:2 31:21 34:14
 40:16 64:24 68:25
 69:7,10,15 70:16
 72:6 116:17 117:2
yearly 31:18 37:1
 39:4
years 13:24 14:6
 14:19 18:12,20
 30:12 34:25 46:24
 61:18 66:14 69:14
 69:17 70:5 75:20
 78:3,7 131:16,17
yep 16:3 56:24
 75:9
york 2:17,17

**z**

zero 39:20
zoom 1:16 2:1
 7:16 18:1,1,2 19:7

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ELEANOR and ROCCO CIOFOLETTI and LARRY STOSPAL, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>-vs-<br><br>SECURIAN FINANCIAL GROUP, INC., MINNESOTA LIFE INSURANCE COMPANY, SHURWEST, LLC, SECURIAN LIFE INSURANCE COMPANY and MINNESOTA MUTUAL COMPANIES, INC.,<br><br>Defendants. | Case No.: 0-18-cv-03025-JNE-ECW<br><br><br>**PLAINTIFFS' RESPONSES TO SHURWEST, LLC'S FIRST SET OF INTERROGATORIES** |

**PLAINTIFFS' RESPONSES AND OBJECTIONS
TO SHURWEST, LLC'S FIRST SET OF INTERROGATORIES**

Plaintiffs, pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("FRCP"), provides the following Responses and Objections to Defendants Shurwest, LLC's First Set of Interrogatories.

**GENERAL OBJECTIONS AND LIMITATIONS**

1.      The information contained in these Responses is being provided in accordance with the applicable Fed. R. Civ. P. provisions requiring the disclosure of all facts which may be relevant or which may lead to the discovery of relevant information.  Accordingly, Plaintiffs do not, by providing information requested, waive objections to the admissibility of any such information on the basis of materiality, relevance, or any other appropriate ground.

2.      Plaintiffs object to any and all Interrogatories propounded to the extent such Interrogatories seek identification of documents or information protected from discovery by any privilege, including, but not limited to, the attorney-client and attorney-client work product privileges.  No such privileged or protected information will be disclosed, and any inadvertent disclosure shall not be deemed a waiver of any privilege with respect to any such information.

3.      Plaintiffs object to all Interrogatories propounded to the extent they are vague; ambiguous; overly broad; overly burdensome; seek information irrelevant and/or immaterial to the issues to be tried; or are not reasonably calculated to lead to the discovery of relevant, admissible, or discoverable evidence.

4.      These "GENERAL OBJECTIONS AND LIMITATIONS" are applicable to, and incorporated in, each of Plaintiffs' responses to any of the Interrogatories hereinafter set forth as if specifically set forth in each Response.  The stating of specific objections to a particular Interrogatory shall not be construed as a waiver of Plaintiffs' General Objections and Limitations.

5.      Plaintiffs reserve the right to timely supplement these Responses, and as permitted, to make further objections.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Please identify and describe all communications between any Plaintiff and Shurwest.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiffs invoke and rely upon Fed. R. Civ. P. 33(d) and direct Defendant to the documents provided in Response to Request for Production No. ___ as such responses constitute "records from which the answer to this Interrogatory may be ascertained."

2

**INTERROGATORY NO. 2:**

Please describe the due diligence performed by Plaintiffs prior to purchasing FIP products.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiffs object to this request on the grounds that it contains undefined terms, subject to this objection Plaintiffs state that they looked up information on the internet and consulted with their Shurwest/Securian agent.

**INTERROGATORY NO. 3:**

Please describe the reason for your decision to purchase FIP products.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs object to this request on the grounds that it contains undefined terms, subject to this objection Plaintiffs state that they decided to purchase FIP products based upon information provided by their Advisor.

**INTERROGATORY NO. 4:**

Please describe the factual basis for the allegations in paragraph 20 of Plaintiffs' Complaint.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 4.  Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 4 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 4 constitutes a contention Interrogatory and is therefore premature.

**INTERROGATORY NO. 5:**

Please describe the factual basis for the allegations in paragraph 21 of Plaintiffs'

Complaint.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could

be responsive to Interrogatory 5. Plaintiffs have relied upon the investigation of their counsel

and any knowledge they possess would be/could be responsive to Interrogatory 5 came to them

through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 5 is a contention Interrogatory and is

therefore are premature.

**INTERROGATORY NO. 6:**

Please describe the factual basis for the allegations in paragraph 22 of Plaintiffs'

Complaint.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could

be responsive to Interrogatory 6. Plaintiffs have relied upon the investigation of their counsel

and any knowledge they possess would be/could be responsive to Interrogatory 6came to them

through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 6 is a contention Interrogatory and is

therefore are premature.

**INTERROGATORY NO. 7:**

Please describe the factual basis for the allegation that "Shurwest marketed, promoted

and sold life insurance products and FIP Products to insureds and assisted and directed members

4

of the Securian Financial Network in the marketing, promotion, and sale of life insurance policies," as alleged in paragraph 37 of Plaintiffs' Complaint.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 7. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 7 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 7 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 8:**

Please describe the "education, marketing, and distribution services" you allege Shurwest provided, as found in paragraph 40 of Plaintiffs' Complaint

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 8. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 8 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 8 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 9:**

Please identify the "Shurwest employees" who you allege "sold FIP Products," as alleged in paragraph 40 of Plaintiffs' Complaint

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 9. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 9 came to them through privileged and confidential attorney-client communications.

**INTERROGATORY NO. 10:**

Please describe the factual basis for the allegations in paragraph 43 of Plaintiffs' Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 10. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 10 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 10 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 11:**

Please describe the factual basis for the allegations that the "Shurwest employees . . . pitching FIP Products . . . were at all times acting within the scope of their employment with Shurwest, with the actual or apparent authority of Shurwest, and their actions relative to the FIP Products were known or should have been known to Shurwest," as alleged in paragraph 53 of Plaintiffs' Complaint.

**RESPONSE TO INTERROGATORY NO. 11:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 11. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 11 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 11 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 12:**

Please describe the factual basis for the allegations in paragraph 61 of Plaintiffs' Complaint.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 12. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 12 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 12 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 13:**

Please describe the factual basis for the allegations that "Shurwest claimed it vetted the FIP Products, and it was also responsible for structuring the FIP Products and facilitating the use of the FIP Products for the purchase of the Securian Defendants' life insurance products," as alleged in paragraph 62 of Plaintiffs' Complaint.

7

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 13. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 13 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 13 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 14:**

Please identify the "Shurwest employees" referenced in paragraph 74 of Plaintiffs' Complaint.

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 14. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 14 came to them through privileged and confidential attorney-client communications.

**INTERROGATORY NO. 15:**

**Please explain how the Securian Defendants breached their alleged fiduciary duties to Plaintiffs.**

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory15. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 15 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 15 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 16:**

Please describe the assistance that you claim Shurwest provided to the Securian Defendants in the Securian Defendants' alleged breach of their fiduciary duties to Plaintiffs.

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 16. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 16 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 16 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 17:**

Please state the factual basis for your contention that Shurwest is the agent of the Securian Defendants. Complaint ¶¶ 101-02.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiffs have no personal knowledge of the facts and circumstances that would be/could be responsive to Interrogatory 17. Plaintiffs have relied upon the investigation of their counsel and any knowledge they possess would be/could be responsive to Interrogatory 17 came to them through privileged and confidential attorney-client communications.

Plaintiffs' counsel believes that Interrogatory 17 is a contention Interrogatory and is therefore are premature.

**INTERROGATORY NO. 18:**

Please identify and describe the damages you claim in this Lawsuit, including the cause

of those damages, the amount of damages sought, and the method of calculating those damages.

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiffs believe they have suffered loss of investment monies; loss of investment

opportunities; tax liabilities and penalties; and loss of accrued policy benefits.

Dated:  January 11, 2021

s/Lee Squitieri
Lee Squitieri (*pro hac vice*)
**SQUITIERI & FEARON, LLP**
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
lee@sfclasslaw.com

Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
Amanda M. Williams (#341691)
Daniel J. Nordin (#392393)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
awilliams@gustafsongluek.com
dnordin@gustafsongluek.com

Kenneth A. Wexler (*pro hac vice)*
Kara A. Elgersma (*pro hac vice)*
Melinda J. Morales
**WEXLER WALLACE LLP**
55 W. Monroe Street
Suite 3300
Chicago, Illinois 60603
Tel: (312) 346-2222
kaw@wexlerwallace.com
kae@wexlerwallace.com
mjm@wexlerwallace.com

***Interim Co-Lead Counsel for Proposed Class***

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January, 2021, I served a true and accurate copy of the foregoing document on all counsel of record via email.

*/s/ Lee Squitieri*
Lee Squitieri