# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA LIFE INSURANCE COMPANY,<br><br>                   Plaintiff,<br><br>       -vs-<br><br>SHURWEST HOLDING COMPANY, INC., an Arizona corporation; and SHURWEST, LLC, an Arizona limited liability company, THE QUANTUM GROUP USA, LLC, an Arizona limited liability company, and Ron Shurts, an individual,<br><br>               Defendants. | Case No.:<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Minnesota Life Insurance Company ("Minnesota Life") brings this Complaint against Defendants Shurwest Holding Company, Inc. and Shurwest, LLC (collectively, "Shurwest"), The Quantum Group USA, LLC, and Ron Shurts and alleges as follows:

## NATURE OF THE ACTION

1.    This action arises from a premium funding scheme promoted by Shurwest where certain Shurwest-affiliated agents recommended that their clients invest in "structured cash flows" offered by an entity known as Future Income Payments, LLC ("FIP") as part of an unauthorized strategy to fund the premiums on indexed universal life ("IUL") insurance policies issued by Minnesota Life.

2.    FIP was an entity unrelated to Minnesota Life that purported to sell "structured cash flows" to individual investors. Those investors paid FIP an

upfront lump sum in exchange for a pre-determined monthly income stream based upon FIP's "purchase" of individual pensioners' future monthly pension income streams.

3.      Shurwest employee, Melanie Schulze-Miller, and others at Shurwest trained Shurwest-affiliated agents on the use of FIP "structured cash flows" as a vehicle for funding the premiums on universal life policies, and specifically, Minnesota Life IUL policies.

4.      Minnesota Life prohibits the use of "structured cash flows" to fund policy premiums.

5.      At all relevant times, Shurwest and its employees concealed the FIP premium funding scheme from Minnesota Life and on occasion even altered policy applications to overstate an applicant's income and net worth and to hide from Minnesota Life the source of premium funds.

6.      Minnesota Life discovered that Shurwest affiliated agents had recommended FIP investments in connection with funding Minnesota Life index universal life policies in late 2018 when Minnesota Life began receiving policyholder complaints that they could not pay their life insurance premiums because their FIP investment had failed.

7.      Since then, FIP has become the target of an SEC lawsuit, its assets have been placed into receivership, and its founder, Scott Kohn, has been indicted.

8.      Shurwest employee, Ms. Schulze-Miller, has pled guilty to criminal charges in connection with her role in the FIP premium funding scheme.

9.      After learning of the FIP premium funding scheme in late 2018, Minnesota Life offered rescission, returning all premiums paid, to  policyholders who purchased a Minnesota Life IUL policy in association with an investment in FIP because Minnesota Life issued the policies based upon inaccurate information provided to Minnesota Life's underwriters.

10.    Minnesota Life's investigations have identified 274 Minnesota Life IUL policies sold through Shurwest between 2014 and early 2018 linked to an investment in FIP.

11.    Policyholders who were allegedly deceived by the FIP premium funding scheme promoted by Shurwest have brought numerous claims and lawsuits against Minnesota Life, all as the result of the actions of Shurwest and its representatives.

12.    Minnesota Life brings this action for damages and losses incurred as a result of Shurwest's wrongful actions.  In accordance with the terms of its Brokerage General Agency Contract with Shurwest, Minnesota Life is entitled to recover and recoup the millions of dollars it has paid to policyholders who purchased a Minnesota Life IUL policy in association with an investment in FIP, including the refund of policy premiums and any additional payments made to resolve policyholder's claims.

13.    Minnesota Life is also entitled to recover and recoup the override commissions paid to Shurwest.  Minnesota Life further seeks a declaration regarding the repayment of commissions paid to Shurwest-affiliated agents on the sale of FIP-linked Minnesota Life policies that have since been rescinded. Minnesota Life also seeks recovery of attorney's fees and costs incurred defending against claims brought by the owners of FIP-linked Minnesota Life policies.

## PARTIES

14.    Plaintiff Minnesota Life is an insurance company incorporated in Minnesota with its principal place of business in St. Paul, Minnesota.

15.    Defendant Shurwest, LLC is an Arizona limited liability company.

16.    On information and belief, Shurwest, LLC has two members: Defendant Shurwest Holding Company, Inc., an Arizona corporation with its

principal place of business in Scottsdale, Arizona, and KT Equity Partners III, LLC, which is an LLC based in Topeka, Kansas, whose members are David Callanan, Derek Thompson, Cody Foster, and Jordan Canfield. On information and belief, all the members of KT Equity Partners III, LLC are citizens of Kansas.

17.     Shurwest is an independent marketing organization that sells life insurance, annuities, and securities to consumers.

18.     In 2012, Shurwest entered into a Brokerage General Agency Contract to be affiliated with Minnesota Life as an independent general agency.

19.     Defendant The Quantum Group, USA, LLC ("Quantum") is an Arizona limited liability company, doing business in Scottsdale, Arizona.

20.     On information and belief, Quantum's members are: Quantum Holding Company, Inc., an Arizona corporation with its principal place of business in Scottsdale, Arizona, KT Equity Partners III, LLC a Topeka, Kansas LLC whose members, on information and belief, are all citizens of Kansas, and RLS Capital Holdings, LLLP, a Nevada limited liability limited partnership whose general partner is Shurts Management Company, LLC, an Arizona LLC whose members are Ron Shurts who resides in Scottsdale, Arizona and the Ronald L. Shurts Living Trust, which is located in Scottsdale, Arizona.

21.     Quantum was formed in November 12, 2018. Minnesota Life understands that Shurwest began to rebrand itself as Quantum in February 2019. On information and belief, Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors and officers as Shurwest, offers all of the services Shurwest offers, and was set up as a successor entity to Shurwest.

22.     Minnesota Life alleges, on information and belief, that, at all material times herein mentioned, Quantum was the alter ego of Shurwest, and that there

4

was such unity of ownership and interest between Quantum and Shurwest that the two cannot be considered separate entities.

23. Alternatively, Minnesota Life alleges, on information and belief, that at all material times herein mentioned, Quantum was the successor-in-interest to Shurwest and is liable to Minnesota Life for Shurwest's wrongdoing through the equitable doctrine of *de facto* merger. Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Shurwest used in its business dealings with Minnesota Life. Quantum's creation was a fraudulent transaction, done in order to escape liability for Shurwest's obligations.

24. Defendant Ron Shurts ("Shurts") is the President of Shurwest and owner of Quantum and is a resident of Arizona.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) as there is complete diversity between Minnesota Life and all Defendants, and the amount in controversy exceeds $75,000. Minnesota Life has suffered substantially more than $75,000 in damages as a result of Shurwest's actions described herein.

26. This Court has personal jurisdiction over Defendants because Shurwest, Quantum, and Shurts have purposefully established significant contacts with Minnesota by virtue of Shurwest's entry into a Brokerage General Agency Contract with Minnesota Life in 2012 and its agreement to promote, market, and effectuate the sale of Minnesota Life's insurance products. On information and belief, Quantum is an alter ego of Shurwest and/or the successor-in-interest to Shurwest. Shurts entered into a separate agreement with Minnesota Life in March 2019 to repay the agent commissions earned by Shurwest-affiliated independent agents who sold Minnesota Life policies in connection with FIP. Defendants'

conduct alleged herein and the causes of action asserted in this Complaint arise out of or are related to their agreements with Minnesota Life, and Shurwest's conduct in the promotion, marketing and sale of Minnesota Life's IUL policies.

27.    Venue is proper in the District of Minnesota because a substantial part of the events giving rise to the claims in this action occurred in this District. 28 U.S.C. § 1391(b)(2).  Minnesota Life is based in this District and conducts its operations here.  Shurwest entered into a Brokerage General Agency Contract with Minnesota Life in this District.  Shurts entered into an agreement in this District to repay agent debt to Minnesota Life.

28.    Furthermore, Shurwest's Brokerage General Agency Contract with Minnesota Life specifies that the contract is "governed by the laws of the State of Minnesota.  Any litigation arising between the parties with respect to this Contract shall be conducted in Ramsey County, Minnesota." (*See, e.g.*, Ex. A, ¶ 4.10).

## FACTUAL ALLEGATIONS

**A.    Minnesota Life's Brokerage General Agency Contract with Shurwest**

29.    Shurwest is an independent national marketing organization based in Scottsdale, Arizona that provides independent agents with access to major insurance carriers offering indexed universal life insurance and fixed indexed annuity strategies.  Shurwest also provides independent agents with education and training, marketing support, practice management and programs to attract new clients.  In return, Shurwest received compensation in the form of overrides for every sale of a policy an agent makes through them.

30.    On October 9, 2012, Shurwest was appointed as an independent general agency to sell Minnesota Life products.  (*See* Ex. A, Brokerage General Agency Contract.)

31.    The Brokerage General Agency Contract allowed Shurwest to "market" Minnesota Life to its affiliated agents, to "solicit and procure"

applications for Minnesota Life's fixed insurance products, to "deliver all issued products" and "provide service to product owners" of Minnesota Life products, to "train and manage" its affiliated agents, and to earn compensation for sales of Minnesota Life insurance policies, amongst other things. (*Id.*, p. 1.)

32.    However, Shurwest's authority to act on behalf of Minnesota Life was limited under the Brokerage General Agency Contract, which provided that "Your authority extends no further than is specifically stated in this Contract" and that "You shall have no power or authority to act on [Minnesota Life's] behalf or to authorize Your brokers to act on [Minnesota Life's] behalf." (*Id.*, p. 3.) Specifically, Shurwest and its affiliated independent agents were prohibited from offering for sale any products that were not included on the Brokerage Commission Schedule. (*Id.*)

33.    The Brokerage General Agency Contract also provided that Minnesota Life had "the right to refund any premiums paid on a policy if [Minnesota Life] believe[s] this is proper where a policy is rescinded, cancelled, or not accepted, or for any other reason [Minnesota Life] believe[s] is proper. **[Shurwest] agree[s] to return to [Minnesota Life], when [Minnesota Life] ask[s] for it, all earnings which [Minnesota Life] credited to [Shurwest] on any premiums which [Minnesota Life] refund[s]**." (*Id.*, p. 2 at ¶ 2.1(d)) (emphasis added).

34.    Shurwest's Brokerage General Agency Contract with Minnesota Life also provided that "All compensation paid to [Shurwest] or [its] Brokers as provided in Section 2, on any premiums that are subsequently returned or otherwise not received by [Minnesota Life] shall, upon [Minnesota Life's] demand, become a debt [Shurwest] owe[s] to [Minnesota Life]." (*Id.*, p. 2 at ¶ 2.3(a)).

35.     Shurwest also agreed "to indemnify and hold [Minnesota Life] harmless against any damages or losses which [it] incurred as a result of [Shurwest's] actions or the actions of [its] Brokers or employees." (*Id.*, p. 3 at ¶ 4.3). The Brokerage General Agency agreement provided that Shurwest "will be liable to [Minnesota Life] and agree to reimburse [Minnesota Life] fully for any payments made and any related expenses incurred by [Minnesota Life] in the defense and settlement of any such claim that [Minnesota Life] defend[s], pay[s] or settle[s], including costs of counsel employed for such action." (*Id.*, p. 3 at ¶ 4.5).

**B.      Shurwest's Promotion of the FIP Premium Funding Scheme**

36.     Between 2014 and early 2018, Minnesota Life was the victim of a premium funding scheme promoted by Shurwest and its employee, Melanie Schulze-Miller, who trained independent agents affiliated with Shurwest to recommend to their clients the use of FIP "structured cash flows" as a vehicle for funding the premiums on universal life policies.

37.     The FIP premium funding strategy Shurwest and Ms. Schulze-Miller pitched to certain Shurwest-affiliated agents involved converting taxable assets to a tax advantaged vehicle over a period of time, by "turbocharging" the IUL product through the use of a "structured cash flow" in order to facilitate a more aggressive funding strategy.

38.     A client would withdraw money from his/her IRA or 401k and deposit the funds into a custodial IRA account. Some funds would be released to the client to pay the premiums on an IUL policy. The remaining funds in the custodial account (or a portion thereof) would be released to FIP for the purchase of an investment in a "structured cash flow."[1]

---

[1] FIP specialized in secondary market pension income streams. FIP purchased pension streams from pensioners at a discounted rate with lump sum payments and matched those "structured

39.     Every month, the client would receive a monthly payment from FIP into the custodial account. The expected rate of return of the principal invested in FIP was often around 6.5%-8%.  The client would then use the "structured cash flow" funds to pay the premiums on his or her IUL policy.

40.     According to this unauthorized strategy, over a span of four to five years, and with aggressive funding, a client could convert his/her IRA or 401k monies into a substantial account value in the IUL policy.  The client could then draw upon the accumulation value through policy loans and enhance retirement cash flows.

41.     Ms. Schulze-Miller and other Shurwest employees trained Shurwest-affiliated agents on the FIP premium funding strategy—specifically, on the use of FIP "structured cash flows" in conjunction with Minnesota Life IUL policies—and provided them with webinars and sales materials to help present the strategy to clients.

42.     At no time did any of the policy applications submitted through Shurwest disclose to Minnesota Life that the actual source of premium funding would be "structured cash flows" or FIP, even when specifically asked about the source of funds during the underwriting process.  The FIP source of funds was concealed from Minnesota Life in each instance.

43.     Minnesota Life prohibits the use of "structured cash flows" as a funding source and has communicated this to its independent agents through its Policies and Procedures as follows:

> "Sales of life products when a strategy involving structured cash flows is involved.  This sales strategy encourages the prospective policyowner to lend money to an individual or individuals in return for the promise that the borrower repay the loaned funds with pension, IRA or other sources of structured income.  The individuals

---

cash flow" streams with investments from clients, who were looking for higher fixed rates of return with predictable income over a specific time frame (often five years).

lending in these transactions would then use the income stream resulting from the loan repayment as premiums into a cash value life insurance policy. **Sales involving this type of strategy are not permitted with the Companies' products**." (Exhibit C, 2017 Policies and Procedures, Life Insurance and Annuity Sales).

44.    Minnesota Life prohibits the use of structured cash flows to fund life insurance policy premiums because Minnesota Life loses money on each sale of an IUL policy that results in an early lapse. Its financial underwriting guidelines are designed to prevent the sale of policies that are not affordable or are excessive in terms of needs and goals. Had the applications for IUL policies submitted through Shurwest truthfully disclosed the source of funds for premium payment, Minnesota Life would not have issued the policies as applied for.

45.    In mid-2018, FIP shut down its business and ceased paying monthly income streams on investments.

46.    After FIP's collapse, Minnesota Life began receiving policyholder complaints and discovered that several independent agents affiliated with Shurwest had recommended the use of FIP structured cash flows to fund policy premiums on Minnesota Life's IUL policies.

47.    The FIP premium funding strategy was concealed from Minnesota Life during the application process, so that Minnesota Life's underwriting of the policies was based on inaccurate and misleading information.

48.    Minnesota Life did not approve, endorse, or encourage the FIP premium funding strategy. Rather, Minnesota Life has been financially harmed from the sale of policies using the FIP premium funding strategy.

49.    After discovering the FIP funding scheme in late 2018, Minnesota Life offered to rescind all Minnesota Life IUL policies purchased in conjunction with an investment in FIP and to refund premiums paid for those policies, primarily because the policies were issued based upon inaccurate information provided to Minnesota Life's underwriters.

50.     To date, Minnesota Life has rescinded 210 policies sold through Shurwest.

51.     Minnesota Life is entitled to recoup the amount of compensation Shurwest received on these policies pursuant to section 2.3(a) of the Brokerage General Agency Contract.

52.     Minnesota Life is also entitled to recover from Shurwest the amount of commissions paid to Shurwest-affiliated agents on FIP-linked rescinded policies, because pursuant to section 2.3(a) of the Brokerage General Agency Contract, that became a debt owed to Minnesota Life by Shurwest.

53.     Minnesota Life has also been named as a defendant in several lawsuits across the country as a result of Shurwest's sale of Minnesota Life IUL policies in connection with FIP.

54.     Minnesota Life has incurred and continues to incur attorneys' fees and costs in the course of defending these lawsuits and settling with the claimants, in an amount to be determined a trial.

C.      **Shurwest's Alteration of Policy Applications Submitted to Minnesota Life**

55.     In or around February 2018, Minnesota Life received two complaints from policyholders whose IUL policies were sold through Shurwest and whose policy applications appeared to have been altered after they were signed by the applicant.

56.     In or around March 2018, Minnesota Life initiated an investigation into Shurwest's suspected alterations or "scrubbing" of policy applications submitted to Minnesota Life.

57.     For certain policy applications, Ms. Schulze-Miller and other Shurwest employees "scrubbed" the applications for Minnesota Life IUL policies by altering the applications to overstate the income and net worth of the applicant

11

and to conceal that the true funding source for policy premiums was FIP "structured cash flows."

58.　On information and belief, Ms. Schulze-Miller and other Shurwest employees "scrubbed" the applications for Minnesota Life IUL policies so that Minnesota Life's underwriting team would be more likely to issue the policies with the amount of coverage as applied for.

59.　Policyholders did not authorize these alterations to their policy applications by Ms. Schulze-Miller and other Shurwest employees.

60.　Nobody at Shurwest conducted a further review of the applications after prospective policyholders submitted their applications to Ms. Schulze-Miller and her team.　The applications were submitted directly from Ms. Schulze-Miller and her team to Minnesota Life without any further evaluation or oversight by Shurwest.

61.　Minnesota Life believes that there were over one thousand policies sold through Shurwest between the period 2014 to 2018 where the policy applications were altered.　Two-hundred twenty-two (222) of those policies were linked to an investment in FIP.

62.　Minnesota Life would not have issued these policies as applied for but for the false and/or inaccurate information contained on the policy applications.

**D.　Shurwest Becomes Quantum and Ron Shurts Agrees to Guarantee The Payment of Agent Debt**

63.　In February 2019, Minnesota Life became aware that Shurwest was rebranding itself as Quantum.　Shurwest employees' email signatures included references to Quantum, Shurwest employees answered the phone on Quantum's behalf, and Shurwest President and Quantum owner Ron Shurts used

"Shurwest/Quantum" to refer to one entity in email correspondence with Minnesota Life.

64.    On information and belief, Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors as Shurwest, and was set up as a successor entity to Shurwest. Accordingly, Quantum is an alter ego of Shurwest and/or the successor-in-interest to Shurwest for the wrongdoing alleged in this Complaint.

65.    In March 2019, Shurts and Minnesota Life entered an agreement whereby Shurts would pay Minnesota Life $200,000 up front, and then $50,000 per month (later increased to $75,000 per month) thereafter, for the debt owed to Minnesota Life arising out of the commissions paid to Shurwest-affiliated independent agents on the Minnesota Life IUL policies that were sold in connection with an investment in FIP, which have since been rescinded. Shurts personally guaranteed this debt.

66.    In June 2020, Minnesota Life terminated Shurwest's Brokerage General Agency Contract with Minnesota Life.

## FOR A FIRST CAUSE OF ACTION
### (CONTRACTUAL INDEMNITY AGAINST SHURWEST AND QUANTUM)

67.    Minnesota Life re-alleges and incorporates by reference paragraph 1 through 66 as if set forth fully herein.

68.    At all times relevant to the claims set forth in the Complaint, Minnesota Life and Shurwest were parties to the Brokerage General Agency Contract, which describes their relationship and Shurwest's appointment as an independent general agency for Minnesota Life.

69. The Brokerage General Agency Contract obligates Shurwest to "indemnify and hold [Minnesota Life] harmless against any damages or losses which [Minnesota Life] incurred as a result of [Shurwest's] actions or the actions of [its] Brokers or employees." (Ex. A, p. 3 at ¶ 4.3).

70. The Brokerage General Agency Contract provides that Shurwest "will be liable to [Minnesota Life] and agree to reimburse [Minnesota Life] fully for any payments made and any related expenses incurred by [Minnesota Life] in the defense and settlement of any such claim that [Minnesota Life] defend[s], pay[s] or settle[s], including costs of counsel employed for such action." (*Id.*, p. 3 at ¶ 4.5).

71. Accordingly, under the express provisions of the Brokerage General Agency Contract, Minnesota Life is entitled to indemnification from Shurwest for all such damages and losses and attorneys' fees, costs and other expenses incurred by Minnesota Life related to Shurwest's involvement in and promotion of the FIP premium funding scheme, and Minnesota Life's resolution of claims brought by owners of FIP-linked policies sold through Shurwest.

72. Alternatively, Minnesota Life is entitled to indemnification from Quantum as Shurwest's alter ego and/or successor-in-interest for the damages and losses and attorneys' fees, costs and other expenses incurred by Minnesota Life related to Shurwest's involvement in and promotion of the FIP premium funding scheme, and Minnesota Life's resolution of claims brought by owners of FIP-linked policies sold through Shurwest.

## FOR A SECOND CAUSE OF ACTION
## (EQUITABLE INDEMNITY AGAINST SHURWEST AND QUANTUM)

73. Minnesota Life re-alleges and incorporates by reference paragraph 1 through 72 as if set forth fully herein.

74.     Minnesota Life denies liability for any losses or damages alleged by a policyholder who purchased a Minnesota Life IUL policy in connection with an investment in FIP through Shurwest.

75.     Minnesota Life did not authorize, endorse or ratify any of the FIP investments or promote the FIP premium funding strategy.  In fact, the FIP premium funding strategy was concealed from Minnesota Life by Shurwest, Ms. Schulze-Miller, Shurwest-affiliated agents and employees, and the policyholders during the application process for policies and at all relevant times thereafter.

76.     The sole cause of the losses or damages incurred by these policyholders is due to the negligent or wrongful conduct of Shurwest and its employees and not any primary or affirmative act of Minnesota Life.

77.     Accordingly, Minnesota Life is entitled to indemnification from Shurwest for any and all attorneys' fees and costs, settlements, judgments, and all liability arising out of, or in any way related to Shurwest's role in the FIP premium funding scheme, and its sale of Minnesota Life IUL policies in connection with an investment in FIP.

78.     Alternatively, Minnesota Life is entitled to indemnification from Quantum as Shurwest's alter ego and/or successor-in-interest for any and all attorneys' fees and costs, settlements, judgments, and all liability arising out of, or in any way related to Shurwest's role in the FIP premium funding scheme, and its sale of Minnesota Life IUL policies in connection with an investment in FIP.

**FOR A THIRD CAUSE OF ACTION**
**(NEGLIGENCE AGAINST SHURWEST AND QUANTUM - FIP**
**PREMIUM FUNDING SCHEME)**

79.     Minnesota Life re-alleges and incorporates by reference paragraph 1 through 78 as if set forth fully herein.

80.     Shurwest owed Minnesota Life a duty to exercise reasonable care, skill, diligence and prudence in ensuring that its employees and affiliated agents did not "offer for sale, in [Minnesota Life's] name, any products not included on the attached Contract Update" (Ex. A, p. 3 at ¶ 4.2(a)) and in supervising its employees and affiliated agents in their sale of Minnesota Life IUL policies.

81.     Shurwest breached that duty to Minnesota Life by negligently supervising its employees, including Ms. Schulze-Miller, who promoted and trained Shurwest-affiliated agents on the FIP premium funding strategy and provided them with webinars and sales materials to help present the strategy to clients.

82.     Shurwest further breached that duty to Minnesota Life by negligently supervising its affiliated agents who recommended to their clients the use of FIP "structured cash flows" as a vehicle for funding the premiums on Minnesota Life IUL policies.

83.     Shurwest knew or should have known that allowing its employees and affiliated agents to promote the purchase of unregistered investments was reckless and dangerous, or, at a minimum, negligent and careless.

84.     Shurwest knew or should have known that FIP was at risk of financial ruin due to ongoing legal and regulatory issues, but failed to properly supervise its employees and its affiliated-agents by allowing them to promote and recommend the FIP premium funding strategy.

85.     As a direct and proximate result of Shurwest's negligence, Minnesota Life has suffered substantial financial losses and will continue to suffer damages in an amount to be proven at trial.

86.     At all relevant times herein, Quantum was Shurwest's alter ego and/or successor-in-interest and thereby liable for the damages to Minnesota Life caused by Shurwest's negligence.

## FOR A FOURTH CAUSE OF ACTION
### (NEGLIGENCE AGAINST SHURWEST AND QUANTUM - "SCRUBBING" OF IUL POLICY APPLICATIONS)

87.     Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 86 as if set forth fully herein.

88.     Shurwest owed Minnesota Life a duty to exercise reasonable care, skill, diligence and prudence in supervising its employees, including Ms. Schulze-Miller and her team, in their submission of Minnesota Life IUL policy applications to Minnesota Life.

89.     Shurwest breached that duty to Minnesota Life by negligently supervising its employees, including Ms. Schulze-Miller and her team, who "scrubbed" policy applications by altering them to overstate the income and net worth of the applicant and also to conceal that the true funding source for policy premiums was FIP "structured cash flows."

90.     Shurwest knew or should have known that it was reckless and dangerous, or, at a minimum, negligent and careless to allow its employees, including Ms. Schulze-Miller and her team, to submit policy applications to Minnesota Life without additional review of or oversight over the applications.

91.     Minnesota Life would not have issued these policies as applied for but for the false and/or inaccurate information contained on the policy applications that resulted from the "scrubbing" of policy applications by Shurwest employees.

92.     As a direct and proximate result of Shurwest's negligence, Minnesota Life has suffered substantial financial losses and will continue to suffer damages in an amount to be proven at trial.

17

93.     At all relevant times herein, Quantum was Shurwest's alter ego and/or successor-in-interest and thereby liable for the damages to Minnesota Life caused by Shurwest's negligence.

## FOR A FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST SHURWEST)

94.     Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 93 as if set forth fully herein.

95.     On October 9, 2012, Shurwest entered into a Brokerage General Agency Contract with Minnesota Life.  (*See* Ex. A).

96.     The Brokerage General Agency Contract provides specifically that "[a]ll compensation paid to [Shurwest] or [Shurwest's] Brokers as provided in Section 2 on any premiums that are not subsequently returned or otherwise not received by [Minnesota Life] shall, upon [Minnesota Life's] demand, become a debt [Shurwest] owe[s] to [Minnesota Life], payable according to paragraph 2.3(b) FIRST CLAIM ON EARNINGS" and "[Shurwest] agree[s] to promptly repay all debts to [Minnesota Life], including reasonable interest as [it] determine[s]. [Minnesota Life] ha[s] first claim on all of [Shurwest's] earnings. This means that, as an when elected, [Minnesota Life] may keep all or any part of [Shurwest's] earnings to reduce any debt [Shurwest] owe[s] [Minnesota Life]...." (*Id.*, p. 2 at ¶ 2.3).

97.     The Brokerage General Agency Contract also provides that Minnesota Life had "the right to refund any premiums paid on a policy if [Minnesota Life] believe[s] this is proper where a policy is rescinded, cancelled, or not accepted, or for any other reason [Minnesota Life] believe[s] is proper. **[Shurwest] agree[s] to return to [Minnesota Life], when [Minnesota Life] ask[s] for it, all earnings which [Minnesota Life] credited to [Shurwest] on**

18

**any premiums which [Minnesota Life] refund[s].**" (*Id.*, p. 2 at ¶ 2.1(e)) (emphasis added).

98.     Shurwest was paid compensation in the form of overrides on all Minnesota Life policies sold by Shurwest-affiliated agents, including policies sold in association with a FIP investment. Minnesota Life has offered to rescind the policies of any policyholder who was affected by the FIP premium funding scheme and to return the premiums paid on those policies, due to the lack of accurate or complete information regarding the source of funds for those policies which infected Minnesota Life's underwriting process. To date, Minnesota Life has rescinded 210 policies that were sold through Shurwest with ties to investments in FIP.

99.     Shurwest, however, has failed to return the compensation it was paid by Minnesota Life for the sale of those FIP-linked IUL policies.

100.   Shurwest has also failed to return the compensation Minnesota Life paid to Shurwest-affiliated agents who sold FIP-linked IUL policies that have since been rescinded, a debt Shurwest owes to Minnesota Life pursuant to paragraph 2.3 of the Brokerage General Agency Contract.

101.   By failing to pay the amounts Shurwest owes Minnesota Life under the terms of the Brokerage General Agency Contract for IUL policies sold through Shurwest that were rescinded as a result of the FIP premium funding scheme, Shurwest has breached the contract between itself and Minnesota Life.

102.   As a result of Shurwest's breach of the Brokerage General Agency Contract, Minnesota Life has suffered damages in an amount to be determined at trial, plus statutory pre-judgment interest until the debt is paid or judgement entered.

103.   At all relevant times herein, Quantum was Shurwest's successor-in-interest and/or alter ego and thereby liable for the damages to Minnesota Life caused by Shurwest's breach of contract.

## FOR A SIXTH CAUSE OF ACTION
## (ALTER EGO/SUCCESSOR LIABILITY OF QUANTUM)

104.   Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 103 as if set forth fully herein.

105.   Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors and officers as Shurwest, offers all of the services that Shurwest offers, and was set up as a successor entity to Shurwest.  On information and belief, Shurwest's funds have also been commingled with Quantum's funds.

106.   Minnesota Life alleges, on information and belief, that, at all material times herein mentioned, Quantum was the alter ego of Shurwest, and that there was such unity of ownership and interest between Quantum and Shurwest that the two cannot be considered separate entities.

107.   Alternatively, Minnesota Life alleges, on information and belief, that, at all material times herein mentioned, Quantum was the successor-in-interest to Shurwest and is liable to Minnesota Life for Shurwest's wrongdoing through the equitable doctrine of *de facto* merger.  Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Shurwest used in its business dealings with Minnesota Life.  The creation of Quantum was a fraudulent transaction done in order to escape liability for Shurwest's obligations.

108.   Shurwest has damaged Minnesota Life in a total amount to be determined at trial.

109.   Minnesota Life is therefore entitled to reach beyond Shurwest to the funds of Quantum for satisfaction of the amounts owed to Minnesota Life under the foregoing causes of action.

## FOR A SEVENTH CAUSE OF ACTION
## (DECLARATORY RELIEF AGAINST SHURTS)

110.   Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 109 as if set forth fully herein.

111.   In March 2019, Shurts entered into an agreement with Minnesota Life to pay the debt Shurwest owes to Minnesota Life for the commissions paid to Shurwest-affiliated independent agents who sold FIP-linked Minnesota Life IUL policies that have since been rescinded.

112.   On March 10, 2019, Shurts confirmed this agreement via email to Minnesota Life employee Benjamin Roth.

113.   Specifically, Shurts agreed to the immediate repayment of $200,000 in agent debt, and then $50,000 per month thereafter "until we are out of the woods." In his email, Shurts emphasized that "Shurwest/Quantum is committed to the partnership."

114.   As a result of Shurts' agreement with Minnesota Life, Shurts has personally guaranteed the agent debt owed by Shurwest to Minnesota Life.

115.   Minnesota Life hereby seeks a judicial determination that Shurts is personally liable to Minnesota Life for Shurwest's agent debt in the event Shurwest fails to make its monthly payments to Minnesota Life, under the terms of Shurts' agreement with Minnesota Life.

116.   Such a declaration is necessary and appropriate at this time so that Minnesota Life and Shurts may ascertain their rights and duties with respect to the claims alleged by Minnesota Life in the Complaint. A determination of rights

as between Minnesota Life and Shurts prior to the entry of judgment in this matter is likely to facilitate resolution of the matter and avoid a separate action for breach of contract as between Minnesota Life and Shurts in the event Shurwest defaults on its payment of agent debt amounts owed to Minnesota Life.

**WHEREFORE,** having fully set forth its Complaint, Minnesota Life prays for the following:

(a)     A declaration that Shurwest indemnify and hold Minnesota Life harmless for the claims of all Minnesota Life policyholders who purchased an IUL policy through Shurwest in connection with a FIP investment;

(b)     A declaration that Shurts is personally liable for the agent debt owed by Shurwest to Minnesota Life in the event Shurwest defaults on its payments to Minnesota Life;

(c)     Judgment in an amount to be determined at trial;

(d)     Compensatory damages;

(e)     For the costs and disbursements of this action; and

(f)     For such other and further relief as the Court may deem just and proper.

Dated:  July 12, 2021

_s/     Shawn M. Raiter_
Shawn M. Raiter (#240424)
David M. Wilk (#222860)
**LARSON • KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Tel: (651) 312-6500
sraiter@larsonking.com
dwilk@larsonking.com

Robert D. Phillips, Jr. (*pro hac vice forthcoming*)
Kathy J. Huang (*pro hac vice forthcoming*)
Gillian H. Clow (*pro hac vice forthcoming*)
**ALSTON & BIRD, LLP**
333 South Hope St, 16th FL
Los Angeles, CA 90071
Tel: (213) 576-1000
bo.phillips@alston.com
kathy.huang@alston.com
gillian.clow@alston.com

*Attorneys for Plaintiff Minnesota Life Insurance Company*

# EXHIBIT 2

| | | |
|---|---|---|
| STATE OF ARIZONA | ) | |
| | ) | **AFFIDAVIT** |
| COUNTY OF MARICOPA | ) | |

Personally appeared before me, the undersigned, who being duly sworn, deposes and says:

1. My name is Melanie Schulze-Miller and I currently reside in Arizona.

2. I have an extensive career in the insurance industry.

3. I previously worked at Minnesota Life Insurance Company ("MLIC") before I was hired by Shurwest, Financial Group, LLC ("Shurwest") in June 2012.

4. I was terminated by Shurwest in May 2018. At the time of my termination, I was Shurwest's National Sales Director for Life Insurance.

5. Shurwest served as a liaison between financial advisors and certain life insurance companies, including MLIC.

6. I assisted financial advisors in marketing and selling insurance products and reviewing insurance applications prior to the submission to the insurer for underwriting and approval.

7. Commissions were paid to Shurwest based on the new business written with an insurer.

8. In 2015, I learned about a structured cash flow product offered by Future Income Products, LLC ("FIP").

9. I also learned that FIP could be utilized to fund life insurance products.

10. In April or May 2016, I sought approval from Ron Shurts and Jim Maschek, the owners of Shurwest, for Shurwest to promote the sale of FIP and to use FIP to fund life insurance policies. At that time, I believed that FIP was a good investment for some clients and that utilizing FIP would result in larger life insurance policies being purchased and, therefore, larger commissions for Shurwest.

11. Maschek informed me that if Shurts did not give final approval to promote FIP, I could set up an LLC with him to be used to promote FIP as a life insurance funding source for Shurwest customers.

12. On May 3, 2016, I created MJSM Financial, LLC, to receive the FIP commissions. I did not include Maschek in the creation of this LLC.

13. Two co-workers at Shurwest, Mike Seabolt and Nick Johnson, began to write FIP

business under MJSM along with myself. All of the work we did related to FIP was done in the offices of Shurwest.

14. I began to hold training sessions, some at Shurwest offices, pitching FIP as a funding source for life insurance policies.

15. Maschek attended some of the training sessions that I lead which were held at Shurwest where FIP was discussed.

16. Everyone at Shurwest, including Maschek and Shurts were fully aware that we were promoting FIP to fund life insurance policies..

17. Agent trainings regarding FIP were done on the Shurwest premises when Maschek and other key Shurwest employees were present.

18. Furthermore, Maschek and other marketers took telephone calls on FIP at Shurwest and referred them to me.

19. Under Maschek'a direct guidance, we held live webinars regarding FIP from Shurwest offices with hundreds of agents on the webinars. Maschek approved the Power Point presentation which included the FIP information that was prepared by the Marketing department of Shurwest.

20. When FIP began to collapse, I understand that Maschek directed Shurwest's IT Manager to delete all references to FIP from Shurwest's network.

21. I was told by Shurts and Maschek that I needed to protect Shurwest and accept responsibility for promoting FIP to Shurwest clients, and that protecting Shurwest was the best way to protect me. I was asked to deny that Shurwest had knowledge that FIP was being promoted in connection with the sale of policies, which was not the case.

22. Shortly after my termination, on May 15, 2018, Shurwest filed a civil lawsuit against me, *Shurwest, LLC v. Schulze-Miller, et.al.*, Superior Court Case No. CV2018-004665, in Maricopa County, Arizona, alleging claims for breach of employment agreement, breach of implied duty of good faith and fair dealing, and breach of fiduciary duty. This lawsuit threatened to take away my livelihood and ability to support my family by prohibiting me from selling insurance in competition with Shurwest.

23. On September 12, 2018, as part of the settlement of this lawsuit, Shurwest requested that I sign a declaration in which I stated that Shurwest had rejected my request to form a relationship between Shurwest and FIP and to use FIP to fund life insurance premiums. I agreed to sign this declaration because I could not afford to lose my livelihood or continue to litigate against Shurwest. Moreover, at the time I was marketing FIP, I believed that Shurts and Maschek had not finally rejected my request to market FIP. Both Shurts and Maschek were aware that FIP was being used as a funding source for life insurance policies that Shurwest was selling.

24. In this declaration, I also stated that I formed MJSM to separate Shurwest activities from my FIP-related activities so that I could be a FIP referrer without involving Shurwest and that Shurts and Maschek were unaware of MJSM and the commissions I received from FIP..

25. In the declaration, I stated that all the work I did for FIP was done for MJSM and not for Shurwest. However, the declaration did not include the fact that Shurwest did directly profit through increased commissions from the larger policies Shurwest was able to write by utilizing FIP. It was clear to me that Shurts and Maschek allowed me to market FIP at Shurwest because of the substantial IUL policy commissions that we were generating for the benefit of Shurwest as a result of these efforts. If they were not profiting from these sales, I am confident that they would not have allowed us to market FIP.

26. I executed the declaration solely to facilitate a settlement of the civil action between myself and Shurwest regarding my employment and to preserve my ability to earn a living and support my family. At the time, I did not realize Shurwest would use the declaration offensively to avoid any liability to clients who used FIP as a funding source for life insurance policies purchased through Shurwest.

_____
Melanie Schulze-Miller

SWORN to before me this

17th day of April 2021

_____
Notary Public for Arizona

My commission expires: 8/25/2023

BRIAN R. BACON
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 567836
Expires August 25, 2023

Page **3** of **3**

# EXHIBIT 3

# Exhibit 5

Deposition Of:

# Albert Manfre

## February 09, 2021

---

Emma Angelica McKinnon

vs

CMAM, Inc. dba Heritage Financial Services

---

Volume I

Job Number 209081



```
 1                 IN ARBITRATION BEFORE JAMS

 2           [CONSOLIDATED FOR DISCOVERY WITH JAMS Ref. No.

 3                        1210037271]

 4

 5   EMMA ANGELICA MCKINNON, an        )
     individual,                       )
 6                                     )
                     Claimant,         )
 7                                     )
                  vs.                  ) Case No.
 8                                     ) 1210037267
     CMAM, INC.dba HERITAGE FINANCIAL  )
 9   SERVICES, a California            )
     corporation; ALBERT ANDREW        )
10   MANFRE, an individual; JEANETTE   )
     MANFRE, an individual; and JAMES  )
11   A. ANTON, an individual; and DOES )
     1-10, inclusive,                  )
12                                     )
                     Respondents.      )
13   _____)

14

15

16                      VOLUME I

17      VIDEOTAPED DEPOSITION OF ALBERT ANDREW MANFRE

18                      VIA ZOOM

19           Tuesday, February 9, 2021

20

21

22   REPORTED BY:

23   NOELLE C. KRAWIEC
     CSR NO. 14255
24
     JOB NO.
25   209081
```

```
 1    VIDEOTAPED DEPOSITION OF ALBERT ANDREW MANFRE,

 2    VOLUME I, TAKEN VIA ZOOM ON BEHALF OF THE CLAIMANT,

 3    COMMENCING AT 9:12 A.M., ON TUESDAY,

 4    FEBRUARY 9, 2021, BEFORE NOELLE C. KRAWIEC, CSR

 5    NO. 14255, A CERTIFIED SHORTHAND REPORTER IN AND

 6    FOR THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA.

 7

 8

 9

10

11      APPEARANCES:

12
        FOR CLAIMANT:
13
            REIF LAW GROUP, P.C.
14          BY:  BRANDON REIF, ESQ.
            BY:  LISA FOUTCH, ESQ.
15               (VIA ZOOM)
            1925 CENTURY PARK EAST
16          SUITE 1700
            LOS ANGELES, CALIFORNIA 90067
17          (310) 494-6500
            BREIF@REIFLAWGROUP.COM
18          LFOUTCH@REIFLAWGROUP.COM

19
            FURGISON LAW GROUP, P.C.
20          BY:  JON FURGISON, ESQ.
                 (VIA ZOOM)
21          445 31ST STREET
            HERMOSA BEACH, CALIFORNIA 90254
22          (310) 356-6890
            JON@FURGISONLAWGROUP.COM

23

24

25      (APPEARANCES CONTINUED TO NEXT PAGE.)
```

Deposition Of Albert Manfre

```
 1   (APPEARANCES CONTINUED.)

 2

 3   FOR RESPONDENTS:

 4       CALLAHAN & BLAINE
         BY:  JOHN VAN ACKEREN, ESQ.
 5              (VIA ZOOM)
         3 HUTTON CENTRE DRIVE
 6       FLOOR 9
         SANTA ANA, CALIFORNIA 92707
 7       (714) 241-4444
         JVANACKEREN@CALLAHAN-LAW.COM
 8

 9       ROPERS MAJESKI KOHN & BENTLEY
         BY:  LAWRENCE BORYS, ESQ.
10              (VIA ZOOM)
         445 SOUTH FIGUEROA STREET
11       SUITE 3000
         LOS ANGELES, CALIFORNIA 90071-1619
12       (213) 312-2000
         LAWRENCE.BORYS@RMKB.COM
13

14
     ALSO PRESENT (VIA ZOOM):
15
         SEAN WILLIAMS
16       LUCAS DANNER, VIDEOGRAPHER

17

18

19

20

21

22

23

24

25
```

Deposition Of Albert Manfre

1              Tuesday; February 9, 2021

2                    9:12 a.m.

3

4          THE VIDEOGRAPHER:  We are on the record.

5          My name is Lucas Danner.  I'm a notary

6      republic contracted by Video Solutions.  I'm not

7      financially interested in this action, nor am I a

8      relative or employee of any of the attorneys or any

9      of the parties.

10          Today is February 9, 2021.  The time is

11      9:12 a.m.  The video deposition is taken remotely

12      via Zoom.  The name of the case is Emma Angelica

13      McKinnon versus CMAM, Incorporated, dba Heritage

14      Financial Services, in arbitration; Case Number

15      121 -- or Reference Number 1210037271 [sic].

16      This is Volume 1 in the video deposition of

17      Albert Manfre.  The deposition is taken by Attorney

18      Brandon Reif.

19          Would the attorneys introduce themselves

20      and state who you represent.

21          MR. REIF:  Brandon Reif for plaintiff

22      claimant.  I have with me Lisa Foutch, Jon Furgison.

23          THE VIDEOGRAPHER:  Okay.

24          MR. VAN ACKEREN:  Good morning.  John Van

25      Ackeren on behalf of respondents CMAM, Inc., doing

Deposition Of Albert Manfre

1    business as Heritage Financial Services,

2    Jeanette Manfre, and Albert Manfre, the deponent.

3            MR. BORYS:  Lawrence Borys appearing for

4    the respondent James Anton.

5            THE VIDEOGRAPHER:  Okay.  We are ready to

6    proceed.  The court reporter today is Noelle C.

7    Krawiec with CalDepo.

8            Will the reporter please swear in the

9    witness.

10

11            ALBERT ANDREW MANFRE,

12    having declared under penalty of perjury to tell the

13       truth, was examined and testified as follows:

14

15                    EXAMINATION

16    BY MR. REIF:

17       Q    Mr. Manfre, I'm Brandon Reif.  I've got my

18    right hand up.

19       A    Good morning.

20       Q    I'll be starting by asking you questions.

21            Have you ever had your deposition taken?

22       A    Yes.

23       Q    How many times?

24       A    Exactly probably 3 or 4, over the last

25    30 years.

Deposition Of Albert Manfre

```
 1              If there's anything outside of your
 2    communications with Mr. Anton, you can answer.
 3    Otherwise, I'll instruct you not to answer.
 4              THE WITNESS:  Okay.
 5    BY MR. REIF:
 6         Q    Mr. Manfre, I'll rephrase that one again.
 7         A    Okay.
 8         Q    What did you tell Ms. McKinnon why you were
 9    trying to get a settlement with Shurwest?
10         A    Because they were the only one we had a
11    relationship with that we could get money from.
12         Q    Can you explain what you said to
13    Ms. McKinnon about that relationship involving
14    Shurwest?
15         A    Sure.  Basically, I told her that we have a
16    relationship with Shurwest.  They're the ones that
17    recommended this.  I've known the owner Ron Shurts
18    for 25 years.  I was a good producer for them, so I
19    thought we could a get a settlement based on my
20    production and them doing the right thing.
21         Q    Okay.  Now, when you said to Ms. McKinnon
22    that Shurwest, quote, "recommended this," closed
23    quote, what specifically were you referring to?
24         A    The IUL with the FIP.
25         Q    Okay.  When you say, "the IUL," are you
```

Deposition Of Albert Manfre

```
 1   clients and prospective clients of CMAM?
 2       A     Yeah, as I recall.  Yes.
 3       Q     Okay.
 4       A     The main contact was Mel.
 5       Q     Understood.
 6       A     But, yeah.
 7       Q     Understood.
 8             And from your perspective, Jim Maschek had
 9   knowledge that its employee Melanie Miller was
10   recommending the IRA reboot to you and the company
11   that your wife owns, CMAM?
12             MR. VAN ACKEREN:  Objection.  Calls for
13   speculation.
14   BY MR. REIF:
15       Q     You can answer that.
16       A     Can you resay it again to me.  I'm sorry.
17       Q     Yeah.  I'll do my best.
18             From your perspective --
19       A     Uh-huh.
20       Q     -- did Jim Maschek have knowledge that its
21   employee Melanie Miller was recommending the IRA
22   reboot to you and the company that your wife owns as
23   CMAM?
24             MR. VAN ACKEREN:  Objection.  Calls for
25   speculation.
```

Deposition Of Albert Manfre

```
 1              You can answer.
 2              THE WITNESS:  Yes.
 3    BY MR. REIF:
 4         Q    Tell me upon what you base that
 5    understanding, please.
 6         A    He called me to say how good we were doing
 7    with him, in commissions.
 8         Q    Okay.
 9         A    He obviously knew.
10         Q    Yeah.
11              Okay.  So you have a memory of Jim Maschek
12    calling you and congratulating you or applauding you
13    for the sale of the IRA reboots when they're being
14    sold to the retail customers of CMAM; is that
15    correct?
16         A    I don't recall a specific conversation, but
17    they were happy.  We were one of the top producers
18    that year.
19         Q    Okay.  And when you say that CMAM was one
20    of the top producers, was one of the most important
21    products being sold the IRA reboot?
22         A    No --
23              MR. VAN ACKEREN:  Objection.  Vague and
24    ambiguous.
25              THE WITNESS:  I'm sorry.
```

```
 1   privilege.  Common interest doctrine.  I'm going to
 2   instruct my client not to answer.
 3   BY MR. REIF:
 4        Q     Okay.  Mr. Manfre, did you have
 5   communications with Mr. Shurwest [sic] to make
 6   settlement payments to your clients in the IRA
 7   reboot?
 8             MR. VAN ACKEREN:  Objection.  Vague and
 9   ambiguous.  I presume you mean Mr. Shurts, not
10   Mr. Shurwest.
11             MR. REIF:  Yes.  Yes.
12             THE WITNESS:  Brandon, please ask the
13   question again.
14   BY MR. REIF:
15        Q     Yes.
16             Did you have communications with Ron Shurts
17   of Shurwest about negotiating settlements with the
18   clients of CMAM's with the IRA reboot?
19             MR. VAN ACKEREN:  I'm going to object to
20   the extent it calls for attorney-client privileged
21   communications, communications subject to the common
22   interest doctrine.
23             I'll allow you to answer with a "yes" or
24   "no."
25             THE WITNESS:  Yes.
```

Deposition Of Albert Manfre

```
 1    BY MR. REIF:
 2         Q       When did those communications commence?
 3              MR. VAN ACKEREN:  Same objections.  But I
 4    will allow you to answer the question as to time.
 5              THE WITNESS:  You want a date?  I don't
 6    know exact date but as soon as we found out our
 7    clients weren't going to get paid.
 8    BY MR. REIF:
 9         Q    Okay.  And tell me what happened.  Was it a
10    telephone call, an e-mail, or something other?
11         A    Telephone call.
12         Q    Tell me what was said and who said it.
13              MR. VAN ACKEREN:  Objection.  It will
14    involve confidential communications, communications
15    subject to the common interest doctrine.
16              I'm going to instruct my client not to
17    answer.
18              MR. REIF:  I'm going to reserve rights on
19    that.  I don't think that's a ground to instruct the
20    witness not to answer a question set on
21    communication privilege.
22              MR. VAN ACKEREN:  Also common interest
23    doctrine, joint defense privilege.
24              MR. REIF:  Well, Shurwest is not a party
25    here, and your client has already testified they
```

Deposition Of Albert Manfre

1  answer.

2          MR. REIF:  Okay.

3          MR. BORYS:  Can we take a two-minute break?

4          MR. REIF:  We can take a five-minute break.

5          MR. BORYS:  Perfect.  Thank you.

6          MR. VAN ACKEREN:  Perfect.

7          MR. REIF:  So everybody's got different

8   times.  So I've got 10:17, so let's come back at

9   10:22, or around there, if that's okay with

10  everybody.

11         MR. VAN ACKEREN:  Sure.

12         THE VIDEOGRAPHER:  Just a second.  I'll go

13  off the record.  10:17 off the record.  We're off

14  the record.

15         (Recess.)

16         THE VIDEOGRAPHER:  We are on the record at

17  10:35.

18  BY MR. REIF:

19     Q    Okay.  Mr. Manfre, I want to follow up on

20  one of the last questions I asked you before the

21  break.

22         Did you tell Ms. McKinnon at any point in

23  time that Shurwest or Ron Shurts was going to make a

24  settlement payment or settlement payment plan to her

25  regarding the IRA reboot?

Deposition Of Albert Manfre

```
 1      A    To her directly?  No.
 2      Q    How about indirectly?  Did you tell
 3  Ms. McKinnon that Shurwest was going to make a
 4  settlement payment plan to her regarding the IRA
 5  reboot?
 6      A    Well, what I said to all our clients is
 7  we're going to get a settlement from Shurwest, which
 8  they'll pay us, and then we'll pay them.
 9      Q    And is that what happened with any clients
10  of CMAM?
11           MR. BORYS:  Objection.  Vague and
12  ambiguous.
13           MR. VAN ACKEREN:  Objection.  Overbroad.
14  BY MR. REIF:
15      Q    You can go ahead, Mr. Manfre.
16      A    Please say it again, please, Brandon.
17      Q    Yes.
18           And is that what happened with any of CMAM
19  clients, that settlements were reached, and Shurwest
20  or Ron Shurts paid CMAM, who in turn paid clients?
21      A    Yes.
22           MR. VAN ACKEREN:  Well --
23           THE WITNESS:  I thought --
24           MR. VAN ACKEREN:  Belated objection.  That
25  seeks information protected from disclosure by the
```

Deposition Of Albert Manfre

1          Did Shurwest train CMAM and its agents to
2    sell the IRA reboot to retail clients?
3         A    Yes.
4         Q    Can you explain how that went down.
5         A    Mel Miller came to our office about a month
6    after they presented it to me in their office, and
7    she went through a training with all my advisors at
8    the time on the benefit of the IUL with the FIP.
9         Q    Okay.  So let's start with the time that
10   you said you went to Shurwest offices before the
11   in-person meeting.
12          Did I hear that correctly?
13        A    Correct.
14        Q    Okay.  Shurwest is located, I think, in
15   Phoenix, Arizona?
16        A    Scottsdale, Arizona.
17        Q    Okay.  And you had visited Shurwest's
18   Scottsdale, Arizona office?
19        A    They had me for an annual meeting for top
20   producers for the Waste Management Open, which had
21   just happened.  They sponsor it; they're one of the
22   big sponsors.
23        Q    All right.  And can you tell me the year
24   and the month that you went to Scottsdale, Arizona
25   to Shurwest's offices for a top producer conference?

Deposition Of Albert Manfre

```
 1        A     Well, it's 2017.   The Waste Management just
 2   ended, so it was right around this time 2017.
 3        Q     Okay.   And I'm not sure what that is that
 4   you're referring to.   Is that a golf thing?   I don't
 5   play golf, so...
 6        A     It's a golf tournament.   It's the Waste
 7   Management Golf Tournament that Annexus and
 8   Shurwest -- they're big sponsors there.
 9        Q     Okay.
10        A     For that.
11        Q     See how little I know about golf?
12        A     Me either.   I don't golf.
13        Q     Okay.
14        A     I just go for the fun.
15        Q     So I understand that you're saying in or
16   around February of 2017, you went to Shurwest
17   offices in Scottsdale, Arizona for their annual top
18   producer conference?
19        A     Correct.
20        Q     And tell me how you came to know of the FIP
21   and IRA reboot in February 2017.
22        A     I went to their office, and Mel Miller
23   presented it to me in their conference room.
24        Q     Okay.   So --
25              (Simultaneous crosstalk.)
```

Deposition Of Albert Manfre

```
 1              THE WITNESS:  Mel did.
 2   BY MR. REIF:
 3       Q     -- Mel Miller presented the IRA reboot to
 4   you at Shurwest's conference room?
 5       A     Correct.
 6       Q     How many people, estimate, were present at
 7   Mel Miller's presentation of FIP and IRA reboot at
 8   Shurwest's conference space?
 9       A     Just me and her.
10       Q     And was this -- what type of presentation
11   was it?
12       A     She had a big screen on the conference room
13   and went over some illustrations and the benefit of
14   the FIP with the IUL, and the clients can get 20 to
15   30 percent more income doing it that way.
16       Q     Did you have the impression that she has
17   given this presentation to many other insurance
18   professionals besides yourself?
19              MR. VAN ACKEREN:  Objection.  Calls for
20   speculation.
21              You can answer.
22              THE WITNESS:  Yes.
23   BY MR. REIF:
24       Q     Did Mel Miller tell you she's given the
25   presentation to other insurance agents like
```

Deposition Of Albert Manfre

1  yourself?

2      A    Yes.

3      Q    Did she tell you how many or a ballpark of

4  how many times she's given the presentation?

5      A    No.

6      Q    Did she tell you about the Shurwest success

7  with selling this IRA reboot to retail customers?

8      A    Yes.

9      Q    And what did she say about it?

10      A    There were the number one producer for

11  Minnesota Life in the country.

12      Q    Okay.  And when Melanie Miller said that

13  Shurwest was the number one producer for Minnesota

14  Life in the country, did that include IRA reboots?

15      A    Included IULs, which -- yes.

16      Q    Now, for any of the sales or applications

17  that CMAM made to Minnesota Life for IRA reboots,

18  was FIP ever intentionally concealed from Minnesota

19  Life?

20      A    No.

21      Q    Okay.  So you understand what I'm trying to

22  get at, can you elaborate more on whether CMAM was

23  forthcoming with Minnesota Life when clients were

24  going IRA reboots, including FIP?

25      A    Okay.

Deposition Of Albert Manfre

```
 1              MR. VAN ACKEREN:  Objection.  Vague,
 2    ambiguous, and overbroad.
 3              You can answer to the extent you know and
 4    understand.
 5              THE WITNESS:  To my best knowledge,
 6    Minnesota Life was partners with Shurwest, and they
 7    were doing meetings, which Mel told me, presenting
 8    the FIP with the IUL, as a package.
 9    BY MR. REIF:
10         Q    Okay.  Can you drill down more and explain
11    that in further detail to me.
12         A    So Mel Miller told me that they did joint
13    meetings with producers, which is a big conference,
14    you know, they do a presentation.  And Minnesota
15    Life was there with Shurwest presenting the program.
16         Q    Okay.  You're saying Minnesota Life and
17    Shurwest jointly presented the IRA reboot?
18         A    Yes.
19         Q    And that included FIP component?
20         A    Yes.
21         Q    Were you ever present for any of those
22    joint presentations?
23         A    No.
24         Q    Do you know anybody that was present for
25    those joint presentations?
```

Deposition Of Albert Manfre

```
 1    know specifically what your MGA Shurwest was paid on
 2    insurance sales.
 3             Do I understand your testimony correctly?
 4       A    Yes, I didn't know what they were paid.
 5       Q    Okay.  Was CMAM or you, as an agent,
 6    allowed to deal directly with Minnesota Life to
 7    place business?
 8             MR. VAN ACKEREN:  Objection.  Overbroad.
 9             What products are we referring to?
10             MR. REIF:  Insurance products.
11             MR. VAN ACKEREN:  So in a general sense?
12             MR. REIF:  General sense.
13             THE WITNESS:  Everything went through
14    Mel Miller.  We never went directly to Minnesota
15    Life.
16    BY MR. REIF:
17       Q    And, in fact, CMAM was not allowed to go
18    directly through Minnesota Life to place business;
19    it had to use an MGA like Shurwest or a Shurwest
20    competitor.  That's the nature of the life insurance
21    business; right?
22       A    Correct.
23       Q    And Shurwest was in the business of acting
24    as the MGA for Minnesota Life and potentially other
25    life insurance companies to process and facilitate
```

Deposition Of Albert Manfre

```
 1   insurance business; is that right?
 2        A     Correct.
 3        Q     And you have an understanding of that
 4   that's how it handled the FIP transactions as well?
 5        A     Correct.
 6        Q     Now, I saw something in some documents
 7   about -- I think it's called Agent Connections,
 8   Incorporated.
 9              Do you know what that is?
10        A     No, I'm not aware of that terminology.
11        Q     Okay.  Let me see if I can find that.  One
12   second.
13              MR. BORYS:  While you're doing that,
14   Brandon, can I just confirm something?  Exhibit 3
15   that was marked, that was the settlement agreement
16   with McKinnon; correct?
17              MR. REIF:  Yes.
18              MR. BORYS:  Thank you.
19   BY MR. REIF:
20        Q     Oh, sorry.  I said Agent Connections.  I
21   meant Agent Alternatives, Incorporated.
22        A     I'm not aware of that company.
23        Q     Okay.  All right.  You did not know Agent
24   Alternatives, Incorporated as the entity that paid
25   CMAM commissions for FIP?  Doesn't ring a bell?
```

Deposition Of Albert Manfre

```
 1    BY MR. REIF:
 2        Q     As in a business sense, what's the
 3    relationship between you and Ron Shurts?
 4        A     Do I answer?
 5              MR. VAN ACKEREN:  Same objections.
 6              But you can answer.
 7              THE WITNESS:  We still do business.
 8    They're now called Quantum.
 9    BY MR. REIF:
10        Q     Okay.  And what kind of business is Quantum
11    in?
12        A     Same.
13        Q     Life insurance?
14        A     Annuities.
15        Q     Okay.  And is Quantum paying for part or
16    all of your defense in this action?
17        A     We answered that.  No.  Absolutely not.
18    I'll say it over and over.
19        Q     Okay.  Well, I just want to make sure --
20        A     I wouldn't --
21        Q     I just want to make sure --
22        A     No.  I get it.
23        Q     Sorry.  You go.  You finish.
24        A     Absolutely not.
25        Q     Okay.  I wasn't trying to rub salt in the
```

Deposition Of Albert Manfre

1           MR. BORYS:  Objection.  Calls for
2    conjecture and speculation.
3           MR. VAN ACKEREN:  Join.
4           THE WITNESS:  No.
5    BY MR. REIF:
6       Q    Your answer?
7       A    No.
8       Q    Okay.  How about the amount that's in the
9    settlement sum here?  Who set this amount here,
10   $485,280?
11      A    That was her original loss money.
12      Q    Okay.  Who set it, though, as the offer in
13   the settlement agreement?
14      A    Who set it?  We just told our clients we're
15   trying to get them all their money back, so that was
16   the original investment that she did.
17      Q    Okay.
18      A    Oh.  So she said it.  She wanted her
19   original investment back, which is what that was.
20      Q    Okay.  And who set the 84 equal monthly
21   payment installments in section 1 of Exhibit 3?
22      A    I can answer that; right?
23           MR. VAN ACKEREN:  Yeah.
24           THE WITNESS:  That's what Shurwest was
25   willing to pay us over a period of time.

```
 1           THE WITNESS:  You're right.
 2           MR. REIF:  And in case I haven't marked
 3   this, this is going to be Exhibit 5, this two-page
 4   document.  I'll take it down.
 5       Q   Can you tell me what the -- again, to the
 6   best of your memory, what the Orion IUL was offered
 7   by Minnesota Life?
 8       A   It was just one of those products that
 9   maximized clients' tax free income.
10       Q   Okay.  Did Minnesota Life provide the CMAM
11   agents with training on the Orion Life Insurance
12   product?
13       A   No.  That was Mel Miller.
14       Q   Okay.  And I want to take it back to that.
15   I took that exhibit down.  I want to jump back to
16   the training.
17           You had told me earlier that you went to
18   Scottsdale, and you did a one-on-one training with
19   Mel at the Shurwest conference room on the IRA
20   reboot.
21           Remember that Q and A?
22       A   No.  Yeah, it wasn't a training.  It was a
23   presentation to sell the product.
24       Q   Okay.  Fair enough.  So let me rephrase it.
25           Earlier you testified that you went to
```

Deposition Of Albert Manfre

1    Scottsdale to Shurwest headquarters, and Mel Miller

2    gave you a presentation at the Shurwest conference

3    room to sell the IRA reboot; right?

4        A     Yes.

5        Q     Can you tell me where in the Shurwest space

6    this conference room is?  You know, meaning is it in

7    the center of the main floor?  Is it, you know, in

8    an obscure office space?

9              Describe the room and the situation for me,

10   please.

11       A     As soon as you walk in, there's a giant

12   glass conference room, with TVs and all that.  So

13   it's right -- first thing you walk in, reception

14   area, conference area, TVs.

15       Q     Okay.  So I haven't seen it before, but

16   would you describe it to be as sort of like, you

17   know, corporate headquarters boardroom?

18       A     Yes.

19       Q     Okay.  And how many floors, to the best of

20   your understanding, did Shurwest occupy at that

21   Scottsdale office space?

22       A     I have no idea.

23       Q     Did they have the whole floor that you were

24   on, to the best of your knowledge?

25       A     I don't think so, but I don't recall

Deposition Of Albert Manfre

```
 1    specifically.
 2         Q    What floor of the building were they on?
 3         A    Oh, gosh.  I don't know.
 4         Q    Okay.  But you were in the boardroom
 5    receiving this sale pitch for the IRA reboot by Mel
 6    in the Shurwest boardroom; is that right?
 7         A    Correct.
 8         Q    Okay.  And then you had mentioned, but we
 9    didn't discuss yet, that Mel Miller on behalf of
10    Shurwest came to Southern California to present the
11    IRA reboot to the CMAM agents; is that right?
12         A    Correct.
13         Q    Okay.  Can you tell me approximately when
14    that occurred?
15              And if it was more than once, please tell
16    me so.
17         A    It was only once.  It was in the summer, so
18    I want to say June or July of 2017.  It was maybe a
19    month after I was -- yeah, that was maybe April,
20    May, I can't remember exactly -- but it was in 2017,
21    a month or two after she presented it to me.
22              She flew in from Phoenix.  I picked her up.
23    She came to our conference room for a Monday
24    meeting.  It was a Monday, because we do Monday
25    meetings.  And she presented and trained all my
```

Deposition Of Albert Manfre

```
 1    advisers on the IRA boot -- reboot.
 2         Q     All right.  To the best of your memory,
 3    sometime between April and July of 2017,
 4    Melanie Miller on behalf of Shurwest came to your
 5    Southern California office for the Monday sales
 6    meeting to pitch the IRA reboot; right?
 7         A     Correct.
 8         Q     Okay.  And was it her solo, or did she have
 9    anyone else with Shurwest with her?
10         A     Solo.
11         Q     Okay.  And tell me what the pitch was.
12         A     Well, pitch is not the right terminology.
13    That was actual training.  The other one was pitch.
14    She was going over the product, explaining -- I just
15    want to be clear on it.
16              She explained the product, how it sells,
17    what the process is, and the benefit to the clients.
18         Q     Okay.  And, to the best of your memory,
19    not -- well, how long did the pitch take?  Sorry.
20    Withdrawn.
21              How long did --
22         A     Training.
23         Q     -- the training take?
24         A     No more than two hours.
25         Q     Okay.  And I don't want to take up two
```

Deposition Of Albert Manfre

```
 1   hours of your precious time, but can you give me the
 2   summary of what her training was.
 3       A    I was in there, of course, so this is,
 4   like, embedded in my brain.  She went over the
 5   benefits of Minnesota Life, how big they are, a good
 6   company, dah, dah, dah, which they are.  Huge
 7   company.  The partnership that they have with them,
 8   the benefits of the FIP to actually give you more
 9   income; and, of course, the IUL tax free aspect of
10   the product.
11       Q    Okay.  And was there discussion of it being
12   sold with qualified IRA funds or nonqualified --
13       A    Oh, yeah.
14       Q    -- funds.
15       A    I'll let you finish.
16            That's what it's all about.  You've taken
17   an IRA and making it tax free after four or
18   five years.
19       Q    Did you say you're saying an IRA and making
20   it tax free after four or five years?
21       A    Well, the concept is you're paying the
22   taxes on Uncle Sam, and it will grow on the policy,
23   and by the time you get to five or six years, based
24   on their average performance, you'll have what you
25   started with, and it's -- tax free is not the right
```

Deposition Of Albert Manfre

```
1    just trying to get -- they didn't go through the
2    settlement.  We were going through the first
3    contract, not the second.  I just told them that
4    we're trying to get a settlement, and they
5    appreciated that.
6    BY MR. REIF:
7        Q    Okay.  And with all of those clients,
8    McKinnon, Rodillas, and the Pages, you did tell them
9    that you had negotiated against Shurwest to reach a
10   settlement for their involvement in recommending the
11   IRA reboot; is that right?
12           MR. BORYS:  Was the question he did tell
13   them that or he did not tell them that?
14           MR. REIF:  That he did tell them that.
15       Q    And I'll restate the question.
16           With all those clients, McKinnon, Rodillas,
17   and the Pages, you told them, the clients, that you
18   had negotiated against Shurwest to reach a
19   settlement for their involvement in the IRA reboot;
20   is that correct?
21       A    Yes.
22           MR. REIF:  All right.  I'm going to show
23   you another exhibit.  This is going to be Exhibit 6.
24           (Exhibit 6 was marked for identification by
25           the certified shorthand reporter.)
```

```
 1   insurance world, that someone is supposed to

 2   investigate for suitability purposes if a client can

 3   afford $92,000 in annual premiums; right?

 4        A    That's the agent, Dan Klein.

 5        Q    Is it anybody else's responsibility to

 6   determine whether the prospective insured can afford

 7   a $92,000 a year premium?

 8        A    Mel Miller and Minnesota Life, I would

 9   assume.

10        Q    Okay.  Hold on.  I just lost the page.  One

11   second.

12             Okay.  Here we go.  I got it.  Okay.

13             So I'm going to bring that back up again.

14             So if I -- and you'll forgive me if I

15   wasn't listening entirely to that last answer, but

16   you'll agree with me that the agent, Shurwest and

17   Minnesota Life, are supposed to determine whether

18   the client can afford the annual premiums in the

19   proposed insurance; is that right?

20        A    Yes.

21        Q    Okay.  And here, within Exhibit 6, at PDF

22   page 20, which is Bates Stamped CMAM_MCK00085, this

23   is a document about the client's profession and

24   annual income.

25             Do you see that?
```

Deposition Of Albert Manfre

```
1            THE WITNESS:  Yes.  But let me clarify.  We
2   don't determine the suitability.  It was Mel Miller
3   and Minnesota Life.  We just passed the process
4   over, and they determined the suitability.  We do
5   not determine the suitability.  We can't.  It's the
6   insurance company that takes that liability.
7   BY MR. REIF:
8       Q    Okay.  So --
9       A    We just process the paperwork.
10      Q    So it's your belief that CMAM did not have
11  the responsibility to supervise life insurance
12  business proposed by its agents?  That that was
13  delegated to Shurwest and Minnesota Life?
14           Is that your testimony?
15      A    Well, we don't have the expertise to
16  determine suitability.  So that's up to Minnesota
17  Life and Shurwest.
18      Q    Okay.  So I'll broaden my question a little
19  bit, then, based on your answer.
20           To the best of your understanding, Shurwest
21  approved and did not reject the IRA reboot programs
22  for McKinnon, Rodillas, and the Pages; is that
23  correct?
24      A    Correct.
25      Q    And, to the best of your understanding,
```

Deposition Of Albert Manfre

```
 1        A     No.
 2        Q     Other than the materials provided by
 3   Melanie Miller, did you ask FIP for any other
 4   documents for conducting due diligence on its
 5   offering?
 6        A     No.
 7        Q     Okay.  Did you believe and rely on that
 8   Shurwest conducted a thorough due diligence on FIP
 9   before it was presented to you?
10        A     Yes.
11        Q     Okay.  Did you tell CMAM's agents that --
12   at sales meetings that Shurwest and Minnesota Life
13   had vetted and approved the IRA reboot including
14   FIP?
15        A     I don't remember that conversation, no.
16        Q     But do you remember using the word vetted
17   and --
18        A     No, I don't.
19             MR. VAN ACKEREN:  Wait for the question.
20             THE WITNESS:  Oh, I'm sorry.  I'm sorry.
21   BY MR. REIF:
22        Q     Do you recall using the words vetted and
23   approved with the CMAM agents when discussing the
24   IRA reboot including FIP?
25        A     Honestly, I don't even use that word.  So I
```

Deposition Of Albert Manfre

```
 1        A     It may have come up.  I -- just so you
 2   know, I called the clients once a week after this
 3   happened, every Thursday or Friday, to update them
 4   on, you know, getting the settlement; and that's it.
 5   And I'm sure it came up at some point.  This was a
 6   deer in the headlights.  We were all trying to
 7   figure out what was going on.
 8        Q     Okay.  And I assume it, from these e-mails,
 9   that you were connecting to have a conversation with
10   Ron Shurts in or around April 2018; right?
11        A     Right.  Correct.
12        Q     Okay.  And did you blame him for
13   introducing you -- your company and your clients to
14   Shurwest -- sorry -- to FIP?
15        A     Blame is a loaded word.  I wanted to make
16   him accountable.  I think that's a better way to
17   look at it.
18        Q     Okay.  And is that your position, that
19   Ron Shurts and Shurwest needed to be accountable for
20   recommending and endorsing the FIP and the IRA
21   structure to your company and its clients?
22        A     A partial accountable, as well as we are,
23   yeah.
24        Q     Okay.  Did you ever apologize to
25   Ms. McKinnon for having your agent get her into the
```

Deposition Of Albert Manfre

```
 1        A     I'm upset that it was -- was misrepresented
 2   with Minnesota Life and Shurwest, yes.
 3        Q     Okay.  And then you say, "Plan B looks
 4   inevitable."
 5              What does that mean?
 6        A     Settlement.  We're not going to get our
 7   money from FIP.
 8        Q     Why not?
 9              One quick sec.  Hold on.
10              MR. REIF:  Give me ten seconds.
11              (Pause in proceedings.)
12   BY MR. REIF:
13        Q     All right.  So I'm sorry.  Forgive me.
14              Plan B was the settlement; right?
15        A     Correct.
16        Q     Okay.  And had you and Ron Shurts already
17   struck a deal on how much money he and CMAM was
18   going to contribute to the client settlement?
19        A     No.
20        Q     All right.  What's the allocation split
21   between CMAM and Shurwest or Ron Shurts on the
22   settlements, by the way?
23              MR. VAN ACKEREN:  Objection.  Common
24   interest.  Confidential information.  I'm going to
25   instruct my client not to answer.
```

Deposition Of Albert Manfre

```
 1    insurance at the time or currently?
 2        A     Yeah.  Yeah.  They just won't cover this
 3    because of the FIP thing.  That's what we were told.
 4        Q     Okay.
 5        A     We called them, but they couldn't.
 6              (Reporter clarification.)
 7              THE WITNESS:  Yes, ma'am.
 8    BY MR. REIF:
 9        Q     Okay.  So here, when you communicated with
10    Ron Shurts about what the liability is, what did you
11    explain or what did you understand the liability was
12    for CMAM and for Shurwest?
13        A     Basically --
14              I can answer this?
15              Basically, what was left, that they didn't
16    get paid from the FIP.  That's where all those
17    numbers came from.
18        Q     But what about the life insurance premiums?
19    Did you consider --
20        A     Oh, we calculated all that.  We calculated
21    all of it.  Premiums and FIP.  Now, remember, the
22    life insurance policies had cash value in them.  So
23    they weren't dead.  So a lot of them had a lot of
24    cash value in them.
25              So we took the cash value, which is
```

Deposition Of Albert Manfre

```
 1    liquid -- they could liquidate it at any time --
 2    minus what they originally put in there, and that
 3    was the FIP, and that's how we came up with all the
 4    numbers for different clients.
 5        Q    Okay.
 6        A    Total money, minus cash value and the life
 7    policy, that's what we owed them.
 8        Q    Got it.
 9             MR. REIF:  Okay.  So let me go to the next
10    one.  This is going to be 17.
11             (Exhibit 17 was marked for identification
12             by the certified shorthand reporter.)
13    BY MR. REIF:
14        Q    Okay.  This is a two-page e-mail, your
15    Gmail account with Ron Shurts.
16        A    Okay.
17        Q    Okay.  So, again, I'm going to ask you and
18    your counsel to do a thorough search because I got
19    this from a cooperating third party.  You know, I'm
20    not going to represent that this is -- you know, no
21    one hacked your Gmail account.  So we didn't get
22    this through some other process.  So, you know,
23    we're going to ask for a full and complete search.
24             Okay?
25        A    Happy to do it.  Happy to do it.
```

Deposition Of Albert Manfre

1    BY MR. REIF:

2        Q    Okay.  And you talk about the backup plan

3    and this will limit the litigation for the both of

4    us.

5            Do you see that?

6        A    Yeah.  If we settle, there won't be

7    litigation.

8        Q    Okay.  "In the big picture, our business

9    relationship will get through this, and we are both

10   standup guys."

11           That's what you write to Shurts?

12       A    Yep.  Do the right thing.

13       Q    Okay.  And you did expect when FIP

14   collapsed that if Ron Shurts made settlement

15   contributions, that the business relationship

16   between CMAM and Shurwest would survive; right?

17       A    And it still is.  Correct.

18       Q    Okay.  Now, did you give any thought to the

19   fact that when you're meeting with the clients after

20   they had just lost everything in FIP, that they were

21   under undue influence or vulnerable to undue

22   influence, Mr. Manfre?

23       A    Not at all --

24           MR. BORYS:  Object as being -- hold on.

25           THE WITNESS:  I'm sorry.

Deposition Of Albert Manfre

1           MR. REIF:  Yeah.  Let's go off the record.
2   But, Noelle, stay online so we can talk about the
3   exhibits to make sure we're aligned.
4           THE VIDEOGRAPHER:  Okay.  One second.
5   4:18.  We're off the record.
6
7                      ***
8            (Ending time:  4:18 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Deposition Of Albert Manfre

WITNESS'S CERTIFICATE

1
2
3
4
5          I am the witness in the foregoing
6    deposition. I have read the foregoing deposition
7    and having made such changes and corrections as I
8    desire, I certify that the same is true of my own
9    knowledge, except as to those matters which are
10   therein stated upon my information or belief, and as
11   to those matters, I believe it to be true.
12         I declare under penalty of perjury under
13   the laws of the state of California that the
14   foregoing is true and correct.
15         Executed on _____ 4/19/21 _____.
16   at _____ Laguna Niguel, CA _____.
17
18
19
20              ALBERT ANDREW MANFRE, VOL I
21
22
23
24
25

California Deposition Reporters, Inc.
www.caldepo.com

294

1               REPORTER'S CERTIFICATE

2

3

4        I, NOELLE C. KRAWIEC, CSR No. 14255, a

5  certified shorthand reporter in and for the state of

6  California, do hereby certify:

7        That prior to being examined the witness

8  named in the foregoing proceedings was by me duly

9  sworn to testify to the truth, the whole truth, and

10  nothing but the truth;

11        That said proceedings were taken by me in

12  shorthand at the time and place herein named and was

13  thereafter transcribed into typewriting under my

14  direction, said transcript being a true and correct

15  transcription of my shorthand notes.

16        I further certify that I have no interest

17  in the outcome of this action.

18

19

20

21

22                 NOELLE C. KRAWIEC

23                 CSR NO. 14255

24

25

# EXHIBIT 4

**From:**  Louis G Slagle <louis.slagle@minnesotalife.com> on behalf of louis g slagle
**To:**  Clements Mike
**Sent:**  12/3/2015 7:36:09 AM
**Subject:**  Shurwest Compliance

Hi Mike,

Could you connect with Melanie in regards to the links below?  We wouldn't have a problem except she took screen shots of Eclipse and referenced the illustrated values directly in the slides.  Anything material using our company or product name or references our illustrated values needs to be review by our compliance.  She'll need to remove all materials she has in this matter until we have them submitted and approved.  Happy to help with the conversation if needed.

http://www.slideshare.net/shurwest/ira-reboot-presentation

http://www.slideshare.net/shurwest/ira-reboot2-25?related=2

Thanks

**Louis G. Slagle**
National Sales Director, Independent Distribution Group
Minnesota Life Insurance Company • Securian Life Insurance Company
400 Robert Street North • St. Paul, MN 55101-2098
651-665-4881 • 651-206-1297 (cell) • 651-223-5958 (fax)
louis.slagle@minnesotalife.com • www.minnesotalife.com

Securian Financial Group – Financial security for the long run®

This email transmission and any file attachments may contain confidential information intended solely for the use of the individual or entity to whom it is addressed. If you have received this email message in error, please notify the sender and delete this email from your system. If you are not the intended recipient, you may not disclose, copy, or distribute the contents of this email.

ML0001752

# EXHIBIT 5

**From:** Nicholas Calvaneso <Nicholas.Calvaneso@mandomarketing.com>
**To:** mike.clements@fdgonline.com
**Sent:** 2/2/2017 10:53:47 AM
**Subject:** ???


What is the IRA reboot?????

<u>Having trouble filling seats at your workshops? Call to learn how our advisors are filling rooms with our exclusive Facebook campaigns.</u>



Did you know that you can access forms and applications on our website 24 hours a day? Go <u>HERE</u> to get everything you need.

**Nicholas Calvaneso**
**National Sales Consultant**
**M&O Marketing**
**Toll-Free:** (800) 228-5964 x294
**Direct:** (248) 784-1294
**Cell:** (248) 794-8675
**Fax:** (248) 784-1436
Nicholas.Calvaneso@mandomarketing.com
www.mandomarketing.com

The information contained in this message may be CONFIDENTIAL and is for the intended addressee only. Any unauthorized use, dissemination of the information, or copying of this message is prohibited.  If you are not the intended addressee, please notify the sender immediately and delete this message.

ML0001750

# EXHIBIT 6

**From:** Nicholas Calvaneso <Nicholas.Calvaneso@mandomarketing.com>
**To:** mike.clements@fdgonline.com
**Sent:** 5/8/2017 3:51:33 PM
**Subject:** IRA Reboot

Do you have the info on this or is there someone I should reach out to?

Are they really allowing loans that early to pay the taxes on the IRA distribution?



The information contained in this message may be CONFIDENTIAL and is for the intended addressee only. Any unauthorized use, dissemination of the information, or copying of this message is prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

ML0001751